Nos. 25-1517, -1518, -1519, -1520, -1521

IN THE

# United States Court of Appeals for the Federal Circuit

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD.; WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD.; TIANMA MICROELECTRONICS CO. LTD.; VISIONOX TECHNOLOGY, INC.,

*Appellants*,

*v.*

SAMSUNG DISPLAY CO., LTD.,

*Cross-Appellant.*

On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board Nos. IPR2023-00987, IPR2023-00988, IPR2023-01075

**OPENING BRIEF OF APPELLANTS MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD.; WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD.; TIANMA MICROELECTRONICS CO. LTD.; AND VISIONOX TECHNOLOGY, INC.**


Travis Jensen
Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
Number 1 Jianguomenwai Avenue
5701 China World Tower A
Beijing, Beijing 100004
People's Republic of China

Melanie L. Bostwick
Jonas Q. Wang
Harmann P. Singh
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

Richard Martinelli
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

*Counsel for Appellants*

## CLAIM LANGUAGE AT ISSUE

### U.S. Patent No. 11,594,578 – Illustrative claim 1

**1.** A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising:

a plurality of first pixels;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets,

wherein the first lines and the second lines are alternately arranged,

wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

wherein the third lines and the fourth lines are alternately arranged,

wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

**U.S. Patent No. 9,818,803 – Independent claim 1, Dependent claims 4 & 5**

**1.** A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel having a center coinciding with a center of a virtual square;

a second pixel separated from the first pixel and having a center at a first vertex of the virtual square;

another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels; and

a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square,

wherein the second pixel has a larger area than that of the third pixel, and

wherein the first pixel is configured to emit green light.

**4.** The pixel arrangement structure of claim **3**, wherein the second pixels and the third pixels enclose the first pixel in the virtual square.

**5.** The pixel arrangement structure of claim **4**, wherein the first pixel, the second pixels, and the third pixels have polygonal shapes, and

each of the second pixels and each of the third pixels has a larger area than the first pixel.

**U.S. Patent No. 10,854,683 – Independent claim 1, Dependent claim 2**

**1.** A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel;

a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel; and

a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels[,] and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,

wherein a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels,

wherein the first pixels are configured to emit green light, which is a color that is different from light emitted by the second pixels and the third pixels,

wherein the first pixels are smaller than at least one of the second pixels or the third pixels, and

wherein each of the second pixels has a larger area than each of the third pixels.

**2.** The pixel arrangement structure of claim **1**, wherein the first pixels, the second pixels, and the third pixels have polygonal shapes, and

wherein each of the second pixels and the third pixels has a larger area than the first pixel.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1517, -1518, -1519, -1520, -1521

**Short Case Caption** Mianyang BOE Optoelectronics Technology Co., Ltd. v. Samsung Display Co., Ltd.

**Filing Party/Entity** Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co., Ltd.; Visionox Technology, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/21/2025

Signature: /s/ Melanie L. Bostwick

Name: Melanie L. Bostwick

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Mianyang BOE Optoelectronics Technology Co., Ltd. | | |
| Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd. | | |
| Tianma Microelectronics Co., Ltd. | | |
| Visionox Technology, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Donald Daybell | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

**Page**


CLAIM LANGUAGE AT ISSUE ........ i

CERTIFICATE OF INTEREST ........ v

TABLE OF AUTHORITIES ........ x

STATEMENT OF RELATED CASES ........ xiv

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

By The Early 2000s, Inventors Devise OLED Displays With Pixel Arrangements Designed To Maximize Performance And Lifespan. ........ 4

Samsung Obtains Several Patents That Also Address Pixel Display Arrangements. ........ 14

Samsung Asserts The Pixel Patents, And BOE Pursues Inter Partes Review. ........ 20

The Board Finds All But Two Challenged Claims Of The '803 And '683 Patents Obvious, But Upholds The Challenged Claims Of The '578 Patent. ........ 26

SUMMARY OF ARGUMENT ........ 31

STANDARD OF REVIEW ........ 34

ARGUMENT ........ 35

I. The Board Erred in Upholding the Challenged Claims of the '578 Patent. ........ 35

A. The Board erred in rejecting BOE's showing that Matthies employs a pixel defining layer. ........ 36

B. The Board erred in rejecting BOE's showing that it would have been obvious to include a pixel defining layer in Matthies. ........ 45

II. The Board Erred in Upholding Two Dependent Claims of the ’803 and ’683 Patents. ........ 58

A. The Board erred in rejecting a motivation to combine Matthies and Yamada. ........ 60

1. The Board erred in determining that Matthies is limited to passive-matrix displays. ........ 61

2. The Board erred in its narrow understanding of the useful lifetime of Matthies’s display. ........ 70

B. The Board erred in rejecting a motivation to combine Murai and Yamada. ........ 75

1. The Board erred in demanding a showing that the combination would produce only advantages. ........ 76

2. The Board erred in finding that Murai’s cutouts were not useful for OLEDs. ........ 79

CONCLUSION ........ 81

ADDENDUM

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Erecting and Dismantling Co. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016) .......... 68

*Anacor Pharms., Inc. v. Iancu*,
889 F.3d 1372 (Fed. Cir. 2018) .......... 71

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) .......... 35, 70, 71, 75

*Apple Inc. v. Corephotonics, Ltd.*,
81 F.4th 1353 (Fed. Cir. 2023) .......... 58

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) .......... 50, 68

*Axonics, Inc. v. Medtronic, Inc.*,
75 F.4th 1374 (Fed. Cir. 2023) .......... 55, 56

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) .......... 48

*Campbell Soup Co. v. Gamon Plus, Inc.*,
10 F.4th 1268 (Fed. Cir. 2021) .......... 34

*Chamberlain Grp., Inc. v. One World Techs., Inc.*,
944 F.3d 919 (Fed. Cir. 2019) .......... 75

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) .......... 38

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) .......... 34

*CQV Co. v. Merck Pat. GmbH*,
130 F.4th 1344 (Fed. Cir. 2025) .......... 68

*Custom Computer Servs., Inc. v. Paychex Props., Inc.*,
337 F.3d 1334 (Fed. Cir. 2003) .......... 50

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020) .......... 50

*Dow Jones & Co. v. Ablaise Ltd.*,
606 F.3d 1338 (Fed. Cir. 2010) .......... 48

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) .......... 50

*Ericsson Inc. v. Intell. Ventures I LLC*,
890 F.3d 1336 (Fed. Cir. 2018) .......... 58, 80

*Ericsson Inc. v. Intell. Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018) .......... 69, 75

*In re Etter*,
756 F.2d 852 (Fed. Cir. 1985) .......... 68

*Honeywell Int'l Inc. v. 3G Licensing, S.A.*,
124 F.4th 1345 (Fed. Cir. 2025) .......... 79

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) .......... 34, 79

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 784 (Fed. Cir. 2021) .......... 81

*J & M Corp. v. Harley-Davidson, Inc.*,
269 F.3d 1360 (Fed. Cir. 2001) .......... 38

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
97 F.4th 915 (Fed. Cir. 2024) .......... 65, 67

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......... 44, 48, 81

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006) .......... 78

*Milliken Rsch. Corp. v. Dan River, Inc.*,
739 F.2d 587 (Fed. Cir. 1984) .......................................................... 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)........................................................ 42, 50, 69, 78

*Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*,
923 F.3d 1051 (Fed. Cir. 2019) .......................................................... 78

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) .......................................................... 78

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 56

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022).............................................................. 75

*Qualcomm Inc. v. Apple Inc.*,
24 F.4th 1367 (Fed. Cir. 2022)............................................................ 38

*Qualcomm Inc. v. Intel Corp.*,
6 F.4th 1256 (Fed. Cir. 2021)....................................................... 55, 56

*Randal Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) .......................................................... 38

*Realtime Data, LLC v. Iancu*,
912 F.3d 1368 (Fed. Cir. 2019) ..................................................... 45, 52

*Robinson v. Dep't of Veterans Affs.*,
923 F.3d 1004 (Fed. Cir. 2019) .......................................................... 78

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019 (Fed. Cir. 2017) ..................................................... 34, 35

*SAS Inst., Inc. v. ComplementSoft, LLC*,
825 F.3d 1341 (Fed. Cir. 2016) .......................................................... 55

*Shockwave Med., Inc. v. Cardiovascular Sys., Inc.*,
No. 2023-1864, -- F.4th --, 2025 WL 1922023 (Fed. Cir.
July 14, 2025)................................................................................ 43, 58

*Skky, Inc. v. MindGeek, s.a.r.l.*,
859 F.3d 1014 (Fed. Cir. 2017) ........ 70, 75

*Uber Techs., Inc. v. X One, Inc.*,
957 F.3d 1334 (Fed. Cir. 2020) ........ 42, 58, 68

**Statutes**

5 U.S.C. § 706 ........ 35

28 U.S.C. § 1295(a)(4)(A) ........ 3

35 U.S.C. § 112 ........ 44

35 U.S.C. § 141(c) ........ 3

35 U.S.C. § 142 ........ 3

35 U.S.C. § 311(a) ........ 3

35 U.S.C. § 319 ........ 3

**Rules and Regulations**

37 C.F.R. § 90.3(a)(1) ........ 3

88 Fed. Reg. 7463 (Feb. 3, 2023) ........ 20, 21

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding was previously before this or any other appellate court.

This Court's decision may directly affect or be directly affected by the following cases that involve the same patents that are at issue in this appeal: *Samsung Display Co., Ltd. v. International Trade Commission*, No. 25-1791 (Fed. Cir.); *Samsung Display Co., Ltd. v. BOE Technology Group Co., Ltd. et al.*, No. 1:25-cv-00908-RDA-LRV (E.D. Va.); *Samsung Display Co., Ltd. v. BOE Technology Co., Ltd. et al.*, No. 2:23-cv-00309-JRG-RSP (E.D. Tex.).

## INTRODUCTION

This case involves technology relating to the pixels, or individual picture elements, that make up an electronic display—and specifically an organic light-emitting diode (OLED) display, which relies on organic materials that emit light in response to electric current. In the three inter partes review proceedings that have been consolidated for this appeal, BOE[1] challenged the patentability of several claims of three related patents assigned to Samsung Display Co., Ltd.: U.S. Patent Nos. 9,818,803; 10,854,683; and 11,594,578.

By 2012, when Samsung filed the application that led to these three "pixel patents," a well-developed art contained numerous different approaches to structuring the pixels within an OLED display in order to balance factors such as image quality, display lifespan, manufacturing costs, and more. Yet Samsung persisted in trying to procure patent claims that broadly covered known arrangements which—for reasons the pixel patent specification does not make clear—Samsung claimed

[1] Petitioners before the Board—appellants here—are Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd.; and Visionox Technology, Inc. For simplicity, this brief refers to all petitioners as "BOE."

would balance considerations of display quality and manufacturing reliability. The Patent Office repeatedly rejected Samsung's applications. What emerged in each case was a set of claims containing a patchwork of ad hoc limitations concerning pixel sizing, spacing, and colors—each added during prosecution to overcome the latest rejection from the examiner.

But even this effort did not produce novel claims. As BOE showed, other prior-art references not cited (or not substantively relied on) during prosecution rendered the issued claims obvious as well. As to the '803 and '683 patents, the Patent Trial and Appeal Board largely agreed. It went astray only in upholding a single dependent claim from each patent that recites an approach to sizing different-colored pixels that is plainly disclosed in the prior art. As to the '578 patent, the Board did not even consider BOE's extensive evidence showing the obviousness of the many detailed pixel-arrangement limitations in the challenged claims, because it held that BOE had failed to show the prior art disclosed a "pixel defining layer"—a technology so well-known that the pixel patent specification states it has no need to describe it in detail.

The Board's decisions upholding these claims rested on a series of legal errors and, in all events, are unsupported by substantial evidence. The Court should vacate and remand for further consideration of BOE's obviousness showings.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction of the inter partes review proceedings under 35 U.S.C. § 311(a). The Board issued its final written decisions on January 6, 2025. Appx1-124; Appx125-227; Appx228-261. BOE timely filed notices of appeal on March 10, 2025. Appx955-959; Appx1439-1443; Appx1933-1937; *see* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## STATEMENT OF THE ISSUES

**I.** Whether the Board erred in upholding the challenged claims of the '578 patent despite BOE's evidence showing the obviousness of a "pixel defining layer"—a "known" technology, according to the patent—when the Board ignored BOE's key evidence, imposed an unduly stringent test for obviousness, and implicitly narrowed the meaning of the claim term without providing BOE an opportunity to respond.

**II.** Whether the Board, despite holding most of the challenged claims of the ’803 and ’683 patents obvious, erred in upholding one dependent claim from each patent by again applying an overly rigid test of obviousness and by improperly ignoring both the full teachings of the prior art and BOE’s reply arguments.

## STATEMENT OF THE CASE

### *By The Early 2000s, Inventors Devise OLED Displays With Pixel Arrangements Designed To Maximize Performance And Lifespan.*

These appeals involve technology for organic light-emitting diode (OLED) displays. Like other types of electronic display, OLED displays produce an image using an array of picture elements known as pixels, which output light of different colors and at different intensities. *See* Appx3734-3735. OLED displays use pixels formed from organic materials that emit light when an electric current is applied. *See* Appx3739-3740.[2] These pixels, as well as the circuitry and other

[2] Sometimes, a “pixel” refers to a combination of different color elements, “with the smaller units containing individual colors being referred to as the sub-pixels.” Appx3735. Other times these smaller units are themselves called “pixels.” *See* Appx3735.

necessary components, form part of a stack of different layers that make up the OLED display. *See* Appx3740.

For all kinds of electronic display, pixel arrangement has long been a focus of design efforts. *See* Appx3089 1:56-65; Appx3121 1:18-29, 1:56-64; Appx3737-3739. Inventors working in this field have created countless approaches to balance considerations such as cost, performance, manufacturing ease, and device longevity. *See, e.g.*, Appx3089 1:39-2:22; Appx3121 1:65-2:46. OLED displays also present their own specific engineering challenges stemming in part from the incorporation of organic materials; here too, innovators have dealt with these challenges through various approaches. *See, e.g.*, Appx3158 (Abstract); Appx3170 3:1-8; Appx3075 (Abstract); Appx3091 5:24-35; Appx3742-3743.

The late 1990s and early 2000s produced many innovations in the field. Some inventors experimented with different configurations of pixels and their associated circuitry on a display. As one example, in 1999 a team of inventors submitted an application that would ultimately issue in 2005 as U.S. Patent No. 6,897,855, the "Matthies" reference. *See* Appx3075-3104. Matthies relates to "electronic display

devices and, in particular, large-area display devices," including OLED displays. Appx3089 1:8-10; *see* Appx3075 (Abstract). It deals particularly with displays composed of multiple "smaller tiles," which Matthies explains allows for a relatively small "basic unit of manufacture"—the tile, rather than the entire display—which "reduces manufacturing costs." Appx3089 1:56-65. This basic tiling approach is depicted in Figure 1 of Matthies, reproduced below:



FIG. 1

Appx3077.

Matthies explains that existing tiled approaches had not resulted in a workable "fabrication technology that allows a display to be

constructed so that pixels can be brought up to the very edge"—that is, to allow the pixels to take up more space relative to the size of the tile, while still "providing electrical access to the pixels." Appx3089 2:2-10. Matthies discloses various embodiments of pixel arrangements meant to address this problem. Each tile in Matthies contains multiple pixels. *See* Appx3091 5:53-62. The tile includes a "display section" consisting of various layers that contain electrodes, the organic light-emitting material, and any "[a]dditional layers" that may "improve the function or life of the display layers." Appx3091 6:28-38. In constructing the display section, Matthies explains that "it is desirable" for the OLED materials "to occupy only a portion (e.g. about 25 percent) of the pixel area," although Matthies "contemplates both larger and smaller pixel apertures." Appx3095 13:11-14; Appx3097 17:36-37. An "electronics section" for each tile is manufactured separately and then joined to the display section to make electrical contact. Appx3095 13:41-59.

Matthies discloses several alternative pixel layouts and spacing arrangements that may be used on each tile to achieve different aims. Figure 7 depicts one exemplary "pixel layout" where "the active portions

526 of the pixels are centered in their respective pixel regions," Appx3096 16:21-26, as shown below:




FIG. 7

Appx3080. Matthies also provides details about the distance between the different pixel elements and the edge of the display. *See* Appx3096 16:26-34.

Matthies's Figure 8B provides an example of a "color pixel structure," Appx3096 16:62:




FIG. 8B

Appx3081. Matthies refers to this structure as a "quad sub-pixel," with "[t]wo … sub-pixel elements, 830 and 836," that "emit green light" and "two pixel elements, 832 and 834," that "emit red and blue light, respectively." Appx3096 16:62-67. Here too, Matthies provides specific details about the dimensions of the pixels and sub-pixels and the distances between each element and between the pixels and the edge of the display area. *See* Appx3097 17:16-20.

Other inventors were also focused on finding the ideal spacing configuration for pixels formed from rectangular arrangements of different colored elements. The "Murai" reference, a Japanese patent application filed in 2004 and issued in 2010, teaches an OLED display with red, green, and blue "dots" arranged in a square or cross pattern to form a pixel. Appx3142 (cover); *see* Appx336-337. Murai explains that this arrangement can "improve[]" the "aperture ratio," which refers to the ratio of a pixel's light-emitting area to total pixel area. Appx3145 [0010]; Appx327; Appx336-337. Murai also focuses on improving image quality by avoiding placing dots of the same or similar colors too close together. *See* Appx3143 [0005]. It achieves this objective both by its arrangement of the different colored dots and by using "cut-off portions"

on the corners of individual dots to change their size. Appx3142-3146 [claim 1], [claim 4] [0006], [0008], [0011], [0013]; Appx3149-3150 [0039]; Appx337. Figure 3 of Murai provides an example in which the green dots are in the center of a square shape, surrounded by red and blue pixels, and have cut-outs on their corners:




Appx3154; *see* Appx2978-2979.

Still another approach to pixel layout and design is contained in U.S. Patent No. 7,091,986 (the "Phan" reference), which issued in 2006 from an application filed in 2003 and claiming priority to a 1997 German application. Appx3105; *see* Appx3121 1:8-13. Phan addresses a "display," including an OLED display, using "[d]ynamic pixels" and "adjusting the light emitting area and space of" pixels to "maxim[ize] … brightness." Appx3105 (Abstract); Appx3121 1:23-24. This display

"compris[es] pixels and dots." Appx3121 1:18-19. The "dots" are the "sources of luminous radiation the light of which is mixed to generate luminous mixed colours"—in other words, the light-emitting material that forms the different sub-portions of a pixel. Appx3121 1:61-64; *see* Appx3121 2:54-56. Figure 2a provides one example:




FIG.2a

Appx3106; *see* Appx2975-2976.

Phan's innovation is circuitry that allows each dot to be controlled individually, with groups of "adjacent dots" forming the "one-pixel logical unit." Appx3121-3123 2:66-3:4; 5:12-22. By arranging the color dots into "square" groups according to "a well known grid pattern," Phan discloses a way to individually control the dots to form pixels that "overlap" with one another, achieving a "dynamic" effect. Appx3122 4:41-49. Compared to "normally static pixels," Phan's "dynamic

pixel[s]" create the impression of a display with higher resolution. Appx3122 3:7-18.

Recognizing a need to "compensate" for the "different decreases in light intensity over … time" of the pixel's "red, green, and blue light sources," Appx3122 3:19-24, Phan also teaches that the different-colored dots can have different sizes. Figure 11b, for example, is a modified version of the "square quad pixel" in Figure 11a, with the blue dots made larger than the green, and the green larger than the red:




FIG. 11a




FIG 11b

Appx3112; Appx3123 5:47-54.

Other innovators also focused on adjusting the size of different-colored pixels, with the goal of addressing the same well-known problem alluded to in Phan: the different organic materials that make up the different colored pixels have different emission efficiencies. *See* Appx3169 2:53-54. This means that certain colored pixels require a

higher electrical current to achieve the same level of brightness—causing those pixels to deteriorate faster than other colors. *See* Appx3169 2:55-67. This difference can negatively affect the overall lifespan of the display and make it harder to maintain color balance—a problem addressed by supplying even more current, thus exacerbating the deterioration issue. Appx3169-3170 2:55-3:6; Appx3006-3007.

A team of inventors from Sanyo Electric Co., Ltd., disclosed a solution to this problem in a patent application filed in 2000 and issued in 2002 as U.S. Patent No. 6,366,025 (the "Yamada" reference). Appx3158-3176. Yamada discloses a "color display device having an organic EL [electroluminescent] element for each display pixel" that is designed to "prevent[] the organic EL elements of colors for which the emission efficiency is low from selectively deteriorating, and facilitate[] the control of white balance in the color display." Appx3158 (Abstract). Like the references discussed above, Yamada's display includes red, blue, and green "pixels arranged in a matrix configuration." Appx3172 7:48-54. The pixels are sized "in accordance with the emission efficiency of" each color's "emissive element" to improve the life of the display and avoid premature deterioration. Appx3170 3:16-27, 4:4-14. As shown in

Figure 4 below, for example, if the green pixels (labeled "1G") are the most efficient, they are made "smaller," while the less-efficient blue pixels (labeled "1B") are made "larger":




Fig. 4

Appx3162; Appx3170 3:38-50; Appx3172 7:3-10. Yamada notes that "the order in size of the emission region areas is not fixed at … green<red<blue," but is "determined by the emission efficiency of the emissive materials … used." Appx3172 7:13-18.

***Samsung Obtains Several Patents That Also Address Pixel Display Arrangements.***

Samsung owns several patents covering the same sort of OLED pixel-display arrangement technologies described above and detailed throughout the prior art. That includes the three patents at issue in this appeal, which this brief refers to collectively as the "pixel patents."

These three related patents all share a specification and stem from an application first filed in 2012. Appx262-273; Appx274-286; Appx287-305.

The pixel patents are broadly addressed to "[a] pixel arrangement structure of an OLED display." Appx262. The common specification identifies two competing issues in designing such a structure. On the one hand, "reducing a gap" between pixels can allow for "a high aperture ratio of the pixel." Appx269 1:40-42; *see* Appx2964; Appx3749. But when putting the pixels closer together like this, "deposition reliability may be deteriorated." Appx269 1:40-42. Conversely, if the pixels are spaced farther apart to improve reliable deposition (that is, the application) of the organic light-emitting material, aperture ratio is compromised. *See* Appx269 1:43-45.

The specification goes on to describe various embodiments of "a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels." Appx269 1:54-62. "[F]or ease of description," the specification "omit[s]" any detail regarding the components of the OLED display that are "technologies known in the art," such as "power lines for driving

each of the pixels," "an insulation layer, such as a pixel defining layer, for defining each of the pixels," as well as "an anode, an organic emission layer, and a cathode to correspond to each" set of pixels. Appx270 3:58-4:1. Instead, the specification focuses on the layout, size, and spacing of the various pixels. The pixels are arranged in a "virtual square," Appx269 1:66-67, such as the one depicted by the dotted box in Figure 1, reproduced below:

FIG.1




Appx264. This virtual square has a green pixel (element 100) "as a center point," with blue pixels (element 200) and red pixels (element 300) located at the vertices (labeled P1 and P2, respectively) of the square. Appx270 4:14-21. The specification states that this

configuration results in an improved "aperture ratio," though it does not explain how. Appx271 5:20-26.

The specification also calls out an example of a "length" (labeled L1) between the green, red, and blue pixels, and another "length" (labeled L2) between the "neighboring [green] pixels." Appx270-271 4:64-5:6. It states that L2 is "longer than" L1, and that "[t]his results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers"—though again, it does not explain how. Appx271 5:13-19. And the specification describes other, different spacing arrangements that purportedly produce this same benefit. *See, e.g.*, Appx271 6:23-35.

Separately, echoing Yamada, the specification recognizes the potential for different lifespans among different colors of OLED material, with the pixels "that emit blue hav[ing] the shortest life span." Appx271 6:43-46. Also like Yamada, the specification asserts that its "pixel arrangement structure" can "provide[] improved life span" for an OLED display by using blue pixels with a "larger area" than the green pixels, as shown in Figure 2, reproduced below. Appx271 6:46-50. Other embodiments, however, show different relative

sizing—such as Figure 4, also reproduced below, in which the red pixels have the largest area. *See* Appx272 7:48-50. Here too—and unlike Yamada—the specification does not explain how the different sizing approaches affect pixel lifespan.

FIG.2




FIG.4




Appx265; Appx267.

The original claims of the ’803 patent application broadly recited multiple pixels arranged in a “virtual square” configuration, without providing any specifics as to color, size, or shape of the pixels. Appx329; Appx2860-2863. The examiner issued a series of rejections, leading to a series of narrowing amendments, each targeted to overcome a particular prior-art reference cited by the examiner. *See* Appx2081.

Ultimately, the examiner allowed the issued version of independent claim 1—with its spacing, sizing, and color restrictions—and several dependent claims, each of which adds further details about the pixel arrangement. Appx272-273 8:57-10:55.

The same pattern played out for the ’683 patent. Filed just months after the examiner issued a notice of allowance of the ’803 patent, the ’683 patent application originally included broad claims to three sets of different-colored pixels in a virtual square configuration, though it used different terminology (not found in the specification) to refer to that configuration. Appx5679-5683; Appx1995-1997; *see* Appx970; Appx976-977. As with the ’803 patent, a series of examiner rejections led to a series of narrowing amendments to avoid particular prior-art references, ending with the assortment of size, distance, and color details recited in the issued claims. *See* Appx6248; Appx6255-6263; Appx284-286 8:62-11:32.

The ’578 patent application, filed during the prosecution of the ’683 patent, again broadly recited multiple pixels in a virtual square configuration, using the geometric terminology of the ’683 patent claims (rather than the patent specification). Appx6961-6964. And again, a

series of narrowing amendments followed a series of examiner rejections that was even more extensive than for the prior patents. *See* Appx1463-1464. The ’578 patent emerged from prosecution with 92 claims; the two independent claims at issue here (along with several of their dependent claims), claims 1 and 42, each recite an OLED pixel arrangement structure with an assortment of geometric particulars about the shape, arrangement, and spacing of the various pixels. Appx300 9:5-54; Appx302 13:42-14:22. The Matthies and Murai references were not among the numerous prior-art references cited in the pixel patent prosecution. Yamada was cited, but not substantively discussed. Appx288. And although Phan was invoked as a basis to reject certain application claims of the ’578 patent, it was not cited in the ’803 or ’683 patent prosecutions. *See* Appx1465.

***Samsung Asserts The Pixel Patents, And BOE Pursues Inter Partes Review.***

In February 2023, based on a complaint filed by Samsung, the U.S. International Trade Commission instituted a Section 337 investigation into alleged infringement of the pixel patents and others. 88 Fed. Reg. 7463 (Feb. 3, 2023). Samsung’s complaint sought a general exclusion order barring importation of allegedly infringing replacement

screens for mobile devices, including those made by BOE. *See id.* But Samsung named as respondents only various retailers who sell those devices. BOE therefore intervened and responded in the ITC action. *See* Appx322.

BOE also filed petitions with the Patent Trial and Appeal Board seeking inter partes review of claims 1-5 and 19-21 of the ’803 patent; claims 1, 2, 4-10, 13, and 15 of the ’683 patent; and claims 1-6, 10, 12, 17-19, 21-23, 40-47, 51, and 52 of the ’578 patent. Appx324; Appx974; Appx1459. Samsung has since sued petitioner-appellant Mianyang BOE Optoelectronics Technology Co., Ltd., along with other defendants, in multiple district courts, alleging infringement of the same patents involved in the ITC action. *See* Appx3.

Given the similarity of the ’803 and ’683 patent claims, BOE’s grounds for challenging these two patents were substantively identical. *See* Appx338-401; Appx987-1047. With supporting expert testimony from Dr. P. Morgan Pattison, a leading expert in the OLED field, *see* Appx2951-2952, BOE’s petitions demonstrated how the challenged claims of these patents were obvious in multiple respects.

BOE's first ground showed how Matthies's "quad sub-pixel structure" discloses the "virtual square" arrangement of independent claim 1 of the '803 patent (and the substantively identical arrangement of the '683 patent's independent claims, which use different terminology). Appx339-353; Appx987-1000. As the claims recite, the green pixels are at the center of the virtual square, with red and blue pixels centered at the vertices (that is, corners) of that virtual square:







Appx345 ('803 patent, left); Appx994 ('683 patent, right). For the independent claims' limitations reciting different sizing of the different-colored pixels, BOE showed how Yamada disclosed these requirements and further demonstrated why a person of ordinary skill would be motivated to combine Yamada and Matthies to achieve the claimed inventions. Appx358-364; Appx3006-3015; Appx1004-1010; Appx6483-

6492. And BOE demonstrated how this Matthies-Yamada combination would render obvious the remaining details of all of the challenged claims. Appx349-358; Appx2995-3006; Appx997-1010; Appx6459-6483.

BOE's second ground presented a similar showing based on the Murai reference. Here too, BOE showed how Murai discloses the pixel arrangement of the challenged independent claims. Appx383-390; Appx3042-3051; Appx1029-1037; Appx6519-6529. And BOE again relied on a skilled artisan's motivation to use the specific pixel sizing approach of Yamada—implemented through Murai's "cutout" technique—to meet the remaining claim limitations. Appx390-401; Appx3042; Appx3051-3067; Appx1037-1047; Appx6519; Appx6529-6542.

BOE also presented a ground based on the Phan reference. BOE relied on Phan's Figure 11 pixel incorporated into the "quad pixel display" of Figure 12:



Appx368; Appx1015. BOE illustrated how Phan's "dots" form the '803 patent's claimed "virtual square" with a green dot at its "center" (and the similar configuration of blue and green dots recited in the '683 patent claims):




Appx369; Appx1016. Because Phan also discloses different sizing for different-colored pixels, BOE showed how Phan alone renders obvious most of the challenged claims. Appx364-378; Appx3015-3033; Appx1010-1024; Appx6493-6510. For one dependent claim from each patent, however—claim 5 of the '803 patent and claim 2 of the '683 patent—BOE relied on combining Yamada with Phan to achieve the limitation reciting that the "third pixel" (the red dots) be larger than the "first pixel" (the green dots). Appx378-383; Appx3033-3041; Appx1024-1029; Appx6511-6519.

BOE's petition challenging the '578 patent relied principally on the Matthies reference. As with its other petitions, BOE showed how Matthies's "quad sub-pixel structure" from Figure 8B, drawn according to exemplary dimensions provided in Matthies's Table 2, taught all the pixel positioning and distance details of the structural arrangement recited in the challenged claims. *See* Appx1472-1488. And, as with its other petitions, BOE demonstrated how the combination of Matthies and Yamada would achieve the pixel sizing details recited in the claims. Appx1488-1528. BOE further demonstrated how and why a person of ordinary skill would include a third prior-art reference, Hong, in the combination to achieve additional limitations of some dependent claims. Appx1528-1536.

BOE's petition also addressed the obviousness of a limitation that appears in the '578 patent claims but not the other pixel patents: that the OLED display includes "a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels." Appx300 9:11-13; Appx302 13:48-50, 14:45-47; *see* Appx1476-1479. As noted above (at 15-16), the pixel patent specification describes this as a "technolog[y] known in the art" and does not describe it in detail. Appx297 4:4-11.

BOE's petition relied on that acknowledgement and further showed how a person of ordinary skill would recognize a pixel defining layer in the figures and description of Matthies or, at minimum, would find it obvious to add such a layer in view of (1) Matthies's teaching that other "layers" can be present in its OLED display stack "to improve the function or life of the display layers," Appx3091 6:37-39, and (2) examples in the art, including in Yamada, of insulating layers used to define the emissive areas of pixels, Appx3173 9:13-35; Appx1476-1479; Appx7446-7450.

***The Board Finds All But Two Challenged Claims Of The '803 And '683 Patents Obvious, But Upholds The Challenged Claims Of The '578 Patent.***

The Board instituted review on all three petitions, received separate briefing in each proceeding, and held a single consolidated hearing. Appx484-537; Appx1128-1176; Appx1618-1666; Appx830. The Board thereafter issued three separate final written decisions. Appx1-124; Appx125-227; Appx228-261.

The Board agreed with BOE that Phan renders obvious nearly all of the challenged claims of the '803 and '683 patents, and it rejected Samsung's argument that secondary considerations of non-obviousness

saved these claims. Appx42-83; Appx138-184. But the Board rejected BOE's proposed combination of Phan and Yamada to teach the limitation of the two dependent claims requiring the red pixels to be larger than the green; the Board agreed with Samsung that the pixels of Phan, which discloses a passive-matrix OLED, could not be resized as BOE proposed to meet this limitation. Appx83-96; Appx184-194.

The Board also rejected BOE's proposed combinations of Matthies or Murai with Yamada. Appx14-42; Appx96-111; Appx194-213. Because the Board found that a person of ordinary skill would not make either combination, it did not address whether the combinations, if made, would render obvious the limitations of the two dependent claims that were upheld against the Phan challenge.

As to Matthies, the Board agreed with Samsung's expert, Dr. Kymissis, that varying pixel sizes within each tile in accordance with emissive efficiency would be problematic in a passive-matrix OLED (or "PMOLED"). Appx30-37. Whereas active-matrix OLED (or "AMOLED") displays use individually controlled pixel drive circuits, PMOLED displays use voltage applied to intersecting rows and columns of electrodes to sequentially illuminate rows of pixels. *See* Appx3744-

3747. Samsung argued, and the Board accepted, that changing the size of a pixel in a passive-matrix display required changing the size of a row or column electrode, which would also change the size of all other pixels of that row or column. Appx32-33. The Board then distinguished each of BOE's citations to Matthies's discussion of active components and circuitry, rejecting the contention that Matthies's OLED pixel arrangements can be used in both passive- and active-matrix displays. Appx30-37; Appx201-206. The Board also concluded that BOE's proposal would "shorten[] … the lifetime" of Matthies's display. Appx38 (emphasis omitted); *see* Appx202. In doing so, the Board refused to consider BOE's counter-showing. The Board found that BOE's reply material, addressing Samsung's argument about display lifetime from its patent owner response, "present[ed] an impermissible new argument." Appx40-41; *see* Appx205.

As to Murai, the Board rejected BOE's proposed combination for three reasons: (1) downsizing Murai's pixels based on Yamada's teachings is incompatible with Murai's goal of improving the display's overall aperture ratio, *see* Appx103-108; Appx212-213; (2) reducing the sizes of the green and red pixels while keeping the blue pixels their

same size would not extend the overall lifetime of Murai's display, *see* Appx108-109; Appx213; and (3) Murai's cutouts would not be useful for OLEDs, even though Murai itself applies them to OLEDs, *see* Appx109-110; Appx212.

The Board rejected BOE's showing as to all challenged claims of the '578 patent. Its decision turned on a single limitation: the "pixel defining layer" common to all challenged claims. Although Samsung had agreed in its preliminary response that such a layer "must be included for the OLED display to operate properly," Appx1551 n.1, post-institution Samsung took the position that Matthies's OLED displays "do not include a pixel defining layer," and that "there is no reason" why an OLED display combining Matthies and Yamada would do so. Appx1709. The Board ultimately agreed. Appx250-259.

The Board first rejected BOE's showing that a person of ordinary skill in the art would recognize that Matthies already employs a pixel defining layer even though—as in the '578 patent itself—this layer is not specifically called out or labeled in Matthies's figures. Appx250-254. The Board faulted BOE for engaging in "inappropriate application of hindsight." Appx254. In doing so, the Board stated that BOE had

not "identif[ied] any acknowledgement or admission in the '578 patent that the inclusion of a 'pixel defining layer' was previously known in the art"—without addressing the language BOE had cited where the '578 patent said exactly that. Appx254.

The Board also rejected BOE's alternative argument that a person of ordinary skill in the art would have known to include such a layer in Matthies's OLED display tiles. Appx257-259. The Board first faulted BOE for taking "somewhat contradictory" positions by offering alternative arguments. Appx253. And, although it acknowledged Matthies's express statement that other useful layers can be added to the OLED stack, the Board faulted BOE for not explaining why a pixel defining layer would be useful in Matthies—here too, ignoring BOE's expert testimony providing exactly this explanation. *See* Appx252-253; Appx7449-7450. Instead of engaging with the substance of this showing for why a skilled artisan *would* include the known pixel defining layer in Matthies, the Board faulted BOE for using the word "could" in its analysis. Appx251-252.

Finally, although Samsung did not dispute this point, the Board found that Yamada—which BOE had relied on to provide an example of

a pixel defining layer known in the art—did not actually disclose such a layer. Appx255-258. The Board did so by imposing requirements on a "pixel defining layer" that no party had advocated, then finding that Yamada did not meet these requirements. Appx255-257.

## SUMMARY OF ARGUMENT

**IA.** The Board erred in rejecting BOE's obviousness showing with respect to the "pixel defining layer" limitation of the '578 patent in two ways, each independently warranting vacatur. First, the Board found that a skilled artisan would not have known that Matthies employs a pixel defining layer, even though BOE showed that it was a concededly familiar technology that the '578 patent describes as "known in the art," Appx297 4:10. The Board inexplicably concluded the opposite, faulting BOE for "not identify[ing] any acknowledgement or admission in the '578 patent that the inclusion of a 'pixel defining layer' was previously known in the art." Appx254. The Board acted arbitrarily in ignoring BOE's evidence, and it further erred by demanding express disclosure in an obviousness analysis and by improperly faulting BOE for offering arguments in the alternative.

**IB.** Second, the Board erred in rejecting BOE's alternative showing that it would have been obvious to add a pixel defining layer to Matthies. Matthies teaches that any useful layers can be added to its OLED stack, and BOE showed why this addition would be useful. BOE also demonstrated readily available examples of such a layer, including the one in Yamada. The Board's contrary conclusion again ignored BOE's evidence. And the Board went further astray in finding that Yamada does not disclose a pixel defining layer—a point uncontested by Samsung—by invoking an implicit claim construction that was both substantively flawed and procedurally improper.

**II.** The Board properly held most challenged claims of the '803 and '683 patents obvious over Phan. But it erred in rejecting BOE's other grounds for those claims, including the two dependent claims whose patentability was upheld against the Phan ground.

**IIA.** The Board legally erred in holding that Matthies's pixel arrangement is limited to passive-matrix displays and thus could not be combined with Yamada. The Board applied an unlawfully narrow approach to obviousness, both by distinguishing each reference in Matthies to active-matrix displays rather than considering what the

reference taught as a whole, and by demanding a detailed showing of how Matthies and Yamada would be physically combined. The Board also abused its discretion in ignoring reply material that properly elaborated on a contention raised in BOE's petition and responded to Samsung's counterarguments.

The Board also erred in concluding that the Matthies-Yamada combination would shorten the useful lifetime of Matthies's display. Here too, the Board ignored BOE's evidence to the contrary only by concluding that BOE was raising a new argument on reply, despite BOE's petitions unquestionably including this argument (and its reply material being responsive to Samsung's patent owner response).

**IIB.** The Board also erred in rejecting BOE's proposed combination of Murai and Yamada. Here the Board made the same "useful lifetime" error as it did with the Matthies-Yamada ground while adding two other errors. First, the Board departed from this Court's precedent by demanding a showing that the combination would maximize a single advantage—increased aperture ratio—despite clear evidence of other benefits. Second, the Board concluded that Murai's

cutouts were not useful for OLEDs, directly contradicting Murai's express references to OLED displays.

## STANDARD OF REVIEW

"Obviousness is a question of law based on underlying facts." *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir. 2021). This Court "review[s] the Board's legal determinations de novo and its factual findings for substantial evidence." *Id.* Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1378 (Fed. Cir. 2023) (citation omitted). "What the prior art discloses and whether a person of ordinary skill would have been motivated to combine prior art references are both fact questions" that the Federal Circuit "review[s] for substantial evidence." *Id.*

This Court reviews the Board's claim constructions de novo. *Corning v. Fast Felt Corp.*, 873 F.3d 896, 901 (Fed. Cir. 2017). The Court also "review[s] the Board's decisions under the Administrative Procedure Act (APA)." *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017). The Court must "hold unlawful and set aside" any findings or conclusions that are "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law"; "without observance of procedure required by law"; or "unsupported by substantial evidence." *Id.* (quoting 5 U.S.C. § 706).

This Court reviews the Board's determination on the proper scope of a reply brief for abuse of discretion. *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020).

## ARGUMENT

### I. The Board Erred in Upholding the Challenged Claims of the '578 Patent.

BOE thoroughly demonstrated that the prior art disclosed all of the allegedly novel particulars of pixel sizing, spacing, and arrangement that are recited in the challenged claims of the '578 patent. The Board, however, did not decide those issues. It rejected BOE's obviousness showing based on a single finding: that BOE had failed to demonstrate that the prior art discloses a "pixel defining layer"—a limitation common to all challenged claims, and which the '578 patent describes as being sufficiently "known in the art" that the specification "omit[s]" any "further description" of it "for ease of description." Appx297 4:4-11.

The Board's decision hinged on two errors, each independently warranting vacatur. First, the Board erred in rejecting BOE's showing

that a skilled artisan would have known that Matthies employs a pixel defining layer—a concededly well-known technology that Matthies, just like the ’578 patent itself, would not need to depict or describe in detail. § I.A. Second, the Board erred in rejecting BOE’s showing that it would have been obvious to add a pixel defining layer to Matthies, particularly in view of Matthies’s teaching that any useful layers can be added to its OLED stack and in view of readily available examples of such a layer, including the one in Yamada. § I.B.

### A. The Board erred in rejecting BOE’s showing that Matthies employs a pixel defining layer.

BOE demonstrated that a skilled artisan would have found it obvious that Matthies already contains a pixel defining layer, because such a layer was well-known in the art. The Board’s rejection of that showing was erroneous.

**1.** To begin, BOE showed that a pixel defining layer is simply a standard component in OLEDs, as the ’578 patent itself acknowledges and as Samsung initially agreed.

The petition cited the ’578 patent’s “Description of the Related Art,” which states that “[i]n addition” to other commonplace components, “there may be an insulation layer such as a pixel definition

layer to define an area and a shape of each pixel." Appx296 1:42-44; *see* Appx1476; Appx1799; Appx1810. Further underscoring that this layer was routinely included in OLED displays, the '578 patent describes the "pixel defining layer" as part of "configurations" sufficiently "known in the art" that the specification "omit[s]" any "further description" of it "for ease of description." Appx297 4:4-11; *see* Appx1476; Appx1810; *see also* Appx3231 [0003], Appx3233 [0056] (Smith prior-art reference describing "different light-emissive material defining the sub-pixels," with examples); Appx7651 Figs. 2B, 3B, Appx7665 6:38-63 (Seo prior-art reference showing an "insulating bank").

Indeed, the concept was so well-known that the '578 patent does not even depict the pixel defining layer in any of its drawings. *See* Appx291-295 (Figs. 1-5). Accordingly, BOE demonstrated that the '578 patent "explains that this type of pixel defining layer is, quote a technology known in the art[,] [s]o the patent is simply using existing known pixel dividing layers, not something that the patent contributed." Appx940-941.

Samsung initially agreed. Far from contesting the pixel defining layer limitation in its preliminary response to BOE's petition, Samsung

instead acknowledged that such a component was not only common but indeed "must be included for the OLED display to operate properly." Appx1551 n.1 (citing Appx297 4:1-6).

As this Court has recognized, "a patentee's admissions about the scope and content of the prior art provide a factual foundation as to what a skilled artisan would have known at the time of invention." *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367, 1376 (Fed. Cir. 2022) (citing *Randal Mfg. v. Rea*, 733 F.3d 1355, 1362-63 (Fed. Cir. 2013)). In other words, "[b]y characterizing certain parts as conventional in the specification, the patentee effectively admits that such things would be known to a POSA." *Id.* (citation omitted); *see Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) ("A statement in a patent that something is in the prior art is binding on the … patentee for determinations of … obviousness."); *cf. J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001) (concluding that patent's "Description of the Related Art" was probative of claim scope in rejecting patentee's infringement theory). That is the background against which BOE made its obviousness showing.

**2.** Relying on the ’578 patent’s acknowledgment about pixel defining layers being standard in the prior art, BOE showed that Matthies’s display was precisely the kind of OLED display that a skilled artisan would have understood as containing such a layer.

BOE showed that Matthies uses the same “known” prior art “configuration[]” referenced in the ’578 patent. Appx297 4:4-11. Just as the ’578 patent describes “an anode, an organic emission layer, and a cathode to correspond to each” pixel, Appx1476 (quoting Appx297 4:6-9), Matthies discloses a “basic light emitting structure consist[ing] of a thin organic polymer layer”—what Matthies calls its “pixel forming elements”—“sandwiched between a pair of appropriately selected and patterned electrodes,” Appx1476 (quoting Appx3091 6:18-22); *see* Appx1810-1811.

BOE elaborated on this showing with reference to Matthies’s Figure 3:




*FIG. 3*

Appx1475 (reproducing Appx3078). Matthies describes how the OLED materials depicted as elements 324 and 326 in Figure 3 "define the active area of the pixel" and are layered between the column electrodes (element 322) and the row electrodes (element 328). Appx3094-3095 12:62-65, 13:1-5, 13:10-11; *see* Appx1476-1475. BOE's expert, Dr. Pattison, confirmed: "OLED pixel forming elements 324 and 326 are located in their own layer, and have a defined, specific shape and area that serves to define the display's pixel shape." Appx7448; *see* Appx1479; Appx1810-1811.

Dr. Pattison also provided an annotated version of Matthies's Figure 10B, which shows a "cross sectional view" of the "layered structure" of Figure 3:




*FIG. 10B*

Appx7448; *see* Appx1478. Dr. Pattison described how the active pixel areas (324, in yellow) "are depicted as existing in their own layer, are physically separated from each other, and have a defined shape." Appx7448; *see* Appx1478. And again, Dr. Pattison emphasized that Matthies uses the same "'known'" configuration "referenced in the '578 patent." Appx7449 (quoting Appx297 4:6-9).

**3.** The Board, however, criticized BOE's showing as "based on inappropriate application of hindsight." Appx254. In doing so, the Board inexplicably found that "Petitioner does not identify any acknowledgement or admission in the '578 patent that the inclusion of a 'pixel defining layer' was previously known in the art." Appx254.

BOE plainly did identify that "acknowledgement or admission in the '578 patent." As noted above (at 25-26), BOE's petition cited the

’578 patent’s description of the “pixel defining layer” as part of “configurations” sufficiently “known in the art” that the specification had no need to describe them further. Appx1476 (quoting Appx297 4:1-13). And BOE’s reply similarly invoked the ’578 patent’s admission that pixel definition layers were “known.” Appx1810 (quoting Appx296-297 1:36-44, 4:1-12). The Board ignored these citations (as well as Samsung’s admission, Appx1551 n.1). *See* Appx254.

BOE did not fail to identify the ’578 patent’s acknowledgment that a pixel defining layer was known in the art—rather, the Board failed to address the admissions BOE repeatedly invoked. That failure renders the Board’s decision arbitrary and capricious. *See, e.g.*, *Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency acts arbitrarily when it “offer[s] an explanation for its decision that runs counter to the evidence before the agency”).

The Board’s charge of “hindsight” was also legal error. This Court has reversed the Board’s finding of non-obviousness where, as here, the record reflected a finite set of “well-known design choices” for a claim limitation unrelated to “the alleged novelty” of the challenged patent. *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1338-40 (Fed. Cir. 2020)

(finding legal error and rejecting Board's conclusion that petitioner had engaged in "impermissible hindsight"); *see Shockwave Med., Inc. v. Cardiovascular Sys., Inc.*, No. 2023-1864, -- F.4th --, 2025 WL 1922023, at *8 (Fed. Cir. July 14, 2025) (similar). The '578 patent clearly identifies a pixel defining layer as a known technology, and Samsung itself originally described it as necessary for an "OLED display to operate properly." Appx1551 n.1. It was not "hindsight" for BOE to take the same position.

**4.** The Board's other reasons for rejecting this part of BOE's showing are similarly flawed.

The Board first objected that Matthies's Figures 3 and 10B do not expressly "call[] out" the space between the active areas "with a reference number," reasoning that, "without Petitioner's annotations, the 'pixel defining layer' does not exist." Appx253. But an obviousness analysis does not require such an express labeling. *See Milliken Rsch. Corp. v. Dan River, Inc.*, 739 F.2d 587, 602 (Fed. Cir. 1984) (rejecting obviousness requirement of "an express suggestion in a prior art reference," because "[t]his is clearly not the law"). Indeed, the '578 patent itself does not label any "pixel defining layer" in its figures, yet—

unless the claims are invalid under § 112—it must be there. The Board legally erred in demanding that Matthies put a label on what a person of ordinary skill in the art would readily appreciate. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (obviousness "analysis need not seek out precise teachings" but can "take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

The Board also faulted BOE for taking "somewhat contradictory" positions regarding Matthies's disclosures. Appx253-254. Here, the Board simply misunderstood BOE's argument. In walking through Matthies's teachings, BOE showed that a skilled artisan would understand that the pixel defining layer could define pixels in multiple different ways. Appx1476-1479; Appx1810-1811. That accords with the '578 patent's broad description of the pixel defining layer. *See* Appx7446 (citing Appx296-297 1:42-44, 4:1-13).

As explained above (at 39-40), BOE first showed how the pixel-forming elements (324 and 326) themselves define the active area of the pixels. *See* Appx1477-1478; Appx7447-7449; Appx1810-1811. And, as explained below (at 46-48), BOE separately relied on a skilled artisan's knowledge that one could use an insulating layer in the spaces between

the active areas, highlighted in blue in the annotated version of Matthies's Figure 10B. *See* Appx1478; Appx7449; Appx1811. There was no need for BOE to "reconcile these ideas," as the Board erroneously held, Appx254. They are simply alternative ways of understanding how a pixel defining layer obviously is or could be employed by Matthies. *See, e.g.*, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1371-74 (Fed. Cir. 2019) (affirming obviousness where arguments were made "in the alternative" (citation omitted)).

### B. The Board erred in rejecting BOE's showing that it would have been obvious to include a pixel defining layer in Matthies.

BOE demonstrated, alternatively, that a skilled artisan would have known to add a pixel defining layer to Matthies, to the extent it does not already disclose one. Matthies expressly allows for the addition of undepicted layers, including an insulation layer—which the '578 patent identifies as a potential pixel defining layer—and BOE showed an illustration of such a layer in Yamada. The Board's rejection of BOE's showing impermissibly ignored record evidence, was unsupported by substantial evidence, and relied in part on an improper

implicit claim construction that the Board adopted without notice in the final written decision.

**1.** Matthies instructs that its "exemplary display structure" can include "[a]dditional layers" that "improve the function or life of the display layers." Appx3091 6:28-38. And it specifically identifies the possibility of including "a structural layer[]" such as an "insulator." Appx3092 7:24-26. The '578 patent explains that an "'insulation layer' surrounding the OLED active areas may be the 'pixel defining layer.'" Appx1479 (quoting Appx297 4:4-6 and citing Appx7449-7450). Accordingly, as BOE showed, it at least would have been obvious to include "an intervening layer of insulation (blue below) that surrounds the active areas" of Matthies's pixels:




*FIG. 10B*

Appx1478; *see* Appx7448-7449; Appx1810.

BOE then showed—and Samsung did not dispute—that Yamada "provides an example" of an insulation layer used in this way. Appx1478-1479. In Yamada's Figure 6B, a "planarization insulating film" (element 167) bounds the emissive area of a pixel:




Fig. 6B

Appx1478-1479 (quoting Appx3173 9:13-35). Using an insulation film like this in Matthies's OLED structure "would serve various, well-known purposes" such as protecting the active areas, preventing electrical shorts, and "planarization of the active area" to allow the row electrodes to be applied on top. Appx7450; *see also* Appx1811 (citing Appx7651 Figs. 2B, 3B); Appx7665 6:38-44, 6:53-59 (Seo prior-art reference showing an "insulating bank" 203/303 "surrounding the pixels").

Therefore, to the extent that Matthies does not already contain a pixel defining layer, BOE showed that a pixel defining layer was a "well known" feature that a skilled artisan would have found obvious to add to Matthies. *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1350-51 (Fed. Cir. 2010) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." (quoting *KSR*, 550 U.S. at 416)).

**2.** The Board's reasons for rejecting BOE's showing were again unfounded.

To begin with, the Board improperly faulted BOE for using the word "could" in its obviousness analysis. Appx251. The Board is correct that "obviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (cited at Appx251). But despite using the word "could," the substance of BOE's showing clearly satisfied the obviousness standard. Indeed, BOE's use of permissive language simply tracked Matthies's own disclosure; just as Matthies states that additional, undepicted layers "may be present"

to improve the display tile, Appx3091 6:37-38, BOE's petition stated that the tile "obviously could include, for instance, an intervening layer of insulation," Appx1478.

BOE also expressly linked Matthies's contemplation of additional layers "to improve the function or life of the display layers," Appx3091 6:36-38—and its specific mention of including an "insulator" as one such "layer[]," Appx3092 7:24-29—with the benefits of using an insulation layer to surround the OLED active areas in Matthies: namely, "protection of the active areas from contamination or damage, prevention of electrical shorts," and "planarization of the active area." Appx7449-7450; *see* Appx1477-1479. The Board ignored the substance of this showing in its blinkered focus on BOE's use of the word "could."

The Board also ignored this evidence entirely in faulting BOE for supposedly "provid[ing] no reasoning or explanation as to how or why Matthies'[s] disclosed structure would benefit from the addition of a 'pixel defining layer.'" Appx252-253. BOE plainly provided both Matthies's own statement that an insulator would be useful and additional, expert-backed reasoning for why an insulator would improve the display's life and function. The Board simply did not address BOE's

argument or its supporting expert testimony. Here again, the Board's approach was inconsistent with reasoned decisionmaking. *See Motor Vehicle Mfrs.*, 463 U.S. at 43; *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1353 (Fed. Cir. 2018) ("*AIT*"); *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1358-59 (Fed. Cir. 2020). Moreover, because the Board ignored BOE's extensive evidence while failing to "point to any evidence to support its conclusion," the Board's finding lacks substantial evidence. *Custom Computer Servs., Inc. v. Paychex Props., Inc.*, 337 F.3d 1334, 1337 (Fed. Cir. 2003).

Notably, the Board did not adopt Samsung's arguments against including a pixel defining layer in Matthies (other than its criticism of the word "could," which is misplaced for the reasons discussed above). Appx257-258. The Court therefore cannot affirm on the bases offered by Samsung. *See DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1376 n.4 (Fed. Cir. 2018) ("Under the *Chenery* doctrine, we decline [the] invitation to consider evidence that the Board did not cite in its decision.").

Regardless, nothing that Samsung offered could overcome BOE's showing. First, although its expert originally asserted that "Matthies

does not use … a blocking or isolation layer between the row and column electrodes for defining the pixel area of the organic material," Appx7773, Samsung later conceded that Matthies in fact discloses "[a]dditional layers such as blocking or passivation layers" "to improve the function or life of the display layers," Appx1852 (quoting Appx3091 6:37). Samsung's suggestion that a pixel defining layer "would require unnecessary additional manufacturing steps and materials," Appx1852, is likewise contradicted by Samsung's admission elsewhere that such a layer is necessary for any OLED display (and the '578 patent's recognition of its utility). *See* Appx1551 n.1; Appx296 1:42-44.

Finally, Samsung's argument (Appx1709-1711) that a skilled artisan would not look to Yamada's active-matrix example to inform what could be added to Matthies was doubly flawed. As detailed more fully below (at 61-64), Matthies is not limited to passive-matrix embodiments but includes active as well. *See* Appx1800-1803; Appx7591-7594. Moreover, BOE demonstrated that a skilled artisan would have understood that the concept of a pixel-defining insulation layer could apply equally to both active- and passive-matrix displays, and Samsung did not rebut this showing. *See* Appx1811 (citing

Appx7665 6:38-63, Appx7651 Figures 2B, 3B, Seo prior-art reference, which shows both active- and passive-matrix displays employing the same pixel-surrounding "insulating bank").[3]

**3.** The Board also erred in its refusal to recognize Yamada as disclosing the kind of "pixel defining layer" that a person of ordinary skill in the art would have known could be added to Matthies. Samsung did not even dispute that Yamada disclosed a "pixel defining layer," contesting only motivation to combine. But the Board violated the APA by changing theories midstream, to adopt an implicit claim construction excluding Yamada's insulation film from being a pixel defining layer. Furthermore, the Board's implicit construction was erroneous. Remand is required at a minimum for the Board to reconsider Yamada's disclosure under the proper (and previously undisputed) plain meaning of the claim term.

---

[3] The Board also faulted BOE for not demonstrating a motivation to combine Matthies and Yamada. Appx259. But BOE did not argue a combination for this limitation; it relied on Yamada "simply to demonstrate [what] a person of ordinary skill in the art would have understood." *Realtime Data*, 912 F.3d at 1372-73; *see* Appx1476-1479; Appx1810-1811.

At institution, both the parties and the Board agreed that no specialized construction of "pixel defining layer" was required. Appx1466; Appx1682-1683; Appx1630-1631. Indeed, Samsung's preliminary response did not even contest BOE's showing that this limitation was obvious, instead agreeing that a "pixel defining layer" is a component that "must be included for the OLED display to operate properly." Appx1551 n.1.

Even post-institution, Samsung did not dispute that Yamada's insulation layer is a pixel defining layer within the meaning of the '578 patent; it argued only that a person of ordinary skill would not combine Matthies and Yamada (which, as discussed above, was irrelevant to BOE's theory). Appx1710-1711; Appx1851-1853; *supra* 52 n.3.

Yet the Board departed from that shared understanding in its final written decision when it held that BOE "fail[ed] to establish that Yamada teaches or suggests a 'pixel defining layer.'" Appx259. Again, BOE's identification of the pixel defining layer in Yamada is reflected in annotated Figure 6B:



Fig. 6B

Appx1479.

The Board reasoned that Yamada's "emissive element layer 165"—that is, the "pixel" being defined—"extend[s] above and beyond the internal boundaries of planarization insulating film 167"; in the Board's view, this meant that the insulating film "does not bound or define the shape or area" of Yamada's pixels. Appx255-256. The Board also noted that Yamada's planarization insulating film 167 is "depicted as below and separated" from the emissive layer 163 by an "intervening hole transport layer 162." Appx256. And the Board further reasoned that "the function of planarization insulating film 167 is to prevent a short circuit … not to bound or define the area or shape of the pixel." Appx257.

The Board's reasoning reflects three implicit narrowing constructions on the otherwise plain meaning of "pixel defining layer": the layer must (1) completely surround and (2) be directly adjacent to the emissive material of the pixel it is defining, as well as (3) serve no purpose other than defining the pixel.

To begin with, the Board's imposition of these requirements for the first time in its final written decision improperly made claim construction a "moving target[]." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1263 (Fed. Cir. 2021). This Court has repeatedly instructed that, "under the APA, the Board 'may not change theories midstream' by adopting a different claim construction in the final written decision than that adopted in the institution decision 'without giving respondents reasonable notice of the change and the opportunity to present argument under the new theory.'" *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1381-82 (Fed. Cir. 2023) (quoting *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016)). Yet that is what the Board did here, inventing these new requirements without providing BOE a chance to respond and defend its (again, undisputed) assertion that Yamada's insulating film is a pixel defining layer. At a

minimum, remand is warranted. *Axonics*, 75 F.4th at 1384; *Qualcomm,* 6 F.4th at 1267.

The Board's implicit construction was erroneous in any event. Like all claim language, the term "pixel defining layer" must be given the meaning it would have to a person of ordinary skill "in the context of the particular claim" in which it appears and "the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). That context makes clear a "pixel defining layer" is simply a layer that defines the area or shape of the pixels—the meaning that BOE's petition gave to the term. *See* Appx1476. It does not require any of the attributes the Board found lacking in Yamada's insulation film.

The claims of the '578 patent recite only that the pixel defining layer "defin[es] areas of" the first, second, and third pixels. Appx300 9:11-13; Appx302 13:48-50, 14:45-47. They say nothing about surrounding the pixel entirely or being directly adjacent to it, nor do they suggest that the layer can serve no function other than defining the pixel areas. Indeed, claim 48 contradicts the Board's requirement of a clear and complete demarcation between the pixel defining layer and

the pixel materials, reciting that "at least one of the anode, the cathode, or the organic emission layer" of each pixel "partially overlap[s] the pixel defining layer." Appx303 15:1-6.

The specification reinforces the breadth of what a "pixel defining layer" can be. All that the '578 patent says is that the layer "define[s] an area and a shape of each pixel." Appx296 1:42-44. It declines to provide any further detail, deferring to a skilled artisan's understanding of this "technolog[y]" that is "known in the art." Appx297 4:9-11. And it explains that the "shape of each of the pixels" can be "defined" in different and non-limited ways, not simply by a pixel defining layer but also by "power lines, … the anode, or the like." Appx297 4:11-13. A power line or anode would not completely surround a pixel, and each surely serves other functions in the display—yet the specification still contemplates them "defining" the shape of the pixels. *See, e.g.*, Appx3163, Appx3165 (disclosing a power source line 53 and an anode 161 that do not completely surround the pixel). The specification provides no basis to require something more particular if a "pixel defining layer" serves this role instead. Indeed, the specification twice mentions that an insulation layer can be the pixel defining layer—and

the insulation layer necessarily serves the separate function of insulating. Appx296-297 1:43, 4:4-5; *see* Appx7450.

This Court should vacate on this basis alone, because the Board failed to fully consider BOE's challenge with reference to Yamada as illustrating the background knowledge of a skilled artisan. *See Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1359-60 (Fed. Cir. 2023).

***

The Board thus erred in upholding the patentability of the pixel defining layer, a component well-known in the art. The Court should at minimum vacate the Board's findings. *See Ericsson Inc. v. Intell. Ventures I LLC*, 890 F.3d 1336, 1348 (Fed. Cir. 2018). But it can also reverse outright with respect to this limitation as compelled by the evidence, and remand for consideration of the remainder of BOE's obviousness showing. *See Uber*, 957 F.3d at 1342; *Shockwave Med.*, 2025 WL 1922023, at *8-9.

## II. The Board Erred in Upholding Two Dependent Claims of the '803 and '683 Patents.

The Board properly rejected most of the challenged claims of the '803 and '683 patents, finding them obvious in view of the Phan reference. Appx42-83; Appx138-184. BOE had also relied on Phan,

combined with Yamada, to demonstrate obviousness of two dependent claims: claim 5 of the '803 patent and claim 2 of the '683 patent. Appx378-838; Appx1024-1029. Both dependent claims contain a limitation that requires the second and third pixels to have a larger area than the first pixel. Appx273 9:30-31; Appx285 9:30-31. Yamada discloses that pixel sizing. Appx338; Appx356-357.

The Board rejected BOE's Phan-based challenge to these claims, and BOE does not challenge that holding on appeal. *See* Appx83-96; Appx184-194. But BOE also presented two other obviousness grounds in both the '803 and '683 patent proceedings: (1) Matthies and Yamada; and (2) Murai and Yamada. The Board did not address whether either combination renders obvious the specific pixel-size limitation of the two dependent claims. *See* Appx42; Appx111; Appx206; Appx213. Instead, it rejected both grounds across the board, finding that BOE had not shown a motivation to make either combination. Every challenged independent claim recites that the second pixel has a larger area than the third pixel. *See* Appx273 9:7-8; Appx285-286 9:25-26, 10:26-27, 11:31-32. The Board found that BOE had not shown a motivation to

combine either Matthies or Murai with Yamada to satisfy that limitation. Appx25-42; Appx102-111; Appx194-213.

For the reasons discussed below, the Board's findings were both legally flawed and unsupported by substantial evidence. The Court should therefore vacate these findings and remand for the Board to consider whether either combination renders obvious claim 5 of the '803 patent and claim 2 of the '683 patent.[4]

### A. The Board erred in rejecting a motivation to combine Matthies and Yamada.

For both patents, BOE contended that, "[w]hile Matthies'[s] pixels are all equally sized in certain examples," a skilled artisan would have considered it obvious to "resize the pixels in view of Yamada," "result[ing] in an OLED display with pixels that are arranged in the claimed 'virtual square' shape and also sized in the way the '803 [and '683] patent claims require." Appx339; *see* Appx982. A skilled artisan would also have been motivated to make this obvious combination

[4] Samsung has cross-appealed from the Board's decisions holding that all other challenged claims of these two patents are obvious based on Phan. Should the Court accept Samsung's argument and vacate or reverse the Board's holding as to any of the invalidated claims, then BOE respectfully requests vacatur and remand for reconsideration of those claims on the Matthies and Murai grounds as well.

because "Matthies is subject to the very problem identified by Yamada: its OLED pixels are all the same size"—so "[a]pplying Yamada's teachings and re-sizing the pixels in accordance with their emission efficiencies … would allow each pixel to be supplied with a similar current increasing the display's life" and "simplif[ying]" its design. Appx359-360; Appx1006.

The Board rejected BOE's contention for two reasons: (1) it found that Matthies's pixel arrangement does not apply to active-matrix displays, and varying pixel sizes in a passive-matrix display is problematic; and (2) reducing the size of the red and green pixels as BOE proposed would shorten the lifetime of Matthies's display. Both conclusions are legally unsustainable and, in all events, are not based on substantial evidence.

#### 1. The Board erred in determining that Matthies is limited to passive-matrix displays.

The Board concluded that BOE "ha[d] not adequately explained how Matthies's sub-pixels may be made larger or smaller, individually, to implement Yamada's pixel sizing in order of emission efficiency" because, in the Board's view, Matthies's OLED pixel arrangement did not apply to active-matrix displays. Appx32; *see* Appx203-204. That

was error. And it was a dispositive error: there is no dispute that the Board's pixel resizing concerns vanish if Matthies teaches active-matrix displays, because the pixels in active-matrix displays can be resized without issue. *See* Appx36-37; Appx205.

The Board made three critical legal errors en route to rejecting significant evidence that Matthies teaches active-matrix displays: (1) the Board took each individual reference in Matthies to "active" components, circuits, and matrices and distinguished each one-by-one, rather than considering what the reference as a whole fairly suggested, as required by this Court; (2) the Board required BOE to explain in detail how Matthies's sub-pixels may be made larger or smaller despite this Court's clear precedent that it is not necessary for references to be physically combinable to render the patent obvious; and (3) the Board concluded that, even assuming Matthies disclosed an active-matrix display, BOE did not rely on any such embodiment in its petition—even though BOE plainly contended in its petition that Matthies disclosed an active-matrix display.

**a.** For context, BOE presented extensive evidence that Matthies teaches "active matrix" displays. *See* Appx332; Appx685-688; Appx980;

Appx1307-1310. Matthies explicitly mentions using both "active and passive" electronics and circuits. Appx3092 7:15-19, 7:42-45. Even more specifically, Matthies teaches that the "electronics," such as the "pixel driving circuitry," can be "both active and passive." Appx3092 8:21-23. And it teaches that such electronics can be "formed in place by processes such as those now used to make active matrix circuits." Appx3092 8:21-26. Matthies also includes claims that specify "pixel driving circuitry" that can "provide a plurality of electrical signals which are conditioned to activate respective ones of the plurality of pixel structures." Appx3103 29:21-25; *accord* Appx3103-3104 30:6-11, 30:50-55, 31:13-18; *see also* Appx3328; Appx6607. As Samsung's expert testified, using a drive circuit to control individual pixels is a hallmark of active-matrix design. Appx3746-3747.

BOE further demonstrated how an active-matrix display is technologically compatible with Matthies's pixel arrangement. It was well-known in the industry that "square pixels formed from four sub-pixels like that shown in Figure 8B of Matthies are usable in an active-matrix OLED display." Appx3327-3328; Appx6606-6607; *see also, e.g.*, Appx3305 5:53-56; Appx3965 4:10-21. Matthies even incorporates by

reference U.S. Patent 5,644,327, *see* Appx3089 2:11-15, which is an example of an active-matrix display that depicts a "completely active drive of the display," Appx3320-3321 6:67-7:1; *see* Appx3328-3329. And BOE's expert detailed how a person of ordinary skill "would have understood that when Matthies'[s] display is implemented as an active-matrix display—which Matthies itself contemplates," one could use the technical details from this incorporated reference: namely, Matthies's electrical vias could "facilitate connection to, for instance, a select line, data line, common power line, and/or ground line located on the backside of Matthies'[s] tile." Appx3328-3329; Appx6607-6608. And Samsung's own expert agreed that a person of ordinary skill in the relevant timeframe would have known about the industry shifting toward AMOLED displays and weighed such "engineering tradeoffs" in deciding which type of display to use. Appx3371-3375.

**b.** The Board failed to consider what this evidence fairly suggested and instead took each individual reference in Matthies to "active"—whether to "active" components, "active" circuits, or "active matrix"—and distinguished them one by one. By dissecting and scrutinizing each reference to "active" in Matthies individually, the

Board lost sight of the broader context and failed to appreciate all that the "reference[] … fairly suggest[s]." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 930-31 (Fed. Cir. 2024). Put another way, the Board addressed "the express statements of each reference one-by-one" without "fully assessing the teachings" of Matthies "in toto." *Id.* at 928.

Consider, for example, how the Board addressed Matthies's explicit reference to an "active matrix." Matthies states: "Electronics are used in the broadest sense to include both active and passive, and both discrete devices mounted on the layers and devices formed in place by processes such as those now used to make active matrix circuits for displays on various high temperature substrates." Appx3092 8:21-27. The Board explained away this broadly inclusive statement by reasoning that the reference to an "active matrix" was limited to the manufacturing process for forming electrical components. *See* Appx36; Appx205. Similarly, the Board agreed with Samsung's sur-reply argument that when "Matthies discusses 'active and passive' 'electronics' or 'devices'" it is referring only to "active electrical *components* like transistors, and passive electrical components like

resistors." Appx35 (quoting Appx728-730); Appx203. The Board also endorsed Samsung's explanation that Matthies's reference to an "active circuit" simply means "a circuit with active components." Appx35.

The Board missed the point. True, Matthies describes the "processes … used to make active matrix circuits." Appx3092 8:25-26. But it does so in the context of a reference to "[e]lectronics … in the broadest sense to include both active and passive" and considers employing processes that are used to make active-matrix circuits. Appx3092 8:20-26. Likewise, even if "active" electronics, devices, and circuits refer to different concepts, "the primary distinction between an active matrix circuit and a passive matrix circuit is the presence of active components." Appx853. Moreover, these instances must be considered collectively to determine whether a skilled artisan would have understood Matthies to teach or suggest active-matrix displays. Matthies, considered as a whole, contemplates flexibility in pixel size and shape; it mentions "active" "electronics," "circuits," "display[s]," "devices," and "pixel driving circuitry"; it contemplates use of manufacturing processes used to make active-matrix circuits; and it includes claims reciting a key feature of active-matrix design. A skilled

artisan would therefore have understood that Matthies's OLED pixel arrangements—just like those in many other prior-art references and in the pixel patents themselves, *see* Appx3327—can be used in both passive- and active-matrix displays. *See* Appx3326-3329; Appx6605-6608; Appx685-688; Appx1307-1310. But the Board employed a "siloed and inflexible approach [that] left insufficient room for consideration of how background knowledge in the art would have impacted a POSA's understanding of" Matthies. *Janssen*, 97 F.4th at 931.

**c.** Next, the Board faulted BOE for not explaining in precise detail how Matthies and Yamada could be physically combined at the level of individual circuitry and components. Specifically, the Board faulted BOE for not "explain[ing] how Matthies's sub-pixels may be made larger or smaller, individually, to implement Yamada's pixel sizing in order of emission efficiency." Appx32; Appx204 (similar). The Board thought this explanation necessary because of circuitry changes that would be required in a PMOLED design. *See* Appx31; Appx33. The Board particularly focused on Matthies's supposed failure to disclose "having an individual circuit for each pixel." Appx35-36.

As explained above (at 62-64), however, the Board overlooked BOE's evidence that Matthies's physical structure can accommodate either passive- or active-matrix designs, including BOE's evidence about individual pixel-driving circuitry. Matthies's flexibility on this point would resolve the Board's concern. The Board's failure to consider BOE's evidence alone requires vacatur. *See AIT*, 897 F.3d at 1358; *see also CQV Co. v. Merck Pat. GmbH*, 130 F.4th 1344, 1349-50 (Fed. Cir. 2025) (vacating Board decision that "omitted from its opinion any discussion of … highly material and unrebutted evidence").

To the extent the Board required BOE to prove with further specificity how the references would be physically combined, that was legal error. This Court has emphasized that "'it is not necessary that [the primary reference and secondary reference] be physically combinable to render obvious the [patent].'" *Allied Erecting and Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (citations omitted); *see also In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc) (noting that it is "basically irrelevant" whether one prior-art reference can be incorporated into another); *Uber*, 957 F.3d at 1341 (concluding that the Board erred and that "'it is not

necessary that [two pieces of prior art] be physically combinable to render obvious' the asserted patent"). BOE therefore was not required to demonstrate with precise detail how Matthies's sub-pixels would be physically resized to implement Yamada's pixel sizing in order of emission efficiency.

**d.** Finally, in the '803 patent proceeding (but not the '683 patent proceeding, despite substantively identical petitions), the Board concluded that BOE's argument that Matthies disclosed an active-matrix display was raised for the first time on reply. *See* Appx34. That was an abuse of discretion. *See Ericsson Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1375, 1380-81 (Fed. Cir. 2018) (finding abuse of discretion when Board "improperly did not consider portions of [petitioner's] Reply"). BOE's petition clearly stated: "Matthies relates to 'tiled display devices.' The display can employ 'active matrix circuits.'" Appx332 (quoting Appx3089 1:8-10, Appx3092 8:21-26). The Board did not acknowledge, let alone respond to, this clear statement. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (agency "must examine the relevant data and articulate a satisfactory explanation for its action").

At most, BOE elaborated on this statement in reply by responding to Samsung's counterarguments and explaining why "Matthies is *not* limited to passive-matrix displays." Appx685 (capitalization altered); Appx1307. Indeed, BOE's reply quoted its argument from the petition before expanding on why Matthies contemplates active-matrix OLEDs. *See* Appx685-686 ("But [Matthies] *also* teaches 'active matrix' displays.") (quoting Appx332). BOE's "legal ground did not change in its reply," and its "reply relie[d] on … the same prior art reference to support the same legal argument"—the motivation to resize Matthies's pixels. *Andrea Elecs.*, 949 F.3d at 706.

Finally, even if BOE's reply had raised any new substantive point, Samsung was provided a sur-reply in which it could, and did, respond. *See* Appx728-731; Appx1349-1351. That opportunity to respond to BOE in a sur-reply cured any arguable problem. *See, e.g.*, *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1023 (Fed. Cir. 2017).

#### 2. The Board erred in its narrow understanding of the useful lifetime of Matthies's display.

The Board rejected BOE's proposed combination of Matthies and Yamada for a second reason: "[a]lthough the purported rationale for Petitioner's proposed combination is to *increase* the lifetime of Matthies'

display," the "proposed modifications would have had the opposite effect, *shortening* its lifetime." Appx38; *see* Appx205. BOE had shown why the Board was wrong. But the Board refused to engage with this demonstration solely because, in its view, BOE provided the explanation for the first time on reply.

Far from "present[ing] an impermissible new argument," Appx40-41, Appx205, BOE's reply properly expanded on the argument made in its petitions and directly responded to a counterargument in Samsung's response. This Court has repeatedly held that a petitioner may use its reply to elaborate on arguments made in the petition and may even introduce new evidence—such as BOE's reply expert declaration here—that responds to a patent owner's attacks on the petition's theory. *See, e.g.*, *Andrea Elecs.*, 949 F.3d at 706-07; *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380-82 (Fed. Cir. 2018). That is what BOE did here, and the Board's refusal to consider BOE's reply material was an abuse of discretion.

From the start, BOE has contended that the useful life of a display must account for how pixels age relative to each other. In the "Motivation to Combine" section of its petitions, BOE specifically relied

on Yamada's teachings regarding the different emissive efficiencies of different colored pixels. Appx358-360; Appx1004-1005; *see also* Appx3006-3015 (discussing motivation to combine Matthies and Yamada); Appx6483-6492 (same). If the pixels are all the same size, the ones made from less-efficient material (like the blue pixels) must be supplied with more current than the ones made from more-efficient material (like the green pixels). Appx358-359; Appx1004-1005; Appx3169 2:55-67; Appx3006-3007. As Yamada explains, this excess stress on the blue pixels decreases their lifespan and can negatively affect the overall life of the display. Appx3169-3170 2:60-67, 3:1-6, 3:38-43, 3:51-57. The one-size-fits-all approach also makes it more difficult to maintain color or "white balance" in the display, because some pixels will deteriorate faster than others. Appx3170 3:1-8; Appx3174 11:48-55.

Yamada's solution is to resize OLED pixels in accordance with emission efficiency: with a larger blue pixel and a smaller green pixel, for example, one can apply similar currents to both and still achieve balanced luminance while avoiding undue deterioration. Appx3172 7:3-12, 8:19-28. As an added benefit, overall display design is simplified. Appx3170 4:57-5:8. BOE's petitions and its opening expert declarations

explained all this as well, and detailed how "[t]his would have provided a POSITA with a strong motivation to apply Yamada to Matthies." Appx359; *see also* Appx358-364; Appx1004-1010; Appx3006-3015. The petitions also showed how Yamada's design was "referenced repeatedly in the prior art," such that a skilled artisan would have been well aware of it. Appx362; *see* Appx3304 4:31-36, 4:41-44; Appx3964 1:50-56.

In its patent owner response, Samsung disagreed with BOE's argument and contended that "Petitioner's proposed combination would *reduce* the lifetime of Matthies'[s] display overall." Appx577. Because BOE proposed to resize Matthies's pixels by shrinking the more-efficient green and red pixels, Samsung and its expert claimed that the lifetime of these pixels and thus somehow the overall display would be reduced. Appx576-577; Appx1202-1203; Appx3785-3788.

On reply, BOE and its expert explained why Samsung's objection was misplaced. In particular, Samsung failed to account for the fact that a display's lifetime is improved when all the pixels "age at approximately the same rate *relative to each other*," which makes it easier to maintain "color or 'white balance.'" Appx689 (quoting

Appx3174 11:48-55); *see* Appx3332-3335.[5] BOE had made that exact point in its petitions, explaining how applying Yamada to Matthies "would allow each pixel to be supplied with a similar current increasing the display's life," Appx360, and quoting from Yamada's discussion linking differential pixel aging to problems with color balance, Appx358 (quoting Appx3170 3:1-6). The additional prior-art references cited in BOE's petitions had likewise identified the importance of all pixels aging at the same rate. *See* Appx362 (citing Appx3303 1:63-67; Appx3234 [0062]); *see also* Appx689-690 (citing Appx3304 4:32-45; Appx3964 1:50-2:4).

Yet the Board declined to consider BOE's reply argument and evidence, insisting that BOE's petitions had focused only on "mak[ing] the blue pixels larger." Appx40-41. That is simply not correct. BOE's petitions clearly identified the relative lifespan of the pixels as the important point of Yamada, and at most BOE elaborated on this point

---

[5] BOE's expert also explained why any reduction in the life of green pixels from making them smaller would be irrelevant. Because they are made from a material that is "many times more efficient and longer lived than that employed to form blue pixels," the resizing contemplated by the Matthies-Yamada combination would shorten the lives of the green pixels, but they *still* would not fail before the much-less-efficient blue pixels. Appx3334-3335; Appx6613-6614.

on reply. A party is "not barred from elaborating on [its] arguments on issues previously raised." *Chamberlain Grp., Inc. v. One World Techs., Inc.*, 944 F.3d 919, 925 (Fed. Cir. 2019); *see also Andrea Elecs.*, 949 F.3d at 705-07. Indeed, this elaboration is particularly important and permissible when it rebuts arguments raised by the other party, as BOE did here. *See, e.g.*, *Provisur Techs., Inc. v. Weber*, *Inc.*, 50 F.4th 117, 122 (Fed. Cir. 2022) (finding petitioner's reply proper when it was "directly responsive" to the patent owner's arguments). It was an abuse of discretion for the Board to refuse to consider this argument. *See Ericsson*, 901 F.3d at 1380-81.

Finally, as above, even assuming that BOE's response to Samsung's arguments raised any new substantive point, Samsung was provided a sur-reply in which it did, in fact, respond to BOE's argument. *See* Appx731-733; Appx1351-1354. Samsung's opportunity to respond should have obviated the Board's concern. *See Skky*, 859 F.3d at 1023.

### B. The Board erred in rejecting a motivation to combine Murai and Yamada.

Beyond its Matthies-Yamada combination, BOE also relied on a combination of Murai and Yamada as a separate basis for its

obviousness showing. In rejecting this ground, the Board relied in part on its discussion of reduced display lifetime from the Matthies-Yamada ground, which was flawed as discussed above in Part II.A.2. *See* Appx108-109; Appx213. The Board also gave two further reasons for why a skilled artisan supposedly would not have combined Murai and Yamada to meet the pixel-size limitations in the independent claims of the '803 and '683 patents: (1) downsizing Murai's pixels is incompatible with its goal of improving the display's overall aperture ratio, *see* Appx103-108, Appx211-213; and (2) Murai's cutouts would not be useful for OLEDs, *see* Appx109-110, Appx212.

Neither rationale can support the Board's decision. First, the Board legally erred in demanding a showing that the combination would produce only advantages (and no disadvantages). Second, the Board's decision was not supported by substantial evidence because Murai explicitly contemplates using cutouts in OLEDs.

#### 1. The Board erred in demanding a showing that the combination would produce only advantages.

The Board concluded that downsizing Murai's pixels based on Yamada's teachings is incompatible with Murai's goal of improving the display's overall aperture ratio. According to the Board, "Murai conveys

that it does not want to cut off too much of the dots/pixels, which would further reduce the aperture ratio." Appx104; Appx212-213.

The Board recognized that there were two competing benefits here: On the one hand, Murai's goal was to "improve[]" the "aperture ratio" (that is, the light-emitting area as compared to total display area) by packing pixels close together. Appx3145 [0010]; Appx3150 [0042]. On the other hand, resizing pixels according to Yamada lengthens the life of the display. *See* Appx399-400; Appx1044-1045. The Board, however, faulted BOE for "not attempt[ing] to balance, or otherwise take into account, the loss of aperture ratio when resizing Murai's pixels according to Yamada's teachings." Appx105; Appx213. That was error.

To start, BOE did, in fact, discuss why the benefits of combining Murai and Yamada outweighed any disadvantages from reducing the aperture ratio. BOE noted that "aperture ratio is not the be-all and end-all of display design. It is simply one factor a POSITA would have considered." Appx692 (citing examples of prior art recognizing, for example, the "tradeoff between aperture ratio/manufacturability"); *see* Appx1314. Other relevant factors would include the "improved color,"

"simpler" design, and "improved life" of a display that combined Yamada's insights with Murai's "pixel layout and notches." Appx399-401; *see* Appx1046. So the Board was simply wrong when it said this explanation was missing from the record. Appx107; Appx213. The Board's decision was therefore not supported by substantial evidence. *See Robinson v. Dep't of Veterans Affs.*, 923 F.3d 1004, 1013 (Fed. Cir. 2019) ("When considering the substantiality of the evidence, contradictory evidence in the record that may detract from its weight must also be considered.") (citation omitted). And because its explanation ran "counter to the evidence," its decision was also arbitrary and capricious. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

Beyond this factual error, the Board legally erred in demanding a showing that the combination would produce only advantages (and no disadvantages). This Court has made clear that it is not necessary to show that a particular combination is "the *best* option, only that it be a *suitable* option." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197-98 (Fed. Cir. 2014); *see also, e.g.*, *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir.

2006). The Board legally erred in holding that reduced aperture alone defeated a showing of obviousness—particularly where the only evidence of this supposed disadvantage that the Board engaged with was Samsung's conclusory expert testimony. *See* Appx104; Appx106; Appx212. Samsung's expert testified, with no citation or explanation, that Murai's disclosures "are incompatible with Yamada's teachings" because it would reduce the aperture ratio "and do so for no benefit." Appx104 (quoting Appx3878-3879). But "[c]onclusory expert testimony does not qualify as substantial evidence." *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1354 n.6 (Fed. Cir. 2025).

It was "enough for [BOE] to show that there was a known problem … in the art, that [Yamada] helped address that issue, and that combining the teachings of [Yamada] and [Murai] wasn't beyond the skill of an ordinary artisan. Nothing more is required to show a motivation to combine under *KSR*." *Intel*, 61 F.4th at 1381.

#### 2. The Board erred in finding that Murai's cutouts were not useful for OLEDs.

The Board next concluded that a skilled artisan "would not have viewed Murai's cut-outs as necessary" "[i]n an OLED display." Appx109 (quoting Appx616); *see* Appx212. Murai's cutouts were intended to

facilitate fitting more pixels onto a screen while increasing the overall aperture ratio. Appx3145 [0010]; Appx3150 [0042]. But for OLED displays, the Board reasoned, "different-colored pixels must be spaced farther apart due to manufacturing requirements," so a skilled artisan would not have viewed Murai's cut-outs as useful. Appx109 (quoting Appx616); *see* Appx212. That was error twice over.

First, the Board's conclusion cannot be correct when Murai itself specifically mentions applying its technique to OLED displays. *See* Appx3152 [0058] ("The color image display device according to the present invention can be applied to … organic EL display devices."). A statement that defies the prior art's plain disclosure cannot support a finding of patentability even under the deferential substantial-evidence standard. *Cf. Ericsson*, 890 F.3d at 1346 (holding that even expert testimony cannot be substantial evidence when it "contradict[s] a reference").

Second, the Board impermissibly required BOE to show that the Murai-Yamada combination would provide one *specific* advantage, even though petitioners offered multiple advantages. The Board observed that "OLED displays are spaced farther apart than the LCD displays

that Murai primarily addresses," and on that basis reasoned that corner cutouts would not be necessary to improve aperture ratio. Appx110; *see* Appx212. But even if the Board's theory were correct, BOE provided evidence of other benefits that would flow from the combination—including "improved color" and that "the display would be simpler and have improved life," Appx399-401—and there was no dispute that these benefits would apply to all displays, including OLEDs. The Board erred in its myopic focus on one particular benefit of Murai's cutouts while ignoring other benefits from the combination. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800-01 (Fed. Cir. 2021) (the "primary purposes of prior-art references" do not control what those references disclose, because "[c]ommon sense teaches … that familiar items may have obvious uses beyond their primary purpose") (quoting *KSR*, 550 U.S. at 420). Thus, even assuming that BOE did not demonstrate why Murai's cut-outs were necessary to increase the density of pixels in an OLED screen, the Board's finding of no motivation to combine was flawed.

## CONCLUSION

The Court should vacate and remand the Board's determinations

as to claim 5 of the ’803 patent, claim 2 of the ’683 patent, and all challenged claims of the ’578 patent.

July 21, 2025

Respectfully submitted,

*/s/ Melanie L. Bostwick*


Melanie L. Bostwick
Jonas Q. Wang
Harmann P. Singh
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

Richard Martinelli
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

Travis Jensen
Bas de Blank
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
Number 1 Jianguomenwai Avenue
5701 China World Tower A
Beijing, Beijing 100004
People’s Republic of China

*Counsel for Appellants*

**ADDENDUM**


Final Written Decision, IPR2023-00987
Paper No. 46, filed January 6, 2025 ........ Appx1

Final Written Decision, IPR2023-00988
Paper No. 44, filed January 6, 2025 ........ Appx125

Final Written Decision, IPR2023-01075
Paper No. 46, filed January 6, 2025 ........ Appx228

U.S. Patent No. 9,818,803 ........ Appx262

U.S. Patent No. 10,854,683 ........ Appx274

U.S. Patent No. 11,594,578 ........ Appx287

Trials@uspto.gov
571-272-7822

Paper 46
Date: January 6, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD., TIANMA MICROELECTRONICS CO. LTD., and VISIONOX TECHNOLOGY, INC.,
Petitioner,

v.

SAMSUNG DISPLAY CO., LTD.
Patent Owner.

---

IPR2023-00987
Patent 9,818,803 B2

---

Before JAMESON LEE, TERRENCE W. McMILLIN, and JOHN A. HUDALLA, *Administrative Patent Judges.*

LEE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Granting-in-Part Petitioner's First Motion to Strike
Dismissing Petitioner's Second Motion to Strike
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. §§ 42.5(a), 42.64(c)*

## I. INTRODUCTION

We instituted an *inter partes* review of claims 1–5 and 19–21 ("challenged claims") of U.S. Patent No. 9,818,803 B2 (Ex. 1001, "the '803 patent") owned by Samsung Display Co., Ltd. ("Patent Owner"). Paper 10 ("Decision to Institute"). We have authority to conduct this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. We determine that Mianyang Boe Optoelectronics Technology Co., Ltd., Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd., Tianma Microelectornics Co., Ltd., and Visionox Technology, Inc. (collectively, "Petitioner") have proved by a preponderance of the evidence that claims 1–4 and 19–21 of the '803 patent are unpatentable, but have not proved by a preponderance of the evidence that claim 5 of the '803 patent is unpatentable.

### *A. Background*

Petitioner filed a Petition requesting an *inter partes* review of the challenged claims pursuant to 35 U.S.C. §§ 311–319. Paper 1 ("Pet."). Patent Owner filed a Preliminary Response. Paper 9. The Decision to Institute was entered on January 8, 2024. Paper 10. Thereafter, Patent Owner filed a Response (Paper 19, "PO Resp."), Petitioner filed a reply (Paper 29, "Reply"), and Patent Owner filed a sur-reply (Paper 31, "Sur-reply").

A consolidated oral hearing was held on October 9, 2024, for this proceeding and related proceedings IPR2023-00988 and IPR2023-01075. The hearing transcript has been entered as Paper 44 ("Tr.").

Petitioner filed a Motion to Exclude Evidence. Paper 39 ("Exclude Mot."). Patent Owner filed an opposition to Petitioner's Motion to Exclude

Evidence. Paper 40 ("Exclude Opp."). Petitioner filed a reply to Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence. Paper 41.

Additionally, Petitioner filed a First Motion to Strike (Paper 24, "1st Strike Mot.") to which Patent Owner filed an opposition (Paper 25, "1st Strike Opp.") to which Petitioner filed a reply (Paper 26, "1st Strike Reply"). Petitioner also filed a Second Motion to Strike (Paper 33, "2nd Strike Mot.") to which Patent Owner filed an opposition (Paper 37) to which Petitioner filed a reply (Paper 38).

*B. Real Parties-in-Interest*

Petitioner identifies Mianyang BOE Optoelectronics Technology Co., Ltd., Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd., Tianma Microelectronics Co. Ltd., Visionox Technology, Inc., and their subsidiaries as the real parties-in-interest. Pet. 3. Patent Owner identifies Samsung Display Co., Ltd., as the real party-in-interest. Paper 7, 2.

*C. Related Matters*

The parties identify the following two proceedings as related to the '803 patent (Pet. 3; Paper 7, 2):

1. *Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For Mobile Devices, And Components Thereof*, Inv. No. 337-TA-1351 (USITC);[1] and

[1] The Initial Determination of the U.S. International Trade Commission ("ITC ID") was entered in this investigation on November 15, 2024. Ex. 2088. With regard to validity of the '803 patent, the Administrative Law Judge determined that no asserted claim of the '803 patent in that proceeding, i.e., claims 5 and 21, was shown to be invalid. *Id.* at 61–66.

2. *Samsung Display Co., Ltd. v. BOE Technology Co., Ltd.*, Case No. 2-23-cv-00309 (E.D. Tex.).

*Inter partes* review proceedings IPR2023-00988 and IPR2023-01075 involve patents issuing from applications that claim priority to the application which issued as the ’803 patent.

*D. The ’803 Patent (Ex. 1001)* [2]

The ’803 patent is directed to “a pixel arrangement structure of an organic light emitting diode (OLED) display.” Ex. 1001, 1:18–19. The ’803 patent indicates that “[a]n organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM).” *Id.* at 1:38–40. The ’803 patent notes, however, that “[w]hen reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated,” but “[o]n the other hand, when increasing the gap between the pixels to improve the deposition reliability, the aperture ratio of the pixel may be deteriorated.” *Id.* at 1:40–45. The ’803 patent also indicates that pixels of certain colors may have different lifespans from other pixels, and that the pixel arrangement structure of the OLED display may provide improved life span of the pixels. *Id.* at 7:25–32.

The ’803 patent states that a “pixel refers to a minimum unit for displaying an image (for example, the minimum addressable unit of the display).” Ex. 1001, 3:55–57. The ’803 patent also states that an exemplary embodiment “provides a pixel arrangement structure for an OLED display

[2] The ’803 patent issued from Application No. 13/614,197, filed September 12, 2013, and claims priority to KR 10-2012-0022967, filed March 6, 2012. Ex. 1001, codes (21), (22), (30).

having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels." *Id.* at 1:59–62.

Figure 1 of the '803 patent is reproduced below.

FIG.1




Figure 1 is "a view of a pixel arrangement structure of an OLED display." Ex. 1001, 2:66–67. "[T]he pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300." *Id*. at 3:52–55. First pixels 100 emit green light, second pixels 200 emit blue light, and third pixels 300 emit red light. *Id.* at 4:11–12, 4:30–31; 4:43–44.

According to the '803 patent, "each of the first pixels 100 has a smaller area than neighboring second pixels 200 and third pixels 300, and has a quadrilateral (i.e., four-sided) shape." Ex. 1001, 4:4–7. "The second pixels 200 are arranged diagonally with respect to the first pixels 100, such as at first vertices P1 along one diagonal of a virtual square VS having one

of the first pixels 100 as a center point (or center) of the virtual square VS." *Id.* at 4:14–18. "In a similar fashion, the third pixels 300 are arranged diagonally with respect to the first pixels 100, such as at second vertices P2 along the other diagonal of the virtual square VS." *Id.* at 4:18–21.

According to the '803 patent, "[e]ach of the third pixels 300 has a larger area than the neighboring first pixel 100 and the same area as each of the second pixels 200." Ex. 1001, 4:32–34. The '803 patent indicates that "by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved." *Id.* at 5:20–23.

The '803 patent further states:

> [T]he gap of the first length L1 is formed between adjacent pairs of the first pixels 100 and the second pixels 200, between adjacent pairs of the first pixels 100 and the third pixels 300, and between adjacent pairs of the second pixels 200 and the third pixels 300. In addition, the gap of the second length L2 that is longer than the first length L1 is formed between the neighboring ones of the first pixels 100. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

Ex. 1001, 5:9–19.

Figure 2 of the '803 patent is reproduced below.

FIG.2




Figure 2 is "a view of a pixel arrangement structure of an OLED display." Ex. 1001, 3:1–3. In Figure 2, "[t]he plurality of first pixels 100 have the same quadrilateral shape (e.g., a parallelogram)" and "the second pixels 200 have a larger area than the third pixels 300." *Id.* at 5:67–6:2. According to the '803 patent, because "the second pixels 200 that emit blue have the shortest life span," "the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display." *Id.* at 6:44–49.

Figure 5 of the ’803 patent is reproduced below.

FIG.5




Figure 5 is “a view of a pixel arrangement structure of an OLED display.” Ex. 1001, 3:9–10. According to the ’803 patent, “the neighboring first pixels 100 have a[n] octagonal shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300.” *Id.* at 8:31–34. The ’803 patent states that “[t]his results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.” *Id.* at 8:34–38.

Claim 1 is independent and claims 2–5 and 19–21 each depend, directly or indirectly, from claim 1. Claim 1 is reproduced below:

> 1. [1-pre] A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:
>
> [1-a] a plurality of pixels for displaying an image on the OLED display and comprising:
>
> [1-a(1)] a first pixel having a center coinciding with a center of a virtual square;
>
> [1-a(2)] a second pixel separated from the first

pixel and having a center at a first vertex of the virtual square;

[1-a(3)] another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels; and

[1-a(4)] a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square,

[1-b] wherein the second pixel has a larger area than that of the third pixel, and

[1-c] wherein the first pixel is configured to emit green light.

Ex. 1001, 8:58–9:9.[3]

### *E. Evidence relied on by Petitioner and Declarations*

Petitioner relies on the following references:

U.S. Patent No. 6,897,855 B1, filed Feb. 16, 1999, issued May 24, 2005 (Ex. 1004, "Matthies");

U.S. Patent No. 7,091,986 B2, filed Dec. 5, 2003, issued Aug. 15, 2006 (Ex. 1005, "Phan");

Japanese Patent No. 4496852 B2, filed June 10, 2004, issued July 7, 2010 (Exs. 1006, 1007, "Murai");[4] and

U.S. Patent No. 6,366,025 B1, filed Feb. 24, 2000, issued Apr. 2, 2002 (Ex. 1008, "Yamada").

---

[3] The bracketed labels correspond to those used by Petitioner to reference the claim elements. Pet. 20–34, 46–54, 65–74. We use the same labels here for ease of reference, understanding, and consistency.

[4] Murai is a Japanese-language publication (Ex. 1006) that was filed with an English translation (Ex. 1007, 1–15). Our citations to Murai refer to the English translation.

Petitioner relies on the Declaration of P. Morgan Pattison, Ph.D. Ex. 1003. Patent Owner relies on the Declarations of Ioannis Kymissis, Ph.D. (Ex. 2009), Aris K. Silzars, Ph.D. (Ex. 2061), and Adam Fontecchio, Ph.D. (Ex. 2063).

### *F. Asserted Grounds of Unpatentability*

Petitioner asserts that the challenged claims of the ’803 patent are unpatentable based on the following grounds (Pet. 5):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–5, 19–21 | 103(a)[5] | Matthies, Yamada |
| 1–4, 19–21 | 103(a) | Phan |
| 5 | 103(a) | Phan, Yamada |
| 1–5, 19–21 | 103(a) | Murai, Yamada |

## II. ANALYSIS

### *A. Burden of Proof*

The Petitioner has the burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). That burden never shifts to Patent Owner except in limited circumstances not present here. *In re Magnum Oil Tools Int’l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016). “Preponderance of the evidence means the greater weight of evidence, evidence which is, more convincing than the evidence which is offered in

[5] The Leahy-Smith America Invents Act (“AIA”), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103. Because the ’803 patent claims priority to an application filed before March 16, 2013 (the effective date of the relevant amendments), the pre-AIA versions of §§ 102 and 103 apply.

opposition to it." *United States v. C.H. Robinson Co.*, 760 F.3d 1376, 1383 (Fed. Cir. 2014) (internal quotations omitted).

### *B. Level of Ordinary Skill in the Art*

Citing testimony from Dr. Pattison, Petitioner contends a person of ordinary skill in the art "would have had a degree in electrical engineering, materials science, physics, or a similar discipline, along with 2 years of professional experience working with display design, including OLED displays, or an equivalent level of skill, knowledge, and experience." Pet. 12 (citing Ex. 1003 ¶¶ 37–40). Petitioner further notes that such a person of ordinary skill in the art "would have been aware of and generally knowledgeable about OLED materials, and display pixel design, layout, and operation." *Id.* (citing Ex. 1003 ¶ 40). We adopted Petitioner's definition in the Decision to Institute. Paper 10, 11.

Patent Owner proposes that

> consistent with the finding in the related ITC Investigation for the related '578 patent, that a person of ordinary skill in the art ("POSITA") would have had a relevant technical degree in Electrical Engineering, Computer Engineering, Material Science, Physics, or the like, and experience in electroluminescence and the design of active-matrix displays or pixel arrangements for such displays.

PO Resp. 4–5 (citing Ex. 2009 ¶ 64; Ex. 2001, 15). Patent Owner describes its proposal as containing "slightly different language" than Petitioner's definition and does not explain why we should adopt its proposal over Petitioner's articulation. *Id.* Notwithstanding, Patent Owner contends that "Petitioner fails to establish unpatentability under either [party's] definition." *Id.*

For purposes of this Decision, we again adopt Petitioner's definition of the level of ordinary skill in the art. It is supported by the testimony of Dr. Pattison, and appears consistent with what is reflected by the content of the applied prior art references. *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).

We find Patent Owner's articulation of the level of ordinary skill to be imprecise, because Patent Owner does not specify the amount of experience possessed by an ordinarily skilled artisan. The unbounded reference to "experience" is vague and overly broad, as it could mean 1 year of experience or over 30 years of experience, for example. In addition, the '803 patent is directed to "a pixel arrangement structure of an (OLED) [organic light emitting diode] display" (Ex. 1001, 1:54–56), whereas Patent Owner's proposed experience is tied to "active-matrix displays." PO Resp. 5. Given that the field of OLED displays includes both passive and active matrix designs (*see generally* Ex. 2009 ¶¶ 40–56), we see no reason to restrict the relevant experience to active matrix displays. For these reasons, we do not adopt Patent Owner's definition of the level of ordinary skill in the art.

### *C. Claim Construction*

We use the same claim construction standard that would be used to construe a claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b)

(2022). The claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) is applicable.

Claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

The specification may reveal a special definition given to a claim term by the patentee, or the specification or prosecution history may reveal an intentional disclaimer or disavowal of claim scope by the inventor. *Phillips*, 415 F.3d at 1316. If an inventor acts as his or her own lexicographer, the definition must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). The disavowal, if any, can be effectuated by language in the specification or the prosecution history. *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner states that "[f]or purposes of this petition . . . the terms of the '803 patent's claims do not require further construction and can be afforded their plain and ordinary meaning." Pet. 12. Patent Owner states that "[n]o specialized constructions are necessary in this proceeding." PO Resp. 4. We agree with the parties that it is not necessary to conduct express claim construction for any claim term.

### D. *Alleged Obviousness of Claims 1–5 and 19–21 over Matthies and Yamada*

#### 1. *The Law on Obviousness*

A claim is unpatentable if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103(a); *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations, including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). "[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d at 988.

"[W]here a party argues a skilled artisan would have been motivated to combine references, it must show the artisan 'would have had a reasonable expectation of success from doing so.'" *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1360–61 (Fed. Cir. 2017) (quoting *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012)).

*2. Overview of Matthies (Ex. 1004)*

Matthies is directed to "large-area display devices which are formed as an array of tiled display devices." Ex. 1004, 1:8–10. Matthies states that by "[b]uilding a large-area display out of smaller tiles has been recognized as a desirable solution," because "the basic unit of manufacture is relatively small," which "reduces manufacturing costs." *Id.* at 1:56–65. Matthies explains that "[n]o practical tiled display system has yet been developed" because "[w]hat has been missing is a fabrication technology that allows a display to be constructed so that pixels can be brought up to the very edge . . . while at the same time allowing for electronics to address each tile, even those tiles completely surrounded by other tiles." *Id.* at 1:66–2:7.

Figure 1 of Matthies is reproduced below.




FIG. 1

Figure 1 "is a front plan drawing of a large area display device from which two tiles have been removed." Ex. 1004, 3:49–50.

According to Matthies, "display 100 is a tiled display in which emissive or reflective elements, on which the image pixels are formed, are built as relatively small arrays on tiles 120 and assembled into a frame to produce the large-area display having a large number of pixel forming elements." *Id.* at 5:38–42. Matthies indicates that "[a]lthough the display 100 is shown as being formed from tiles having 16 pixel forming elements in a four by four array, it is contemplated that each tile may include many more pixels." *Id.* at 5:56–59.

Matthies states that in an exemplary embodiment, "the pixel forming elements are made from an organic light emitting diode (OLED) material." Ex. 1004, 6:17–19. According to Matthies, "[t]he active portion . . . of the pixels occupies only about 1/4 of the total pixel area." *Id.* at 15:67–16:1. Matthies indicates "that this spacing of the pixels leaves room along the edges of the display for the vias . . . to connect to the row and column electrodes of the pixel without interfering with the regular spacing of the pixels across tile boundaries." *Id.* at 16:5–9.

Figure 7 of Matthies is reproduced below.




FIG. 7

Figure 7 "is a pixel diagram which shows an exemplary pixel layout for portions of four tiles." Ex. 1004, 4:6–7. "In the layout shown in FIG. 7, the active portions 526 of the pixels are centered in their respective pixel regions and the vias which connect the row and column electrodes of the display to the electronics are formed between respective pixel elements." *Id.* at 16:22–26. "The distance between the edge of an active region 526 and the edge 712 of the display is equal on all sides of the tile." *Id.* at 16:26–28.

With respect to the general illustration in Figure 1, Matthies describes:

> The tiles are constructed with pixel forming elements evenly spaced up to the edges of the tiles. As described below with reference to FIGS. 15 through 19, the tiles are formed such that, when they are joined, the inter-pixel distance between the edge pixels of two adjacent tiles is the same as the inter-pixel distance of adjacent pixels in the interior of a tile.

Ex. 1004, 5:47–53. Similarly, Matthies again states: "The edges of the tiles are desirably carefully formed to ensure that the tiles display has no visible seams between the tiles. One criterion for the tiles is that the spacing between the pixels separated by the tile seam is the same as the spacing of pixels on the tile." *Id.* at 8:37–41.

Figure 8B of Matthies is reproduced below.




**FIG. 8B**

Figure 8B is "a front-plan view of an alternative single color pixel structure which includes separate sub-pixels." Ex. 1004, 4:12–13. According to

Matthies, Figure 8B illustrates a "color pixel structure" that "includes four sub-pixel elements, 830, 832, 834 and 836." *Id.* at 16:62–64. "Two of these sub-pixel elements, 830 and 836 emit green light when stimulated while the other two pixel elements, 832 and 834 emit red and blue light, respectively." *Id.* at 16:64–66. Matthies indicates that "[t]his structure is known as a quad sub-pixel structure." *Id.* at 16:67. According to Matthies, "[t]he geometry of the quad sub-pixel structure is defined by the dimensions $d_{SH}$, the height of the sub-pixel, $d_{SW}$, the width of the sub-pixel, $d_e$, the distance from the active sub-pixel areas to the edge of the pixel area, and $d_{SI}$, the distance between adjacent sub-pixels." *Id.* at 17:16–20. Matthies further provides a table of exemplary dimensions for $d_{SH}$, $d_{SW}$, $d_e$, and $d_{SI}$. *Id.* at 17:24–29 (Table 2).

Matthies further describes:

> The basic light emitting structure consists of a thin organic polymer layer sandwitched between a pair of appropriately selected and patterned electrodes. Current flowing form one electrode to the other electrode causes the organic polymer to emit light. At least one of the electrodes is desirably transparent to the emitted light. Indium tin-oxide is the usual material used for this purpose. OLED materials provide high brightness and high efficiency, and are relatively low cost materials.
>
> An exemplary display structure according to the present invention is formed in two parts: a display section and an electronics section. These two parts are made separately and then joined to form a complete tile. The display section consists of a transparent glass layer on which are transparent column electrodes are disposed. The OLED material is deposited onto these layers, as the active (i.e., light emitting) medium. Row electrodes are deposited as the final display layer.

Ex. 1004, 6:19–36.

Matthies teaches that a "tile may also include circuitry which automatically adjusts the pixel brightness to compensate for aging of the display material," such as a "small light sensor over one or more pixel positions which continually monitors the brightness of that pixel and adjusts the current level applied to that pixel—and the current levels applied to all of the other pixels on the display—to compensate for variations in pixel brightness due to aging of the display." Ex. 1004, 11:47–58. Matthies also teaches "that the decay in the brightness of an OLED pixel that occurs with aging can be predicted" by, for example, "measuring the current and time for a particular pixel, and integrating the product of current and time" or by "monitor[ing] the voltage that is applied to the pixel." *Id.* at 11:61–12:16. Matthies indicates that the "methods for adjusting the current applied to a pixel in order to maintain a predetermined brightness level may be combined with any other method either as a check or to augment the performance of the other method." *Id.* at 12:41–46.

*3. Overview of Yamada (Ex. 1008)*

Yamada relates to an "electroluminescence (EL) display apparatus." Ex. 1008, 1:6–7. Yamada discusses an "EL display apparatus" including "emissive regions 1B [blue], 1R [red], and 1G [green] for the display pixel of the respective color . . . arranged in a matrix configuration." *Id.* at 2:55–60. Yamada indicates that "the emission efficiency of the emissive layer for emitting light of various colors differs with each color." *Id.* at 2:53–54. According to Yamada, when the pixels "all have identical emissive areas in size," "in order to obtain the same luminance at the display pixels having a low emission efficiency, a current larger than that supplied to the other display pixels having a high emission efficiency must be supplied." *Id.* at 2:55–64. Yamada teaches that "[t]his causes the life of those display

pixels having a low emission efficiency, in particular, to shorten, and also possibly causes the life of the EL display apparatus to shorten." *Id.* at 2:64–67.

Yamada purports to improve upon these aspects of EL displays by way of "a color display device, in which a display pixel having an emissive element is provided for every color, wherein the emissive area of the display pixel of any one color, among the display pixels of various colors, is different in size from the emissive area of the display pixel of another color." Ex. 1008, 3:17–22. According to Yamada,

> [b]y setting the emissive area of the display pixel, namely, the emissive area of the emissive element, in accordance with the emission efficiency of the emissive element as in the foregoing, and by supplying, for example, the same power to the emissive elements of colors having different emission efficiencies, it becomes possible to have the same emission luminance at the various display pixels.

*Id.* at 3:65–4:5. Therefore, Yamada states "it is possible to prevent the deterioration from accelerating when a load is selectively placed on the emissive element having low emission efficiency and extend the life of the display device." *Id.* at 4:11–14.

Figure 4 of Yamada is reproduced below.




Fig. 4

Figure 4 is a "conceptual diagram showing emissive region areas of the EL display apparatus." Ex. 1008, 6:24–25. According to Yamada, Figure 4 "is a top plan view of an EL display apparatus 100" representing "a case where the respective display pixels emit red (R), green (G), and blue (B) light." *Id.* at 6:49–52. "[I]n the case of FIG. 4, the emissive area of the green display pixel 1G is provided as the smallest," while "[e]missive regions 1R and 1B of the other colors are formed with a larger area than that of emissive region 1G." *Id.* at 7:6–10. Yamada indicates that while in Figure 4 the "[a]rea of green emissive region 1G<area of red emissive region 1R<area of blue emissive region 1B," "the order in size of the emission region areas is not fixed at the above-mentioned green<red<blue, but is determined by the emission efficiency of the emissive materials that are used." *Id.* at 7:10–19.

*4. Independent Claim 1*

We find below that Petitioner has not set forth a persuasive rationale for combining Matthies and Yamada. We first discuss Petitioner's contentions for the preamble of claim 1 and limitations [1-a], [1-a(1)], [1-a(2)], [1-a(3)], [1-a(4)], and [1-c] of claim 1. Thereafter, we explain why Petitioner has not set forth a persuasive rationale to combine the teachings of Matthies and Yamada to meet limitation [1-b].

*a) Preamble [1-pre]*

The preamble of claim 1 recites "[a] pixel arrangement structure of an organic light emitting diode (OLED) display." Ex. 1001, 8:58–59. Petitioner asserts: "Matthies discloses a tiled 'electronic display device.'" Pet. 20 (citing Ex. 1004, 1:8–10.) The Petitioner also asserts: "The display can be an 'OLED . . . display' that includes OLED 'pixel forming elements.'" *Id.* (citing Ex. 1004, 5:29–30, 6:18–22, 16:40–43) (alteration in original). Patent Owner does not argue otherwise.

*b) Limitations [1-a], [1-a(1)], [1-a(2)], [1-a(3)], [1-a(4)], and [1-c]*

Limitation [1-a] recites "a plurality of pixels for displaying an image on the OLED display." Ex. 1001, 8:60–61. Petitioner explains:

> Matthies relates to an "OLED . . . display device." (Ex. 1004, 3:6–7, 5:29–30, 6:18–22, 16:40–43.) This device is formed as a "tiled display" that includes a multitude of "picture element[s]" or "pixels." (Ex. 1004, Abstract; *see also id.*, 2:35–37.) In one embodiment, the display pixels can be formed from "red(R) . . ., green (G) . . . and blue (B) . . . sub-pixels," each of which is formed from an "OLED material[.]" (Ex. 1004, 16:40–44; 13:1–2.)
>
> The sub-pixels receive "image data for display." (*Id.*, 2:58–63.) Each sub-pixel can [be] "controlled by a single row and column electrode pair." (*Id.*, 16:38–41; *see also id.*, 9:10–13; Fig. 2.) There can be a large number of sub-pixels in each of the display's tiles (*i.e.*, from 16 to 896). (*Id.*, 5:54–61.)
>
> In the '803 patent, the "term pixel refers to a minimum unit for displaying images." (Ex. 1001, 1:31–32; 3:55–56.) Matthies includes such a "**plurality of pixels**" (its red, green, and blue OLED sub-pixels are its display's minimum unit). And, Matthies' sub-pixels together form an "**OLED display**" for "**displaying an image**." (Ex. 1003, ¶¶ 151–159.)

Pet. 21 (all alterations in original). Patent Owner does not present a contrary argument in this regard.

Petitioner then presents an expanded version of tile 124 in Figure 1 of Matthies, reproduced below with Petitioner's color annotations, to illustrate how limitations [1-a(1)], [1-(a)(2)], [1-a(3)], and [1-c] are met by Matthies:




In this illustration, Petitioner expands tile 124 in Figure 1 of Matthies, with color annotations of elements including "another first pixel," "second pixel at a first vertex," "first pixel at center of virtual square," and "virtual square" to show Matthies's disclosure of limitations [1-a(1)], [1-(a)(2)], [1-a(3)], and [1-c]. Pet. 25–29.

Specifically, the illustration shows a first pixel (green) having a center coinciding with the center of a virtual square (red sides), which is limitation [1-a(1)]. The illustration shows a second pixel (blue) separated from the first pixel and having a center at a first vertex of the virtual square, which is limitation [1-a(2)]. The illustration shows another first pixel (green) on a line defined by the center of the virtual square and the first vertex, where the first pixel, the second pixel, and the other first pixel are consecutive pixels on the line, which is limitation [1-a(3)]. Limitation [1-c] recites that the first pixel is configured to emit green light. As shown in the illustration, the first pixel is green. Patent Owner does not present a contrary argument with regard to these contentions of Petitioner.

Limitation [1-a(4)] recites: "a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square." Ex. 1001, 9:4–6.

Petitioner presents an expanded version of tile 124 in Figure 1 of Matthies, reproduced below with color annotations from Petitioner, with elements including "first pixel at center of virtual square," "second pixel at a first vertex," "third pixel at second vertex," and "virtual square" to show how limitation 1-a(4) is met by Matthies:




The illustration shows a third pixel (red) separated from the first pixel (green) and the second pixel (blue), and having a center at a second vertex neighboring the first vertex of the virtual square. Pet. 29–30. Patent Owner does not present a contrary argument with regard to these contentions of Petitioner.

*c) Limitation [1-b]*

Limitation [1-b] recites "wherein the second pixel has a larger area than that of the third pixel." Ex. 1001, 9:7–8. Petitioner relies on a combination of Matthies and Yamada for limitation [1-b]. Pet. 30–31.

*(1) Petitioner's Reasoning*

Petitioner explains:

> Matthies explains that it also "contemplates both larger and smaller pixel apertures." ([Ex. 1004,] 17:36–28.) Further, sub-pixel spacing can also be made "different" if needed. (*Id.*, 17:31–33; *see also id.*, 19:9–10 (referencing the use of "different pixel pitches").)
>
> Yamada provides an example of an array of red, green, and blue pixels that are differently sized and have different amounts of pixel-to-pixel spacing. Like Matthies, Yamada relates to an "electroluminescent display apparatus." (Ex. 1008, 1:6–10.) Also like Matthies, Yamada explains that such a display includes red, blue, and green "pixel[s] . . . arranged in a matrix configuration." (*Id.*, 2:55–60; *see also id.*, 6:44–7:2.) In such a display, the different colors' "emission layer[s]" have different "emission efficienc[ies]." (*Id.*, 2:53–54.) To account for this, Yamada re-sizes the pixels "in accordance with . . . emission efficiency." (*Id.*, 2:5–60, 3:16–27.) Yamada explains that in a typical OLED display, the "green pixel" has the highest efficiency and is thus made smallest, while the "blue pixel" has the lowest efficiency and is made largest. (*Id.*, 7:3–12, 8:19–28; 8:47–52; 10:52–55; 11:4–15; *see also* 3:38–44, 3:51–57.)

Pet. 30–31 (alterations in original).

Petitioner relies on Yamada's Figure 4 (Pet. 21), reproduced below:




**Fig. 4**

Figure 4 shows the emissive regions areas of the electroluminescent display apparatus according to an embodiment of Yamada. Ex. 1008, 6:24–26.

Yamada describes what is shown in Figure 4 as follows:

> As shown in FIG. 4, the display pixels for the various colors are arranged in a matrix configuration on the substrate. The emissive areas of the display pixels differ among 1R, 1B, and 1G. Specifically, in the case of FIG. 4, the emissive area of the green display pixel 1G is provided as the smallest. Emissive regions 1R and 1B of the other colors are formed with a larger area than that of emissive region 1G. More specifically in this case: Area of green emissive region 1G<area of red emissive region 1R<area of blue emissive region 1B.
>
> The order in size of the areas of the green, red, and blue emission regions 1G, 1R, and 1B is dependent on the emission efficiency of the emissive materials of the organic EL element 160. Therefore, the order in size of the emission region areas is not fixed at the above-mentioned green<red<blue, but is determined by the emission efficiency of the emissive materials that are used.

Ex. 1008, 7:3–18. Yamada also indicates that its teachings are applicable to an arrangement of the display pixels in a "delta layout" and a "diagonal layout" besides the "stripe layout" shown in Figure 4. *Id*. at 12:37–40.

Yamada further provides a specific example of an area ratio among pixels of different colors: "The ratio of emissive areas of the colors required to achieve a luminance of '1' among all the colors is set to 1/10:1/3.8:1/1.8=1:2.6:5.6." *Id*. at 11:8–10.

Petitioner further explains:

> Following these teachings, rather than making all the sub-pixels all the same size, a POSITA [person of ordinary skill in the art] would have understood that Matthies' sub-pixels should be re-sized in accordance with their emission efficiencies such that the "first pixels" (the green sub-pixels) are smallest, the "second pixels" (the blue sub-pixels) are largest, and the "third pixels" (the red sub-pixels) have an intermediate size. The same "quad sub-pixel structure" taught by Matthies would continue to be used (just with re-sized pixels). (*See* [Ex. 1003] ¶¶ 222–224).

Pet. 32.

As motivation to combine, Petitioner points to Yamada's teaching that it was a problem in prior art OLED devices that the red, green, and blue pixels all have the same size, because the different colored pixels have different emissive efficiencies. Pet. 39 (citing Ex. 1008, 2:55–63). Petitioner notes Yamada's disclosure that to achieve consistent pixel luminance with same-sized pixels, the pixels with lower emission efficiencies, such as blue pixels, must be supplied with a larger current than the pixels with higher emission efficiencies, such as green, and that that causes the pixels supplied with a larger current, such as blue pixels, to have a shorter life span. *Id.* (citing Ex. 1008, 2:55–66). Petitioner further notes Yamada's disclosure that when the size of pixels of different colors are the same, color balance is difficult to achieve and would require adjustments in the supplied current which causes deterioration of pixels supplied with the higher current. *Id.* (citing Ex. 1008, 3:1–6).

Petitioner explains:

> To address this problem, Yamada teaches that the pixels with lower emission efficiencies (blue) should be made larger than pixels with higher emission efficiencies (green). (*See* [Ex. 1008], 3:38–44, 3:51–57; 7:3–12, 8:19–28; 8:47–52; Figs. 4, 9.) Because the pixels have different sizes, luminance can be balanced while supplying each of the pixels with similar amounts of current or power. (*See id*., 3:65–4:9.) This avoids the deterioration problem experienced in prior art OLED displays with same-sized pixels and "extend[s] the life of the display devices." (*See id*., 4:5–14; *see also* 10:61–11:3.) As an added benefit, the overall display design becomes "simplified" and "extremely easy to control" as each pixel is supplied with "the same amount of power." (*Id*., 4:57–5:8; *see also id*., 5:41–49; Ex. 1003, ¶¶ 268–273.)

Pet. 39–40. Additionally, Petitioner asserts that one of ordinary skill in the art would have recognized that applying Yamada's re-sizing teachings to Matthies would have provided Matthies with greater design flexibility. *Id*. at 43. In that regard, Petitioner explains that reducing the size of the more luminant green and red pixels while leaving the size of the blue pixels the same would create additional space for Matthies's vias. *Id*. at 43–44 (citing Ex. 1003 ¶ 297).

Petitioner provides an illustration of a modified tile of Matthies, with pixels re-sized according to Yamada's formula of 1:2.6:5.6 for green to red to blue:




Pet. 33. The illustration shows Matthies' "quad sub-pixel structure" but with the sizes of the sub-pixels modified according to the formula given in Yamada for green to red to blue as 1:2.6:5.6. *Id*. at 32. Petitioner explains: "consistent with Matthies' teachings, it continues to be the case that no pixel occupies more than '1/4 of the total pixel area.'" *Id*. (citing Ex. 1004, 15:67–16:2, 13:11–14).

Petitioner then provides the following illustration of a modified Matthies pixel configuration according to the re-sizing teachings of Yamada, with color annotations to show satisfaction of all elements of claim 1, i.e., the claimed virtual square, the claimed first pixel at the center of the virtual square, the claimed another first pixel, the claimed second pixel at the first vertex of the virtual square, and the claimed third pixel at a second vertex of the virtual square, where the first pixel, the second pixel, and the other first pixel being consecutive pixels on a line defined by the center of the virtual square and the first vertex, *where the second pixel is larger than the third pixel*, and where the first pixel emits green light:




Pet. 33. In this illustration from the Petition, Petitioner has modified Matthies' pixel configuration according to the re-sizing teachings of Yamada. *Id.*

*(2) Discussion*

*(a) Matthies's Constraint on Sizing*

Patent Owner provides an annotated version of Matthies's Figure 8B, reproduced below.



PO Resp. 13. Figure 8B of Matthies illustrates a pixel structure including four separate sub-pixels, two green, one blue, and one red, and Patent Owner has colored row electrodes yellow and column electrodes orange with labels leading to them by red arrows. *Id.*; Ex. 1004, 4:12–13. Patent Owner explains:

> The light-emitting area in Matthies' PMOLED [passive matrix OLED] is defined by the overlap of Matthies' row and column electrodes. Thus, in Matthies' Figure 8B (. . . with annotations), all pixels in the same row (e.g., green pixel 830 and red pixel 832 in the top row) have the same height, and all pixels in the same column (e.g., green pixel 830 and blue pixel 834 in the left column) have the same width . . . .
>
> A POSITA would have recognized that, unlike in Yamada, changing the size of a pixel in Matthies' Figure 8B would entail changing the size of its row and/or column electrode, which would both (1) change the size of all the other pixels defined by that row and/or column electrode and (2) have electrical effects that could diminish display performance.

PO Resp. 13–14 (citing Ex. 1004, 17:10–20, Fig. 8B; Ex. 2009 ¶¶ 121–128).

Patent Owner further explains: "Matthies' geometric requirements flow from its PMOLED design, as each pixel is defined by the overlap of column and row electrodes, and two different color pixels are found on each row (and column) electrode." PO Resp. 26. Patent Owner asserts that Petitioner ignores that its proposed re-sizing is incompatible with Matthies. *Id.* at 28–29. For example, Patent Owner notes:

> Blue pixel 834 and green pixel 836 have the same height as the row electrode, and blue pixel 834 and green pixel 830 have the same width as the column electrode. To make the green pixel smaller would entail making one or both electrode narrower, which would make the blue pixel correspondingly smaller (and would also have electrical and other effects).

*Id.* at 29 (citing Ex. 2009 ¶ 193).

We agree with Patent Owner's assertions. Petitioner has not adequately explained how Matthies's sub-pixels may be made larger or smaller, individually, to implement Yamada's pixel sizing in order of emission efficiency, i.e., the most efficient green pixels being the smallest, with the moderately efficient red pixels being larger and the least efficient blue pixels being the largest.

Petitioner responds by asserting that "Matthies repeatedly explains that the pixels making up its display can have different sizes and shapes. (*E.g.*, Matthies, 17:36-37 (referencing 'larger and smaller pixel apertures'); 18:63-64 ('[o]ther tile configurations are contemplated'); 19:8-12 ('different pixel pitches' can be employed).)" Reply 11 (alteration in original). None of the referenced text, however, conveys that within each individual tile the various colored pixels optionally may have different sizes. Nor does Dr. Pattison testify about how an ordinarily skilled artisan would have resized Matthies's pixels based on the referenced text to achieve Petitioner's proposed spacing. Rather, these references broadly cover the entire display made up of all the tiles. In addition, Petitioner wrongly conflates the concepts of "pixel pitch" and "pixel size" in making its arguments. *See id.* at 10–11; Tr. 04:24–105:4. "Pixel pitch" refers to spacing between pixels and is not necessarily indicative of pixel size. *See* Ex. 1004, 24:9–11 ("A display tile has an array of pixels equally spaced a distance known as P, the pixel pitch."). For these reasons, we do not agree with Petitioner that Matthies contemplates differently sized pixels within each tile of the display, or differently sized pixels along the column or row electrodes of the display.

We credit, instead, the testimony of Dr. Kymissis, in paragraphs 121–128 of his Declaration (Ex. 2009), explaining the difficulties of

accomplishing individual sizing of pixels. For instance, Dr. Kymissis testifies:

> If a POSITA were to try to change the size of a pixel in the PMOLED shown in Figure 8B, that would require changing the size of a row and/or column electrode, but doing so would also change the size of all the other pixels defined by that row and/or column electrode." Dr. Pattison does not give any explanation of how the pixel sizes could be individually arbitrarily changed into the proportions that he suggests should be used, and it is not clear how such a display could be made.

Ex. 2009 ¶ 123.

> It is not a simple matter to resize the row and/or column electrodes to be irregular. An engineer would have to somehow design and develop a mask to pattern each of the row and column electrodes to be shaped to accommodate the alternatingly large and small pixel shapes required by Dr. Pattison's combination. Patterning the electrodes would further add a process step, increasing manufacturing costs and reduce yield. Additionally, if a POSITA were to try to make such irregularly sized electrodes, that would have an effect on the IR voltage drop, which would need to be compensated differently than in a typical PMOLED display with uniformly sized electrodes, thus adding additional complexity to the design. This would necessitate changes not only to the structure of the electrodes, but also to the display driver circuitry for applying the appropriate voltages to the row and column electrodes to allow the OLED to display images.

*Id.* ¶ 124.

In its Reply, Petitioner does not dispute Patent Owner's assertion that varying pixel sizes within each tile in accordance with emissive efficiency as Petitioner has proposed for the passive-matrix display of Matthies would be problematic or Dr. Kymissis' testimony that it is not clear how it could be done. Instead, Petitioner shifts its focus to active-matrix displays, which do not use row and column electrodes. Reply 2–4.

In the Reply, Petitioner asserts:

> Matthies does explain that "exemplary embodiment[s]" "employ[] a passive addressing technique." (Matthies, 10:31-33.) But it **<u>also</u>** teaches "active matrix" displays. Petition, 13 (quoting Matthies, 8:21–26). In fact, Matthies **<u>repeatedly</u>** states that it is equally applicable to both actively and passively driven OLEDs. (*Id.*, 7:15-19 ("display" can be "active and passive"); 7:42-45 ("active" or "passive . . . circuits" can be employed); 8:21-23 ("electronics," such as "pixel driving circuitry[,]" can be "both active and passive"); 8:20-26 (referencing "active matrix circuits" particularly with "high temperature" substrates); 8:30-33 (use of either "active or passive devices" is contemplated).)

Reply 2–3 (emphasis by Petitioner) (alterations in original). On that basis, Petitioner further asserts: "Here, a POSITA plainly would have understood—just as Matthies itself states—that Matthies' OLED pixel arrangements can be used in both passive- and active-matrix displays." *Id.* at 3. Additionally, Petitioner asserts that numerous other references teach that the same pixel layout can be employed with both passive- and active-matrix OLEDS. *Id.* at 4.

For reasons discussed below, these reply contentions by Petitioner distort the disclosure of Matthies, are misplaced and unpersuasive, and also raise an impermissible new argument.

Petitioner's citations to Matthies's teachings of active circuit components do not cure the deficiencies in its rationale for modifying the passive matrix display embodiment in Matthies's Figure 8B, because Petitioner does not persuasively show how such active components would allow for differently sized pixels in a passive matrix display. These deficiencies would remain even if we assumed, *arguendo*, that the cited teachings regarding active electronics from Mathies pertained specifically to active matrix OLED displays, which they do not.

In its Sur-reply, Patent Owner explains:

> Matthies discusses "active and passive" "electronics" or "devices"—*i.e.*, active electrical *components* like transistors, and passive electrical components like resistors, under standard definitions in electrical engineering. Matthies, 7:15-19, 7:42-45, 8:20-32; Ex. 2086, 33:6-34:15, 36:21-40:4, 78:5-80:14. Moreover, even "active *circuit*" means something entirely different than "active-*matrix*": an active circuit is a circuit with active components; active matrix refers to an *addressing scheme* for a matrix of pixels each having its own pixel circuit. Ex. 2086, 41:5-42:4; Ex. 1018, 97:21-100:10, 101:4-102:6. Matthies explicitly discusses *passive-matrix* addressing (Matthies, 10:31-33, 3:4-5), but does **not** refer to, let alone describe, *active-matrix* addressing, as Dr. Pattison conceded. Ex. 2086, 81:9-12. Nor does Matthies discuss or suggest having individual pixel circuits for each pixel, a defining feature of active-matrix displays. Ex. 2009, ¶¶53-54; Ex. 2086, 62:10-63:8; Ex. 2073, 13-14; Ex. 2074, 9; Ex. 2080, 8-11.
>
> The *only* reference in Matthies to "active matrix" is in connection with Matthies' reference to *manufacturing processes* for forming electrical components *in place* on a substrate (*i.e.*, a an alternative to attaching discrete, preformed components). Matthies, 8:21-26. Dr. Pattison agrees. Ex. 2086, 46:8-47:19.
>
> Every disclosure in Matthies indicates its display is passive-matrix. *Compare* Matthies, Fig. 2 ("column drivers," "current sources") *with* Ex. 2074, 6 ("[t]o achieve gray levels [in PMOLED], the column drivers must be current sources"); *compare* Matthies, 10:31-33 (only one row of pixels is illuminated at any time") *with* Ex. 2080, 5 (in PMOLED, "only one row can be selected and displayed at a time": in AMOLED, "the turn-on/turn-off and different grayscales can be controlled independently").

Sur-reply 5–7 (alterations in original).

Dr. Pattison acknowledges that Matthies does not use the term "active matrix addressing." Ex. 2086, 81:9–12. We agree with Patent Owner that nowhere does Matthies disclose or describe having an individual circuit for

each pixel. Petitioner has not persuasively shown any such disclosure in Matthies.

There is just one mention of "active matrix" in Matthies:

> The electronics which form the image processing and pixel driving circuitry are mounted on the layers. Electronics are used in the broadest sense to include both active and passive, and both discrete devices mounted on the layers and devices formed in place by processes such as those now used to make active matrix circuits for displays on various high temperature substrates.

Ex. 1004, 8:20–26. Petitioner does not persuasively show how such electronic components would inform one of ordinary skill in the art how to make differently sized pixels in a passive matrix display as Petitioner has proposed with respect to a modification of Mathies's Figure 8B.

Rather, as recognized by Dr. Pattison (Ex. 2086, 46:8–47:19), Matthies states that the electronics forming its disclosed "image processing and pixel driving circuitry" may be created two ways: (1) mounting discrete devices on a substrate; or (2) forming devices in place on the substrate using processes like those used to make active matrix circuits. *See* Ex. 1004, 8:20–26. Regarding the second option, Dr. Pattison recognized that this refers to "a whole field of making transistors and passive components that are integrated into electronics." Ex. 2086, 47:10–19. In this sense, the reference to "active matrix" simply identifies known semiconductor manufacturing processes. It does not teach or suggest implementing Matthies's embodiments with active-matrix OLED circuits which provide for variable sizing of individual pixels. And, regardless of how an ordinarily skilled artisan would have understood the mentions of the word "active" in Matthies, Petitioner never explains how Matthies's passively driven

embodiment in Figure 8B would have been modified to accommodate differently sized pixels.

We find that Matthies does not disclose or describe an active-matrix embodiment for the pixel layout shown in Figure 8B. We agree with Patent Owner that "[e]very disclosure in Matthies indicates its display is passive-matrix." Sur-reply 6.

Petitioner additionally argues that "**[b]oth** passive- and active-matrix OLEDs are embraced [by the challenged claims]." Reply 4. Petitioner asserts that "Patent Owner's arguments to the contrary essentially require more specificity and detail from the prior art than the '803 patent itself provided." *Id.* at 5. Patent Owner has not argued that the challenged claims exclude active-matrix or passive-matrix OLED displays. That the '803 patent itself does not describe how to implement pixels of varying sizes in a passive-matrix display does not help the Petitioner here, because in this proceeding it is Petitioner who bears the burden of proof and who needs to show a reasonable expectation of success in accomplishing what it proposes.

For the foregoing reasons, Petitioner has not shown why or how an ordinarily skilled artisan would have implemented Yamada's teachings of different pixel sizes in Matthies's disclosed passive-matrix display.

We further agree with Patent Owner that even assuming Matthies discloses an active-matrix display embodiment, Petitioner may not, at the time of the Reply, switch its position to rely on it, because the Petition did not rely on any such embodiment. Sur-reply 7. Patent Owner correctly states: "Petitioner's theory [in the Petition] is exclusively based on modifying Matthies' passive-matrix Figure 8B display. Petition, 23-26; DI, 16, 20-21." *Id.*

*(b) Petitioner's Proposal Reduces Lifetime of Green and Red Pixels*

Patent Owner asserts that "[a]lthough the purported rationale for Petitioner's proposed combination is to *increase* the lifetime of Matthies' display (Pet. at 40-41), Petitioner's proposed modifications would have had the opposite effect, *shortening* its lifetime. Ex. 2009, ¶¶133-139." PO Resp. 14. Patent Owner notes that Petitioner relies on Yamada as teaching to make the blue light-emitting area larger to lower the current density for blue light emission and thus lengthening the lifetime of blue pixels. *Id.* at 15 (citing Pet. 19, 70). Patent Owner explains:

> But Petitioner's proposed modifications to Matthies' structure do not make the blue light-emitting area larger. They would not reduce the blue pixels' current density or extend their lifetime. Instead, Petitioner's proposal would shrink the red and green pixels, substantially reduce their light-emitting areas, increasing their current densities and reducing their lifetimes. Ex. 2009, ¶¶136-137.
>
> Petitioner's proposed combination would **reduce** the lifetime of Matthies' display overall, contradicting Petitioner's purported rationale for it. Ex. 2009, ¶¶136-137. And AMOLEDs like those in Matthies were already well-known to suffer from short lifetimes. A POSITA would have had no reason to make Petitioner's proposed combination nor a reasonable expectation of success in doing so. *Id.*, ¶¶136–139.

*Id.* at 15–16. These assertions are supported by the cited testimony of Dr. Kymissis. Dr. Kymissis testifies: "By reducing the sizes of the red and green pixels, Dr. Pattison's proposed modification would require a significantly higher current current density to be supplied to the red and green pixels to maintain the same brightness as before." Ex. 2009 ¶ 137. Dr. Kymissis also testifies: "And by reducing the sizes of the red and green pixels, the life of the red and green pixels would be **reduced**." *Id.* ¶ 136.

Dr. Kymissis further also testifies: "a POSITA, particularly a POSITA concerned with the lifetime of the display, would not have sought to reduce the sizes of any of the pixels, as Dr. Pattison suggests, because doing so would decrease the lifetime of the display." *Id.* We credit these testimony of Dr. Kymissis.

Petitioner does not dispute that reducing the size of the red and green pixels would reduce the lifetime of the red and green pixels. Petitioner responds to Patent Owner's assertion as follows:

> Patent Owner is also wrong when it argues that Matthies' display lifetime will purportedly not be "extend[ed]" unless Matthies' blue pixels are made "larger." Response, 15. While it is of course true that supplying a lower current density to blue pixels will increase those pixels' lifetime, this is only half the story. The art teaches that it is also important for pixels to age at approximately the same rate relative to each other. (Ex. 1017, ¶¶ 34-38.
>
> Here, Yamada explains that if increased "load is selectively placed" on a subset of pixels, their "deterioration" is "accelerated" relative to the other pixels. (Yamada, 3:62-4:14; see also 5:4-8.) This not only increases the risk of individual pixel failure, but it also decreases the display's overall "service life" by making it more difficult to maintain color or "white balance." (*Id.*, 11:48-55; see also 2:64-67 (application of larger currents to certain pixels impacts overall "life of the EL display apparatus").) So, resizing OLEDS pixels in accordance with emission efficiency both prevents less efficient blue pixels from failing earlier and prevents different pixel aging rates from impacting display usability over time. (Ex. 1017, ¶¶ 45-48.)
>
> This same concept is also discussed elsewhere. For instance, another reference cited in the Petition explains that by resizing an OLED display's pixels, the "light emitting elements will age at approximately the same rate. . ." (Ex. 1015, 4:32-37.) This in turn avoids the "color shift expressed" when pixels age differently. (*Id.*, 4:43-45.) Another reference similarly explains

> that "[t]o maintain a well-balanced, full color display, it is important that the relative luminance of the three-colored materials be maintained throughout the lifetime of the display." (Ex. 2011, 1:50-56.) Once again, this improves the display's "useful lifetime" by "maximiz[ing] the time that the relative luminance of the three-color elements can be maintained. . . ." (*Id.*, 2:1-4.)

Reply 5–7 (alterations in original). In summary, Petitioner asserts that the useful life of an OLED display is dictated not only by the lifetimes of the individual pixels, "but also by how long proper color and white balance can be maintained," and that "[b]y applying Yamada's teachings, a POSITA would have understood that Matthies' pixels would all age at or near the same rate." *Id.* at 7.

We agree with Patent Owner that the above-noted response by Petitioner in the reply presents an impermissible new argument that its proposed combination would improve the useful lifetime of the display by maintaining color or white balance longer. The original theory in the Petition simply is that (1) because blue pixels have lower emission efficiencies, they require a larger current, and the larger current reduces the lifetime of the blue pixels thus impacting the overall life of the display, and (2) to solve that problem Yamada proposes to make the blue pixels larger than pixels with higher emission efficiencies. Pet. 39–40. For example, the Petition states: "To address this problem [shorter lifetime of blue pixels and complications resulting therefrom], Yamada teaches that the pixels with lower emission efficiencies (blue) should be made larger than pixels with higher emission efficiencies (green)." *Id.* Petitioner does state in the Petition: "As an added benefit, the overall display design becomes 'simplified' and 'extremely easy to control' as each pixel is supplied with

'the same amount of power." *Id.* at 40. But this added benefit is hinged on Petitioner's explanation of the base benefit, i.e., making the blue pixels larger.

"Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g., to make out a prima facie case of unpatentability." PTAB Consolidated Trial Practice Guide November 2019 (CTPG), 73–74. Section 42.23(b), Title 37, Code of Federal Regulations provides: "A reply may only respond to arguments raised in the corresponding opposition." Although a reply may respond to arguments raised in the PO Response, "'Respond,' in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing." CTPG, 74. Petitioner's argument in the Reply changes the thrust and direction of its original argument in the Petition and thus is not entitled to consideration. We decline to consider it.

Thus, we are not persuaded that, based on Yamada's teachings, one of ordinary skill in the art would have modified the pixel sizing in Matthies as proposed by Petitioner.

*(3) Conclusion for Limitation [1-b]*

We conclude that Petitioner has not persuasively shown that an ordinarily skilled artisan would have combined Matties and Yamada in the manner suggested by Petitioner to meet limitation [1-b].

*d) Conclusion for Claim 1*

For the foregoing reasons, Petitioner has not set forth a persuasive reason for one of ordinary skill in the art to combine the teachings of Matthies and Yamada in the manner suggested by Petitioner. Petitioner has

not shown by a preponderance of the evidence that claim 1 would have been obvious over the combination of Matthies and Yamada.

*5. Dependent Claims 2–4 and 19–21*

Claims 2–4 and 19–21 each depend, directly or indirectly, on claim 1. The deficiencies in Petitioner's accounting for claim 1, as discussed above, equally apply to claims 2–4 and 19–21. Petitioner has not shown by a preponderance of the evidence that claims 2–4 and 19–21 would have been obvious over the combination of Matthies and Yamada.

*E. Alleged Obviousness of Claims 1–4 and 19–21 over Phan*

*1. Overview of Phan*

Phan is a U.S. patent directed to a "display comprising pixels and dots." Ex. 1005, 1:18–19. Phan indicates that such a display may be one of a number of display technologies including an OLED display. *Id.* at 1:19–29. According to Phan, "[t]he pixels generally consist of so-called dots representing the three basic colours red, green and blue." *Id.* at 1:59–61. Phan discloses displays in which "each dot has a receiver of its own . . . to convert digital information transmitted through [a] network . . . into luminous intensity levels for [the] dots." *Id.* at 5:16–19. Phan discloses "dynamic generation of pixels wherein a one-pixel logical unit is formed by grouping adjacent dots, with adjacent pixels being physically superimposed and the dynamic pixels being generated by sequential addressing at a rate such that said generation is not perceivable by the human eye." *Id.* at 2:66–3:4.

Figures 11a and 11b of Phan are reproduced below.




FIG. 11a FIG 11b

Figure 11a "shows a square quad pixel where the crosspoint 33 is in the centre of the four dots (individual elements) of equal light emitting area and space, contoured by black mask or black barrier ribs 21 with the same structure." Ex. 1005, 5:47–50. Figure 11b "shows a typical square quad pixel where the crosspoint 33 moving along the diagonal line 35 forms two dots (individual elements) of equal light emitting area and space 38 of green color (G)." *Id.* at 5:51–54.

Figure 12 of Phan is reproduced below.




FIG. 12

Figure 12 "shows a quad pixels display with a resolution of 480x640 static pixels 17." Ex. 1005, 4:5–6, 5:55–56.

Petitioner notes that Phan issued August 15, 2006, and contends that Phan qualifies as prior art under 35 U.S.C. § 102(b). Pet. 16. Patent Owner does not contest the prior art status of Phan. We determine that Phan qualifies as prior art under 35 U.S.C. § 102(b) because Phan's issue date of August 15, 2006, is more than one year before the earliest effective filing date of the challenged claims, which is March 6, 2012. Ex. 1001, code (30); Ex. 1005, code (45).

*2. Independent Claim 1*

*a) Preamble [1-pre]*

The preamble of claim 1 recites "[a] pixel arrangement structure of an organic light emitting diode (OLED) display." Ex. 1001, 8:58–59. Petitioner cites Phan's teaching of a "display comprising pixels and dots." Pet. 46 (quoting Ex. 1005, 1:18–19) (citing Ex. 1005, 2:51–53). Petitioner contends that Phan's "teachings can be employed with various 'display technologies,' including 'Organic Light Emitting Diode (OLED)' displays." *Id.* (quoting Ex. 1005, 1:18–29) (citing Ex. 1003 ¶¶ 324–327). Petitioner also notes that "Phan includes two sets of example pixel designs," including the "quad pixel" designs of Figure 11a and 11b. *Id.* at 58–59 (citing Ex. 1005, 5:47–54). Petitioner contends that an ordinarily skilled artisan would have been motivated to use these pixel designs with the displays referenced elsewhere in Phan with "every reason to believe that those pixels can be successfully employed." *Id.* at 59 (citing Ex. 1003 ¶¶ 401–403); *see also* Ex. 1003 ¶ 321 (similar testimony from Dr. Pattison). In its Reply, Petitioner argues that, like Phan, "[n]umerous prior art references" teach that "the same pixel arrangement can be used by different displays." Reply 12–

13 (citing Ex. 1004, 5:28–35; Ex. 2018 ¶ 6). Petitioner specifically cites a reference known as Cok[6] for teaching that "the very same 'pixel pattern' shown in Figure 11b of Phan is useful with both 'passive-matrix or active matrix' OLEDs." *Id.* at 13 (citing Ex. 1015, 2:61–67, 4:8–15, Fig. 1).

Patent Owner disputes that Phan's pixel arrangements apply to OLEDs. PO Resp. 31–34; Sur-reply 15–16. Patent Owner argues that Phan makes a single passing reference to OLEDs among a "laundry list of every conceivable display technology," which does not "mean that [Phan's] embodiments of pixel arrangements were for OLEDs or for each of the listed alleged 'display technologies.'" PO Resp. 31–32 (citing Ex. 2009 ¶ 202); *see also* Sur-reply 16 (similar argument). Patent Owner also argues that "Phan does not state, nor suggest, that the pixel arrangements it draws, or Figures 11a and 11b specifically, would be suitable for an OLED display." PO Resp. 33.

As further evidence that Phan's embodiments do not relate to OLEDs, Patent Owner notes that "Phan mentions only CRT, LCD, LED, PDP, and FED in the sole portion of its specification containing any substantive discussion of the display technologies."[7] PO Resp. 33–34 (footnote omitted) (citing Ex. 1005, 1:56–2:46; Ex. 2009 ¶ 204) (footnote omitted). In a similar fashion, Patent Owner argues that an ordinarily skilled artisan would have known that Phan's mentions of "displays using 'optical fiber network[s]' and 'receivers' do not relate to OLEDs." *Id.* at 33 (alteration in original)

---

[6] U.S. Patent No. 6,867,549 B2, filed Dec. 10, 2002, issued Mar. 15, 2005 (Ex. 1015, "Cok").

[7] Patent Owner notes that the mention of "LED" in this context refers to "solid-state light-emitting diodes, which are distinct from OLEDs." PO Resp. 33 n.5 (citing Ex. 2009 ¶ 204). Petitioner does not dispute this.

(citing Ex. 1005, 5:9–24; Ex. 2009 ¶ 203). Patent Owner also argues that "Phan's virtual driving method—the heart of Phan's disclosure—would not be feasible in an OLED display." *Id.* at 34 (citing Ex. 1005, 2:35–38, 5:23–24, 5:55–60; Ex. 2009 ¶¶ 207–215). Patent Owner additionally notes that "Phan's figures depict essentially no spacing between adjacent dots," which is "not feasible for an OLED display due to issues of color mixing of the organic light-emitting materials and shorting between adjacent pixels." *Id.* (citing Ex. 2009 ¶¶ 205–206).

Finally, Patent Owner argues that Petitioner's allusions to other prior art references that use the same pixel arrangement for different types of displays should be rejected because they "do not support Petitioner's attorney argument" and because they effectively amount to new combinations. Sur-reply 16.

At the outset, we note that claim 1 includes no specific limitations directed to OLEDs other than reciting that the claimed "plurality of pixels" display an image on an OLED display. *See* Ex. 1001, 8:56–9:9. More specifically, claim 1 includes no limitations directed to the '803 patent's disclosures about "power lines for driving each of the pixels, such as a gate line, a data line, a driving power line" or "an anode, an organic emission layer, and a cathode" corresponding to the pixels. *Id.* at 3:58–66. Indeed, the '803 patent states that "[t]hese configurations are technologies known in the art and further description thereof is omitted for ease of description." *Id.* at 3:66–4:1. Nor does claim 1 include limitations directed to the '803 patent's disclosures about manufacturing OLED displays (*see id.* at 1:38–45) or the different lifespans for various organic materials (*see id.* at 7:25–32).

Thus, Petitioner's obviousness analysis need not account for these aspects of an OLED display.

Given this background, we note that the parties' disputes regarding Phan turn on whether Phan teaches that its disclosed pixel arrangements can be applied to OLED displays. We find that it does.[8] In the "Field of the Invention" section, Phan states that "[t]he *invention* [of Phan] relates to a display comprising pixels and dots, including but not limited to" various "display technologies" including "Organic Light Emitting Diode (OLED)." Ex. 1005, 1:17–29 (emphasis added). Accordingly, we find that Phan fairly suggests that the pixel arrangements disclosed in Phan—which are part of Phan's "invention"—may be applied to OLEDs. *See Twitter, Inc. v. VidStream LLC*, 825 F. App'x 844, 850 (Fed. Cir. 2020) (quoting *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019)) ("[W]hen conducting an obviousness analysis, the Board must consider a prior art reference 'not only for what it expressly teaches, but also for what it fairly suggests.'"). In making this finding, we note that obviousness is determined from the perspective of a person of ordinary skill in the art (*see* 35 U.S.C. § 103(a)), who in this case would have had "2 years of professional experience working with display design, including OLED displays." *See supra* § II.B. In light of this specific experience, we find that an ordinarily skilled artisan would have been inclined to link Phan's disclosed pixel arrangements with OLEDs based on the plain statement about related

[8] Patent Owner contends that the preamble is limiting (PO Resp. 31), whereas Petitioner takes no position on this issue (*see* Tr. 6:12–22). Because Petitioner shows persuasively that Phan teaches the preamble, we need not determine whether the preamble is limiting. *See Realtime Data*, 912 F.3d at 1375.

"display technologies" in Phan's "Field of the Invention" section. *See, e.g.*, Ex. 1003 ¶¶ 321, 399–403. For these reasons, we disagree with Patent Owner's assertion that "Phan does not teach about OLED displays." PO Resp. 33.

The fact that Phan teaches OLED displays among "a laundry list of every conceivable display technology, including non-existent technologies" does not undermine Phan's express statement that its disclosed invention relates to OLED displays, which themselves were known at the time of the '803 patent. *See* Ex. 1017 ¶ 96; Ex. 1018, 18:6–9. We also find Patent Owner's citation (PO Resp. 32) to *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012), regarding the alleged "laundry list" to be inapposite. *Otsuka* merely observes how a skilled artisan would not have understood a "'laundry list' of potential central nervous system controlling effects" in the involved patent to mean that every one of the trillions of compounds encompassed by that patent is a potential antipsychotic. *Id.* at 1293–94. *Otsuka* does not discredit the use of a list in a prior art patent to associate related technologies with a disclosed invention, as Patent Owner seems to imply. And, as discussed above, Phan expressly associates OLED displays with its allegedly inventive arrangements of pixels. *See* Ex. 1005, 1:17–29.

We also are persuaded by Petitioner's contentions (Pet. 46, 58–59) that an ordinarily skilled artisan would have considered Phan's pixel designs as "an obvious starting place when implementing the rest of what Phan teaches," including the "displays referenced elsewhere in Phan." *See, e.g.*, Ex. 1003 ¶¶ 324–327, 399–403; Ex. 1005, 1:18–29, 2:51–53. We consider the application of Phan's pixel arrangements to OLED displays—which

themselves are disclosed in Phan—to be among the "inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

Patent Owner's arguments focus on the particular embodiments of Phan, which allegedly are limited to technologies other than OLED. *See* PO Resp. 33–34 (stating that Phan mentions only CRT, LCD, LED, PDP, and FED display types and certain circuitry that is not associated with OLEDs); *see also* Sur-reply 15–16 (arguing that Phan's pixel arrangements do not apply to OLEDs). For example, Patent Owner argues that "Phan's virtual driving method—the heart of Phan's disclosure—would not be feasible in an OLED display." PO Resp. 34 (citing Ex. 2009 ¶¶ 207–215). But "[a] reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (alteration in original) (quoting *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985)). Thus, regardless of whether Phan focuses on other display technologies and/or particular algorithms in its embodiments, we must still consider Phan's teaching of OLEDs being a display technology related to its pixel arrangement disclosures.

We further note that many of Patent Owner's arguments are rooted in its conception of how "Phan's figures depict essentially no spacing between adjacent dots." PO Resp. 34. As such, Patent Owner argues that an ordinarily skilled artisan would have recognized that the spacing "was not feasible for an OLED display due to issues of color mixing of the organic light-emitting materials and shorting between adjacent pixels." *Id.* (citing Ex. 2009 ¶¶ 205–206). Yet, contrariwise, Patent Owner acknowledges that

"Phan does not describe its figures as drawn to scale." Sur-reply 18–19 (citing *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000)). Given that we generally do not rely on patent drawings for showing particular sizes (*see Hockerson-Halberstadt*, 222 F.3d at 956), we do not agree that the alleged spacing in Phan's drawings would have impeded an ordinarily skilled artisan from using Phan's pixel designs in OLED displays.

Regarding Patent Owner's argument that an ordinarily skilled artisan "would not have had a reasonable expectation of success in making Phan an OLED display" (PO Resp. 34), we have considered Dr. Kymissis's supporting testimony. *See* Ex. 2009 ¶ 215. He relies on the same arguments discussed above in which Patent Owner attempts to cabin Phan's teachings within the specific (non-OLED) embodiments disclosed. *See id.* Against this showing, Petitioner cites Dr. Pattison's testimony and contends that an ordinarily skilled artisan would have expected success employing Phan's pixel designs with the displays referenced elsewhere in Phan. Pet. 58–59 (citing Ex. 1003 ¶¶ 400–403). We find Dr. Pattison's testimony regarding expected success more persuasive because it is consistent with Phan's express statement that its disclosed invention relates to OLEDs. *See* Ex. 1005, 1:17–29. We also note that the '803 patent itself acknowledges that OLED componentry, such as power lines for driving OLED pixels, was known in the art. *See* Ex. 1001, 3:58–4:1. This is consistent with Petitioner's assertions regarding expected success in implementing Phan's pixel arrangement in an OLED display. Finally, at least one other contemporaneous reference cited by Petitioner, Cok, discloses the same pixel arrangement as Phan (*compare* Ex. 1005, Fig. 11b, *with* Ex. 1015,

Fig. 1) and states that it is for "an OLED display device" (Ex. 1015, 4:8–13), which also is consistent with Petitioner's assertions of expected success.

For these reasons, we are persuaded that Phan teaches, or at least fairly suggests, that its disclosed pixel arrangements may be implemented as an OLED display.

*b) Limitation [1-a]*

Claim 1 further recites "a plurality of pixels for displaying an image on the OLED display." Ex. 1001, 8:60–61. Petitioner cites Phan's teaching of a display including "so-called pixels" that "consist of so-called dots representing the three basic colours of red, green and blue." Pet. 46 (quoting Ex. 1005, 1:57–61). Petitioner maps the recited "plurality of pixels" to Phan's dots, which Petitioner calls Phan's display's "minimum [display] unit." *Id.* at 47 (citing Ex. 1003 ¶¶ 328–335). Petitioner also cites the same teachings discussed above from the preamble for teaching the "OLED display" and contends that the display is "intended to allow for generation of a high resolution image." *Id.* (internal quotation and alteration omitted) (citing Ex. 1003 ¶¶ 336–338; Ex. 1005, 2:51–3:25, 4:19–24).

Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. We are persuaded that Phan's dots teach the recited "pixels." *See, e.g.*, Ex. 1005, 1:57–61. We also are persuaded that Phan teaches OLED displays and the use of such displays for generating images. *See, e.g.*, Ex. 1003 ¶¶ 336–338; Ex. 1005, 1:18–29, 2:51–3:25, 4:19–24.

*c) Limitations [1-a(1)], [1-a(2)], [1-a(3)], [1-a(4)], and [1-c]*

Claim 1 further recites "a first pixel having a center coinciding with a center of a virtual square." Ex. 1001, 8:62–63. A later limitation recites that

"the first pixel is configured to emit green light." *Id.* at 9:9. Petitioner cites Phan's teaching of pixels that "comprise regularly disposed dots 11 radiating the basic colours red (red dot 13), green (green dot 14) and blue (blue dot 15)." Pet. 48 (quoting Ex. 1005, 4:29–32). As such, Petitioner maps the recited "first pixel" to Phan's green dots. *Id.* at 49–50, 54 (citing Ex. 1003 ¶¶ 371–373; Ex. 1005, 4:29–32, Fig. 11b).

For the recited "virtual square," Petitioner cites Phan's teaching of disposing square pixels in a grid pattern. Pet. 48 (citing Ex. 1005, 4:41–43). Petitioner further cites Phan's Figure 2a, which Petitioner calls "an example of a 'display with square pixels' (like that shown in Figure 1a) 'with well-known static pixels being shown within squares, and the dynamic pixels of the invention within circles.'" *Id.* (quoting Ex. 1005, 3:33–36, 4:41–47) (citing Ex. 1005, Figs. 1a, 2a). Petitioner also cites the "quad pixel" arrangement disclosed in Figure 11b of Phan and contends it can be implemented in the "quad pixel display" of Figure 12 from Phan. *Id.* at 48–49 (citing Ex. 1005, 5:47–60, Figs. 11–12). Petitioner depicts this concept in the following illustration from the Petition, which includes annotated versions of Phan's Figure 11b and 12, as reproduced below.




*Id.* at 49. In this illustration, Petitioner indicates how "[u]se of the pixel structure shown in Fig. 11b in a grid or matrix [as shown in Figure 12] to produce Phan's display results in what this limitation requires." *Id.* (citing

Ex. 1005, 4:29–32, 4:41–43, 5:47–54, Figs. 11b, 12). Petitioner contends that, "[d]ue to the use of a square pixel shape that is regularly arranged in an identically repeating matrix, Phan's dots form a ***'virtual square'*** with a green dot at its ***'center.'***" *Id.* at 50.

To summarize these contentions, Petitioner provides the following illustration in the Petition.




Pet. 50 (citing Ex. 1003 ¶¶ 339–356). In this illustration from the Petition, Petitioner shows the recited "virtual square" as a red square and indicates with a green arrow how a green "first pixel" is at the center of the virtual square. *Id.*

Claim 1 further recites "a second pixel separated from the first pixel and having a center at a first vertex of the virtual square." Ex. 1001, 8:64–65. Petitioner cites the same teaching of dots from Phan and maps the "pair of second pixels" to the blue dots in particular. Pet. 50 (citing Ex. 1005, 4:29–32, Fig. 11b). Petitioner contends that adjacent dots are "separated" based on Phan's teaching that dots are "surrounded by a black mask or black barrier ribs 21 to obtain a higher contrast." *Id.* (citing Ex. 1005, 4:33–37, Figs. 1a–c, 10a–11b). For the center of the second pixel being "at a first

vertex of the virtual square," Petitioner contends that, "due to the use of square pixels arrange[d] in a matrix or grid, Phan's blue dots are located at a ***'first vertex'*** of the square formed around the green dot." *Id.* at 50–51. To summarize these contentions, Petitioner provides the following illustration in the Petition:




*Id.* at 51 (citing Ex. 1003 ¶¶ 357–361). In this illustration from the Petition, Petitioner shows the recited "virtual square" as a red square, indicates with a green arrow how a green "first pixel" is at the center of the virtual square, and indicates with a blue arrow how a blue "second pixel" is at a first vertex of the virtual square. *Id.*

Claim 1 further recites "another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels." Ex. 1001, 8:66–9:3. Petitioner cites Phan's teachings that its pixels and dots are identical and regularly disposed in a repeating matrix. Pet. 51 (citing Ex. 1005, 4:29–32, Fig. 11b). Continuing its analysis based on Phan from above, Petitioner contends that "[t]his results in ***'another first pixel'*** being located ***'consecutive[ly]'*** after the 'second pixel' on a ***'line'*** passing through the 'first' and 'second pixel[s].'"

*Id.* (second and third alterations in original). To summarize these contentions, Petitioner provides the following illustration in the Petition.




*Id.* at 52 (citing Ex. 1003 ¶¶ 362–364). In this illustration from the Petition, Petitioner shows the recited "virtual square" as a red square, indicates with one green arrow how a green "first pixel" is at the center of the virtual square, indicates with another green arrow "another" green "first pixel," and indicates with a blue arrow how a blue "second pixel" is at a first vertex of the virtual square. *Id.*

Claim 1 further recites "a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square." Ex. 1001, 9:4–6. Petitioner cites Phan's teaching of pixels including red, blue, and green dots, and Petitioner maps the recited "third pixel" to the red dots. Pet. 52 (citing Ex. 1005, 4:29–32, Fig. 11b). Continuing its analysis based on Phan from above, Petitioner contends the red dots "are located on the ***'second vertex'*** of the square formed around the green dot" and "***'neighbor[]'*** the square's 'first vertex.'" *Id.* (alteration in original). To summarize these contentions, Petitioner provides the following illustration in the Petition.




*Id.* at 53 (citing Ex. 1003 ¶¶ 365–367). In this illustration from the Petition, Petitioner shows the recited "virtual square" as a red square, indicates with a green arrow how a green "first pixel" is at the center of the virtual square, indicates with a blue arrow how a blue "second pixel" is at a first vertex of the virtual square, and indicates with a red arrow how a red "third pixel" is at a second vertex of the virtual square. *Id.*

Patent Owner disputes Petitioner's conception of how Phan's quad pixel arrangement from Figure 11b would be implemented in the display of Figure 12. PO Resp. 35–37. In particular, Patent Owner argues that "Petitioner inexplicably changes the arrangement and geometry of Phan's Figure 12 to remove the spacings between the adjacent quad-pixels." *Id.* at 35–36. Patent Owner further argues that "Petitioner and Dr. Pattison offer no justification for changing Phan's display to remove its clearly-disclosed spacings between adjacent quad-pixels, which would allow, for example, placement of wiring for Phan's '[c]ontrol circuitry,' or 'optical fiber network.'" *Id.* at 37 (citing Ex. 1005, 5:20–24, Fig. 5; Ex. 2009 ¶¶ 220–221). Patent Owner additionally argues that "Petitioner's changes are also incompatible with Phan's dynamic pixel approach" insofar as "the visual

locus of the *dynamic* quad-pixel disclosed by Phan . . . will be perceived by the viewer to be shifted from the physical center of the *static* quad-pixel." *Id.* at 36–37 (citing Ex. 1005, Figs. 9.1–9.8; Ex. 2009 ¶¶ 225–226). Patent Owner explains that this would result in "distortion and poor image quality," which "would contradict Phan's goal of improving resolution and image quality through 'variable generation of pixels from existing dots,' *i.e.*, its 'dynamic generation of pixels.'" *Id.* (citing Ex. 1005, 2:54–3:19; Ex. 2009 ¶¶ 225–230).

Patent Owner also offers its own counterexample of how pixel spacing would be implemented when combining Phan's Figures 11b and 12, which is shown in the following illustration from the Patent Owner Response.




FIG. 12

PO Resp. 35. This illustration presents Patent Owner's conception of how the pixel arrangement of Phan's Figure 11b would be implemented in the display of Phan's Figure 12. *Id.* In particular, Patent Owner has indicated its conception of Petitioner's mapping of the recited "virtual square" with a red irregular quadrilateral. *Id.* Given that the sides of the red quadrilateral

are irregular and do not form a square, Patent Owner argues that "the 'first pixel' (green) does **not** have a center coinciding with a center of a virtual square." *Id.* (citing Ex. 2009 ¶¶ 216–219).

Petitioner replies that "all of Phan's figures show displays with the dots/sub-pixels regularly spaced in a consistent, repeating pattern." Reply 13 (citing Ex. 1005, Figs. 2a–b, 7, 9–9.8, 12–12d). Petitioner again emphasizes Phan's teachings that "pixels are 'regularly disposed' in a repeating 'grid' or 'matrix.'" *Id.* (citing Ex. 1005, 2:51–53, 4:29–50). Petitioner also counters Patent Owner's arguments about Phan's static and dynamic pixels by noting that (1) Phan teaches them as having the same matrix geometry and (2) Phan depicts them has having the same shape and geometry across the display. *Id*. at 14 (citing Ex. 1005, 6:4–23, 7:59–67, Figs. 2a–b, 4a–b, 5, 7, 8–8.12, 9–9.8, 12a–12d). According to Petitioner, "[t]his is purposeful" because "employing dynamic pixels that 'overlap[]' the 'static pixels' allows a 'given grid' to have an 'enhanced' or 'higher' 'resolution.'" *Id.* at 14–15 (quoting Ex. 1005, code (57), 2:51–53) (second alteration in original); *see also* Ex. 1017 ¶ 68 (Dr. Pattison testifying that "Phan['s] display includes not only static pixels, but many dynamic pixels that are the same size as the static pixels for purposes of increasing the display's effective resolution."). Petitioner additionally argues that it is Patent Owner's counterexample based on Phan, not Petitioner's proposal, that renders Phan's dynamic pixels unworkable, leading to variances in brightness from pixel-to-pixel and adding spaces so as to introduce distortion. Reply 15 (citing Ex. 1017 ¶¶ 73–79). Petitioner contends that this result "would all be contrary to Phan's teaching that its dynamic pixels

are meant 'not to be perceivable by the human eye.'" *Id.* (citing Ex. 1005, 2:57–59).

Although Patent Owner states that "Phan does not describe its figures as drawn to scale," Patent Owner argues in its Sur-reply that Figure 12 of Phan depicts spacing between sub-pixels. Sur-reply 18–19. Patent Owner also argues

> that displays having spacing between pixel units were not uncommon . . . , that [persons of ordinary skill in the art] would have understood spacing (such as shown in Fig. 12) is necessary for Phan's control circuitry or optical fiber network . . . , and that spacing would prevent image distortion.

*Id.* at 19 (citing Ex. 2009 ¶¶ 223–229). Patent Owner additionally argues that "removing quad-pixel spacing . . . is contrary to Phan's goal of applying dynamic driving to a given grid." *Id.* (citing Ex. 1005, 2:50–3:19; Ex. 2009 ¶¶ 229–230).

Patent Owner's arguments are premised on its interpretation of spacing between pixels in Phan's Figure 12. *See* PO Resp. 35 ("Phan's Figure 12 shows spacings between each quad-pixel"); Sur-reply 18 (stating that Phan "depicts spacing between quad-pixels in Figure 12"). As stated above, however, we do not interpret Phan's teachings as being limited by the spacing depicted in Figure 12. Indeed, Patent Owner acknowledges that "Phan does not describe its figures as drawn to scale." Sur-reply 18–19. Further, as discussed above, we generally do not rely on patent drawings for showing particular sizes. *See Hockerson-Halberstadt*, 222 F.3d at 956.

As noted by Petitioner, the figures in Phan—including Figure 12—depict pixels having the same shape and geometry across the display. Reply 14 (citing Ex. 1005, Figs. 2a–b, 4a–b, 5, 7, 8–8.12, 9–9.8, 12a–12d). Phan also teaches that pixels and dots are "regularly disposed" in a "grid." *See,*

*e.g.*, Ex. 1004, 2:51–53, 4:29–50, 5:47–54. Based on these teachings, we are persuaded that an ordinarily skilled artisan would have had reason to dispose Phan's pixels and dots in a regular pattern in the manner suggested by Petitioner. In fact, Dr. Kymissis agreed that it was common in the art of OLED displays to repeat unit pixel designs across a display. *See* Ex. 1018, 105:9–12, 106:2–6. Further, we do not agree with Patent Owner's argument (*see* PO Resp. 34; Sur-reply 18–19) that regular spacing is necessarily incompatible with dynamic driving of pixels. Patent Owner appears to base this argument on the need to dispose "Phan's control circuitry or optical fiber network" among the quad pixels. *See* Sur-reply 19 (citing Ex. 2009 ¶ 223). Yet Patent Owner has not explained how equal spacing precludes the disposition of such elements. Nor does Dr. Kymissis's supporting testimony establish as much. *See* Ex. 2009 ¶ 223.

We also have considered Patent Owner's arguments (PO Resp. 36–37; Sur-reply 19) about shifting of the visual locus and the potential for distortion in Petitioner's proposed pixel arrangement. Based on the full trial record, we are more persuaded by Petitioner's position because Petitioner shows persuasively how Phan's dots are intended to be evenly spaced. *See, e.g.*, Pet. 48–53; Ex. 1003 ¶¶ 339–367. This is supported by every drawing figure in Phan, which shows even spacing for both static and dynamic pixels. *See, e.g.*, Ex. 1005, Figs. 2a–b, 4a–b, 5, 7, 8–8.12, 9–9.8, 12a–12d. Notably, Phan does not disclose any need for "spacing between each quad-pixel to prevent distortion and poor image quality," as is suggested by Patent Owner (PO Resp. 37), even though Phan discloses embodiments with sub-pixels of unequal sizes. Phan also teaches that dynamic pixels are not meant to be perceptible by the human eye (Ex. 1005, 2:57–59), which renders the

uneven spacing in Patent Owner's counterexample—and the attendant distortion and brightness variances (*see, e.g.*, Ex. 1017 ¶¶ 73–79)—implausible, or at least outside of the natural reading of Phan.

For these reasons, we are persuaded that the "virtual square" limitations of claim 1 would have been obvious in light of Phan's teachings. *See* Pet. 48–53.

*d) Limitation [1-b]*

Claim 1 further recites that "the second pixel has a larger area than that of the third pixel." Ex. 1001, 9:7–8. Petitioner cites the embodiment in Figure 11b of Phan (reproduced above) where "the central 'crosspoint' of the pixel has been shifted 'along diagonal line 35' resulting in dots with non-equal areas." Pet. 53–54 (citing Ex. 1003 ¶¶ 368–370; Ex. 1005, 5:47–54, Fig. 11b). Thus, according to Petitioner, Figure 11b shows the blue dot as having a larger area than the red dot. *Id.* Patent Owner does not dispute this limitation apart from its arguments discussed above. Based on Phan's Figure 11b embodiment, we are persuaded that Phan's blue dot (i.e., "second pixel") has a larger area than the red dot (i.e., "third pixel"). *See, e.g.*, Ex. 1003 ¶¶ 368–370; Ex. 1005, 5:47–54, Fig. 11b.

*e) Secondary Considerations of Nonobviousness*

"[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)). "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention.*" *In re Huai-Hung Kao*,

639 F.3d 1057, 1068 (Fed. Cir. 2011). Patent Owner argues that "Petitioner's obviousness theories are . . . undercut by extensive objective evidence of non-obviousness, including long-felt need, failure of others, skepticism, praise, and copying." PO Resp. 58–74; Sur-reply 25–28. Petitioner disputes that there is a nexus between the challenged claims and the asserted secondary considerations. Reply 20–22.

We now consider Patent Owner's evidence of secondary considerations of nonobviousness starting with its assertion of a nexus between the '803 patent and the Samsung Galaxy S22 Ultra smartphone. We then turn to Patent Owner's arguments regarding long-felt need, failure of others, industry praise, and copying.

*(1) Nexus*

Patent Owner contends that it "successfully mass-produced full-HD [full high definition] AMOLED [active-matrix OLED] displays for the first time in the world beginning with the AMOLED display for the Samsung Galaxy S4, overcoming skepticism and satisfying the industry's long-felt need." PO Resp. 71–72 (citing Ex. 2009 ¶¶ 347–349). According to Patent Owner, "the '803 Patent's 'Diamond Pixel' arrangement has been widely adopted in AMOLED displays for flagship mobile devices, including every Samsung Galaxy and Apple iPhone model that has used AMOLED displays." *Id.* at 72 (citing Ex. 2009 ¶ 349); *see also id.* at 65–66 (stating that Patent Owner's "'Diamond Pixel' arrangement . . . embodies the invention claimed in the '803 Patent"). As an example, Patent Owner cites, but does not analyze in its briefs, a "Galaxy S22 ULTRA Claim Chart" in support of its contention that "the Samsung Galaxy S22 Ultra product practices all challenged claims of the '803 Patent." *Id.* at 72 (citing Ex. 2009 ¶¶ 350–352; Ex. 2028 (claim chart); Ex. 2063); *see also* Sur-reply 25 (citing

same). Patent Owner also provides one teardown image in support of its showing of nexus, which is reproduced below.




PO Resp. 72–73 (citing Ex. 2029, 5). This image from the Patent Owner Response is what Patent Owner calls "[a] teardown image . . . of the pixel arrangement obtained from a Galaxy S22 Ultra sample . . . with Figure 5 of the '803 Patent superimposed."[9] *Id.* Patent Owner additionally argues that "Petitioner does not assert any limitation is not met." Sur-reply 25; *see also id.* at 27 ("Regarding nexus, there is no dispute that [Patent Owner's] Diamond Pixel arrangement structures practice the claims.").

[9] In its Opposition to Petitioner's first motion to strike, which was filed after the Patent Owner Response, Patent Owner implies that the teardown images in the Response speak for themselves and, as such, are entitled to a presumption of nexus. *See* 1st Strike Opp. 3–4; *see also* Tr. 102:19–103:15 (similar argument by Patent Owner's counsel at the oral hearing). Petitioner argues that Patent Owner did not assert an entitlement to a presumption of nexus in the Response, and that Patent Owner's Opposition is an improper vehicle to introduce such an argument. 1st Strike Reply 1. We agree with Petitioner that Patent Owner did not address in the Response whether the Samsung Galaxy S22 Ultra smartphone is coextensive with the claims of the '803 patent. *See id.*; Reply 21. Accordingly, we decline to consider any argument that Patent Owner is entitled to a presumption of nexus.

Further addressing nexus, Patent Owner argues that

> [p]racticing the claims of the '803 Patent is what enabled the manufacture of full HD AMOLED displays suitable for mobile devices by striking the Patent's novel balance of improving the aperture ratio of the AMOLED display (by enlarging the emissive areas) and allowing an increased density of pixels while allowing for a more reliable deposition of the organic material (by ensuring sufficient gaps between pixels), and improving the display lifetime.

PO Resp. 73 (citing Ex. 2009 ¶¶ 353–356). Patent Owner also argues that "[t]he challenged claims achieve the abovementioned benefits by reciting pixel arrangements with specific groupings, shapes, sizes, and layouts of the red, green, and blue OLED sub-pixels." *Id.* (citing, *inter alia*, Ex. 2009 ¶¶ 353–356). According to Patent Owner, the pixel arrangement of the '803 patent allowed Patent Owner "to overcome manufacturing and design obstacles to attaining higher-resolution and higher brightness AMOLED displays that relate to the sensitive light-emitting organic layers of OLEDs." *Id.* at 74 (citing, *inter alia*, Ex. 2009 ¶¶ 353–356).

Petitioner argues that Patent Owner "has not even alleged—[l]et alone established—that any of the products it identifies are 'coextensive' with the claims." Reply 21. By Petitioner's reckoning, "[t]his makes sense, as the Samsung Galaxy S22 Ultra—and the other referenced products—are smartphones" whereas "[t]he '803 patent is not directed to a smartphone." *Id.* Petitioner also argues that Patent Owner does not establish that the asserted secondary considerations are the direct result of the unique characteristics of the claims and not the prior art. *Id.* Petitioner also argues that the claimed pixel arrangement "is at best ***indirectly*** responsible for any purported success, praise, and need satisfaction" given Patent Owner's statement that the arrangement "allowed [Patent Owner] to overcome

manufacturing and design obstacles." *Id.* at 21–22 (alteration in original) (quoting PO Resp. 73–74). Petitioner additionally argues that "[i]t is actually Patent Owner's 'highly sophisticated evaporation technology' that permits higher OLED resolutions." *Id.* at 22 (quoting Ex. 2065, 5) (citing Ex. 1018, 45:6–22).

A patent owner is entitled to a presumption of nexus when it shows that the asserted objective evidence is tied to a specific product that "embodies the claimed features, and is coextensive with them." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). A patent owner is further "afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019) (internal quotation omitted).

We agree with Petitioner (Reply 21; 1st Strike Reply 1) that Patent Owner is not entitled to a presumption of nexus because Patent Owner does not make any showing of coextensiveness between the Samsung Galaxy S22 Ultra smartphone and the claims of the '803 patent. Thus, Patent Owner necessarily must prove nexus "by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–74 (internal quotation omitted). We now discuss Patent Owner's proffered evidence of a direct nexus, and we find that it is entitled to little or no weight.

First, Patent Owner relies on the claim chart at Exhibit 2028 to support its statement that "the Samsung Galaxy S22 Ultra product practices all challenged claims of the '803 Patent." PO Resp. 72. We find below that

Patent Owner's mere mention of the claim chart at Exhibit 2028 without any explanation in the Patent Owner Response amounts to improper incorporation by reference in contravention of 37 C.F.R. § 42.6(a)(3). *See infra* § II.H. We grant Petitioner's motion to strike this statement below, and we accord it no weight in our nexus analysis. *See id.*

Second, Patent Owner's provision of "[a] teardown image . . . of the pixel arrangement obtained from a Galaxy S22 Ultra sample . . . with Figure 5 of the '803 Patent superimposed" (PO Resp. 72–73) is conclusory and entitled little or no weight. Indeed, the Patent Owner Response does not even provide a citation supporting the provenance of the annotated figure. One would have to look at paragraph 350 of Dr. Kymissis's declaration to find that annotated figure, which in turn cites Dr. Fontecchio's images of the Galaxy S22 Ultra teardown and Dr. Fontecchio's declaration. Ex. 2009 ¶ 350 (citing Ex. 2029, 5; Ex. 2063). We can only assume that Dr. Kymissis applied the annotations to an image provided by Dr. Fontecchio. Further, even if we were to overlook these gaps, we would accord little weight to the annotated figure because the overlaid aspects from Figure 5 of the '803 patent do not necessarily embody or account for all of the limitations of the challenged claims. In the absence of any explanation from Patent Owner, we find Patent Owner's annotated figure unavailing. In addition, the fact that Petitioner does not dispute the correspondence between particular limitations of the '803 patent claims and the Galaxy S22 Ultra smartphone (*see* Sur-reply 25, 27) is of no consequence given that Patent Owner has the burden of production on the issue of nexus. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

Third, to the extent that Patent Owner might separately assert a nexus between Patent Owner's so-called "Diamond Pixel" arrangement[10] and the claims of the '803 patent, Patent Owner does not substantiate such a nexus with evidence or analysis. *See* PO Resp. 71–74. Although Patent Owner uses "Diamond Pixel" as a shortcut way of referring to a pixel arrangement (*see id.* at 61–62, 65–66, 68, 72; Sur-reply 26–27), Patent Owner has neither established what the term "Diamond Pixel" encompasses, nor attempted to compare a "Diamond Pixel" arrangement to the claims of the '803 patent separate from its arguments related to the Galaxy S22 Ultra smartphone. The closest Patent Owner comes to providing a separate nexus analysis for a "Diamond Pixel" arrangement is in the Sur-reply, where it provides quotes from an exhibit titled "Samsung Diamond Pixels." Sur-reply 26 (quoting Ex. 2027, 1). Yet Patent Owner's mere mention of a "sub-pixel arrangement . . . [where] Red, Green, and Blue sub-pixels have very different sizes . . . [with] vertical, horizontal, and particularly diagonal line segments and vectors . . . maximiz[ing] the sub-pixel packing" is not keyed to any challenged claim. *Id.* (alterations in original) (quoting Ex. 2027, 1); *see also* PO Resp. 66 (similar quotation). Thus, we accord such mentions of "Diamond Pixel" arrangements no weight with respect to nexus. By extension, Patent Owner's attempts to tie the Samsung Galaxy S4 and iPhone X smartphones to "Diamond Pixel" arrangements (*see* PO Resp. 64, 66–68, 71–72) suffer from the same deficiencies related to nexus.

Fourth, we agree with Petitioner (Reply 21–22) that Patent Owner's statement about the claimed pixel arrangement helping Patent Owner

---

[10] "Diamond Pixel" appears to be an advertising mark. *See* PO Resp. 61 (indicating that the term is a trademark).

"overcome manufacturing and design obstacles" (PO Resp. 74) tends to show an indirect link between the alleged secondary considerations and the challenged claims. Petitioner also argues persuasively (Reply 21) that a pixel arrangement is but a component of the Samsung Galaxy S22 Ultra *smartphone*, which also tends to undermine a showing of nexus for considerations tied to the smartphone. *See Fox Factory*, 944 F.3d at 1374 (discussing how there is "no or very little correspondence" between a product and a patent claim where "the patented invention is only a component of a commercially successful machine or process"). Finally, Petitioner also cites some of Patent Owner's own proffered evidence that suggests that it is Patent Owner's "highly sophisticated evaporation technology" that permits higher resolution OLEDs for its smartphones. *See* Ex. 2065, 5. This too tends to undermine Patent Owner's showing of nexus.

For these reasons, we accord Patent Owner's evidence of a nexus between the claims of the '803 patent and the Samsung Galaxy S22 Ultra smartphone little to no weight. We also find that Patent Owner does not establish any nexus between devices allegedly embodying a so-called "Diamond Pixel" arrangement and the claims of the '803 patent. Despite the weak evidence of nexus in this case, we still consider Patent Owner's evidence of long-felt need, failure of others, industry praise, and copying below.

*(2) Long-Felt Need*

Patent Owner argues that in the early 2010s, "AMOLED displays for mobile devices suffered from a significant shortcoming—namely the difficulty of manufacturing higher resolution displays." PO Resp. 58 (citing Ex. 2009 ¶¶ 313–322; Ex. 2013, 3). Thus, Patent Owner argues that

> [t]here was a long-felt need to develop pixel arrangements that would enable the manufacture of high-resolution AMOLED displays that would provide superior image quality, particularly displays with sufficiently high pixel densities (measured as pixels-per-inch or 'PPI'), aperture ratio, and lifetime to support 'full high definition' ('full-HD') graphics in mobile devices.

*Id.* at 58–59 (citing Ex. 2009 ¶¶ 315–319); *see also id.* at 59–61 (further discussion about alleged manufacturing challenges). Patent Owner asserts that "the '803 Patent's novel pixel arrangement, which became widely recognized as the 'Diamond Pixel™' arrangement, enabled the manufacture of full-HD AMOLED displays suitable for mobile devices, satisfying the industry's longstanding need." *Id.* at 61; *see also* Sur-reply 27 (citing Ex. 2009 ¶¶ 353–356) (similar argument). Patent Owner also argues that alleged needs for higher resolutions and manufacturability of displays need not be expressly recited in the challenged claims as long as these "advantages [are] inherent in what is specifically disclosed in a patent." Sur-reply 27 (quoting *In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 n.5 (Fed. Cir. 1985)).

Petitioner argues that the things Patent Owner cites as being long-felt needs, including "'AMOLED displays' with 'sufficiently high pixel densities' and 'full HD' 'graphics in mobile devices,'" are not claimed in the '803 patent. Reply 23 (quoting PO Resp. 58–59). A such, Petitioner argues that no such needs could be met by the '803 patent. *Id.* Petitioner also cites information in Patent Owner's exhibits showing "not only optimism, but that there were numerous available OLED displays on the market long before the patent was filed." *Id.* at 23–24 (citing Ex. 2016, 1; Ex. 2019, 14; Ex. 2020, 3, 7; Ex. 2023, 1; Ex. 2025, 2; Ex. 2039, 2; Ex. 2074, 15).

Patent Owner's assertion of long-felt need is tied to the so-called "Diamond Pixel" arrangement (*see* PO Resp. 62; Sur-reply 27); as discussed

above (*see supra* § II.E.2.e).(1)), Patent Owner fails to substantiate a nexus to the "Diamond Pixel" arrangement. Further, even if we were to assume that some resolution and manufacturability benefits might flow from certain devices within the scope of the challenged claims, the record does not substantiate that these benefits satisfied a particular unmet need related to manufacturing higher resolution OLEDs. As noted by Petitioner (Reply 22), record evidence credits Patent Owner's "highly sophisticated evaporation technology" as allowing mass production of OLEDs with higher resolutions. Ex. 2065, 5. Other record evidence substantiates commercialization of OLED displays as of the time of the patent. *See, e.g.*, Ex. 2020, 3, 7; Ex. 2023, 1; Ex. 2025, 2; Ex. 2039, 2. Further, the claimed pixel arrangements could conceivably be used in displays having various densities and resolutions and with displays produced by both difficult and easy manufacturing processes. This lack of correspondence between the alleged need and the challenged claims undermines Patent Owner's assertion of long-felt need. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) (holding that where claims are broad enough to cover devices that either do or do not solve the identified problem, objective evidence of non-obviousness fails because it is not commensurate in scope with the claims which the evidence is offered to support).

For these reasons, we accord Patent Owner's evidence of long-felt need little or no weight.

*(3) Failure of Others*

Patent Owner also argues that "display manufacturers and researchers proposed many AMOLED pixel arrangements in an attempt to answer the industry's calling for full-HD AMOLED displays suitable for mobile devices." PO Resp. 61 (citing Ex. 2009 ¶¶ 330–336). Patent Owner argues

that these "wide-ranging efforts" did not result in success. *Id.* at 61–62; *see also id.* at 62–63 (further detailing alleged failures of others). Accordingly, Patent Owner argues that "the industry was highly skeptical that a pixel arrangement could be devised that would enable the manufacture of full-HD AMOLED displays for mobile devices," and that LCDs were viewed as a preferred alternative. *Id.* at 64 (citing Ex. 2009 ¶¶ 326–328). Patent Owner even argues that "[c]ontinued research efforts *after* the inventions of the '803 Patent also failed to result in a successful pixel arrangement that has been adopted for use in flagship mobile devices." *Id.* at 64–66 (alleging failure of a pixel arrangement by Petitioner Mianyang BOE). According to Patent Owner, "it was only [Patent Owner's] innovative 'Diamond Pixel' arrangement, which embodies the invention claimed in the '803 Patent, that was ultimately successful at enabling the manufacture of full-HD mobile AMOLED displays." *Id.* at 65–66 (citing Ex. 2009 ¶¶ 347–348).

Petitioner argues that the alleged lack of available "full-HD AMOLED displays suitable for mobile devices" is irrelevant because "[t]he claims do not require AMOLED displays, HD, or mobile devices." Reply 24 (quoting PO Resp. 61). Further, Petitioner argues that "numerous working AMOLED displays existed before the '803 patent." *Id.*

Patent Owner's assertions are again tied to the so-called "Diamond Pixel" arrangement (*see* PO Resp. 63, 65–66), but Patent Owner has failed to substantiate a nexus to the "Diamond Pixel" arrangement. *See supra* § II.E.2.e).(1). We also agree with Petitioner that record evidence supports the commercialization of OLED displays as of the time of the patent, which tends to disprove that others had failed. *See, e.g.*, Ex. 2020, 3, 7; Ex. 2023, 1; Ex. 2025, 2; Ex. 2039, 2. Moreover, to the extent Patent Owner's

assertions of failure by others are tied to manufacturing of high-resolution displays (*see, e.g.*, PO Resp. 64–66), such assertions fail for the same reasons as Patent Owner's long-felt need assertions discussed above. *See supra* § II.E.2.e).(2). Specifically, Patent Owner's proffered evidence related to display resolution and manufacturing is not commensurate in scope with the claims. *See Therasense*, 593 F.3d at 1336. Thus, we accord Patent Owner's evidence of failure of others little or no weight.

*(4) Industry Praise*

Patent Owner cites "significant praise" for the so-called "Diamond Pixel" arrangement that Patent Owner associates with the '803 patent, including "praise for the full-HD resolution and superior image quality of the AMOLED displays implementing these arrangements." PO Resp. 66–68 (citing Ex. 2009 ¶¶ 336–339; Ex. 2027, 1; Ex. 2067). Patent Owner further argues that "Samsung Galaxy S4's AMOLED display was the first commercial embodiment of the '803 Patent" and "[p]raise for the Galaxy S4's AMOLED display, and specifically the novel pixel arrangement of the '803 Patent that enabled full HD, was overwhelming." *Id.* at 66 (citing Ex. 2013, 3; Ex. 2026, 2; Ex. 2037, 3). Patent Owner also cites praise for the iPhone X and other "[f]lagship mobile devices," which also "adopted [Patent Owner's] AMOLED displays implementing the pixel arrangement of the '803 Patent." *Id.* at 67–68 (citing Ex. 2038, 1–2; Ex. 2039, 3, 5; Ex. 2040; Exs. 2068–2072). Patent Owner additionally cites an award presented by the Commissioner of South Korea's Intellectual Property Office to inventor Sang-Shin Lee. *Id.* at 68 (citing Ex. 2066, 9).

Petitioner criticizes Patent Owner's evidence of industry praise for the Samsung Galaxy S4 and the iPhone X because Patent Owner only attempts to show a nexus to the Samsung Galaxy S22 Ultra. Reply 24 (citing PO

Resp. 66–68, 71–72). Petitioner also criticizes Patent Owner's reference to an award by the Korean Patent Office as being devoid of explanation tying it to the '803 patent. *Id.* Petitioner additionally argues that "pixel arrangement is simply one among many product features discussed in Patent Owner's exhibits" and that various other features, such as precision display calibration, lower screen reflectance, high dynamic range, night shift mode, true tone viewing, super dim setting, and viewing angle performance, "are also important." *Id.* at 25 (citing Ex. 2039, 2–5). Petitioner further argues that "enhancements to the circuit structure" of the Galaxy S4 allowed for an improved contrast ratio, reduced power consumption, increased outside visibility, and a thinner display with a reduced bezel. *Id.* (quoting Ex. 2037, 4).

As discussed above, Patent Owner's attempt to establish a nexus between the claims of the '803 patent and the so-called "Diamond Pixel" arrangement is entitled to little or no weight. *See supra* § II.E.2.e).(1). Thus, Patent Owner's alleged evidence of praise for the "Diamond Pixel" structure (PO Resp. 66–68) is entitled to little or no weight. Given that Petitioner's only evidence of nexus for the Samsung Galaxy S4 and the iPhone X smartphones is tied to the "Diamond Pixel" arrangement (*see supra* § II.E.2.e).(1)), we likewise accord little or no weight to Patent Owner's alleged evidence of praise for these smartphones. *See* PO Resp. 66–68. Finally, Patent Owner cites no creditable analysis or evidence tying the cited Korean Patent Office award to the challenged claims. *See id.* at 68.

For these reasons, we accord Patent Owner's evidence of industry praise little or no weight.

*(5) Copying*

Patent Owner argues that "widespread copying of [Patent Owner's] patented pixel arrangements is evident from teardown photographs of commercially-available AMOLED display products that employ near carbon copies of [Patent Owner's] pixel arrangements. PO Resp. 68 (citing Ex. 2009 ¶¶ 340–346). In particular, Patent Owner argues that "Petitioner Mianyang BOE copied [Patent Owner's] pixel arrangements to commercialize AMOLED displays for products including the iPhone 12." *Id.* at 69 (citing Ex. 2009 ¶ 341). In support of this argument, Patent Owner provides the following illustration.

**Samsung Display AMOLED (Galaxy S22 Ultra)**




Ex. 2029 at 5 (annotated)

**Mianyang BOE AMOLED (iPhone 12)**




Ex. 2041, ¶84

PO Resp. 69 (citing Ex. 2029, 5; Ex. 2041 ¶ 84). In this illustration from the Patent Owner Response, the left image shows a pixel arrangement labeled "Samsung Display AMOLED (Galaxy S22 Ultra)" and the right image shows a pixel arrangement labeled "Mianyang BOE AMOLED (iPhone 12)." *Id.* According to Patent Owner, this illustration demonstrates that "the pixel arrangement used in Mianyang BOE's AMOLED display for the iPhone 12 is nearly identical to [Patent Owner's] patented pixel

arrangement," as exemplified by an image of an AMOLED display from a Galaxy S22 Ultra smartphone. *Id.*

Patent Owner additionally alleges "[w]idespread copying" by "numerous vendors of replacement AMOLED displays for mobile phones." PO Resp. 69 (citing Exs. 2042–2061). According to Patent Owner, the pixel arrangements in these replacement displays "not only infringe the challenged claims . . . , they bear such similarity to those of Samsung Display that they demonstrate copying." *Id.* at 69–70 (citing Ex. 2009 ¶¶ 342–346; Exs. 2042, 2043; *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1339–42 (Fed. Cir. 2023)). Patent Owner also provides a number of "[e]xemplary teardown images of such replica products . . . with Figure 5 of the '803 Patent overlayed on top" to support its analysis. *Id.* at 70–71 (citing Ex. 2029, 5; Ex. 2044, 4; Ex. 2045, 5; Ex. 2046, 6; Ex. 2047, 6; Ex. 2048, 5). Patent Owner compares these images with an image of an AMOLED display from a Galaxy S22 Ultra smartphone. *Id.*

Petitioner disputes Patent Owner's allegations of "widespread copying" because Patent Owner "does nothing more than (1) allege infringement and (2) compare product images." Reply 25 (citing PO Resp. 68–71). Petitioner argues that copying requires a showing of more than just similarity between the challenged patent and a competitor's product. *Id.* (citing, *inter alia*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019); *Iron Grip Barbell Co. v. USA Sports Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004); *Instiute Pasteur v. Focarino*, 738 F.3d 1337, 1347–48 (Fed. Cir. 2013)).

We first turn to Patent Owner's allegation that Petitioner Mianyang BOE's pixel arrangement for the iPhone 12 copied Patent Owner's patented

pixel arrangements. Patent Owner bases its analysis on a comparison to an image from a Samsung Galaxy S22 Ultra smartphone. *See* PO Resp. 70. As discussed above, however, we accord Patent Owner's evidence of nexus between the claims of the '803 patent and the Samsung Galaxy S22 Ultra smartphone little to no weight. *See supra* § II.E.2.e).(1). Thus, the basis of Patent Owner's copying analysis is dubious. The remainder of Patent Owner's analysis consists of an image comparison and an allegation that the images are "nearly identical." PO Resp. 69, 70–71; *see also* Ex. 2009 ¶¶ 345–346 (Dr. Kymissis's testimony regarding same). We find this analysis to be rudimentary at best. And, even if this were probative evidence of similarity, "[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying" because "[o]therwise every infringement suit would automatically confirm the nonobviousness of the patent." *Iron Grip Barbell*, 392 F.3d at 1325. Indeed, our reviewing court's "case law holds that copying requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). Patent Owner has presented no such evidence here. Thus, we accord Patent Owner's evidence of copying related to Mianyang BOE little or no weight.

We next turn to Patent Owner's allegations of "widespread copying" related to vendors of replacement AMOLED displays. Patent Owner relies on, *inter alia*, claim charts at Exhibits 2042 and 2043 to support its statement that certain vendors' pixel arrangements infringe the challenged claims. PO Resp. 69. As discussed below, we find that Patent Owner's incorporation of arguments by reference to these claim charts (and Dr. Kymissis's accompanying testimony) constitutes a violation of 37 C.F.R. § 42.6(a)(3).

*See infra* § II.H. We grant Petitioner's motion to strike this statement alleging infringement below, and we accord it no weight in our copying analysis. *See id.* Moreover, as above, the basis of Patent Owner's comparison is dubious because Patent Owner's evidence of nexus between the claims of the '803 patent and the Samsung Galaxy S22 Ultra smartphone is entitled to little or no weight. *See supra* § II.E.2.e).(1). For these reasons, we accord Patent Owner's evidence of copying related to replacement vendors little or no weight.

Considering all evidence of alleged copying presented by Patent Owner, we accord it little or no weight.

*(6) Other Considerations*

Although Patent Owner makes certain references to the "success[]" of its products (*see, e.g.*, PO Resp. 71–72), Patent Owner acknowledges that it is not asserting evidence of commercial success as a secondary consideration of nonobviousness. Sur-reply 28 n.5.

*(7) Conclusion Regarding Secondary Considerations of Nonobviousness*

Having considered the entire trial record, we accord Patent Owner's asserted evidence of secondary considerations of nonobviousness little or no weight.

*f) Conclusion Regarding Claim 1*

Petitioner has shown persuasively that Phan teaches or suggests all limitations of claim 1 in light of the knowledge of a person of ordinary skill in the art. We have considered Patent Owner's evidence of nonobviousness. Petitioner has shown by a preponderance of the evidence, inclusive of Patent

Owner's evidence of nonobviousness, that the subject matter of claim 1 would have been obvious over Phan.[11]

*3. Dependent Claim 2*

Claim 2 depends from claim 1 and recites that "the plurality of pixels further comprises another second pixel separated from the first pixel and having a center at a third vertex neighboring the second vertex of the virtual square" and that "the second pixels are separated from each other by the first pixel." Ex. 1001, 9:10–16. Petitioner again cites Phan's teaching that pixels are all "identical" and "regularly disposed" in a repeating matrix. Pet. 54 (citing Ex. 1005, 4:29–32, Fig. 11b). Continuing its analysis based on Phan from claim 1, Petitioner contends that "***'another second pixel'*** is located at a ***'third vertex'*** of the same 'virtual square'" and that the "'third vertex' ***'neighbor[s]'*** the square's 'second vertex.'" *Id.* (alteration in original). Petitioner again notes Phan's teaching of a black mask that separates adjacent dots. *Id.* (citing Ex. 1005, 4:33–36, Figs. 1a–c, 10a–11b). Petitioner further contends that "a ***'first pixel'*** (Phan's green dot) is located between and further ***'separate[s]'*** the ***'second pixel'*** and ***'another second pixel'*** (two of Phan's blue dots)." *Id.* (alteration in original). To summarize these contentions, Petitioner provides the following illustration in the Petition.

[11] The ITC Administrative Law Judge determined that claim 1, and claims 2–4 and 21 that depend, directly or indirectly, from claim 1, are not anticipated by Phan under 35 U.S.C. § 102. Ex. 2088, 61–64. The Administrative Law Judge did not consider the obviousness rationale in this ground based on Phan under 35 U.S.C. § 103, particularly with respect to the "virtual square" limitation of claim 1. *See supra* § II.E.2.c).




*Id.* at 55 (citing Ex. 1003 ¶¶ 374–380). In this illustration from the Petition, Petitioner shows the recited "virtual square" as a red square, indicates with a green arrow how a green "first pixel" is at the center of the virtual square, indicates with one blue arrow how a blue "second pixel" is at a first vertex of the virtual square, indicates with a second blue arrow how "another second pixel" is at a third vertex of the virtual square, and indicates with a red arrow how a red "third pixel" is at a second vertex of the virtual square. *Id.*

Patent Owner relies on the same arguments discussed above for claim 1. Based on Phan's Figure 11b embodiment as implemented in the quad pixel display of Figure 12, we are persuaded that Phan teaches the additional limitations of claim 2. *See, e.g.*, Pet. 54–55; Ex. 1003 ¶¶ 374–380. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.E.2.e). Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 2 would have been obvious over Phan.

*4. Dependent Claim 3*

Claim 3 depends from claim 2 and further recites that "the plurality of pixels further comprises another third pixel separated from the first pixel and having a center at a fourth vertex neighboring the third vertex of the virtual square" and that "the third pixels are separated from each other by the first pixel." Ex. 1001, 9:17–23. Petitioner again cites Phan's teaching that pixels are all "identical" and "regularly disposed" in a repeating matrix. Pet. 55 (citing Ex. 1005, 4:29–32, Fig. 11b). Continuing its analysis based on Phan from claim 2, Petitioner contends that "***'another third pixel'*** is located at a ***'fourth vertex'*** of the 'virtual square' centered on the green dot" such that the "'fourth vertex' ***'neighbor[s]'*** the square's 'third vertex'" and "a ***'first pixel'*** (Phan's green dot) is located between and ***'separate[s]'*** the ***'third pixel'*** and ***'another third pixel'*** (two Phan's red dots)." *Id.* (alterations in original). To summarize these contentions, Petitioner provides the following illustration in the Petition.




Pet. 56 (citing Ex. 1003 ¶¶ 381–385). In this illustration from the Petition, Petitioner shows the recited "virtual square" as a red square, indicates with a green arrow how a green "first pixel" is at the center of the virtual square,

indicates with one blue arrow how a blue "second pixel" is at a first vertex of the virtual square, indicates with a second blue arrow how "another second pixel" is at a third vertex of the virtual square, indicates with one red arrow how a red "third pixel" is at a second vertex of the virtual square, and indicates with a second red arrow how "another third pixel" is at a fourth vertex of the virtual square. *Id.*

Patent Owner relies on the same arguments discussed above for claim 1. Based on Phan's Figure 11b embodiment as implemented in the quad pixel display of Figure 12, we are persuaded that Phan teaches the additional limitations of claim 3. *See, e.g.*, Pet. 55–56; Ex. 1003 ¶¶ 381–385. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.E.2.e). Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 3 would have been obvious over Phan.

*5. Dependent Claim 4*

Claim 4 depends from claim 3 and further recites that "the second pixels and the third pixels enclose the first pixel in the virtual square." Ex. 1001, 9:24–26. Petitioner cites Phan's teaching of employing pixels with dots arranged in a square shape. Pet. 56 (citing Ex. 1005, 3:65–4:4, 4:29–30, 4:54–55, 5:47–54, Figs. 2a–b, 11b, 12). Continuing its analysis based on Phan from claim 3, Petitioner contends that "Phan's ***'second pixels'*** (the blue dots) and ***'third pixels'*** (the red dots) surround and ***'enclose'*** its ***'first pixel'*** (the green dot) in the center of a ***'virtual square.'***" *Id.* at 56–57 (citing Ex. 1003 ¶¶ 386–389). Petitioner also cites the same illustration reproduced above in the analysis of claim 3. *Id.*

Patent Owner relies on the same arguments discussed above for claim 1. Based on Phan's Figure 11b embodiment as implemented in the quad pixel display of Figure 12, we are persuaded that Phan teaches the additional limitations of claim 4. *See, e.g.*, Pet. 56–57; Ex. 1003 ¶¶ 386–389. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.E.2.e). Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 4 would have been obvious over Phan.

*6. Dependent Claims 19 and 20*

Claim 19 depends from claim 1 and further recites that "the first pixel, the second pixel, and the third pixel are configured to emit different color lights." Ex. 1001, 10:48–50. Claim 20 depends from claim 19 and recites that "the second pixel and the third pixel are configured to emit blue light and red light, respectively." *Id.* at 10:51–53. Petitioner cites the same analysis from claim 1 in which it maps the recited "first pixel," "second pixel," and "third pixel" to Phan's green, blue, and red dots, respectively. Pet. 57–58 (citing Ex. 1005, 4:29–32, Figs. 11b, 12); *see also supra* § II.E.2.c) (analysis for [1-a(1)] through [1-a(4)]).

Patent Owner relies on the same arguments discussed above for claim 1. For the same reasons discussed above, we are persuaded that Phan teaches pixels of different colors with the "second pixel" being blue and the "third pixel" being red. *See, e.g.*, Ex. 1005, 4:29–32, Figs. 11b, 12; *see also supra* § II.E.2.c) (analysis for [1-a(1)] through [1-a(4)]). Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to these claims. *See supra* § II.E.2.e). Thus, we

determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claims 19 and 20 would have been obvious over Phan.

*7. Dependent Claim 21*

Claim 21 depends from claim 1 and further recites that "the second pixel has a larger area than that of the first pixel." Ex. 1001, 10:54–55. Similar to its analysis for limitation [1-b], Petitioner cites Phan's teachings relative to Figure 11b in which the crosspoint is shifted along a diagonal line in a quad pixel to create a blue dot (i.e., a "second pixel") that is larger than a green dot (i.e., a "first pixel"). Pet. 58 (citing Ex. 1005, Fig. 11); *see also supra* § II.E.2.d) (analysis for [1-b]).

Patent Owner relies on the same arguments discussed above for claim 1. Based on Phan's Figure 11b embodiment, we are persuaded that Phan's blue dot (i.e., "second pixel") has a larger area than the green dot (i.e., "first pixel"). *See, e.g.*, Ex. 1005, 5:47–54, Fig. 11b. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.E.2.e). Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 21 would have been obvious over Phan.

*F. Alleged Obviousness of Claim 5 over Phan and Yamada*

Claim 5 depends from claims 4, 3, 2, and 1. Ex. 1001, 8:58–9:31. Claim 5 further recites limitation [5-a]: "the first pixel, the second pixels, and the third pixels have polygonal shapes," and limitation [5-b]: "each of the second pixels and each of the third pixels has a larger area than the first pixel." *Id.* at 9:27–31; Pet. 59–60. We find below that Petitioner has not put forth a persuasive rationale for combining Phan and Yamada, which Petitioner relies on to meet limitation [5-b]. We first discuss Petitioner's

contentions for limitation [5-a], and then explain why Petitioner has not set forth a persuasive rationale to combine the teachings of Phan and Yamada to meet limitation [5-b].

*1. Limitation [5-a]*

Petitioner asserts that Phan's Figures 11a and 11b, reproduced below, teach limitation [5-a] (Pet. 59–60):




FIG. 11a




FIG 11b

Figure 11a shows a square quad-pixel where the crosspoint is at the center of the four dots or individual elements of equal light emitting area and space, contoured by black mask or black barrier ribs with the same structure. Ex. 1005, 3:64–67. Figure 11b shows a typical square quad-pixel where the crosspoint moving along the diagonal line forms two dots (individual elements) of equal light emitting area and space of green color (G). *Id.* at 4:1–4.

Petitioner asserts:

> Phan explains that the dots making up its pixels can be formed as a "square quad." (Ex. 1005, 5:47–54.) For instance, in Fig. 11a, each dot is an "equal" part of the "square" pixel (and thus is also square). (*Id.*, 5:47–50.) And, in Fig. 11b, while the overall pixel still has a square shape, the "crosspoint" that separates the dots has "mov[ed]" along a "diagonal line" resulting in square and rectangular shaped dots. (*Id.*, 5:51–54.)

Pet. 59 (alteration in original). Thus, according to Petitioner, each of the dots shown in the illustration above is either square or rectangular, both of which are polygonal as is required by claim 5. *Id.*

*2. Limitation [5-b]*

*a) Petitioner's Reasoning*

The illustration Petitioner relies on to show satisfaction of claim 4 from which claim 5 depends is reproduced below:




Pet. 56–57. The illustration is Petitioner's depiction of the resulting arrangement when the quad pixel structure of Phan's Figure 11b is substituted into the pixel display structure of Phan's Figure 12, which shows a first pixel, a second pixel, another second pixel, a third pixel, and another third pixel. *Id.*

Although Phan teaches that its second pixel (blue) can be made larger than its first pixel (green), Petitioner acknowledges that Phan does not provide an example where its third pixel (red) is also made larger than the first pixel as is required by limitation 5-b. Pet. 60. Petitioner asserts, however, that it would have been obvious to one of ordinary skill in the art

to re-size Phan's dots according to Yamada's teachings of sizing the pixels according to the emission efficiency of each color's emissive element, i.e., the pixel with a color having the highest emission efficiency, green, is made the smallest, and the pixel with a color having the lowest emission efficiency, blue, is made the largest. *Id.* at 60–62. Regarding motivation to combine the teachings of Phan and Yamada, Petitioner states:

> A POSITA would have been motivated to apply Yamada to Phan in the manner discussed above for the same reasons it would have been obvious to apply Yamada to Matthies. (Ex. 1003, ¶¶ 433–442.) As explained, it was well-known that adjusting pixel size—and making pixels with lower emission efficiencies (like blue pixels) larger and pixels with higher emission efficiencies (like green pixels) smaller—reduces deterioration and improves display life. . . . A POSITA would have recognized that applying Yamada to Phan would have similarly improved the life of Phan's display. (Ex. 1003, ¶¶ 434–437.) By making the blue pixels largest and the green pixels smallest, display deterioration and dot failure would have been reduced. (*Id.*)

*Id.* at 62–63. Additionally, Petitioner asserts that re-sizing pixels according to their emission efficiency was also known to simplify display design because each pixel can be supplied with the same current or power. *Id.* at 63 (citing Ex. 1003 ¶¶ 438–439).

Petitioner generally refers back to its reasoning for combining Yamada and Matthies as being equally applicable to this ground. Pet. 62. For instance, Petitioner asserts that, according to Yamada, to achieve constant pixel luminance with same-sized pixels, pixels with lower emission efficiency, like blue, must be supplied with a larger current than pixels with higher emission efficiency, like green, but supplying the blue pixels with a larger current shortens their lives. *Id.* at 39–40. Petitioner asserts that, to address this problem, Yamada teaches that the pixels with lower emission

efficiencies (blue) should be made larger than pixels with higher emission efficiencies (green), and that this solution avoids the deterioration problem and lengthens the life of the display. *Id.*

Petitioner identifies several other reasons for combining teachings. Pet. 41–43. But they all hinge on the base motivation that enlarging the size of blue pixels would extend their lifetimes and thus improve the overall life of the display and are not presented as motivations independent of that base motivation. For example, Petitioner indicates that extending the life of the blue pixels would create a more balanced luminance that would obviate the need for additional adjustment circuitry to tailor the supplied current on a pixel-by-pixel basis. *Id.* at 41–42.

Petitioner provides an illustration of the resulting pixel display structure which applies Yamada's pixel sizing teachings to Phan:




The illustration is Petitioner's depiction of the resulting pixel display structure that incorporates Yamada's teaching about sizing pixels according to their emission efficiency to Phan's pixel display. Pet. 61–62. Petitioner

explains that the blue dots maintain their original size, the green dots are made the smallest, and the red dots are of an intermediate size between the blue dots and green dots. *Id*. at 61. According to Petitioner, the sizing requirements of claim 5 are thus met by the combined teachings of Phan and Yamada. *Id.* at 62.

*b) Patent Owner's Arguments*

Patent Owner argues:

> *First*, for reasons as discussed above in connection with Ground 1, a POSITA would have understood that keeping the blue pixel the same size and shrinking the red and green pixels would require higher current density to be applied to the red and green pixels, accelerating their aging and reducing display lifetime. These effects would be exacerbated because Phan's passive-matrix displays require high driving voltages and current densities. [Ex. 2009] ¶¶245-246. The Petition's proposed combination of Phan with Yamada would have the opposite effect of Petitioner's purported motivation to combine of extending display lifetime. *Id.*
>
> *Second*, Petitioner's proposed modification conflicts with Phan's express teachings concerning how to adjust the relative sizes of subpixels (dots) in a quad-pixel structure. *Id.*, ¶247. Phan discloses that the relative sizes of the dots in its square quad-pixel are changed by moving the crosspoint—i.e., the point at which the corners of all four pixels meet —along a diagonal line of the square, for example along the red arrow. Phan, 5:51-54.



FIG. 11a FIG 11b

[The illustration shows Phan's manner of adjusting pixel sizes, by moving the crosspoint (Patent Owner added a red arrow to note the direction of crosspoint movement).] *Id.*, Figs. 11a, 11b. As shown in Figures 11b, when the blue pixel's size is increased, each green pixel is necessarily made an intermediate size and the red pixel is necessarily made smallest. Ex. 2009, ¶248.

Phan teaches adjusting the sizes of dots without adding space between subpixels—keeping the overall aperture ratio constant—by moving the crosspoint along a diagonal line. Phan, 5:43-46, 5:51-54. Petitioner inextricably breaks apart Phan's quad-pixel, contrary to Phan's requirements, and introduces arbitrary spacing between the subpixels without any support in Phan:




[The illustration shows Petitioner's modification of Phan's unmodified quad-pixel.] Pet. at 61. *Not only is this inconsistent with Phan's teachings about the crosspoint, but it is inconsistent with Phan's passive-matrix design constraining adjustments of pixel sizes*. Ex. 2009, ¶¶249–250. Indeed,

> Petitioner provides no reason for ignoring Phan's Figure 11b in enlarging the blue pixel.

PO Resp. 41–43 (emphasis added except for first and second).

*c) Discussion*

*(1) Deficient Manner of Resizing Phan's Pixels*

Patent Owner asserts that Petitioner's manner of resizing Phan's pixels "conflicts with Phan's express teachings concerning how to adjust the relative sizes of subpixels (dots) in a quad pixel structure," and "is inconsistent with Phan's passive-matrix design constraining adjustments of pixel sizes." PO Resp. 41–43. Petitioner does not dispute Patent Owner's assertion (*id.* at 38) that Phan explicitly concerns passive-matrix displays as an alternative to actively-driven displays.

Dr. Kymissis has testified that for passive-matrix OLEDs, the light-emitting area is defined by the overlap of row and column electrodes and, consequently, the pixels in the same row have the same height and the pixels in the same column have the same width. Ex. 2009 ¶¶ 123, 250. Dr. Kymissis further has testified that changing the size of a row or column electrode would change the size of all the pixels in that row or column. *Id.* With respect to the testimony of Dr. Kymissis, Petitioner identifies no countering testimony from its own expert Dr. Pattison. We credit the testimony of Dr. Kymissis, and find that for the passive-matrix display of Phan, the pixels in the same row must have the same height and the pixels in the same column must have the same width.

Phan describes that the sizes of the dots in its square quad-pixel are changed by moving the crosspoint, the point at which the corners of all four pixels meet, along a diagonal line of the square. Ex. 1005, 5:51–54. Phan's

Figure 11b shows one such example where the crosspoint has been moved toward the lower right and is reproduced below:




FIG 11b

Figure 11b shows a square quad-pixel where crosspoint 33 has been moved from the center along diagonal line 35. *Id.* at 5:51–54. As is readily apparent from Figure 11b, as compared to their sizes when the crosspoint is at the center of the square, the blue pixel has been made bigger and the red pixel has been made smaller than both the blue pixel and the green pixels. This described manner of resizing is consistent with the structural requirements of a passive-matrix OLED where the pixels in the same row have the same height and the pixels in the same column have the same width. Ex. 2009 ¶¶ 123, 250.

In contrast, Petitioner's proposed manner of adjustment of pixel sizes foregoes the crosspoint movement, separates the four sub-pixels of the square quad-pixel, and includes intermediate spacing among the four, as shown below:




Pet. 61. Phan's Figure 11a is on the left, showing an unmodified quad-pixel with four equal sized square color light emitting sub-pixels contiguous to each other, and the modified structure purportedly according to Yamada's teachings is shown on the right, with an arrow pointing from left to right between the unmodified quad-pixel on the left and the modified quad-pixel structure. The modified structure has made the red sub-pixel R smaller than the blue sub-pixel B, and the two green sub-pixels G even smaller than the red sub-pixel R. The four sub-pixels in the modified structure are separated from each other by intermediate spacing.

Petitioner's proposed modified structure of Phan is not compatible with Phan's passive matrix OLED to which Petitioner applies the proposed modification. In the above-reproduced illustration of the modified structure, the pixels in the same row do not have the same height and the pixels in the same column do not have the same width.

Petitioner's expert, Dr. Pattison, testifies with respect to Petitioner's illustrated modified structure that "[w]hile the pixels are no longer touching each other as they are shown to be in Figure 11a, a POSITA would have understood that there already is space (even if not depicted) between the pixels to allow for the intermediate signal lines." Ex. 1003 ¶ 428.
Dr. Pattison also testifies that the modification simply decreases the size of the green and red pixels "so as to allow all the pixels to be supplied with the

same current." *Id.* ¶ 429. Such testimony does not aid Petitioner because it does not change the fact that in the modified structure the pixels in the same row do not have the same height and the pixels in the same column do not have the same width.

Petitioner asserts:

> Patent Owner also argues that the Petition's example application of Yamada to Phan "violates Phan's requirement of adjusting the pixel sizes along a crosspoint." Response, 40, 41. It does not. Phan explains that "[t]he precise arrangement of the various color dots . . . is not critical" so long as this arrangement is "identical" from pixel-to-pixel. (Phan, 4:37–40; 5:3-5.) "Other pixel shapes are contemplated" besides those shown. (*Id.*, 5:32.) And per Phan, pixels' light emitting areas can be "adjust[ed]" using a black mask/barrier. (*Id.*, Abstract, 1:30-34.) So, far from "violat[ing]" any "requirement" in Phan, the Petition merely follows Phan's teachings.

Reply 16–17 (alterations in original). This explanation does not address and respond to the fact that Petitioner's proposed modification does not result in pixels in the same row having the same height and the pixels in the same column having the same width as would be necessary with the structure of Phan's passive-matrix OLED, even assuming that other pixel shapes are contemplated besides those expressly shown.

We also have considered Petitioner's argument that Cok's Figure 1 pixel arrangement—which is similar to Phan's Figure 11b pixel arrangement—is used in an active-matrix OLED. Reply 16 (citing Ex. 1015, Fig. 1). Although Cok makes general statements about the application of its disclosed invention to "passive-matrix or active-matrix [OLED] devices" (Ex. 1015, 2:61–67), Cok does not specify whether its Figure 1 embodiment pertains to active- or passive-matrix OLEDs. *See id.* at 4:8–13; *see also* Ex. 1018, 70:5–18 (Dr. Kymissis's testimony regarding same). And, even if

we were to assume that Cok's Figure 1 pixel arrangement might be applicable to active-matrix OLEDs, this fact still would not cure the deficiencies in Petitioner's obviousness rationale. Specifically, Petitioner offers no explanation why or how Phan's passively driven pixel arrangement would be resized in a manner at odds with Phan's own teachings to allegedly achieve the pixel arrangement of claim 5. We also note that Cok's Figure 1 pixel arrangement does not resemble Petitioner's proposed pixel arrangement for this ground, which undermines Petitioner's argument. *Compare* Ex. 1015, Fig. 1, *with* Pet. 61–62 (illustrations).

For the foregoing reasons, we find Petitioner has not persuasively shown how or why one of ordinary skill in the art would have adapted the pixel structure of Phan based on Yamada as proposed by Petitioner.

*(2) Petitioner's Proposal Reduces Lifetime of Red and Green Pixels*

Patent Owner asserts that Petitioner has not proposed to enlarge the size of the blue pixel as disclosed by Yamada but to keep the size of the blue pixel the same, reduce the size of the red pixel, and reduce the size of the two green pixels even more. PO Resp. 37 (citing Pet. 61). Patent Owner explains:

> for reasons as discussed above in connection with Ground 1 [obviousness over Matthies and Yamada], a POSITA would have understood that keeping the blue pixel the same size and shrinking the red and green pixels would require higher current density to be applied to the red and green pixels, accelerating their aging and reducing display lifetime. These effects would be exacerbated because Phan's passive-matrix displays require high driving voltages and current densities. [Ex. 2009] ¶¶245-246. The Petition's proposed combination of Phan with Yamada would have the opposite effect of Petitioner's purported motivation to combine of extending display lifetime. *Id.*

*Id.* at 41. These assertions are supported by the cited testimony of Dr. Kymissis. For instance, Dr. Kymissis testifies:

> [B]y reducing the red and green light-emitting areas, Dr. Pattison [Petitioner's expert]'s combination would require a higher current density to be applied to the red and green pixels to drive them at the same amount of brightness as before, thus accelerating aging of the red and green pixels and reducing display lifetime. In Phan's passive-matrix displays, the aging and lifetime effects of higher driving voltages and current densities would be further exacerbated.

Ex. 2009 ¶ 245.

Petitioner does not dispute that reducing the size of the red and green dots would reduce the lifetime of the red and green dots. Petitioner does not dispute that this result would be exacerbated by the higher driving voltages and current densities associated with Phan's passive-matrix display. Petitioner responds to Patent Owner's assertion as follows: "Patent Owner also repeats many of the same arguments it makes elsewhere, *i.e.*, applying Yamada *would not extend display life*, . . . *E.g.*, Response, 40-47. As explained. these arguments lack merit. *Supra* Sections II.A.3, II.B.2." Reply 17 (emphasis added).

Petitioner relies on the same arguments it asserts on this same issue in the context of the ground of unpatentability based on Yamada and Matthies. We have already discussed and rejected those arguments in our discussion of the alleged obviousness of claim 1 over Yamada and Matthies. For the same reasons, we determine Petitioner has not shown that its proposed combination of Phan and Yamada would extend the life of the display, which further undermines Petitioner's reason for combining the teachings of Phan and Yamada.

*d) Conclusion for Limitation [5-b]*

For the foregoing reasons, we conclude that Petitioner has not set forth a persuasive rationale to combine the teachings of Phan and Yamada to meet limitation [5-b].

*3. Conclusion for Claim 5*

Petitioner has not proved by a preponderance of the evidence that claim 5 would have been obvious over Phan and Yamada.

*G. Alleged Obviousness of Claims 1–5 and 19–21 over Murai and Yamada*

*1. Overview of Murai*

Murai is a Japanese patent directed to "a color image display device" that seeks to "display color images having a high-quality appearance." Ex. 1007 ¶¶ 1, 5. Murai indicates that the display device may be "an organic EL display device[]." *Id.* ¶ 58. Murai discloses a color image display device that "has unit pixels . . . made up of four dots disposed as a grid in the vertical and horizontal direction." *Id.* ¶ 28. To display higher-quality images, Murai calls for regularly disposing the unit pixels and effectively utilizing all regions of the screen so that the "overall aperture ratio can be improved." *Id.* ¶¶ 10, 42. Figure 3 of Murai is reproduced below.




Figure 3 is "a plane view illustrating dot shape and dot arrangement in a color image display device." Ex. 1007 ¶ 27. "The unit pixels 30 are configured by four dots: one first dot 31, two second dots (32a and 32b), and one third dot 33, as a combined display unit." *Id.* ¶ 28. "[T]he second dots (32a and 32b) are configured by a first auxiliary dot 32a disposed on a top right corner of a rectangle made by the unit pixel 30 and a second auxiliary dot 32b disposed on a bottom left corner of the rectangle." *Id.* "[T]he first auxiliary dot 32a and the second auxiliary dot 32b are disposed diagonally in the rectangle made by the unit pixel 30." *Id.*

According to Murai, "the first auxiliary dot and the second auxiliary dot [may] be shaped having cut-off portions wherein at least one corner of the rectangular shape is cut off, and [may] be disposed so that there is a cut-off portion near a space between the first auxiliary dot and the second auxiliary dot." Ex. 1007 ¶ 11.

2. *Independent Claim 1*

We find below that Petitioner has not set forth a persuasive rationale for combining Murai and Yamada. We first discuss Petitioner's contentions for the preamble of claim 1 and limitations [1-a], [1-a(1)], [1-a(2)], [1-a(3)], [1-a(4)], and [1-c] of claim 1. Thereafter, we explain why Petitioner has not set forth a persuasive rationale to combine the teachings of Murai and Yamada to meet limitation [1-b].

*a) Preamble [1-pre]*

The preamble of claim 1 recites "[a] pixel arrangement structure of an organic light emitting diode (OLED) display." Ex. 1001, 8:58–59. Petitioner asserts: "Murai teaches a 'color image display device'" that includes "colored 'dots' arranged into 'unit pixels[s].'" Pet. 65 (citing Ex. 1007 ¶¶ 1, 6) (alteration in original). Petitioner contends that Murai's display "can be 'an organic EL display device.'" *Id*. (citing Ex. 1007 ¶ 58). Patent Owner argues that "Murai does not disclose or suggest that any of its figures, let alone Figure 3, represent how an OLED display . . . could or would be implemented." PO Resp. 48–49 (citing Ex. 2009 ¶¶ 277–278). We need not decide whether the preamble is limiting and whether Murai meets the preamble recitation because the alleged ground of obviousness based on Murai and Yamada is deficient in other ways.

*b) Limitation [1-a]*

Limitation [1-a] recites "a plurality of pixels for displaying an image on the OLED display and comprising." Ex. 1001, 8:60–61. Petitioner refers to Murai's Figure 3 and asserts the figure shows "multiple red (R), green (G), and blue (B) dots 31, 32a, 32b, and 33 arranged into unit pixels 30." Pet. 65 (internal quotation marks omitted) (citing Ex. 1007 ¶¶ 28–29). Murai's Figure 3 is reproduced below.




Figure 3 is "a plane view illustrating dot shape and dot arrangement in a color image display device." Ex. 1007 ¶ 27. Petitioner asserts Murai characterizes its dots (31, 32a, 32b, and 33) as pixels. Pet. 66 (citing Ex. 1007 ¶ 16). Petitioner further contends that Murai's dots are equivalent to the claim's "pixel" because the '803 patent teaches a "pixel" is the "minimum unit for displaying images," and Murai's dots "are the minimum unit of Murai's display." *Id*. (citing Ex. 1003 ¶¶ 461–466). Patent Owner reiterates its arguments that Murai does not teach an OLED display. PO Resp. 48–49 (citing Ex. 2009 ¶¶ 277–278). We need not resolve the issue because the alleged ground of obviousness based on Murai and Yamada is deficient in other ways.

*c) Limitations [1-a(1)], [1-a(2)], [1-a(3)], [1-a(4)], and [1-c]*

Petitioner presents multiple annotated versions of Murai's Figure 3, one of which is reproduced below, to illustrate how limitations [1-a(1)], [1-a(2)], and [1-a(3)] are met by Murai. Pet. 68–70.




In this version of Murai's Figure 3, Petitioner identifies elements including a "first pixel at center of virtual square," "second pixel at first vertex," and "another first pixel." *Id.* at 70 (internal quotations omitted). Specifically, the illustration shows a red-lined virtual square and a first pixel (green) at the center of the virtual square, which is limitation [1-a(1)]. Pet. 68 (citing Ex. 1003 ¶¶ 467–480). The illustration shows a second pixel (blue) separated from the first pixel and having a center at a first vertex of the virtual square, which is limitation [1-a(2)]. *Id.* at 69 (citing Ex. 1003 ¶¶ 481–484). The illustration shows another first pixel (green) on a line defined by the center of the virtual square and the first vertex, where the first pixel, the second pixel, and the other first pixel are consecutive pixels on the line, which is limitation [1-a(3)]. *Id.* at 70 (citing Ex. 1003 ¶¶ 485–488).

Limitation [1-a(4)] recites "a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square." Ex. 1001, 9:4–6.

Petitioner presents another annotated version of Murai's Figure 3, reproduced below, with color annotations including "first pixel at center of virtual square," "second pixel at a first vertex," "third pixel at second vertex," to show how limitation [1-a(4)] is met by Murai. Pet. 71 (internal quotations omitted).




In this version of Murai's Figure 3, Petitioner identifies a third pixel at a second vertex of the virtual square. Specifically, the illustration shows a third pixel (red) separated from the first pixel (green) and the second pixel (blue), and having a center at a second vertex neighboring the first vertex of the virtual square. *Id.* at 70–71 (citing Ex. 1003 ¶¶ 489–492).

Limitation [1-c] recites "wherein the first pixel is configured to emit green light." Ex. 1001, 9:9. Petitioner asserts that "Murai's display includes 'green (G)' dots/pixels" and references the above figures as teaching a green pixel at the center of a virtual square. Pet. 74 (citing Ex. 1003 ¶¶ 512–514). In rebuttal, Patent Owner argues that the combination of Murai and Yamada does not disclose a virtual square. PO Resp. 49–53. We need not decide whether the Murai and Yamada combination discloses a virtual square

because, for reasons discussed below, the Petition is deficient with respect to limitation [1-b].

*d) Limitation [1-b]*

Limitation [1-b] recites "wherein the second pixel has a larger area than that of the third pixel." Ex. 1001, 9:7–8. Petitioner relies on a combination of Murai and Yamada to meet limitation [1-b]. Pet. 71.

*(1) Petitioner's Reasoning*

Petitioner asserts Murai teaches that its "dots/pixels can include a 'cut-off portion' that adjusts the dot area." Pet. 71 (citing Ex. 1007 ¶¶ 6, 11). Petitioner then proposes combining Murai's dot/pixel "cut-off portion" with Yamada's teachings to yield second pixels (blue dots) with a larger area than both of the other pixels (the green and red dots). *Id.* at 74 (citing Ex. 1003 ¶¶ 507–510).

Petitioner asserts: "A POSITA would have been motivated to apply Yamada to Murai in the manner discussed above for the same reason it would have been obvious to apply Yamada to both Matthies and Phan. Pet. 80. Petitioner states that "Yamada teaches an OLED display with red, green, and blue pixels re-sized 'in accordance with the emission efficiency of' each color's 'emissive element.'" *Id.* at 73 (citing Ex. 1008, 2:55–60, 3:16–27). According to Petitioner, Yamada discloses that re-sizing of the pixels according to emission efficiency, i.e., pixels with lower emission efficiency (blue) made larger than pixels with higher emission efficiency (green), avoids a pixel deterioration problem caused by supplying pixels with lower emission efficiency with higher current, and lengthens the overall life of the display. *Id.* at 39–40. Petitioner states: "As an added benefit, the overall display design become 'simplified' and 'extremely easy to control' as each pixel is supplied with 'the same amount of power.'" *Id.* at 40.

Petitioner further explains:

> Applying [Yamada] to Murai results in what the claim requires: Murai's dots would be relatively resized per Yamada using the method Murai already teaches—different numbers and sizes of cutouts—such that "***second pixels***" (the blue dots) have a "***larger area***" than both of the other "***pixel[s]***" (the green and red dots). (Ex. 1003, ¶¶ 507-510.)

Pet. 74 (second alteration in original). Petitioner provides an illustration as reproduced below:




*Id.* Petitioner's illustration depicts 9 dots from Murai's Figure 3 dot arrangement comprising red, green, and blue dots. *Id.* The green dots have two cutouts making the green dots the smallest. *Id.* The red dots also have two cutouts but are larger than the green dots. *Id.* Lastly, the blue dots have no cutouts and thus are the largest of the colored dots. *Id*.

Petitioner asserts that this illustration shows "an example" of how a POSITA would have combined Yamada and Murai to meet the limitation [1-b]. Pet. 74.

*(2) Discussion*

*(a) Not Balancing for Reduced Aperture Ratio*

Patent Owner asserts that downsizing Murai's pixels based on Yamada's teachings is "incompatible" with Murai's goal of improving the display's overall aperture ratio. PO Resp. 53 (citing Ex. 1007 ¶ 42; Ex. 2009 ¶ 298). Patent Owner asserts that "Petitioner's modifications would reduce

the aperture ratio and thereby undercut Murai's very purpose." *Id.* at 55. For reasons discussed below, we agree with Patent Owner.

Patent Owner's expert, Dr. Kymissis, explains:

> Further, Murai's disclosures—including its very reason for having cutoff corner positions in the green dots in Figure 3—are incompatible with Yamada's teachings. Murai's goal is to "improve[]" the "aperture ratio" (*i.e.*, the light-emitting area of the display) by packing pixels very closely together. Murai, ¶¶ [0010], [0042]. Dr. Pattison's proposed modification of Murai, purportedly based on Yamada's teachings, would *reduce* the display aperture ratio, and do so for no benefit.

Ex. 2009 ¶ 298 (emphasis in original) (alteration in original). Additionally, Dr. Kymissis explains:

> Murai, in the context of LCD displays having dots placed closely together, observes that diagonal lines of green dots can create visible streaks. Murai, ¶¶ [0004]-[0005]. Thus, Murai's solution to avoid these unwanted streaks is to cut out alternating corners on adjacent green dots to increase their separation, while **maximizing the light-emitting area**. Murai, ¶¶ [0008], [0010], [0011], [0012], [0042].

*Id.* ¶ 299 (emphasis added). Thus, improving the aperture ratio of the display, i.e., increasing the overall light-emitting area of the display, is Murai's goal even as it cuts off corners of various dots/pixels in its disclosed embodiments. In other words, Murai conveys that it does not want to cut off too much of the dots/pixels, which would further reduce the aperture ratio.

In its Reply, Petitioner does not dispute that Murai has a goal of improving the display's overall aperture ratio or that its proposed combination of Murai and Yamada would further reduce the display's aperture ratio from that which is already reduced by Murai's cutting of two corners of the green dots. Reply 19–20.

Petitioner has not persuasively shown that one of ordinary skill in the art would have been motivated to combine the teachings of Murai and Yamada in the manner proposed by Petitioner. Our reviewing court has explained that, regarding a showing of proper motivation to combine teachings, when one "motivating benefit comes at the expense of another benefit, . . . the benefits, both lost and gained, should be weighed against one another." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citing *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000)); *see also Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 795 (Fed. Cir. 2021).

Here, it is uncontested that a stated goal of Murai is to increase the aperture ratio of the display, and that, contrariwise, Petitioner's proposed combination of Murai and Yamada would decrease the aperture ratio of the display. *See* Reply 19–20; Ex. 1007 ¶¶ 10, 42; Ex. 2009 ¶ 298. The Petition does not attempt to balance, or otherwise take into account, the loss of aperture ratio when resizing Murai's pixels according to Yamada's teachings. Pet. 80–82 (citing Ex. 1003 ¶¶ 547–562). Similarly, Petitioner in its Reply also fails to balance the alleged benefits with corresponding drawbacks in reduction of aperture ratio. Reply 19 (citing Pet. 81–82).

In its Reply, Petitioner asserts that "it would have been well within the ability of a POSITA to balance the benefits provided by Murai's pixel arrangement with Yamada's teachings to implement a working display." Reply 19–20. The assertion is not supported by any expert testimony. Also, the assertion, even if true, is misplaced. It would be mere speculation to assume that one of ordinary skill in the art would have determined that the alleged benefits in increased lifetime of the display outweighs the

disadvantages brought about by reduced aperture ratio due to decreasing the sizes of the red and green dots. Petitioner has not established that that is so.

Further, Patent Owner argues:

> [I]f it were possible to make such a densely packed display as Murai's Figure 3 with OLED and make cutouts of the dots, Petitioner's proposed combination may introduce unwanted visual artifacts, contrary to Murai's purpose. Murai's embodiments do not have the asymmetry of Petitioner's proposal and have blue and red dots equally sized. In Petitioner's combination, a top-left-to-bottom-right diagonal of red and blue dots may exhibit a different degree of color mixing and streaking effects than a top-right-to-bottom-left diagonal of red and blue dots. A POSITA would have had no motivation to make Petitioner's proposed modifications, nor a reasonable expectation of success. Ex. 2009, ¶306.

PO Resp. 56. Dr. Kymissis explains:

> [I]n the illustration below, I have taken the 3x3 pixel array drawn by Dr. Pattison and tiled it to form a 2 more rows and 2 more columns. When looking along the orange diagonal, there are 0 cut-off corners along that diagonal. On the other hand, when looking along the purple diagonal, there are 2 cut-off corners in each red pixel along that diagonal. This would result in an asymmetry in the degree of color mixing and streaking effects in images along the two diagonals. In contrast, none of Murai's embodiments suffer from this asymmetry introduced by Dr. Pattison's proposed combination because the blue and red dots are always equally sized in Murai's embodiments. A POSITA would have had no motivation to make Dr. Pattison's proposed modifications, and would not have had a reasonable expectation of success.




[The illustration depicts color mixing and streaking effects Dr. Kymissis opines would exist in Petitioner's proposed modification of Murai in view of Yamada]

Ex. 2009 ¶ 306.

Petitioner does not dispute that the illustration it provided would, in fact, have the color mixing and streaking effects explained by Dr. Kymissis. Instead, Petitioner answers:

> The Petitioner's example, however, was merely meant to conceptually illustrate one way to apply Yamada. Petition, 71-74. Murai is open to the use of variably sized pixels with differently arranged cutouts. (*E.g.*, Murai, [0013], [0048]-[0052].) The Petition simply noted that this invites application of Yamada. Petition, 81-82. And it would have been well within the ability of a POSITA to balance the benefits provided by Murai's pixel arrangement with Yamada's teachings to implement a working display.

Reply 19–20. Even if true, the argument does not aid Petitioner, because it confirms that Petitioner has not even attempted to balance the alleged benefits of Yamada's teachings with the disadvantage of reducing aperture ratio in Murai, which is an explicit concern of Murai.

Absent such balancing by Petitioner, we are not persuaded that one of ordinary skill in the art would have implemented Yamada's teaching in Murai regarding resizing colored dots/pixels in the manner proposed by Petitioner.

*(b) Petitioner's Proposal Reduces Lifetime of Red and Green Dots/Pixels*

Patent Owner asserts that one of ordinary skill in the art "would have understood that reducing the sizes of the green and red pixels while keeping the blue pixels their same size would not extend the overall lifetime of Murai's display. Ex. 2009, ¶305. *See supra*." PO Resp. 56 (citing Ex. 2009 ¶ 305). Patent Owner also asserts: "Maintaining the blue pixels' size would not reduce the current density supplied to them that "[m]aintaining the blue pixels' size would not reduce the current density supplied to them so as to extend the display lifetime. Likewise, reducing the sizes of the green and red pixels would require increasing the current densities supplied to those pixels, shortening their lives." *Id.*

Dr. Kymissis testifies:

> [A] POSITA would have understood that reducing the sizes of the green and red dots while keeping the blue dots the same size would not extend the overall lifetime of Murai's display, for the same reasons discussed above in Sections X.A.3, X.B. In brief, according to Dr. Pattison's theory underlying his proposed combination with Yamada, blue OLED materials have lower emission efficiency, requiring blue pixels to be driven at a higher current density which promotes degradation of the organic material, shortening its lifetime. Yamada, 2:60-67; 11:11-15. But Dr. Pattison's proposed combination to keep blue dots the same size would maintain, not reduce the current density applied to the blue dots and thus would not extend the lifetime of the display. At the same time, Dr. Pattison's proposed combination would require increasing the current density applied to each of the red and green dots to maintain the same luminance and

> brightness, shortening the lifetime of those pixels and thus reducing the lifetime of the display. A POSITA would have had no reason to make such changes to Murai.

Ex. 2009 ¶ 305.

Petitioner does not dispute that reducing the size of the red and green dots would reduce the lifetime of the red and green dots. Petitioner responds to Patent Owner's assertion as follows: "Patent Owner concludes by once again repeating its arguments regarding *display lifetime*, . . . . Response, 56-57. These fare no better here. *Supra* Sections II.A.3." Reply 20 (emphasis added). Petitioner relies on the same arguments it asserted on this same issue in the context of the grounds of unpatentability based on Matthies and Yamada. We have already discussed and rejected those arguments in our discussion of the alleged obviousness of claim 1 over Matthies and Yamada. For the same reasons, we determine that Petitioner has not shown that its proposed combination of Murai and Yamada would extend the life of the display, which further undermines Petitioner's reason for combining the teachings of Murai and Yamada.

*(c) Murai's Cutouts Not Useful for OLEDs*

Patent Owner asserts:

> Petitioner disregards the reasons for Murai's cut-outs. Having packed dots especially closely together in its display, Murai observes that its diagonal lines of close green dots create visible streaks, which Murai avoids by cutting-out alternating corners on the green dots to increase their separation and improve "visual connectivity" of individual unit pixels, Murai, ¶[0011], Fig. 6(a). In an OLED display, however, different-colored pixels must be spaced farther apart due to manufacturing requirements, and a POSITA would not have viewed Murai's cut-outs as necessary. Ex. 2009, ¶¶299. For instance, Yamada's disclosed emissive area ratios of 1:2.6:5.6 between green, red, and blue pixels, or alternatively 1:14.2:35—which Petitioner cites, Pet. at 32;

> Yamada, 11:8-10, 11:34-39—would result in separations of green dots sufficient to nullify the reason for Murai's cut-out portions. A POSITA would not have been motivated to make this combination nor had a reasonable expectation of success in doing so. Ex. 2009, ¶¶299-301.

PO Resp. 53–54.

We agree with Patent Owner that Petitioner has not persuasively shown why an ordinarily skilled artisan would have re-sized Murai's dot arrangement based on Yamada using additional corner cutouts as suggested by Murai. First, even though Murai mentions OLED devices (*see* Ex. 1007 ¶ 58), Petitioner has not persuasively shown that Murai's corner cutouts would be useful in the context of OLED displays, particularly when considering that OLED displays are spaced farther apart than the LCD displays that Murai primarily addresses. *See* Ex. 2009 ¶ 300. This problem is exacerbated when considering the OLED emissive area ratios from Yamada that Petitioner and Dr. Pattison cite in support of making the combination (*see* Pet. 73; Ex. 1003 ¶¶ 219, 258, 418, 508), because the combination "would result in such large cut-off corners and separations between green dots that it would nullify the reason for implementing Murai's cut-off corners." Ex. 2009 ¶ 301; *see also* Ex. 1008, 11:4–15, 11:34–39 (emissive area ratios from Yamada). Petitioner's failure to establish how Murai's corner cutouts are suitable in the context of OLED displays further undermines Petitioner's reason for combining the teachings of Murai and Yamada.

*(3) Conclusion on Limitation [1-b]*

We conclude that Petitioner has not persuasively shown that an ordinarily skilled artisan would have combined Murai and Yamada in the manner suggested by Petitioner to meet limitation [1-b].

*e) Conclusion for Claim 1*

For the forgoing reasons, Petitioner has not set forth a persuasive reason for one of ordinary skill in the art to combine the teachings of Murai and Yamada in the manner suggested by Petitioner. Petitioner has not proved by a preponderance of the evidence that claim 1 would have been obvious over the combination of Murai and Yamada.

*3. Claims 2–5 and 19–21*

Claims 2–5 and 19–21 each depend, directly or indirectly, from claim 1. The deficiency of Petitioner's accounting for claim 1, as discussed above, equally applies to claims 2–5 and 19–21. Petitioner has not proved by a preponderance of the evidence that any of claims 2–5 and 19–21 would have been obvious over the combination of Murai and Yamada.

*H. Petitioner's First Motion to Strike*

Petitioner moves to strike a sentence of Patent Owner's Response that allegedly incorporates arguments from Exhibit 2028. 1st Strike Mot. 1. The sentence states: "For example, the AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the '803 Patent. Ex. 2009, ¶¶350–352; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063." *Id.* (quoting PO Resp. 72). Petitioner faults Patent Owner for failing to explain the basis for this statement in the Response and instead "simply say[ing] so and point[ing] to Exhibit 2028 (a 20-page claim chart) for the supporting argument." *Id.* at 1, 5. Petitioner argues that this amounts to improper incorporation by reference of an argument for which Patent Owner bears the burden of production. *Id.* at 2. Petitioner also argues that Patent Owner cannot merely explain in exhibits its contention that the Samsung Galaxy S22 Ultra practices the claims of the '803 patent. *Id.* at 2–

3; *see also* Exclude Reply 2 (citing Ex. 2009 ¶ 352) (arguing that "Dr. Kymissis's declaration is no better" because "he includes a bare citation to Ex. 2028 without engaging in any explanation or claim-by-claim elaboration.").

Patent Owner characterizes the claim chart at Exhibit 2028 "as supporting *evidence* for . . . nexus arguments that are thoroughly presented in the [Patent Owner Response]." 1st Strike Opp. 1. Patent Owner notes that the Response presents a "teardown image . . . of the pixel arrangement obtained from a Galaxy S22 Ultra . . . with Figure 5 of the '803 Patent superimposed." *Id.* at 3 (alteration in original) (citing PO Resp. 72–73); *see also supra* § II.E.2.e).(1) (reproducing referenced teardown image). Accordingly, Patent Owner argues that the Response "cites Exhibit 2028, a claim chart mapping the challenged claims to the same teardown image presented in the [Patent Owner Response], as additional evidence." 1st Strike Opp. 3; *see also* Exclude Opp. 1 (citing Ex. 2009 ¶ 352) (describing Exhibit 2028 as "a claim chart prepared by Patent Owner's expert, Dr. Kymissis, explaining his opinion that the Galaxy S22 Ultra practices the challenged claims of the '803 Patent").

37 C.F.R. § 42.6(a)(3) states that "[a]rguments must not be incorporated by reference from one document into another document." In this case, Patent Owner's Response states the following in support of its nexus arguments: "[T]he AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the '803 Patent. Ex. 2009, ¶¶350-352; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063." PO Resp. 72. But Patent Owner's argument amounts to a conclusion without any explanation.

To understand Patent Owner's argument, one must synthesize four separate exhibits: Dr. Kymissis's declaration (Ex. 2009 ¶¶ 350–352), the proffered claim chart (Ex. 2028), teardown images of the Galaxy S22 Ultra (Ex. 2029), and another declaration by Dr. Fontecchio (Ex. 2063). Specifically, one must first turn to paragraphs 351 of Kymissis's declaration to learn that "[a] software package called ImageJ was used to obtain certain information about the images of the Galaxy S22 Ultra's pixel arrangement structures." Ex. 2009 ¶ 351. Notably, Dr. Kymissis never states how he obtained the Galaxy S22 Ultra images, but he seemingly relies on a single unexplained reference to "Ex. 2063." *See id.* ¶ 350. Turning to Exhibit 2063, one would learn that Dr. Fontecchio "t[ore] down and obtain[ed] photographs from an AMOLED display in a Samsung Galaxy S22 Ultra smartphone product." Ex. 2063 ¶ 2. In turn, Dr. Fontecchio's images are contained in Exhibit 2029.[12] *Id.* ¶ 3. Then, one would have to turn to the claim chart itself at Exhibit 2028 for a limitation-by-limitation analysis comparing the claims of the '803 patent and the Galaxy S22 Ultra smartphone, which relies on Dr. Fontecchio's images. *See* Ex. 2028. None of this is mentioned in the main document, Patent Owner's Response. As such, the Board is forced to "play archeologist with the record" in order to understand Patent Owner's arguments, which "is precisely what the rule against incorporation by reference was intended to prevent." *Gen. Access Sols., Ltd. v. Sprint Spectrum L.P.*, 811 F. App'x 654, 657–58 (Fed. Cir. 2020).

---

[12] We also note that Dr. Fontecchio does not explain his methodology for obtaining the teardown images at Exhibit 2029.

We also have considered Patent Owner's inclusion of "[a] teardown image (Ex. 2029 at 5) of the pixel arrangement obtained from a Galaxy S22 Ultra . . . with Figure 5 of the '803 Patent superimposed." PO Resp. 72–73; *see also supra* § II.E.2.e).(1) (reproducing referenced teardown image). Although Patent Owner characterizes the claim chart of Exhibit 2028 as "additional evidence" supporting the annotated teardown image (1st Strike Opp. 3), we do not agree with Patent Owner that this solves its incorporation problem relative to Exhibit 2028. Although Petitioner does not ask us to strike the annotated image or the sentence that supports it,[13] we agree with Petitioner that the "the explanation of [its] connection to the '803 patent is found only in exhibits." 1st Strike Reply 3. Indeed, the context for this annotated image is only discernable with reference to some of the same exhibits discussed in the previous paragraph. *See, e.g.*, Ex. 2009 ¶ 350 (citing Ex. 2029, 5; Ex. 2063).

For these reasons, we *grant* Petitioner's motion to strike the following statement from Patent Owner's Response at page 72: "For example, the AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the '803 Patent. Ex. 2009, ¶¶350-352; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063." *See* 37 C.F.R. § 42.6(a)(3).

Petitioner also moves to strike another sentence in the Patent Owner Response: "Petitioner Mianyang BOE copied Samsung Display's pixel arrangements to commercialize AMOLED displays for products including the iPhone 12. Ex. 2009, ¶341." 1st Strike Mot. 1–2 (quoting PO Resp. 69).

---

[13] In our analysis of secondary considerations of nonobviousness above, we accord the annotated teardown image little to no weight based on its lack of evidentiary support.

Petitioner argues that Patent Owner's statement "relies on its expert declaration and an 80-page district court complaint cited therein (Ex. 2041) to explain the allegation." *Id.* at 5; *see also id.* at 2 (noting that paragraph 341 of Dr. Kymissis's declaration in turn cites Exhibit 2041, the complaint from the Texas litigation). Petitioner again argues that Patent Owner has relegated the basis of its arguments to exhibits, which amounts to improper incorporation by reference. *Id.* at 1–2.

Patent Owner disputes that its argument relies on an 80-page complaint at Exhibit 2041. 1st Strike Opp. 2. Rather, Patent Owner argues that it only utilizes "a specific teardown image from paragraph 84 of a district court complaint." *Id.*

We agree with Patent Owner that it only relies on the complaint from the Texas litigation at Exhibit 2041 for providing a particular teardown image that it uses as part of a side-by-side comparison in its Response. *See* Ex. 2009 ¶ 341 (citing Ex. 2041 ¶ 84) (reproducing the same image from PO Resp. 69 and explaining that it is a "teardown image . . . of the pixel arrangement used in Mianyang BOE's AMOLED display used in the iPhone 12 and comes from a complaint filed against Mianyang BOE"). Patent Owner does not incorporate any comparison or analysis from that complaint. Thus, we *deny* Petitioner's motion to strike the following sentence at page 69 of Patent Owner's Response: "Petitioner Mianyang BOE copied Samsung Display's pixel arrangements to commercialize AMOLED displays for products including the iPhone 12. Ex. 2009, ¶341."

Petitioner additionally moves to strike a third passage of Patent Owner's Response in which Patent Owner alleges copying by vendors of replacement AMOLED displays. *See* 1st Strike Mot. 1–2. Although

Petitioner's motion to strike omits certain parts of the relevant passage, we reproduce the passage in its entirety below:

> Widespread copying of the '803 Patent's inventions is further evident from samples of AMOLED displays distributed by numerous vendors of replacement AMOLED displays for mobile phones. Exs. 2042-2061. These pixel arrangements not only infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-5 and 19-21 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-5 and 19-21 to Sourcely Plus AMOLED Display)), they bear such similarity to those of Samsung Display that they demonstrate copying. Ex. 2009, ¶¶342–346. *See, e.g*., *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1339–42 (Fed. Cir. 2023) (circumstantial evidence of "evidence of access to and substantial similarity with a patented product" can show copying (emphasis omitted)).

PO Resp. 69–70 (partially quoted at 1st Strike Mot. 2). Petitioner faults Patent Owner for not "articulating in its Response why certain third-party displays purportedly 'infringe the challenged claims'" and instead "mak[ing] a bald allegation in its Response and then point[ing] to Exhibits 2042 and 2043 (both 20-page claim charts) for the actual explanation." 1st Strike Mot. 5 (citing PO Resp. 69). Petitioner once again argues that Patent Owner has relegated the basis of its arguments to exhibits, which amounts to improper incorporation by reference. *Id.* at 1–2.

Patent Owner argues that its Response provides an explanation of the alleged copying and "presents exemplary side-by-side comparisons of teardown images of the pixel arrangements in SDC's AMOLED products and teardown images of replica products." 1st Strike Opp. 2 (internal quotations omitted) (citing PO Resp. 69–71). As such, Patent Owner argues that the claim charts at Exhibits 2042 and 2043 are "*further evidence*." *Id.*

We agree with Petitioner that Patent Owner has improperly incorporated by reference the basis for Patent Owner's allegation that "[t]hese pixel arrangements . . . infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-5 and 19-21 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-5 and 19-21 to Sourcely Plus AMOLED Display))." PO Resp. 69. To understand this argument, one must resort to paragraph 342 of Dr. Kymissis's declaration to learn that Dr. Kymissis had reviewed teardown images provided by Dr. Silzars. Ex. 2009 ¶ 342 (citing Exs. 2044–2061). In turn, Dr. Silzars testifies in his declaration that Exhibit 2044 includes teardown images from a Group Vertical AMOLED display sample, whereas Exhibit 2046 includes teardown images from a Sourcely Plus AMOLED display sample. Ex. 2061 ¶¶ 3, 5. Returning to Dr. Kymissis's declaration, one would learn that Dr. Kymissis used ImageJ software on Dr. Silzars's images at Exhibits 2044 and 2046 to obtain data about the Group Vertical and Sourcely Plus AMOLED displays. Ex. 2009 ¶ 343. Dr. Kymissis used this data to create the claim charts located at Exhibits 2042 and 2043. *Id.* These claim charts contain limitation-by-limitation analyses comparing the Group Vertical and Sourcely Plus AMOLED display to the claims of the '803 patent, which is the basis of Patent Owner's allegation of infringement. *See* Exs. 2042, 2043. Patent Owner's tactic of rolling up all of this background information into a single conclusory sentence about alleged infringement amounts to improper incorporation by reference.

We also have considered Patent Owner's arguments about the claim charts at Exhibits 2042 and 2043 being further evidence to certain other of Patent Owner's assertions, such as its presentation of side-by-side

comparison of teardown images with an image of Patent Owner's Galaxy S22 Ultra with Figure 5 of the '803 patent overlaid on top. 1st Strike Opp. 2 (citing PO Resp. 69–71). Again, this does not solve the incorporation issue regarding alleged infringement, because the explanation about infringement, i.e., the "mapping" of the challenged claims, is found only in exhibits. *See* 1st Strike Reply 3.

For these reasons, we *grant* Petitioner's motion to strike the following statement from Patent Owner's Response on page 69: "These pixel arrangements . . . infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-5 and 19-21 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-5 and 19-21 to Sourcely Plus AMOLED Display))." *See* 37 C.F.R. § 42.6(a)(3).

*I. Petitioner's Second Motion to Strike*

Petitioner moves to strike Exhibit 2083, which comprises excerpts of testimony from Dr. Pattison in the ITC Investigation, and the portions of Patent Owner's Sur-reply that rely on it. 2d Strike Mot. 1. We do not rely on this information in rendering this Decision, so we *dismiss as moot* Petitioner's motion to strike these materials and the portions of the Sur-reply that refer to them.

Petitioner also moves to strike the portions of Patent Owner's Sur-reply that rely on two dictionary excerpts that were introduced during the second deposition of Dr. Pattison. 2d Strike Mot. 1, 4. The excerpts, which were identified as "Exhibit 2084" and "Exhibit 2085" at the deposition, are not of record in this proceeding. *Id.* at 4–5. We do not rely on this information in rendering this Decision, so we *dismiss as moot*

Petitioner's motion to strike the portions of the Sur-reply that refer to the dictionary excerpts.

Petitioner additionally reiterates its arguments from its First Motion to Strike related to Exhibits 2028 and 2041–2043. 2d Strike Mot. 1, 5. We have already discussed these arguments above with respect to Petitioner's First Motion to Strike. *See supra* § II.H.

For these reasons, we *dismiss as moot* Petitioner's Second Motion to Strike.

*J. Petitioner's Motion to Exclude*

Petitioner moves to exclude Exhibit 2028, which is a claim chart supporting Patent Owner's allegations of a nexus between the challenged claims and the Samsung Galaxy S22 Ultra smartphone, as inadmissible hearsay. Exclude Mot. 1 (citing Fed. R. Evid. 802). We already have stricken Patent Owner's reference to this claim chart in Patent Owner's Response. *See supra* § II.H. As such, we do not rely on this exhibit in rendering this Decision. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibit 2028.

Petitioner moves to exclude Exhibit 2041, which is the complaint from the Texas litigation, as inadmissible hearsay. Exclude Mot. 2 (citing Fed. R. Evid. 802). Petitioner argues that the complaint constitutes hearsay because "it is an out-of-court statement that Patent Owner improperly relies on to establish the structure possessed by a BOE product." *Id.* This exhibit relates to Patent Owner's evidence of copying as a secondary consideration of nonobviousness, which we have accorded little to no weight above. *See supra* § II.E.2.e).(5). We also have determined that certain challenged claims are unpatentable despite this evidence. *See supra* § II.E.2–7. Under

these circumstances, we find the better course of action is to maintain a complete record of the evidence to facilitate review rather than to exclude this exhibit. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibit 2041.

Petitioner moves to exclude Exhibits 2042 and 2043, which are claim charts supporting Patent Owner's allegations of copying related to Group Vertical and Sourcely Plus AMOLED displays, as inadmissible hearsay. Exclude Mot. 2–3 (citing Fed. R. Evid. 802). We already have stricken Patent Owner's references to these claim charts in Patent Owner's Response. *See supra* § II.H. As such, we do not rely on these exhibits in rendering this Decision. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibits 2042 and 2043.

Petitioner moves to exclude Exhibits 2044–2060, which allegedly are teardown images of various replacement AMOLED displays, as lacking authentication. Exclude Mot. 3–4 (citing Fed. R. Evid. 901). Petitioner notes that Dr. Silzars testifies in his supporting declaration (Exhibit 2061) "only that he 'understand[s]' that the products 'were purchased' from 16 different entities." *Id.* (alteration in original) (quoting Ex. 2061 ¶ 2). Petitioner likewise moves to exclude Exhibit 2061, Dr. Silzars's declaration, because Dr. Silzars lacks "personal knowledge of the origin of any of the products discussed in his declaration." *Id.* at 4–5 (citing Fed. R. Evid. 602). All of these exhibits relate to Patent Owner's evidence of copying as a secondary consideration of nonobviousness, which we have accorded little to no weight above. *See supra* § II.E.2.e).(5). We also have determined that certain challenged claims are unpatentable despite this evidence. *See supra* § II.E.2–7. Under these circumstances, we find the better course of action is

to maintain a complete record of the evidence to facilitate review rather than to exclude these exhibits. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibits 2044–2061.

## III. CONCLUSION[14]

Petitioner has shown, by a preponderance of the evidence, that the subject matter of claims 1–4 and 19–21 of the '803 patent would have been obvious over Phan. Petitioner has *not* shown, by a preponderance of the evidence, that (1) the subject matter of claim 5 of the '803 patent would have been obvious over the combination of Phan and Yamada; (2) the subject matter of claims 1–4 and 19–21 of the '803 patent would have been obvious over the combination of Matthies and Yamada; or (3) the subject matter of claims 1–4 and 19–21 of the '803 patent would have been obvious over the combination of Murai and Yamada.

We *grant* Petitioner's First Motion to Strike as to the following statement from page 72 of Patent Owner's Response: "For example, the AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the '803 Patent. Ex. 2009, ¶¶350-352; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063." We also *grant* Petitioner's First Motion to Strike as to the following statement on page 69 of the Patent

[14] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

Owner's Response: "These pixel arrangements . . . infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-5 and 19-21 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-5, and 19-21 to Sourcely Plus AMOLED Display))." We *deny* Petitioner's First Motion to Strike as to the following statement from page 69 of Patent Owner's Response: "Petitioner Mianyang BOE copied Samsung Display's pixel arrangements to commercialize AMOLED displays for products including the iPhone 12. Ex. 2009, ¶341."

We *dismiss as moot* Petitioner's Second Motion to Strike and Petitioner's Motion to Exclude.

In summary:

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not shown Unpatentable** |
|---|---|---|---|---|
| 1–5, 19–21 | 103(a) | Matthies, Yamada | | 1–5, 19–21 |
| 1–4, 19–21 | 103(a) | Phan | 1–4, 19–21 | |
| 5 | 103(a) | Phan, Yamada | | 5 |
| 1–5, 19–21 | 103(a) | Murai, Yamada | | 1–5, 19–21 |
| **Overall Outcome** | | | 1–4, 19–21 | 5 |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–4 and 19–21 of the ’803 patent are unpatentable;

FURTHER ORDERED that claim 5 of the ’803 patent is not unpatentable;

FURTHER ORDERED that Petitioner’s First Motion to Strike (Paper 24) is *granted-in-part* and *denied-in-part* as indicated above;

FURTHER ORDERED that Petitioner’s Second Motion to Strike (Paper 33) is *dismissed as moot*;

FURTHER ORDERED that Petitioner’s Motion to Exclude (Paper 39) is *dismissed as moot*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

K. Patrick Herman
Richard Martinelli
Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE, LLP
P52ptabdocket@orrick.com
rfmptabdocket@orrick.com
Xw0ptabdocket@orrick.com

FOR PATENT OWNER:

David A. Garr
Scott C. Weidenfeller
COVINGTON & BURLING LLP
dgarr@cov.com
sweidenfeller@cov.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD., TIANMA MICROELECTRONICS CO. LTD., and VISIONOX TECHNOLOGY, INC.,
Petitioner,

v.

SAMSUNG DISPLAY CO., LTD.,
Patent Owner.

---

IPR2023-00988
Patent 10,854,683 B2

---

Before JAMESON LEE, TERRENCE W. McMILLIN, and JOHN A. HUDALLA, *Administrative Patent Judges*.

HUDALLA, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Granting-in-Part Petitioner's First Motion to Strike
Dismissing Petitioner's Second Motion to Strike
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a); 37 C.F.R. §§ 42.5(a), 42.64(c)*

Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd.; and Visionox Technology, Inc. (collectively, "Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1, 2, 4–10, 13, and 15 ("the challenged claims") of U.S. Patent No. 10,854,683 B2 (Ex. 1001, "the '683 patent"). Samsung Display Co., Ltd. ("Patent Owner") filed a Preliminary Response (Paper 9). Taking into account the arguments presented by Patent Owner in the preliminary record, we determined that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims. Pursuant to 35 U.S.C. § 314, we instituted this proceeding on January 8, 2024, as to all challenged claims and all grounds of unpatentability presented in the Petition. Paper 10 ("Dec. on Inst.").

During the course of trial, Patent Owner filed a Patent Owner Response (Paper 18, "PO Resp."), and Petitioner filed a Reply to the Patent Owner Response (Paper 28, "Pet. Reply"). Patent Owner also filed a Sur-reply (Paper 30, "PO Sur-reply"). A consolidated oral hearing with IPR2023-00987 and IPR2023-01075 was held on October 9, 2024, and a transcript of the hearing is included in the record. Paper 43 ("Tr.").

Petitioner filed declarations of P. Morgan Pattison, Ph.D., with its Petition (Ex. 1003) and Reply (Ex. 1018). Patent Owner filed declarations of Ioannis Kymissis, Ph.D. (Ex. 2009), Aris K. Silzars, Ph.D. (Ex. 2061), and Adam Fontecchio, Ph.D. (Ex. 2063) with its Response. The parties also filed the transcripts of the depositions of Dr. Pattison (Exs. 2062, 2086) and Dr. Kymissis (Ex. 1019).

Petitioner filed a first motion to strike the portions of Patent Owner's Response that allegedly incorporate arguments from Exhibits 2028 and 2041–2043. Paper 23 ("1st Strike Mot."). Patent Owner filed an opposition (Paper 24, "1st Strike Opp.") and Petitioner filed a reply (Paper 25, "1st Strike Reply").

Petitioner filed a second motion to strike (1) Exhibit 2083 and the portions of Patent Owner's Sur-reply that rely on it; (2) the portions of Patent Owner's Sur-reply that rely on certain exhibits that were not filed in this case; and (3) the portions of Patent Owner's Sur-reply that reference Exhibits 2028 and 2041–2043. Paper 32 ("2d Strike Mot."). Patent Owner filed an opposition (Paper 36, "2d Strike Opp.") and Petitioner filed a reply (Paper 37, "2d Strike Reply").

Petitioner filed a motion to exclude Exhibits 2028 and 2041–2061. Paper 38 ("Exclude Mot."). Patent Owner filed an opposition (Paper 39, "Exclude Opp.") and Petitioner filed a reply (Paper 40, "Exclude Reply").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1, 2, 4–10, 13, and 15 of the '683 patent. For the reasons discussed below, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 4–10, 13, and 15 of the '683 patent are unpatentable. Petitioner has not demonstrated by a preponderance of the evidence that claim 2 of the '683 patent is unpatentable. We also *grant-in-part* and *deny-in-part* Petitioner's First Motion to Strike. We additionally *dismiss as moot* Petitioner's Second Motion to Strike and Petitioner's Motion to Exclude.

# I. BACKGROUND

## *A. Real Parties-in-Interest*

Petitioner identifies Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd.; and Visionox Technology, Inc. and their subsidiaries as the real parties-in-interest. Pet. 3. Patent Owner identifies Samsung Display Co., Ltd., as the real party-in-interest. Paper 6, 2.

## *B. Related Matters*

The parties identify the following proceedings related to the '683 patent (Pet. 3; Paper 6, 2):

*Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For Mobile Devices, And Components Thereof*, Inv. No. 337-TA-1351 (USITC) ("the ITC Investigation"); and

*Samsung Display Co., Ltd. v. BOE Technology Co., Ltd.*, Case No. 2-23-cv-00309 (E.D. Tex.) ("the Texas litigation").

## *C. The '683 Patent*

The '683 patent is directed to "a pixel arrangement structure of an organic light emitting diode (OLED) display." Ex. 1001, 1:20–21. The '683 patent indicates that "[a]n organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM)." *Id.* at 1:43–45. The '683 patent notes that "[w]hen reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated," but "[o]n the other hand, when increasing the gap between the pixels to improve

the deposition reliability, the aperture ratio of the pixel may be deteriorated." *Id.* at 1:45–50. The '683 patent also indicates that pixels of certain colors may have different lifespans from other pixels, and that the pixel arrangement structure of the OLED display may provide improved life span. *Id.* at 7:29–36.

The '683 patent indicates that an exemplary embodiment "provides a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels." Ex. 1001, 1:62–67.

Figure 1 of the '683 patent is reproduced below.

FIG.1



Figure 1 is "a view of a pixel arrangement structure of an OLED display." Ex. 1001, 3:3–4. "[T]he pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300," which emit green, blue, and red light, respectively. *Id.* at 3:56–59, 4:16–17, 4:34–35, 4:47–48.

According to the '683 patent, "each of the first pixels 100 has a smaller area than neighboring second pixels 200 and third pixels 300, and has a quadrilateral (i.e., four-sided) shape." Ex. 1001, 4:8–11. "The second pixels 200 are arranged diagonally with respect to the first pixels 100, such as at first vertices P1 along one diagonal of a virtual square VS having one of the first pixels 100 as a center point (or center) of the virtual square VS." *Id.* at 4:18–22. "In a similar fashion, the third pixels 300 are arranged diagonally with respect to the first pixels 100, such as at second vertices P2 along the other diagonal of the virtual square VS." *Id.* at 4:22–25.

According to the '683 patent, "[e]ach of the third pixels 300 has a larger area than the neighboring first pixel 100 and the same area as each of the second pixels 200." Ex. 1001, 4:40–42. The '683 patent indicates that "by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved." *Id.* at 5:24–27.

The '683 patent further states that

> the gap of the first length L1 is formed between adjacent pairs of the first pixels 100 and the second pixels 200, between adjacent pairs of the first pixels 100 and the third pixels 300, and between adjacent pairs of the second pixels 200 and the third pixels 300. In addition, the gap of the second length L2 that is longer than the first length L1 is formed between the

> neighboring ones of the first pixels 100. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

Ex. 1001, 5:13–23.

Figure 2 of the ’683 patent is reproduced below.

FIG.2




Figure 2 is “a view of a pixel arrangement structure of an OLED display.” Ex. 1001, 3:5–6. In Figure 2, “[t]he plurality of first pixels 100 have the same quadrilateral shape (e.g., a parallelogram)” and “the second pixels 200 have a larger area than the third pixels 300.” *Id.* at 6:4–6. According to the ’683 patent, because “the second pixels 200 that emit blue have the shortest life span,” “the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display.” *Id.* at 6:47–52.

Figure 5 of the ’683 patent is reproduced below.

FIG.5




Figure 5 is “a view of a pixel arrangement structure of an OLED display.” Ex. 1001, 3:13–14. According to the ’683 patent, “the neighboring first pixels 100 have a[n] octagonal shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300.” *Id.* at 8:35–38. The ’683 patent states that “[t]his results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.” *Id.* at 8:38–42.

The application that led to the ’683 patent was filed on November 13, 2017, and claims priority to, *inter alia*, a Korean application that was filed on March 6, 2012 (i.e., the earliest possible effective filing date). Ex. 1001, codes (22), (30). For purposes of this Decision, we apply the March 6, 2012, date for qualifying the asserted references as prior art.

*D. Illustrative Claim*

Of the challenged claims, claims 1, 13, and 15 are independent. Claims 2 and 4–10 depend directly or indirectly from claim 1. Claim 1 is illustrative of the challenged claims and recites:

> 1. [1-pre] A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:
>
> [1-a] a plurality of pixels for displaying an image on the OLED display and comprising:
>
> [1-a(1)] a first pixel;
>
> [1-a(2)] a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel; and
>
> [1-a(3)] a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels, and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,
>
> [1-b] wherein a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels,
>
> [1-c] wherein the first pixels are configured to emit green light, which is a color that is different from light emitted by the second pixels and the third pixels,
>
> [1-d] wherein the first pixels are smaller than at least one of the second pixels or the third pixels, and

[1-e] wherein each of the second pixels has a larger area than each of the third pixels.

Ex. 1001, 8:63–9:26 (Petitioner's identifiers added in brackets).

*E. Prior Art*

Petitioner relies on the following prior art:

U.S. Patent No. 6,897,855 B1, filed Feb. 16, 1999, issued May 24, 2005 (Ex. 1004, "Matthies");

U.S. Patent No. 7,091,986 B2, filed Dec. 5, 2003, issued Aug. 15, 2006 (Ex. 1005, "Phan");

Japanese Patent No. 4496852 B2, filed June 10, 2004, issued July 7, 2010 (Exs. 1006, 1007, "Murai");[1] and

U.S. Patent No. 6,366,025 B1, filed Feb. 24, 2000, issued Apr. 2, 2002 (Ex. 1008, "Yamada").

*F. The Instituted Grounds*

We instituted *inter partes* review of claims 1, 2, 4–10, 13, and 15 of the '683 patent on the following grounds (Dec. on Inst. 48), which are all the grounds presented in the Petition (Pet. 5):

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4–10, 13, 15 | 103(a)[2] | Matthies, Yamada |
| 1, 4–10, 13, 15 | 103(a) | Phan |
| 2 | 103(a) | Phan, Yamada |
| 1, 2, 4–10, 13, 15 | 103(a) | Murai, Yamada |

[1] Murai is a Japanese-language publication (Ex. 1006) that was filed with an English-language translation (Ex. 1007, 1–15) and a declaration attesting to the accuracy of the translation (*id.* at 16). Our citations to Murai herein refer to the translation at Exhibit 1007.

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103. Because the

## II. ANALYSIS

### *A. Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We also recognize that prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

### *B. Level of Ordinary Skill in the Art*

Citing testimony from Dr. Pattison, Petitioner contends a person of ordinary skill in the art "would have had a degree in electrical engineering, materials science, physics, or a similar discipline, along with 2 years of professional experience working with display design, including OLED displays, or an equivalent level of skill, knowledge, and experience." Pet. 10

---

'683 patent claims priority to an application filed before March 16, 2013 (the effective date of the relevant amendments), the pre-AIA versions of §§ 102 and 103 apply.

(citing Ex. 1003 ¶¶ 37–39). Petitioner further notes that such a person of ordinary skill in the art "would have been aware of and generally knowledgeable about OLED materials, and display pixel design, layout, and operation." *Id.* (citing Ex. 1003 ¶ 39). We adopted Petitioner's definition in the Decision on Institution. Dec. on Inst. 12

Patent Owner cites the level of ordinary skill adopted in the related ITC investigation, as well as testimony from Dr. Kymissis, and contends that an ordinarily skilled artisan "would have had a relevant technical degree in Electrical Engineering, Computer Engineering, Materials Science, Physics, or the like, and experience in electroluminescence and the design of active-matrix displays or pixel arrangements for such displays." PO Resp. 4–5 (citing Ex. 2001, 15; Ex. 2009 ¶ 64). Patent Owner describes its proposal as containing "slightly different language" than Petitioner's definition and does not explain why we should adopt its proposal over Petitioner's definition. *Id.* Notwithstanding, Patent Owner contends that "Petitioner fails to establish unpatentability under either [party's] definition." *Id.* at 5.

For purposes of this Decision, we again adopt Petitioner's definition of the level of ordinary skill in the art. It is supported by the testimony of Dr. Pattison, and appears consistent with what is reflected by the content of the applied prior art references. *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).

We find Patent Owner's articulation of the level of ordinary skill to be imprecise, because Patent Owner does not specify the amount of experience possessed by an ordinarily skilled artisan. The unbounded reference to "experience" is vague and overly broad, as it could mean 1 year of

experience or over 30 years of experience, for example. In addition, the ’683 patent is directed to “a pixel arrangement structure of an organic light emitting diode (OLED) display” (Ex. 1001, 1:19–21), whereas Patent Owner’s proposed experience is tied to “active-matrix displays.” PO Resp. 5. Given that the field of OLED displays includes both passive and active matrix designs (*see generally* Ex. 2009 ¶¶ 40–56), we see no reason to restrict the relevant experience to active matrix displays. For these reasons, we do not adopt Patent Owner’s definition of the level of ordinary skill in the art.

### *C. Claim Interpretation*

In an *inter partes* review, we construe each claim

> using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.

37 C.F.R. § 42.100(b) (2023). Accordingly, our claim construction standard is the same as that of a district court. *See id.* Under the standard applied by district courts, claim terms are generally given their plain and ordinary meaning, as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). “There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the

specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Petitioner states that "[f]or purposes of this petition . . . the terms of the '683 patent's claims do not require further construction and can be afforded their plain and ordinary meaning." Pet. 10. Patent Owner points out that the Administrative Law Judge in the related ITC Investigation issued a claim construction order that did not construe any claim terms of the '683 patent. PO Resp. 4 (citing Ex. 2001). Patent Owner further states that the parties in the ITC Investigation "submitted a list of agreed-upon constructions including certain terms of the '683 Patent." *Id.* (citing Ex. 2002). Notwithstanding, Patent Owner indicates that "[n]o specialized constructions are necessary in this proceeding" and that "Petitioner fails to prove unpatentability of any claims under any interpretation." *Id.*

We determine that no aspects of the challenged claims require explicit construction. *See, e.g.*, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*D. Obviousness Ground Based on Phan*

Petitioner contends that the subject matter of claims 1, 4–10, 13, and 15 would have been obvious over Phan. Pet. 41–55; Pet. Reply 12–16, 19–25. Patent Owner disputes Petitioner's contentions. PO Resp. 30–38, 54–71; PO Sur-reply 15–20, 24–27.

*1. Phan*

Phan is a U.S. patent directed to a "display comprising pixels and dots." Ex. 1005, 1:18–19. Phan indicates that such a display may be one of a number of display technologies including an OLED display. *Id.* at 1:19–29. According to Phan, "[t]he pixels generally consist of so-called dots representing the three basic colours red, green and blue." *Id.* at 1:59–61. Phan discloses displays in which "each dot has a receiver of its own . . . to convert digital information transmitted through [a] network . . . into luminous intensity levels for [the] dots." *Id.* at 5:16–19. Phan discloses "dynamic generation of pixels wherein a one-pixel logical unit is formed by grouping adjacent dots, with adjacent pixels being physically superimposed and the dynamic pixels being generated by sequential addressing at a rate such that said generation is not perceivable by the human eye." *Id.* at 2:66–3:4.

Figures 11a and 11b of Phan are reproduced below.




FIG. 11a




FIG 11b

Figure 11a "shows a square quad pixel where the crosspoint 33 is in the centre of the four dots (individual elements) of equal light emitting area and

space, contoured by black mask or black barrier ribs 21 with the same structure." Ex. 1005, 5:47–50. Figure 11b "shows a typical square quad pixel where the crosspoint 33 moving along the diagonal line 35 forms two dots (individual elements) of equal light emitting area and space 38 of green color (G)." *Id.* at 5:51–54.

Figure 12 of Phan is reproduced below.




FIG. 12

Figure 12 "shows a quad pixels display with a resolution of 480x640 static pixels 17." Ex. 1005, 4:5–6, 5:55–56.

Petitioner notes that Phan issued August 15, 2006, and contends that Phan qualifies as prior art under 35 U.S.C. § 102(b). Pet. 14. Patent Owner does not contest the prior art status of Phan. We determine that Phan qualifies as prior art under 35 U.S.C. § 102(b) because Phan's issue date of August 15, 2006, is more than one year before the earliest effective filing date of the challenged claims, which is March 6, 2012. Ex. 1001, code (30); Ex. 1005, code (45).

*2. Claim 1*

a. Preamble [1-pre]

The preamble of claim 1 recites "[a] pixel arrangement structure of an organic light emitting diode (OLED) display." Ex. 1001, 8:63–64. Petitioner cites Phan's teaching of a "display comprising pixels and dots." Pet. 42 (quoting Ex. 1005, 1:18–19) (citing Ex. 1005, 2:51–53). Petitioner contends that "Phan's teachings can be employed with various 'display technologies,' including 'Organic Light Emitting Diode (OLED)' displays." *Id.* (quoting Ex. 1005, 1:18–29) (citing Ex. 1003 ¶¶ 325–328). Petitioner also notes that "Phan includes two sets of example pixel designs," including the "quad pixel" designs of Figure 11a and 11b. *Id.* at 54 (citing Ex. 1005, 5:47–54). Petitioner contends that an ordinarily skilled artisan would have been motivated to use these pixel designs with the displays referenced elsewhere in Phan with "every reason to believe that those pixel designs can be successfully employed." *Id.* at 54–55 (citing Ex. 1003 ¶¶ 412–414); *see also* Ex. 1003 ¶ 321 (similar testimony from Dr. Pattison). In its Reply, Petitioner argues that, like Phan, "[n]umerous prior art references" teach that "the same pixel arrangement can be used by different displays." Pet. Reply 12–13 (citing Ex. 1004, 5:28–35; Ex. 2018 ¶ 6). Petitioner specifically cites a reference known as Cok[3] for teaching that "the very same 'pixel pattern' shown in Figure 11b of Phan is useful with both 'passive-matrix or active matrix' OLEDs." *Id.* at 13 (citing Ex. 1017, 2:61–67, 4:8–15, Fig. 1).

Patent Owner disputes that Phan's pixel arrangements apply to OLEDs. PO Resp. 30–34; PO Sur-reply 15–16. Patent Owner argues that

---

[3] U.S. Patent No. 6,867,549 B2, filed Dec. 10, 2002, issued Mar. 15, 2005 (Ex. 1017, "Cok").

Phan makes a single passing reference to OLEDs among a "laundry list of every conceivable display technology," which does not "mean that [Phan's] embodiments of pixel arrangements were for OLEDs or for each of the listed alleged 'display technologies.'" PO Resp. 31 (citing Ex. 2009 ¶ 202); *see also* PO Sur-reply 16 (similar argument). Patent Owner also argues that "Phan does not state, nor suggest, that the pixel arrangements it draws, or Figures 11a and 11b specifically, would be suitable for an OLED display." PO Resp. 32.

As further evidence that Phan's embodiments do not relate to OLEDs, Patent Owner notes that "Phan mentions only CRT, LCD, LED, PDP, and FED in the sole portion of its specification containing any substantive discussion of the display technologies."[4] PO Resp. 32–33 (footnote omitted) (citing Ex. 1005, 1:56–2:46; Ex. 2009 ¶ 204). In a similar fashion, Patent Owner argues that an ordinarily skilled artisan would have known that Phan's mentions of "displays using 'optical fiber network[s]' and 'receivers' do not relate to OLEDs." *Id.* at 32 (alteration in original) (citing Ex. 1005, 5:9–24; Ex. 2009 ¶ 203). Patent Owner also argues that "Phan's virtual driving method—the heart of Phan's disclosure—would not be feasible in an OLED display." *Id.* at 33 (citing Ex. 1005, 2:35–38, 5:23–24, 5:55–60; Ex. 2009 ¶¶ 207–215). Patent Owner additionally notes that "Phan's figures depict essentially no spacing between adjacent dots," which is "not feasible for an OLED display due to issues of color mixing of the organic light-

[4] Patent Owner notes that the mention of "LED" in this context refers to "solid-state light-emitting diodes, which are distinct from OLEDs." PO Resp. 33 n.5 (citing Ex. 2009 ¶ 204). Petitioner does not dispute this.

emitting materials and shorting between adjacent pixels." *Id.* (citing Ex. 2009 ¶¶ 205–206).

Finally, Patent Owner argues that Petitioner's allusions to other prior art references that use the same pixel arrangement for different types of displays should be rejected because they "do not support Petitioner's attorney argument" and because they effectively amount to new combinations. PO Sur-reply 16.

At the outset, we note that claim 1 includes no specific limitations directed to OLEDs other than reciting that the claimed "plurality of pixels" display an image on an OLED display. *See* Ex. 1001, 8:63–9:26. More specifically, claim 1 includes no limitations directed to the '683 patent's disclosures about "power lines for driving each of the pixels, such as a gate line, a data line, a driving power line" or "an anode, an organic emission layer, and a cathode" corresponding to the pixels. *Id.* at 3:62–4:3. Indeed, the '683 patent states that "[t]hese configurations are technologies known in the art and further description thereof is omitted for ease of description." *Id.* at 4:3–5. Nor does claim 1 include limitations directed to the '683 patent's disclosures about manufacturing OLED displays (*see id.* at 1:42–50) or the different lifespans for various organic materials (*see id.* at 7:29–36). Thus, Petitioner's obviousness analysis need not account for these aspects of an OLED display.

Given this background, we note that the parties' disputes regarding Phan turn on whether Phan teaches that its disclosed pixel arrangements can be applied to OLED displays. We find that it does.[5] In the "Field of the

---

[5] Patent Owner contends that the preamble is limiting (PO Resp. 30), whereas Petitioner takes no position on this issue (*see* Tr. 6:12–22).

Invention" section, Phan states that "[t]he *invention* [of Phan] relates to a display comprising pixels and dots, including but not limited to" various "display technologies" including "Organic Light Emitting Diode (OLED)." Ex. 1005, 1:17–29 (emphasis added). Accordingly, we find that Phan fairly suggests that the pixel arrangements disclosed in Phan—which are part of Phan's "invention"—may be applied to OLEDs. *See Twitter, Inc. v. VidStream LLC*, 825 F. App'x 844, 850 (Fed. Cir. 2020) (quoting *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019)) ("[W]hen conducting an obviousness analysis, the Board must consider a prior art reference 'not only for what it expressly teaches, but also for what it fairly suggests.'"). In making this finding, we note that obviousness is determined from the perspective of a person of ordinary skill in the art (*see* 35 U.S.C. § 103(a)), who in this case would have had "2 years of professional experience working with display design, including OLED displays." *See supra* § II.B. In light of this specific experience, we find that an ordinarily skilled artisan would have been inclined to link Phan's disclosed pixel arrangements with OLEDs based on the plain statement about related "display technologies" in Phan's "Field of the Invention" section. *See, e.g.*, Ex. 1003 ¶¶ 321, 410–414. For these reasons, we disagree with Patent Owner's assertion that "Phan does not teach about OLED displays." PO Resp. 32.

The fact that Phan teaches OLED displays among "a laundry list of every conceivable display technology, including non-existent technologies"

---

Because Petitioner shows persuasively that Phan teaches the preamble, we need not determine whether the preamble is limiting. *See Realtime Data*, 912 F.3d at 1375.

does not undermine Phan's express statement that its disclosed invention relates to OLED displays, which themselves were known at the time of the '683 patent. *See* Ex. 1018 ¶ 96; Ex. 1019, 18:6–9. We also find Patent Owner's citation (PO Resp. 32) to *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012), regarding the alleged "laundry list" to be inapposite. *Otsuka* merely observes how a skilled artisan would not have understood a "'laundry list' of potential central nervous system controlling effects" in the involved patent to mean that every one of the trillions of compounds encompassed by that patent is a potential antipsychotic. *Id.* at 1293–94. *Otsuka* does not discredit the use of a list in a prior art patent to associate related technologies with a disclosed invention, as Patent Owner seems to imply. And, as discussed above, Phan expressly associates OLED displays with its allegedly inventive arrangements of pixels. *See* Ex. 1005, 1:17–29.

We also are persuaded by Petitioner's contentions (Pet. 42, 54–55) that an ordinarily skilled artisan would have considered Phan's pixel designs as "an obvious starting place when implementing the rest of what Phan teaches," including the "displays referenced elsewhere in Phan." *See, e.g.*, Ex. 1003 ¶¶ 325–328, 410–414; Ex. 1005, 1:18–29, 2:51–53. We consider the application of Phan's pixel arrangements to OLED displays—which themselves are disclosed in Phan—to be among the "inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

Patent Owner's arguments focus on the particular embodiments of Phan, which allegedly are limited to technologies other than OLED. *See* PO Resp. 32–33 (stating that Phan mentions only CRT, LCD, LED, PDP, and

FED display types and certain circuitry that is not associated with OLEDs); *see also* PO Sur-reply 15–16 (arguing that Phan's pixel arrangements do not apply to OLEDs). For example, Patent Owner argues that "Phan's virtual driving method—the heart of Phan's disclosure—would not be feasible in an OLED display." PO Resp. 33 (citing Ex. 2009 ¶¶ 207–215). But "[a] reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (alteration in original) (quoting *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985)). Thus, regardless of whether Phan focuses on other display technologies and/or particular algorithms in its embodiments, we must still consider Phan's teaching of OLEDs being a display technology related to its pixel arrangement disclosures.

We further note that many of Patent Owner's arguments are rooted in its conception of how "Phan's figures depict essentially no spacing between adjacent dots." PO Resp. 33. As such, Patent Owner argues that an ordinarily skilled artisan would have recognized that the spacing "was not feasible for an OLED display due to issues of color mixing of the organic light-emitting materials and shorting between adjacent pixels." *Id.* (citing Ex. 2009 ¶¶ 205–206). Yet, contrariwise, Patent Owner acknowledges that "Phan does not describe its figures as drawn to scale." PO Sur-reply 18–19 (citing *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000)). Given that we generally do not rely on patent drawings for showing particular sizes (*see Hockerson-Halberstadt*, 222 F.3d at 956), we do not agree that the alleged spacing in Phan's drawings would

have impeded an ordinarily skilled artisan from using Phan's pixel designs in OLED displays.

Regarding Patent Owner's argument that an ordinarily skilled artisan "would not have had a reasonable expectation of success in making Phan an OLED display" (PO Resp. 34), we have considered Dr. Kymissis's supporting testimony. *See* Ex. 2009 ¶ 215. He relies on the same arguments discussed above in which Patent Owner attempts to cabin Phan's teachings within the specific (non-OLED) embodiments disclosed. *See id.* Against this showing, Petitioner cites Dr. Pattison's testimony and contends that an ordinarily skilled artisan would have expected success employing Phan's pixel designs with the displays referenced elsewhere in Phan. Pet. 54–55 (citing Ex. 1003 ¶¶ 411–414). We find Dr. Pattison's testimony regarding expected success more persuasive because it is consistent with Phan's express statement that its disclosed invention relates to OLEDs. *See* Ex. 1005, 1:17–29. We also note that the '683 patent itself acknowledges that OLED componentry, such as power lines for driving OLED pixels, was known in the art. *See* Ex. 1001, 3:62–4:5. This is consistent with Petitioner's assertions regarding expected success in implementing Phan's pixel arrangement in an OLED display. Finally, at least one other contemporaneous reference cited by Petitioner, Cok, discloses the same pixel arrangement as Phan (*compare* Ex. 1005, Fig. 11b, *with* Ex. 1017, Fig. 1) and states that it is for "an OLED display device" (Ex. 1017, 4:8–13), which also is consistent with Petitioner's assertions of expected success.

For these reasons, we are persuaded that Phan teaches, or at least fairly suggests, that its disclosed pixel arrangements may be implemented as an OLED display.

b. Limitation [1-a]

Claim 1 further recites "a plurality of pixels for displaying an image on the OLED display." Ex. 1001, 8:65–66. Petitioner cites Phan's teaching of a display including "so-called pixels" that "consist of so-called dots representing the three basic colours of red, green and blue." Pet. 42 (quoting Ex. 1005, 1:57–61). Petitioner maps the recited "plurality of pixels" to Phan's dots, which Petitioner calls Phan's display's "minimum display unit." *Id.* at 43 (citing Ex. 1003 ¶¶ 329–336). Petitioner also cites the same teachings discussed above from the preamble for teaching the "OLED display" and contends that the display is "intended to allow for generation of a high resolution image." *Id.* (internal quotation and alteration omitted) (citing Ex. 1003 ¶¶ 337–339; Ex. 1005, 2:51–3:25, 4:19–24).

Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. We are persuaded that Phan's dots teach the recited "pixels." *See, e.g.*, Ex. 1005, 1:57–61. We also are persuaded that Phan teaches OLED displays and the use of such displays for generating images. *See, e.g.*, Ex. 1003 ¶¶ 337–339; Ex. 1005, 1:18–29, 2:51–3:25, 4:19–24.

c. Limitation [1-a(1)]

Claim 1 further recites "a first pixel." Ex. 1001, 8:67. A later limitation recites that the first pixels "are configured to emit green light." *Id.* at 9:20. Petitioner cites Phan's teaching of pixels that "comprise regularly disposed dots 11 radiating the basic colours red (red dot 13), green (green dot 14) and blue (blue dot 15)." Pet. 44 (quoting Ex. 1005, 4:29–32). As such, Petitioner maps the recited "first pixel" to Phan's green dots. *Id.*

(citing Ex. 1003 ¶¶ 340–343); *see also id.* at 50 (similar mapping). Patent Owner does not dispute these limitations apart from its arguments discussed above with respect to the preamble. We are persuaded that Phan's green dots teach "a first pixel" that is "configured to emit green light." *See, e.g.*, Ex. 1005, 4:29–32.

d. Limitation [1-a(2)]

Claim 1 further recites

> a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel.

Ex. 1001, 9:1–7. Petitioner cites the same teaching of dots from Phan and maps the "pair of second pixels" to the blue dots in particular. Pet. 44 (citing Ex. 1005, 4:29–32, Fig. 11b). Petitioner contends that adjacent dots are "separated" based on Phan's teaching that dots are "surrounded by a black mask or black barrier ribs 21 to obtain a higher contrast." *Id.* (citing Ex. 1005, 4:33–37, Figs. 1a–c, 10a–11b).

For the recited arrangement of pixels, Petitioner cites Phan's teachings of disposing square pixels in a grid pattern with dots "arranged along horizontally and/or vertically extending lines." Pet. 44–45 (quoting Ex. 1005, 1:57–61) (citing Ex. 1005, 3:33–36, 4:41–47, Figs. 1a, 2a). Petitioner also cites the "quad pixel" arrangement disclosed in Figure 11b of Phan and contends it can be implemented in the "quad pixel display" of Figure 12 from Phan. *Id.* at 45–46 (citing Ex. 1005, 5:47–60, Figs. 11–12). Petitioner depicts this concept in the following illustration from the Petition,

which includes annotated versions of Phan's Figure 11b and 12, as reproduced below.



*Id.* at 46. In this illustration, Petitioner indicates how "[u]se of the dot/pixel structure shown in Fig. 11b in a repeating grid or matrix [as shown in Figure 12] to produce Phan's display results in what this limitation requires." *Id.* (citing Ex. 1005, 4:29–32, 4:41–43, 5:47–54, Figs. 11b, 12). Petitioner contends that, "[d]ue to the use of a square pixel shape that is regularly arranged on lines in an identically repeating matrix, Phan's blue and green dots have ***'respective centers'*** that are located ***'along a first line.'***" *Id.* at 46–47. Petitioner further contends that, "because there are twice as many green dots as there are red and blue dots in Phan's 'quad pixel,' the blue and green dots alternate with each other and are ***'consecutively arranged'*** with blue pixels on ***'opposite sides'*** of the green pixels." *Id.* at 47 (citing Ex. 1003 ¶¶ 347–363).

To summarize these contentions, Petitioner provides the following illustration in the Petition.




Pet. 47 (citing Ex. 1003 ¶¶ 347–363). In this illustration from the Petition, Petitioner indicates the recited "first pixel" and "another first pixel" in green, the recited "pair of second pixels" in blue, and the recited "first line" in red. *Id.*

Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. We are persuaded that Phan's blue dots teach the recited "pair of second pixels." *See, e.g.*, Ex. 1005, 4:29–32, Fig. 11b. We also are persuaded that Phan's black mask or black barrier ribs "separate" the dots. *See, e.g.*, Ex. 1005, 4:33–37, Figs. 1a–c, 10a–11b. Petitioner also has established that Phan teaches pixels arranged in a grid pattern with dots arranged along horizontal and/or vertical lines. *See, e.g., id.* at 1:57–61, 4:41–43, Fig. 2a. We also are persuaded by Petitioner's contentions that the dot/pixel structure of Phan's Figure 11b—as implemented in the repeating grid pattern of Phan's Figure 12—results in the arrangement recited in this limitation, including the recited "first line." *See, e.g.*, Ex. 1003 ¶¶ 347–363; Ex. 1005, 4:29–32, 4:41–43, 5:47–60, Figs. 11–12.

e. Limitation [1-a(3)]

Claim 1 further recites

> a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels, and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel.

Ex. 1001, 9:8–16. Petitioner cites the same teaching of dots from Phan and maps the "pair of third pixels" to the red dots in particular. Pet. 47 (citing Ex. 1005, 4:29–32, Fig. 11b). Petitioner again contends that adjacent dots are "separated" based on Phan's teaching that dots are surrounded by a black mask or black barrier ribs. *Id.* (citing Ex. 1005, 4:33–37, Figs. 1a–c, 10a–11b).

Regarding the recited arrangement of pixels, Petitioner cites Phan's teachings that its pixels and dots are identical, regularly disposed, and arranged in a "square quad shape." Pet. 48 (citing Ex. 1005, 4:29–32, 5:47–54, Fig. 11b). As such, Petitioner contends that

> the red dots have their ***"centers"*** on a ***"second line"*** that runs through the red dots, the green ***"first pixel"*** and ***"an additional"*** green ***"first pixel."*** The "second line" ***"cross[es] the first line"*** at a green pixel as required. And, the pixels are ***"consecutively arranged,"*** with "third pixels" (red dots) on ***"opposite sides"*** of the "first pixel[s]" (green dots).

*Id.* (alterations in original) (citing Ex. 1003 ¶¶ 367–369). To summarize these contentions, Petitioner provides the following illustration in the Petition.




Pet. 48 (citing Ex. 1003 ¶¶ 367–369). In this illustration from the Petition, Petitioner indicates the recited "first pixel," "another first pixel," and "additional first pixel" in green, the recited "pair of second pixels" in blue, and the recited "pair of third pixels," "first line," and "second line" in red. *Id.*

Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. We are persuaded that Phan's red dots teach the recited "pair of third pixels." *See, e.g.*, Ex. 1005, 4:29–32, Fig. 11b. We also are persuaded that Phan's black mask or black barrier ribs "separate" the dots. *See, e.g.*, Ex. 1005, 4:33–37, Figs. 1a–c, 10a–11b. Petitioner has also shown sufficiently that the dot/pixel structure of Phan's Figure 11b implemented in the repeating grid pattern of Phan's Figure 12 results in the arrangement recited in this limitation, including the recited "second line crossing the first line at a location of the first pixel." *See, e.g.*, Ex. 1003 ¶¶ 367–369; Ex. 1005, 4:29–32, 5:47–54, Figs. 11–12.

f. Limitation [1-b]

Claim 1 further recites that "a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels." Ex. 1001, 9:17–19. Petitioner notes that "Phan's 'square quad pixels' include twice as many green dots as blue or red dots," so "there are green dots located between all of Phan's 'second pixels' (the blue dots)." Pet. 48–49 (citing Ex. 1005, 5:47–54, Figs. 11a–b, 12). Petitioner further notes that "the 'second pixels' (the blue dots) and the 'third pixels' (the red dots) are arranged diagonally with no intervening pixels." *Id.* at 49 (citing Ex. 1005, Figs. 11a–b). Based on these teachings, Petitioner contends the "***'first distance'*** between Phan's blue dots will always be ***'greater'*** than a ***'second distance'*** between adjacent blue and red dots." *Id.* (citing Ex. 1003 ¶¶ 370–374). To summarize these contentions, Petitioner provides the following illustration in the Petition.




Pet. 49 (citing Ex. 1003 ¶¶ 370–374). In this illustration from the Petition, Petitioner indicates the recited "first distance" between blue dots with a longer red line and the recited "second distance" between a blue dot and a red dot with a shorter red line. *Id.* In particular, Petitioner contends that "if

the dot center to dot center distance is *x*, the 'first distance' between blue pixels will again be 2*x*" and "[t]he 'second distance' between blue and red pixels will once again be only 1.4*x*." *Id.* (citing Ex. 1003 ¶ 375).

Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. We are persuaded that the dot/pixel structure of Phan's Figure 11b implemented in the repeating grid pattern of Phan's Figure 12 results in the arrangement recited in this limitation with a "first distance" between blue dots (i.e., "second pixels") being greater than a "second distance" between a blue dot (i.e., "one of the second pixels") and a red dot (i.e., "a neighboring one of the third pixels"). *See, e.g.*, Ex. 1003 ¶¶ 370–374; Ex. 1005, 5:47–54, Figs. 11a–b, 12.

g. Limitation [1-c]

Claim 1 further recites that "the first pixels are configured to emit green light, which is a color that is different from light emitted by the second pixels and the third pixels." Ex. 1001, 9:20–22. Petitioner relies on the same analysis discussed above mapping the "first pixels" to Phan's green dots. Pet. 50 (citing Ex. 1005, 4:29–32, Fig. 11b). Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. For the same reasons discussed above, this analysis is persuasive.

h. Limitations [1-d] and [1-e]

Claim 1 further recites that "the first pixels are smaller than at least one of the second pixels or the third pixels" and "each of the second pixels has a larger area than each of the third pixels." Ex. 1001, 9:23–26.

Petitioner cites the embodiment in Figure 11b of Phan (reproduced above) where "the central 'crosspoint' of the pixel has been shifted 'along diagonal line 35' resulting in dots with non-equal areas." Pet. 50–51 (citing Ex. 1003 ¶¶ 378–382; Ex. 1005, 5:47–54, Fig. 11b). Patent Owner does not dispute this limitation apart from its arguments discussed above with respect to the preamble. Based on Phan's Figure 11b embodiment, we are persuaded that Phan's green dots (i.e., "first pixels") are smaller than the blue dots (i.e., "second pixels") and that Phan's blue dots (i.e., "second pixels" have a larger area than the red dots (i.e., "third pixels"). *See, e.g.*, Ex. 1003 ¶¶ 378–382; Ex. 1005, 5:47–54, Fig. 11b.

i. Secondary Considerations of Nonobviousness

"[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)). "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention.*" *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Patent Owner argues that "Petitioner's obviousness theories are . . . undercut by extensive objective evidence of non-obviousness, including long-felt need, failure of others, skepticism, praise, and copying." PO Resp. 54–71; PO Sur-reply 24–27. Petitioner disputes that there is a nexus between the challenged claims and the asserted secondary considerations. Pet. Reply 25.

We now consider Patent Owner's evidence of secondary considerations of nonobviousness starting with its assertion of a nexus between the '683 patent and the Samsung Galaxy S22 Ultra smartphone. We then turn to Patent Owner's arguments regarding long-felt need, failure of others, industry praise, and copying.

*(1) Nexus*

Patent Owner contends that it "successfully mass-produced full-HD [full high definition] AMOLED [active-matrix OLED] displays for the first time in the world beginning with the AMOLED display for the Samsung Galaxy S4, overcoming skepticism and satisfying the industry's long-felt need." PO Resp. 68–69 (citing Ex. 2009 ¶¶ 325–327). According to Patent Owner, "the '683 Patent's 'Diamond Pixel' arrangement has been widely adopted in AMOLED displays for flagship mobile devices, including every Samsung Galaxy and Apple iPhone model that has used AMOLED displays." *Id.* at 69 (citing Ex. 2009 ¶ 327); *see also id.* at 62 (stating that Patent Owner's "'Diamond Pixel' arrangement . . . embodies the invention claimed in the '683 Patent"). As an example, Patent Owner cites, but does not analyze in its briefs, a "Galaxy S22 ULTRA Claim Chart" in support of its contention that "the Samsung Galaxy S22 Ultra product practices all challenged claims of the '683 Patent." *Id.* at 69 (citing Ex. 2009 ¶¶ 328–330; Ex. 2028 (claim chart); Ex. 2063); *see also* PO Sur-reply 24 (citing same). Patent Owner also provides one teardown image in support of its showing of nexus, which is reproduced below.




PO Resp. 69–70 (citing Ex. 2029, 5). This image from the Patent Owner Response is what Patent Owner calls "[a] teardown image . . . of the pixel arrangement obtained from a Galaxy S22 Ultra sample . . . with Figure 5 of the '683 Patent superimposed."[6] *Id.* Patent Owner additionally argues that "Petitioner does not assert any limitation is not met." PO Sur-reply 24; *see also id.* at 26 ("Regarding nexus, there is no dispute that [Patent Owner's] Diamond Pixel arrangement structures practice the claims.").

Further addressing nexus, Patent Owner argues that

> [p]racticing the claims of the '683 Patent is what enabled the manufacture of full HD AMOLED displays suitable for mobile devices by striking the Patent's novel balance of improving the

---

[6] In its Opposition to Petitioner's first motion to strike, which was filed after the Patent Owner Response, Patent Owner implies that the teardown images in the Response speak for themselves and, as such, are entitled to a presumption of nexus. *See* 1st Strike Opp. 3–4; *see also* Tr. 102:19–103:15 (similar argument by Patent Owner's counsel at the oral hearing). Petitioner argues that Patent Owner did not assert an entitlement to a presumption of nexus in the Response, and that Patent Owner's Opposition is an improper vehicle to introduce such an argument. 1st Strike Reply 1. We agree with Petitioner that Patent Owner did not address in the Response whether the Samsung Galaxy S22 Ultra smartphone is coextensive with the claims of the '683 patent. *See id.*; Pet. Reply 20. Accordingly, we decline to consider any argument that Patent Owner is entitled to a presumption of nexus.

> aperture ratio of the AMOLED display (by enlarging the emissive areas) and allowing an increased density of pixels while allowing for a more reliable deposition of the organic material (by ensuring sufficient gaps between pixels), and improving the display lifetime.

PO Resp. 70 (citing Ex. 2009 ¶¶ 331–334). Patent Owner also argues that "[t]he challenged claims achieve the abovementioned benefits by reciting pixel arrangements with specific groupings, shapes, sizes, and layouts of the red, green, and blue OLED sub-pixels." *Id.* at 70–71 (citing, *inter alia*, Ex. 2009 ¶¶ 331–334). According to Patent Owner, the pixel arrangement of the '683 patent allowed Patent Owner "to overcome manufacturing and design obstacles to attaining higher-resolution and higher brightness AMOLED displays that relate to the sensitive light-emitting organic layers of OLEDs." *Id.* at 71 (citing, *inter alia*, Ex. 2009 ¶¶ 331–334).

Petitioner argues that Patent Owner "has not even alleged—[l]et alone established—that any of the products it identifies are 'coextensive' with the claims." Pet. Reply 20. By Petitioner's reckoning, "[t]his makes sense, as the Samsung Galaxy S22 Ultra—and the other referenced products—are smartphones" whereas "[t]he '683 patent is not directed to a smartphone." *Id.* Petitioner also argues that Patent Owner does not establish that the asserted secondary considerations are the direct result of the unique characteristics of the claims and not the prior art. *Id.* Petitioner also argues that the claimed pixel arrangement "is at best ***<u>indirectly</u>*** responsible for any purported success, praise, and need satisfaction" given Patent Owner's statement that the arrangement "allowed [Patent Owner] to overcome manufacturing and design obstacles." *Id.* at 20–21 (alteration in original) (quoting PO Resp. 71). Petitioner additionally argues that "[i]t is actually Patent Owner's 'highly sophisticated evaporation technology' that permits

higher OLED resolutions." *Id.* at 21 (quoting Ex. 2065, 5) (citing Ex. 1019, 45:6–22).

A patent owner is entitled to a presumption of nexus when it shows that the asserted objective evidence is tied to a specific product that "embodies the claimed features, and is coextensive with them." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). A patent owner is further "afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019) (internal quotation omitted).

We agree with Petitioner (Pet. Reply 20; 1st Strike Reply 1) that Patent Owner is not entitled to a presumption of nexus because Patent Owner does not make any showing of coextensiveness between the Samsung Galaxy S22 Ultra smartphone and the claims of the '683 patent. Thus, Patent Owner necessarily must prove nexus "by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–74 (internal quotation omitted). We now discuss Patent Owner's proffered evidence of a direct nexus, and we find that it is entitled to little or no weight.

First, Patent Owner relies on the claim chart at Exhibit 2028 to support its statement that "the Samsung Galaxy S22 Ultra product practices all challenged claims of the '683 Patent." PO Resp. 69. We find below that Patent Owner's mere mention of the claim chart at Exhibit 2028 without any explanation in the Patent Owner Response amounts to improper incorporation by reference in contravention of 37 C.F.R. § 42.6(a)(3). *See*

*infra* § II.H. We grant Petitioner's motion to strike this statement below, and we accord it no weight in our nexus analysis. *See id.*

Second, Patent Owner's provision of "[a] teardown image . . . of the pixel arrangement obtained from a Galaxy S22 Ultra sample . . . with Figure 5 of the '683 Patent superimposed" (PO Resp. 69–70) is conclusory and entitled little or no weight. Indeed, the Patent Owner Response does not even provide a citation supporting the provenance of the annotated figure. One would have to look at paragraph 328 of Dr. Kymissis's declaration to find that annotated figure, which in turn cites Dr. Fontecchio's images of the Galaxy S22 Ultra teardown and Dr. Fontecchio's declaration. Ex. 2009 ¶ 328 (citing Ex. 2029, 5; Ex. 2063). We can only assume that Dr. Kymissis applied the annotations to an image provided by Dr. Fontecchio. Further, even if we were to overlook these gaps, we would accord little weight to the annotated figure because the overlaid aspects from Figure 5 of the '683 patent do not necessarily embody or account for all of the limitations of the challenged claims. In the absence of any explanation from Patent Owner, we find Patent Owner's annotated figure unavailing. In addition, the fact that Petitioner does not dispute the correspondence between particular limitations of the '683 patent claims and the Galaxy S22 Ultra smartphone (*see* PO Sur-reply 24, 26) is of no consequence given that Patent Owner has the burden of production on the issue of nexus. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

Third, to the extent that Patent Owner might separately assert a nexus between Patent Owner's so-called "Diamond Pixel" arrangement[7] and the

[7] "Diamond Pixel" appears to be an advertising mark. *See* PO Resp. 57 (indicating that the term is a trademark).

claims of the ’683 patent, Patent Owner does not substantiate such a nexus with evidence or analysis. *See* PO Resp. 69–70. Although Patent Owner uses “Diamond Pixel” as a shortcut way of referring to a pixel arrangement (*see id.* at 57, 58, 62, 66, 69; PO Sur-reply 25, 26), Patent Owner has neither established what the term “Diamond Pixel” encompasses, nor attempted to compare a “Diamond Pixel” arrangement to the claims of the ’683 patent separate from its arguments related to the Galaxy S22 Ultra smartphone. The closest Patent Owner comes to providing a separate nexus analysis for a “Diamond Pixel” arrangement is in the Sur-reply, where it provides quotes from an exhibit titled “Samsung Diamond Pixels.” PO Sur-reply 25 (quoting Ex. 2027, 1). Yet Patent Owner’s mere mention of a “sub-pixel arrangement . . . [where] Red, Green, and Blue sub-pixels have very different sizes . . . [with] vertical, horizontal, and particularly diagonal line segments and vectors . . . maximiz[ing] the sub-pixel packing” is not keyed to any challenged claim. *Id.* (alterations in original) (quoting Ex. 2027, 1); *see also* PO Resp. 62–63 (similar quotation). Thus, we accord such mentions of “Diamond Pixel” arrangements no weight with respect to nexus. By extension, Patent Owner’s attempts to tie the Samsung Galaxy S4 and iPhone X smartphones to “Diamond Pixel” arrangements (*see* PO Resp. 60, 62–65, 68–69) suffer from the same deficiencies related to nexus.

Fourth, we agree with Petitioner (Pet. Reply 20–21) that Patent Owner’s statement about the claimed pixel arrangement helping Patent Owner “overcome manufacturing and design obstacles” (PO Resp. 71) tends to show an indirect link between the alleged secondary considerations and the challenged claims. Petitioner also argues persuasively (Pet. Reply 20) that a pixel arrangement is but a component of the Samsung Galaxy S22

Ultra *smartphone*, which also tends to undermine a showing of nexus for considerations tied to the smartphone. *See Fox Factory*, 944 F.3d at 1374 (discussing how there is "no or very little correspondence" between a product and a patent claim where "the patented invention is only a component of a commercially successful machine or process"). Finally, Petitioner also cites some of Patent Owner's own proffered evidence that suggests that it is Patent Owner's "highly sophisticated evaporation technology" that permits higher resolution OLEDs for its smartphones. *See* Ex. 2065, 5. This too tends to undermine Patent Owner's showing of nexus.

For these reasons, we accord Patent Owner's evidence of a nexus between the claims of the '683 patent and the Samsung Galaxy S22 Ultra smartphone little to no weight. We also find that Patent Owner does not establish any nexus between devices allegedly embodying a so-called "Diamond Pixel" arrangement and the claims of the '683 patent. Despite the weak evidence of nexus in this case, we still consider Patent Owner's evidence of long-felt need, failure of others, industry praise, and copying below.

*(2) Long-Felt Need*

Patent Owner argues that in the early 2010s, "AMOLED displays for mobile devices suffered from a significant shortcoming—namely the difficulty of manufacturing higher resolution displays." PO Resp. 54 (citing Ex. 2009 ¶¶ 291–300; Ex. 2013, 3). Thus, Patent Owner argues that

> [t]here was a long-felt need to develop pixel arrangements that would enable the manufacture of high-resolution AMOLED displays that would provide superior image quality, particularly displays with sufficiently high pixel densities (measured as

> pixels per inch or 'PPI'), aperture ratio, and lifetime to support 'full high definition' ('full HD') graphics in mobile devices.

*Id.* at 54–55 (citing Ex. 2009 ¶¶ 293–297); *see also id.* at 55–57 (further discussion about alleged manufacturing challenges). Patent Owner asserts that "the '683 Patent's novel pixel arrangement, which became widely recognized as the 'Diamond Pixel™' arrangement, enabled the manufacture of full-HD AMOLED displays suitable for mobile devices, satisfying the industry's longstanding need." *Id.* at 57; *see also* PO Sur-reply 26 (citing Ex. 2009 ¶¶ 331–333) (similar argument). Patent Owner also argues that alleged needs for higher resolutions and manufacturability of displays need not be expressly recited in the challenged claims as long as these "advantages [are] inherent in what is specifically disclosed in a patent." PO Sur-reply 26 (quoting *In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 n.5 (Fed. Cir. 1985)).

Petitioner argues that the things Patent Owner cites as being long-felt needs, including "'AMOLED displays' with 'sufficiently high pixel densities' and 'full HD' 'graphics in mobile devices,'" are not claimed in the '683 patent. Pet. Reply 22 (quoting PO Resp. 54–55). A such, Petitioner argues that no such needs could be met by the '683 patent. *Id.* Petitioner also cites information in Patent Owner's exhibits showing "not only optimism, but that there were numerous available OLED displays on the market long before the patent was filed." *Id.* at 22–23 (citing Ex. 2016, 1; Ex. 2019, 14; Ex. 2020, 3, 7; Ex. 2023, 1; Ex. 2025, 2; Ex. 2039, 2; Ex. 2074, 15).

Patent Owner's assertion of long-felt need is tied to the so-called "Diamond Pixel" arrangement (*see* PO Resp. 57; PO Sur-reply 26); as discussed above (*see supra* § II.D.2.i.(1)), Patent Owner fails to substantiate

a nexus to the "Diamond Pixel" arrangement. Further, even if we were to assume that some resolution and manufacturability benefits might flow from certain devices within the scope of the challenged claims, the record does not substantiate that these benefits satisfied a particular unmet need related to manufacturing higher resolution OLEDs. As noted by Petitioner (Pet. Reply 21), record evidence credits Patent Owner's "highly sophisticated evaporation technology" as allowing mass production of OLEDs with higher resolutions. Ex. 2065, 5. Other record evidence substantiates commercialization of OLED displays as of the time of the patent. *See, e.g.*, Ex. 2020, 3, 7; Ex. 2023, 1; Ex. 2025, 2; Ex. 2039, 2. Further, the claimed pixel arrangements could conceivably be used in displays having various densities and resolutions and with displays produced by both difficult and easy manufacturing processes. This lack of correspondence between the alleged need and the challenged claims undermines Patent Owner's assertion of long-felt need. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) (holding that where claims are broad enough to cover devices that either do or do not solve the identified problem, objective evidence of non-obviousness fails because it is not commensurate in scope with the claims which the evidence is offered to support).

For these reasons, we accord Patent Owner's evidence of long-felt need little or no weight.

*(3) Failure of Others*

Patent Owner also argues that "display manufacturers and researchers proposed many AMOLED pixel arrangements in an attempt to answer the industry's calling for full-HD AMOLED displays suitable for mobile

devices." PO Resp. 57 (citing Ex. 2009 ¶¶ 308–314). Patent Owner argues that these "wide-ranging efforts" did not result in success. *Id.* at 57–58; *see also id.* at 58–59 (further detailing alleged failures of others). Accordingly, Patent Owner argues that "the industry was highly skeptical that a pixel arrangement could be devised that would enable the manufacture of full-HD AMOLED displays for mobile devices," and that LCDs were viewed as a preferred alternative. *Id.* at 60 (citing Ex. 2009 ¶¶ 304–306). Patent Owner even argues that "[c]ontinued research efforts *after* the inventions of the '683 Patent also failed to result in a successful pixel arrangement that has been adopted for use in flagship mobile devices." *Id.* at 60–62 (alleging failure of a pixel arrangement by Petitioner Mianyang BOE). According to Patent Owner, "it was only [Patent Owner's] innovative 'Diamond Pixel' arrangement, which embodies the invention claimed in the '683 Patent, that was ultimately successful at enabling the manufacture of full-HD mobile AMOLED displays." *Id.* at 62 (citing Ex. 2009 ¶¶ 325–326).

Petitioner argues that the alleged lack of available "full-HD AMOLED displays suitable for mobile devices" is irrelevant because "[t]he claims do not require AMOLED displays, HD, or mobile devices." Pet. Reply 23 (quoting PO Resp. 57). Further, Petitioner argues that "numerous working AMOLED displays existed before the '[683] patent." *Id.*

Patent Owner's assertions are again tied to the so-called "Diamond Pixel" arrangement (*see* PO Resp. 58, 61–62), but Patent Owner has failed to substantiate a nexus to the "Diamond Pixel" arrangement. *See supra* § II.D.2.i.(1). We also agree with Petitioner that record evidence supports the commercialization of OLED displays as of the time of the patent, which tends to disprove that others had failed. *See, e.g.*, Ex. 2020, 3, 7; Ex. 2023,

1; Ex. 2025, 2; Ex. 2039, 2. Moreover, to the extent Patent Owner's assertions of failure by others are tied to manufacturing of high-resolution displays (*see, e.g.*, PO Resp. 60, 62), such assertions fail for the same reasons as Patent Owner's long-felt need assertions discussed above. *See supra* § II.D.2.i.(2). Specifically, Patent Owner's proffered evidence related to display resolution and manufacturing is not commensurate in scope with the claims. *See Therasense*, 593 F.3d at 1336. Thus, we accord Patent Owner's evidence of failure of others little or no weight.

*(4) Industry Praise*

Patent Owner cites "significant praise" for the so-called "Diamond Pixel" arrangement that Patent Owner associates with the '683 patent, including "praise for the full-HD resolution and superior image quality of the AMOLED displays implementing these arrangements." PO Resp. 62–63 (citing Ex. 2009 ¶¶ 314–317; Ex. 2027, 1; Ex. 2067). Patent Owner further argues that "Samsung Galaxy S4's AMOLED display was the first commercial embodiment of the '683 Patent" and "[p]raise for the Galaxy S4's AMOLED display, and specifically the novel pixel arrangement of the '683 Patent that enabled full HD, was overwhelming." *Id.* at 63 (citing Ex. 2013, 3; Ex. 2026, 2; Ex. 2037, 3). Patent Owner also cites praise for the iPhone X and other "[f]lagship mobile devices," which also "adopted [Patent Owner's] AMOLED displays implementing the pixel arrangement of the '683 Patent." *Id.* at 64–65 (citing Ex. 2038, 1–2; Ex. 2039, 3, 5; Ex. 2040, 1–2; Exs. 2068–2072). Patent Owner additionally cites an award presented by the Commissioner of South Korea's Intellectual Property Office to inventor Sang-Shin Lee. *Id.* at 65 (citing Ex. 2066, 9).

Petitioner criticizes Patent Owner's evidence of industry praise for the Samsung Galaxy S4 and the iPhone X because Patent Owner only attempts to show a nexus to the Samsung Galaxy S22 Ultra. Pet. Reply 23 (citing PO Resp. 62–65, 68–71). Petitioner also criticizes Patent Owner's reference to an award by the Korean Patent Office as being devoid of explanation tying it to the '683 patent. *Id.* Petitioner additionally argues that "pixel arrangement is simply one among many product features discussed in Patent Owner's exhibits" and that various other features, such as precision display calibration, lower screen reflectance, high dynamic range, night shift mode, true tone viewing, super dim setting, and viewing angle performance, "are also important." *Id.* at 24 (citing Ex. 2039, 2–5). Petitioner further argues that "enhancements to the circuit structure" of the Galaxy S4 allowed for an improved contrast ratio, reduced power consumption, increased outside visibility, and a thinner display with a reduced bezel. *Id.* (quoting Ex. 2037, 4).

As discussed above, Patent Owner's attempt to establish a nexus between the claims of the '683 patent and the so-called "Diamond Pixel" arrangement is entitled to little or no weight. *See supra* § II.D.2.i.(1). Thus, Patent Owner's alleged evidence of praise for the "Diamond Pixel" structure (PO Resp. 62–63) is entitled to little or no weight. Given that Petitioner's only evidence of nexus for the Samsung Galaxy S4 and the iPhone X smartphones is tied to the "Diamond Pixel" arrangement (*see supra* § II.D.2.i.(1)), we likewise accord little or no weight to Patent Owner's alleged evidence of praise for these smartphones. *See* PO Resp. 63–65. Finally, Patent Owner cites no creditable analysis or evidence tying the cited Korean Patent Office award to the challenged claims. *See id.* at 65.

For these reasons, we accord Patent Owner's evidence of industry praise little or no weight.

*(5) Copying*

Patent Owner argues that "widespread copying of [Patent Owner's] patented pixel arrangements is evident from teardown photographs of commercially-available AMOLED display products that employ near carbon copies of [Patent Owner's] pixel arrangements. PO Resp. 65 (citing Ex. 2009 ¶¶ 318–324). In particular, Patent Owner argues that "Petitioner Mianyang BOE copied [Patent Owner's] pixel arrangements to commercialize AMOLED displays for products including the iPhone 12." *Id.* at 66 (citing Ex. 2009 ¶ 319). In support of this argument, Patent Owner provides the following illustration.

**Samsung Display AMOLED (Galaxy S22 Ultra)**




Ex. 2029 at 5 (annotated)

**Mianyang BOE AMOLED (iPhone 12)**




Ex. 2041, ¶84

PO Resp. 66 (citing Ex. 2029, 5; Ex. 2041 ¶ 84). In this illustration from the Patent Owner Response, the left image shows a pixel arrangement labeled "Samsung Display AMOLED (Galaxy S22 Ultra)" and the right image shows a pixel arrangement labeled "Mianyang BOE AMOLED (iPhone 12)." *Id.* According to Patent Owner, this illustration demonstrates

that "the pixel arrangement used in Mianyang BOE's AMOLED display for the iPhone 12 is nearly identical to [Patent Owner's] patented pixel arrangement," as exemplified by an image of an AMOLED display from a Galaxy S22 Ultra smartphone. *Id.*

Patent Owner additionally alleges "[w]idespread copying" by "numerous vendors of replacement AMOLED displays for mobile phones." PO Resp. 66 (citing Exs. 2042–2061). According to Patent Owner, the pixel arrangements in these replacement displays "not only infringe the challenged claims . . . , they bear such similarity to those of Samsung Display that they demonstrate copying." *Id.* at 66–67 (citing Ex. 2009 ¶¶ 320–324; Exs. 2042, 2043; *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1339–42 (Fed. Cir. 2023)). Patent Owner also provides a number of "[e]xemplary teardown images of such replica products . . . with Figure 5 of the '683 Patent overlayed on top" to support its analysis. *Id.* at 67–68 (citing Ex. 2029, 5; Ex. 2044, 4; Ex. 2045, 5; Ex. 2046, 6; Ex. 2047, 6; Ex. 2048, 5). Patent Owner compares these images with an image of an AMOLED display from a Galaxy S22 Ultra smartphone. *Id.*

Petitioner disputes Patent Owner's allegations of "widespread copying" because Patent Owner "does nothing more than (1) allege infringement and (2) compare product images." Pet. Reply 24 (citing PO Resp. 65–67). Petitioner argues that copying requires a showing of more than just similarity between the challenged patent and a competitor's product. *Id.* (citing, *inter alia*, *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019); *Iron Grip Barbell Co. v. USA Sports Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004); *Instiute Pasteur v. Focarino*, 738 F.3d 1337, 1347–48 (Fed. Cir. 2013)).

We first turn to Patent Owner's allegation that Petitioner Mianyang BOE's pixel arrangement for the iPhone 12 copied Patent Owner's patented pixel arrangements. Patent Owner bases its analysis on a comparison to an image from a Samsung Galaxy S22 Ultra smartphone. *See* PO Resp. 66. As discussed above, however, we accord Patent Owner's evidence of nexus between the claims of the '683 patent and the Samsung Galaxy S22 Ultra smartphone little to no weight. *See supra* § II.D.2.i.(1). Thus, the basis of Patent Owner's copying analysis is dubious. The remainder of Patent Owner's analysis consists of an image comparison and an allegation that the images are "nearly identical." PO Resp. 66; *see also* Ex. 2009 ¶ 319 (Dr. Kymissis's testimony regarding same). We find this analysis to be rudimentary at best. And, even if this were probative evidence of similarity, "[n]ot every competing product that arguably falls within the scope of a patent is evidence of copying" because "[o]therwise every infringement suit would automatically confirm the nonobviousness of the patent." *Iron Grip Barbell*, 392 F.3d at 1325. Indeed, our reviewing court's "case law holds that copying requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). Patent Owner has presented no such evidence here. Thus, we accord Patent Owner's evidence of copying related to Mianyang BOE little or no weight.

We next turn to Patent Owner's allegations of "widespread copying" related to vendors of replacement AMOLED displays. Patent Owner relies on, *inter alia*, claim charts at Exhibits 2042 and 2043 to support its statement that certain vendors' pixel arrangements infringe the challenged claims. PO Resp. 66–67. As discussed below, we find that Patent Owner's incorporation of arguments by reference to these claim charts (and

Dr. Kymissis's accompanying testimony) constitutes a violation of 37 C.F.R. § 42.6(a)(3). *See infra* § II.H. We grant Petitioner's motion to strike this statement alleging infringement below, and we accord it no weight in our copying analysis. *See id.* Moreover, as above, the basis of Patent Owner's comparison is dubious because Patent Owner's evidence of nexus between the claims of the '683 patent and the Samsung Galaxy S22 Ultra smartphone is entitled to little or no weight. *See supra* § II.D.2.i.(1). For these reasons, we accord Patent Owner's evidence of copying related to replacement vendors little or no weight.

Considering all evidence of alleged copying presented by Patent Owner, we accord it little or no weight.

*(6) Other Considerations*

Although Patent Owner makes certain references to the "success[]" of its products (*see, e.g.*, PO Resp. 69), Patent Owner acknowledges that it is not asserting evidence of commercial success as a secondary consideration of nonobviousness. PO Sur-reply 27 n.5.

*(7) Conclusion Regarding Secondary Considerations of Nonobviousness*

Having considered the entire trial record, we accord Patent Owner's asserted evidence of secondary considerations of nonobviousness little or no weight.

j. Conclusion Regarding Claim 1

Petitioner has shown persuasively that Phan teaches or suggests all limitations of claim 1 in light of the knowledge of a person of ordinary skill

in the art. We also have considered Patent Owner's evidence of secondary considerations of nonobviousness, and we accord it little or no weight. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 1 would have been obvious over Phan.

*3. Claim 4*

Claim 4 depends from claim 1 and further recites that "the first pixels, the second pixels, and the third pixels are configured to emit different color lights." Ex. 1001, 9:34–36. As discussed above with respect to claim 1, Petitioner contends that "Phan's green dot is the claimed ***'first pixel,'*** its blue dot is the claimed ***'second pixel,'*** and its red dot is the claimed ***'third pixel.'***" Pet. 51; *see also supra* § II.D.2.c–e.

Patent Owner relies on the same arguments discussed above for claim 1. PO Resp. 30–34; PO Sur-reply 15–17. Based on the same analysis discussed above for claim 1, we are persuaded by Petitioner's analysis that Phan teaches green, blue, and red dots (i.e., "different color lights") corresponding to the recited first, second, and third pixels, respectively. *See supra* §§ II.D.2.c–e. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 4 would have been obvious over Phan.

*4. Claim 5*

Claim 5 depends from claim 4 and further recites that "the second pixels are configured to emit blue light, and the third pixels are configured to emit red light." Ex. 1001, 9:37–39. Petitioner relies on the same analysis from claims 1 and 4. Pet. 51; *see also supra* §§ II.D.2.c–e, II.D.3.

Patent Owner relies on the same arguments discussed above for claim 1. PO Resp. 30–34; PO Sur-reply 15–17. Based on the same analysis discussed above for claims 1 and 4, we are persuaded by Petitioner's analysis that Phan teaches blue and red dots corresponding to the recited second and third pixels, respectively. *See supra* §§ II.D.2.c–e, II.D.3. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 5 would have been obvious over Phan.

*5. Claim 6*

Claim 6 depends from claim 1 and further recites that "each of the second pixels has a larger area than that of the first pixel." Ex. 1001, 9:40–42. Petitioner cites Phan's Figure 11b for teaching that Phan's "***'second pixel'*** (the blue dot) has a ***'larger area'*** than its ***'first pixel'*** (the green dot)." Pet. 52 (citing Ex. 1005, Fig. 11b).

Patent Owner relies on the same arguments discussed above for claim 1. PO Resp. 30–34; PO Sur-reply 15–17. We are persuaded by Petitioner's analysis that Phan teaches a blue dot (i.e., "second pixel") that is larger than a green dot (i.e., "first pixel"). *See, e.g.*, Ex. 1005, Fig. 11b. Our analysis regarding secondary considerations of nonobviousness discussed

above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 6 would have been obvious over Phan.

*6. Claim 7*

Claim 7 depends from claim 1 and further recites that "the second pixels are substantially equidistant from the first pixel interposed between the second pixels, and the third pixels are substantially equidistant from the first pixel interposed between the third pixels." Ex. 1001, 9:43–47. Petitioner cites Phan's teachings that pixels and dots "are 'identical' and 'regularly disposed' in a repeating grid or matrix." Pet. 52 (citing Ex. 1005, 4:29–32, Fig. 11b). Petitioner further cites Phan's teachings that "each pixel has a 'square quad' shape, with the pixel's dots surrounding a 'crosspoint.'" *Id.* (citing Ex. 1005, 5:47–54, Figs. 11a, 11b). Accordingly, Petitioner contends that "distances between dots will be the same across the display." *Id.* To help explain its contentions, Petitioner provides the following illustration in the Petition.



Pet. 52–53 (citing Ex. 1003 ¶¶ 393–398). In this illustration from the Petition, Petitioner indicates distances $D_1$ in red, which allegedly show that "a 'first pixel' will be ***'substantially equidistant'*** to two surrounding 'second pixels.'" *Id.* Petitioner also indicates distances $D_2$ in red, which allegedly show that "the 'first pixel' will also be ***'substantially equidistant'*** to two surrounding 'second [sic, third] pixels.'" *Id.* Petitioner contends that "[t]he distance between dots is determined by the 'black mask or black barrier ribs 21' that surrounds the dots." *Id.* at 53 (citing Ex. 1005, 4:33–37). According to Petitioner, an ordinarily skilled artisan "would have understood that this mask has (or at least obviously could have) the same width/thickness across Phan's display," and Petitioner explains that "[m]aking the black mask the same across the display would facilitate the use of 'regularly disposed' dots Phan teaches." *Id.* (citing Ex. 1003 ¶¶ 399–401).

Patent Owner disputes Petitioner's conception of how Phan's quad pixel arrangement from Figure 11b would be implemented in the display of Figure 12. PO Resp. 35–38. In particular, Patent Owner argues that "Petitioner inexplicably changes the arrangement and geometry of Phan's Figure 12 to remove the spacings between the adjacent quad-pixels." *Id.* at 36. Patent Owner further argues that "Petitioner and Dr. Pattison offer no justification for changing Phan's display to remove its clearly-disclosed spacings between adjacent quad-pixels, which would allow, for example, placement of wiring for Phan's '[c]ontrol circuitry,' or 'optical fiber network.'" *Id.* at 37 (alteration in original) (citing Ex. 1005, 5:20–24, Fig. 5; Ex. 2009 ¶¶ 221–223). Patent Owner additionally argues that "Petitioner's changes are also incompatible with Phan's dynamic pixel approach" insofar

as "the visual locus of the *dynamic* quad-pixel disclosed by Phan . . . will be perceived by the viewer to be shifted from the physical center of the *static* quad-pixel." *Id.* at 37–38 (citing Ex. 1005, Figs. 9.1–9.8; Ex. 2009 ¶¶ 226–227). Patent Owner explains that this would result in "distortion and poor image quality," which "would contradict Phan's goal of improving resolution and image quality through 'variable generation of pixels from existing dots,' *i.e.*, its 'dynamic generation of pixels.'" *Id.* at 38 (citing Ex. 1005, 2:54–3:19; Ex. 2009 ¶¶ 226–230).

Patent Owner also offers its own counterexample of how pixel spacing would have been implemented when combining Phan's Figures 11b and 12, which is shown in the following illustration from the Patent Owner Response.




PO Resp. 36. This illustration presents Patent Owner's conception of how the pixel arrangement of Phan's Figure 11b would have been implemented in the display of Phan's Figure 12. *Id.* Referring to the illustration, Patent Owner argues that "the distance from the green pixel to an adjacent blue pixel ($d_{B1}$) is different from the distance from the green pixel to another adjacent blue pixel ($d_{B2}$)." *Id.* Patent Owner further argues that "the

distance from the green pixel to an adjacent red pixel ($d_{R1}$) is different from the distance from the green pixel to another adjacent red pixel ($d_{R2}$)."[8] *Id.* Patent Owner explains that these types of "spacings between individual pixel unit groups were common in manufactured display devices." *Id.* at 37 (citing Ex. 2009 ¶¶ 224–225).

Petitioner replies that "all of Phan's figures show displays with the dots/sub-pixels regularly spaced in a consistent, repeating pattern." Pet. Reply 13 (citing Ex. 1005, Figs. 2a–b, 7, 9–9.8, 12–12d). Petitioner again emphasizes Phan's teachings that "pixels are 'regularly disposed' in a repeating 'grid' or 'matrix.'" *Id.* (citing Ex. 1005, 2:51–53, 4:29–50). Petitioner also counters Patent Owner's arguments about Phan's static and dynamic pixels by noting that (1) Phan teaches them as having the same matrix geometry and (2) Phan depicts them has having the same shape and geometry across the display. *Id*. at 14–15 (citing Ex. 1005, 6:4–23, 7:59–67, Figs. 2a–b, 4a–b, 5, 7, 8–8.12, 9–9.8, 12a–12d). According to Petitioner, "[t]his is purposeful" because "employing dynamic pixels that 'overlap[]' the 'static pixels' allows a 'given grid' to have an 'enhanced' or 'higher' 'resolution.'" *Id.* at 15 (quoting Ex. 1005, code (57), 2:51–53); *see also* Ex. 1018 ¶ 68 (Dr. Pattison testifying that "Phan['s] display includes not only static pixels, but many dynamic pixels that are the same size as the static pixels for purposes of increasing the display's effective resolution."). Petitioner additionally argues that it is Patent Owner's counterexample based on Phan, not Petitioner's proposal, that renders Phan's dynamic pixels

[8] Patent Owner acknowledges that the relevant "distances can be measured either edge-to-edge or center-to-center." PO Resp. 34 (citing Ex. 2009 ¶¶ 216–217).

unworkable, leading to variances in brightness from pixel-to-pixel and adding spaces so as to introduce distortion. Pet. Reply 15 (citing Ex. 1018 ¶¶ 73–79). Petitioner contends that this result "would all be contrary to Phan's teaching that its dynamic pixels are meant 'not to be perceivable by the human eye.'" *Id.* (citing Ex. 1005, 2:57–59).

Although Patent Owner states that "Phan does not describe its figures as drawn to scale," Patent Owner argues in its Sur-reply that Figure 12 of Phan depicts spacing between sub-pixels. PO Sur-reply 18–19. Patent Owner also argues

> that displays having spacing between pixel units were not uncommon . . . , that [persons of ordinary skill in the art] would have understood spacing (such as shown in Fig. 12) is necessary for Phan's control circuitry or optical fiber network . . . , and that spacing would prevent image distortion.

*Id.* at 19 (citing Ex. 2009 ¶¶ 223–229). Patent Owner additionally argues that "removing quad-pixel spacing . . . is contrary to Phan's goal of applying dynamic driving to a given grid." *Id.* (citing Ex. 1005, 2:50–3:19; Ex. 2009 ¶¶ 229–230).

Patent Owner's arguments are premised on its interpretation of spacing between pixels in Phan's Figure 12. *See* PO Resp. 36 ("Phan's Figure 12 shows spacings between each quad-pixel"); PO Sur-reply 18 (stating that Phan "depicts spacing between quad-pixels in Figure 12"). As stated above, however, we do not interpret Phan's teachings as being limited by the spacing depicted in Figure 12. Indeed, Patent Owner acknowledges that "Phan does not describe its figures as drawn to scale." PO Sur-reply 18–19. Further, as discussed above, we generally do not rely on patent drawings for showing particular sizes. *See Hockerson-Halberstadt*, 222 F.3d at 956.

As noted by Petitioner, the figures in Phan—including Figure 12—depict pixels having the same shape and geometry across the display. Pet. Reply 14–15 (citing Ex. 1005, Figs. 2a–b, 4a–b, 5, 7, 8–8.12, 9–9.8, 12a–12d). Phan also teaches that pixels and dots are "regularly disposed" in a "grid." *See, e.g.*, Ex. 1005, 2:51–53, 4:29–50, 5:47–54. Based on these teachings, we are persuaded that an ordinarily skilled artisan would have had reason to dispose Phan's pixels and dots in a regular pattern in the manner suggested by Petitioner. In fact, Dr. Kymissis agreed that it was common in the art of OLED displays to repeat unit pixel designs across a display. *See* Ex. 1019, 105:9–12, 106:2–6. Further, we do not agree with Patent Owner's argument (*see* PO Resp. 33; PO Sur-reply 18–19) that regular spacing is necessarily incompatible with dynamic driving of pixels. Patent Owner appears to base this argument on the need to dispose "Phan's control circuitry or optical fiber network" among the quad pixels. *See* PO Sur-reply 19 (citing Ex. 2009 ¶ 223). Yet Patent Owner has not explained how equal spacing precludes the disposition of such elements. Nor does Dr. Kymissis's supporting testimony establish as much. *See* Ex. 2009 ¶ 223.

We also have considered Patent Owner's arguments (PO Resp. 37–38; PO Sur-reply 19) about shifting of the visual locus and the potential for distortion in Petitioner's proposed pixel arrangement. Based on the full trial record, we are more persuaded by Petitioner's position because Petitioner shows persuasively how Phan's dots are intended to be evenly spaced. *See, e.g.*, Pet. 44–50, 52–53; Ex. 1003 ¶¶ 347–374, 393–398. This is supported by every drawing figure in Phan, which shows even spacing for both static and dynamic pixels. *See, e.g.*, Ex. 1005, Figs. 2a–b, 4a–b, 5, 7, 8–8.12, 9–9.8, 12a–12d. Notably, Phan does not disclose any need for "spacing

between each quad-pixel to prevent distortion and poor image quality," as is suggested by Patent Owner (PO Resp. 38), even though Phan discloses embodiments with sub-pixels of unequal sizes. Phan also teaches that dynamic pixels are not meant to be perceptible by the human eye (Ex. 1005, 2:57–59), which renders the uneven spacing in Patent Owner's counterexample—and the attendant distortion and brightness variances (*see, e.g.*, Ex. 1018 ¶¶ 73–79)—implausible, or at least outside of the natural reading of Phan.

Phan also teaches that "black mask or black barrier ribs 21" surround Phan's dots. Ex. 1005, 4:33–37. Based on this teaching, we are persuaded by Petitioner's contention that an ordinarily skilled artisan "would have understood that this mask has (or at least obviously could have) the same width/thickness across Phan's display." Pet. 53; Ex. 1003 ¶¶ 399–401. This contention is supported by Phan's teaching of "regularly disposed" pixels and dots. Given these premises, and based on the full trial record, we are persuaded that Phan teaches or suggests the "substantially equidistant" limitations of claim 7. *See, e.g.*, Pet. 52–53; Ex. 1003 ¶¶ 393–398.

Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 7 would have been obvious over Phan.

*7. Claim 8*

Claim 8 depends from claim 1 and further recites that "the first distance is measured between respective centers of the second pixels, and

the second distance is measured between respective centers of the one of the second pixels and the neighboring one of the third pixels." Ex. 1001, 9:48–52. Petitioner relies on the same analysis from limitation [1-b]. Pet. 53; *see also supra* § II.D.2.f.

Patent Owner relies on the same arguments discussed above for claim 1. PO Resp. 30–34; PO Sur-reply 15–17. For the same reasons discussed above for limitation [1-b], we are persuaded by Petitioner's analysis, because Petitioner measures the recited "first distance" and "second distance" based on the centers of Phan's dots. *See supra* § II.D.2.f. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 8 would have been obvious over Phan.

*8. Claim 9*

Claim 9 depends from claim 1 and further recites that "the first line passes through respective centers of the first pixel and the second pixels, and the second line passes through respective centers of the first pixel and the third pixels." Ex. 1001, 9:53–56. Petitioner relies on the same analysis from limitations [1-a(2)] and [1-a(3)]. Pet. 54; *see also supra* §§ II.D.2.d–e.

Patent Owner relies on the same arguments discussed above for claim 1. PO Resp. 30–34; PO Sur-reply 15–17. For the same reasons discussed above for limitations [1-a(2)] and [1-a(3)], we are persuaded by Petitioner's analysis, because Petitioner's analysis disposes the "first line" and "second line" in the centers of Phan's dots. *See supra* §§ II.D.2.d–e.

Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 9 would have been obvious over Phan.

*9. Claim 10*

Claim 10 depends from claim 1 and further recites that "each of the first pixels, the second pixels, and the third pixels has a convex shape." Ex. 1001, 9:57–59. Petitioner contends that "Phan's dots are square or rectangular," so "they are ***'convex.'***" Pet. 54 (citing Ex. 1003 ¶¶ 406–409; Ex. 1005, 5:47–54, Figs. 11a–b).

Patent Owner relies on the same arguments discussed above for claim 1. PO Resp. 30–34; PO Sur-reply 15–17. We are persuaded by Petitioner's showing that all of Phan's pixels are convex shapes. *See, e.g.*, Ex. 1003 ¶¶ 406–409; Ex. 1005, 5:47–54, Figs. 11a–b. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to this claim. *See supra* § II.D.2.i. Thus, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claim 10 would have been obvious over Phan.

*10. Claims 13 and 15*

Claims 13 and 15 are independent claims that are almost identical to claim 1. *Compare* Ex. 1001, 8:63–9:26, *with id.* at 9:66–10:27, *and id.* at 10:66–11:32. Petitioner relies on the same analysis that we have discussed above for claim 1. Pet. 42–51; *see supra* § II.D.2. Patent Owner does not

dispute Petitioner's showing for these claims apart from its arguments discussed above with respect to claim 1. *See supra* § II.D.2.a. Our analysis regarding secondary considerations of nonobviousness discussed above for claim 1 applies equally to these claims. *See supra* § II.D.2.i. Thus, for the same reasons discussed above, we determine that Petitioner has shown by a preponderance of the evidence that the subject matter of claims 13 and 15 would have been obvious over Phan.

### *E. Obviousness Ground Based on Phan and Yamada*

Petitioner contends that the subject matter of claim 2 would have been obvious over the combination of Phan and Yamada. Pet. 55–60; Pet. Reply 16–17, 19–25. Patent Owner disputes Petitioner's contentions. PO Resp. 38–47, 54–71; PO Sur-reply 20–22, 24–27.

#### *1. Yamada*

Yamada is a U.S. patent related to an "electroluminescence (EL) display apparatus." Ex. 1008, 1:6–7. Yamada discusses an "EL display apparatus" including "emissive regions 1B [blue], 1R [red], and 1G [green] for the display pixel of the respective color . . . arranged in a matrix configuration." *Id.* at 2:55–60; *see also id.* at 7:6–12 (discussing colors for the various emissive regions). Yamada indicates that "the emission efficiency of the emissive layer for emitting light of various colors differs with each color." *Id.* at 2:53–54. According to Yamada, when the pixels all have identically sized emissive areas, "a current larger than that supplied to the other display pixels having a high emission efficiency must be supplied" to obtain the same luminance at display pixels having a low emission

efficiency. *Id.* at 2:55–64. Yamada teaches that "[t]his causes the life of those display pixels having a low emission efficiency, in particular, to shorten, and also possibly causes the life of the EL display apparatus to shorten." *Id.* at 2:64–67.

Yamada purports to improve upon these aspects of EL displays by way of "a color display device, in which a display pixel having an emissive element is provided for every color, wherein the emissive area of the display pixel of any one color, among the display pixels of various colors, is different in size from the emissive area of the display pixel of another color." Ex. 1008, 3:17–22. According to Yamada,

> [b]y setting the emissive area of the display pixel, namely, the emissive area of the emissive element, in accordance with the emission efficiency of the emissive element as in the foregoing, and by supplying, for example, the same power to the emissive elements of colors having different emission efficiencies, it becomes possible to have the same emission luminance at the various display pixels.

*Id.* at 3:65–4:5. Therefore, Yamada states "it is possible to prevent the deterioration from accelerating when a load is selectively placed on the emissive element having low emission efficiency and extend the life of the display device." *Id.* at 4:11–14.

Figure 4 of Yamada is reproduced below.




**Fig. 4**

Figure 4 is a "conceptual diagram showing emissive region areas of the EL display apparatus." Ex. 1008, 6:24–25. According to Yamada, Figure 4 "is a top plan view of an EL display apparatus 100" representing "a case where the respective display pixels emit red (R), green (G), and blue (B) light." *Id.* at 6:49–52. "[I]n the case of FIG. 4, the emissive area of the green display pixel 1G is provided as the smallest," while "[e]missive regions 1R and 1B of the other colors are formed with a larger area than that of emissive region 1G." *Id.* at 7:6–10. Yamada indicates that while in Figure 4 the "[a]rea of green emissive region 1G<area of red emissive region 1R<area of blue emissive region 1B," "the order in size of the emission region areas is not fixed at the above-mentioned green<red<blue, but is determined by the emission efficiency of the emissive materials that are used." *Id.* at 7:10–19.

*2. Claim 2*

Claim 2 depends from claim 1 and recites, *inter alia*, that "each of the second pixels and the third pixels has a larger area than the first pixel." Ex. 1001, 9:30–31. Petitioner concedes that "Phan does not . . . provide an example where its 'third pixel' (red dots) is also larger than its 'first pixel' (green dots)." Pet. 56. Thus, building upon its obviousness contentions based on Phan alone, Petitioner cites Yamada's teaching of "an OLED display with red, green, and blue pixels re-sized in accordance with the emission efficiency of each color's emissive element." *Id.* (internal quotations omitted) (citing Ex. 1008, 2:55–60, 3:16–27). Applying this teaching to Phan's Figure 11a embodiment, Petitioner contends that the result would be such that "the blue dot maintains its original size (making it relatively larger), the green dots have been made smallest and the red dot an intermediate size." *Id.* at 57 (citing Ex. 1003 ¶¶ 433–441).

In support of this argument, Petitioner provides the following illustration at page 57 of the Petition.




Pet. 57 (citing Ex. 1003 ¶¶ 433–441). The left portion of this illustration depicts Phan's Figure 11a, which "shows a square quad pixel where the crosspoint 33 is in the centre of the four dots (individual elements) of equal light emitting area and space, contoured by black mask or black barrier ribs 21 with the same structure." Ex. 1005, 5:47–50. The right portion of this illustration shows Petitioner's resizing of dots in Phan's Figure 11a to

make the red dot a smaller size and the green dots the smallest size while maintaining the size of the blue dot. Pet. 57. According to Petitioner, "the dots remain centered on the same points maintaining the same overall geometry." *Id.* (citing Ex. 1003 ¶¶ 437–441).

Similar to the Phan obviousness ground, Petitioner applies its modified version of the dot/pixel structure from Phan's Figure 11a to the display matrix or grid of Phan's Figure 12. Pet. 57–58. To summarize these contentions, Petitioner provides the following illustration in the Petition.




*Id.* (citing Ex. 1003 ¶ 442). In this illustration from the Petition, Petitioner indicates the recited "first pixel," "another first pixel," and "additional first pixel" in green, the recited "pair of second pixels" in blue, and the recited "pair of third pixels," "first line," and "second line" in red. *Id.* Petitioner has resized Phan's dots in its illustration consistent with the modified version of Figure 11a discussed above. *Id.* Petitioner contends that "the dot-to-dot distances remain the same" because "the overall square shape and repeating matrix/grid Phan teaches would continue to be employed." *Id.* at 58 (citing Ex. 1003 ¶ 443).

Petitioner contends an ordinarily skilled artisan would have made this combination because "it was well-known that adjusting pixel size—and making pixels with lower emission efficiencies (blue) larger and pixels with higher emission efficiencies (green) smaller—reduces deterioration and improves display life." Pet. 58 (citing Ex. 1003 ¶¶ 444–454). According to Petitioner, an ordinarily skilled artisan "would have recognized that applying Yamada to Phan would have similarly improved the life of Phan's display." *Id.* at 59 (citing Ex. 1003 ¶¶ 444–448).

Patent Owner argues that "Phan explicitly concerns passive-matrix displays." PO Resp. 39 (citing Ex. 1005, 5:23–24). As such, Patent Owner argues that an ordinarily skilled artisan "would not have looked to Yamada, which concerns AMOLEDs, to design a pixel arrangement for Phan, which involves a passive-matrix display intended to implement Phan's dynamic pixel driving." *Id.* (citing Ex. 2009 ¶¶ 235–236). Specifically, Patent Owner argues that Petitioner's proposal to modify Phan's dots "violates Phan's requirement of adjusting the pixel sizes along a crosspoint," which "relates to Phan's passive-matrix structure." *Id.* at 41 (citing Ex. 2009 ¶¶ 241–242). Patent Owner explains that in a passive matrix structure, "each row of pixels shares the same row electrode, and each column of pixels shares the same column electrode" such that "when Phan adjusts the sizes of pixels, pixels in the same column retain an equal width and pixels in the same row retain an equal height." *Id.* In contrast, Patent Owner argues that Petitioner "splits apart the subpixels and introduces uneven spacing between them," which "ignores, and conflicts with, Phan's requirements" and is "incompatible with Phan's passive-matrix structure." *Id.* (citing Ex. 2009 ¶¶ 242–243); *see also id.* at 43 (similar argument).

Patent Owner also notes that Phan's teaching of moving the crosspoint results in a larger blue dot, green dots of intermediate size, and a red pixel that is the smallest size, which conflicts with Petitioner's proposed modification (i.e., maintaining the size of the blue dot while reducing the size of the red dot to an intermediate size and the sizes of the green dots to a smaller size). PO Resp. 42–43 (citing Ex. 1005, Figs. 11a–b; Ex. 2009 ¶ 248); *see also id.* at 44 (citing Ex. 2009 ¶ 253) (similar augment). In addition, Patent Owner argues that "keeping the blue pixel the same size and shrinking the red and green pixels would require higher current density to be applied to the red and green pixels, accelerating their aging and reducing display lifetime." *Id.* at 42 (citing Ex. 2009 ¶¶ 245–246).

In its Reply, Petitioner argues that Phan "is not limited to passive-matrix displays." Pet. Reply 16. Petitioner also argues that, based on the teachings of Cok, "it was known that the very same pixel arrangement Phan teaches can be used in an active-matrix OLED." *Id.* (citing Ex. 1017, Fig. 1).

In its Sur-reply, Patent Owner notes Dr. Kymissis's "unrebutted testimony that Phan teaches passive-matrix displays, which are fundamentally different from active-matrix displays." PO Sur-reply 20 (citing Ex. 2009 ¶¶ 47–56, 80–81, 116–128, 211, 234–238). Patent Owner also notes Dr. Kymissis's "unrebutted testimony" that the pixel arrangement of Cok's Figure 1 embodiment "is *not* described as being used in an active-matrix OLED." *Id.* at 21 (citing Ex. 1019, 70:5–18).

We agree with Patent Owner that Petitioner has not persuasively shown how or why an ordinarily skilled artisan would have modified Phan's passive-matrix structure based on Yamada in the manner suggested by

Petitioner. Importantly, Petitioner's combination is based on Phan's embodiments, which pertain to passively driven displays. *See* Ex. 1005, 5:23–24; Ex. 2009 ¶¶ 80, 211, 235. In contrast, Yamada is directed to active-matrix OLEDS. *See* Ex. 1008, 1:6–9; Ex. 2009 ¶¶ 93, 235. Although Phan may not be "limited to passive-matrix displays" (Pet. Reply 16), Petitioner still must show that an ordinarily skilled artisan would have had a reason to modify Phan's passively driven embodiments in the manner it suggests. And, as noted by Dr. Kymissis, "the design considerations for a pixel arrangement of a passive-matrix OLED are significantly different from the design considerations for a pixel arrangement of an active-matrix OLED," as we will now discuss in more detail. Ex. 2009 ¶ 237.

In particular, pixels are formed in passive-matrix OLEDs where column electrodes and row electrodes overlap. Ex. 2009 ¶ 49. "[T]he intersection of column electrodes and row electrodes defines the OLED pixel size." *Id.* In addition, "a row of pixels shares one row electrode and a column of pixels shares one column electrode," such that "one row of pixels is illuminated at a time by applying a scan signal to that row, and applying data signals to each of the columns in that row." *Id.* A complete image is outputted "[b]y scanning through all the rows successively within one time frame." *Id.* These characteristics would apply when Phan's passively driven embodiments are implemented as OLEDs, as is taught by Phan. *See id.* ¶¶ 81–82; *supra* § II.D.2.a. This is why Phan constrains the "resizing of pixels by moving the crosspoint along a diagonal," which "ensures that the pixels that share a row electrode have the same height and the pixels that share a column electrode have the same width." Ex. 2009 ¶ 242.

Despite these known design considerations for passive displays, Petitioner never explains how or why an ordinarily skilled artisan would have modified Phan's pixel arrangement to "split[] apart the subpixels and introduce[] uneven spacing between them." PO Resp. 41 (citing Ex. 2009 ¶¶ 242–243). In this way, we agree with Patent Owner that Petitioner's proposed modification is "incompatible with Phan's passive-matrix structure." *Id.* We also disagree with Petitioner that its proposed modification "maintain[s] the square pixel shape and matrix geometry Phan already employs" (Pet. 57) given that Petitioner's modification departs significantly from Phan's disclosure of moving the crosspoint to change the size of dots in a quad-pixel. *See* Ex. 1005, 5:47–54, Fig. 11b. Petitioner neither explains how a passively driven display with differently sized pixels along each column and row electrode might work, nor explains how Phan's passive embodiments might be modified to become an actively driven configuration compatible with differently sized pixels.

We also have considered Petitioner's argument that Cok's Figure 1 pixel arrangement—which is similar to Phan's Figure 11b pixel arrangement—is used in an active-matrix OLED. Pet. Reply 16 (citing Ex. 1017, Fig. 1). Although Cok makes general statements about the application of its disclosed invention to "passive-matrix or active-matrix [OLED] devices" (Ex. 1017, 2:61–67), Cok does not specify whether its Figure 1 embodiment pertains to active- or passive-matrix OLEDs. *See id.* at 4:8–13; *see also* Ex. 1019, 70:5–18 (Dr. Kymissis's testimony regarding same). And, even if we were to assume that Cok's Figure 1 pixel arrangement might be applicable to active-matrix OLEDs, this fact still would not cure the deficiencies in Petitioner's obviousness rationale.

Specifically, Petitioner offers no explanation why or how Phan's passively driven pixel arrangement would be resized in a manner at odds with Phan's own teachings to allegedly achieve the pixel arrangement of claim 2. We also note that Cok's Figure 1 pixel arrangement does not resemble Petitioner's proposed pixel arrangement for this ground, which undermines Petitioner's argument. *Compare* Ex. 1017, Fig. 1, *with* Pet. 57–58 (illustrations).

Furthermore, contrary to Petitioner's contentions (Pet. 58–59), Petitioner's proposal to maintain the size of Phan's blue dot while shrinking the red and green dots would not increase the lifetime of the display. As explained by Dr. Kymissis, "reducing the red and green light-emitting areas . . . would require a ***higher*** current density to be applied to the red and green pixels to drive them at the same amount of brightness as before, thus accelerating aging of the red and green pixels and reducing display lifetime." Ex. 2009 ¶ 245. Moreover, the size of the blue pixels is unchanged in Petitioner's proposed modification, so Petitioner's proposed combination "would not lower the current density" for blue pixels. *Id.* Petitioner essentially concedes these points in its Reply by focusing on the concept of a display's "usability over time" based on the pixels' aging relative to one another (*see* Pet. Reply 6 (citing Ex. 1018[9] ¶¶ 34–48)), but that was not Petitioner's rationale in the Petition. We decline to consider these new arguments.

For these reasons, we are not persuaded that an ordinarily skilled artisan would have modified Phan's teachings based on Yamada in the

[9] Petitioner mistakenly cites to Exhibit 1019, but the context makes clear that Petitioner intended to cite to Exhibit 1018.

manner suggested by Petitioner. Based on the entire trial record, we determine that Petitioner has not shown by a preponderance of the evidence that the subject matter of claim 2 would have been obvious over the combination of Phan and Yamada.

### *F. Obviousness Ground Based on Matthies and Yamada*

Petitioner contends that the subject matter of claims 1, 2, 4–10, 13, and 15 would have been obvious over the combination of Matthies and Yamada. Pet. 18–41; Pet. Reply 2–12, 19–25. Patent Owner disputes Petitioner's contentions. PO Resp. 7–30, 54–71; PO Sur-reply 4–15, 24–27.

#### *1. Matthies*

Matthies is a U.S. patent directed to "large-area display devices which are formed as an array of tiled display devices." Ex. 1004, 1:8–10. Matthies states that "[b]uilding a large-area display out of smaller tiles has been recognized as a desirable solution," because "the basic unit of manufacture is relatively small," which "reduces manufacturing costs." *Id.* at 1:56–65. Matthies explains that "[n]o practical tiled display system has yet been developed" because "[w]hat has been missing is a fabrication technology that allows a display to be constructed so that pixels can be brought up to the very edge . . . while at the same time allowing for electronics to address each tile, even those tiles completely surrounded by other tiles." *Id.* at 1:66–2:7.

Figure 1 of Matthies is reproduced below.




**FIG. 1**

Figure 1 "is a front plan drawing of a large area display device from which two tiles have been removed." Ex. 1004, 3:49–50. According to Matthies, "display 100 is a tiled display in which emissive or reflective elements, on which the image pixels are formed, are built as relatively small arrays on tiles 120 and assembled into a frame to produce the large-area display having a large number of pixel forming elements." *Id.* at 5:38–42. Matthies indicates that "[a]lthough the display 100 is shown as being formed from tiles having 16 pixel forming elements in a four by four array, it is contemplated that each tile may include many more pixels." *Id.* at 5:56–59.

Matthies states that in an exemplary embodiment, "the pixel forming elements are made from an organic light emitting diode (OLED) material." Ex. 1004, 6:17–19. According to Matthies, "[t]he active portion . . . of the pixels occupies only about 1/4 of the total pixel area." *Id.* at 15:67–16:1.

Matthies indicates that "this spacing of the pixels leaves room along the edges of the display for the vias . . . to connect to the row and column electrodes of the pixel without interfering with the regular spacing of the pixels across tile boundaries." *Id.* at 16:5–9.

Figure 7 of Matthies is reproduced below.




FIG. 7

Figure 7 "is a pixel diagram which shows an exemplary pixel layout for portions of four tiles." Ex. 1004, 4:6–7. "In the layout shown in FIG. 7, the active portions 526 of the pixels are centered in their respective pixel regions and the vias which connect the row and column electrodes of the display to the electronics are formed between respective pixel elements." *Id.* at 16:22–26. "The distance between the edge of an active region 526 and the edge 712 of the display is equal on all sides of the tile." *Id.* at 16:26–28.

Figure 8B of Matthies is reproduced below.




FIG. 8B

Figure 8B is "a front-plan view of an alternative single color pixel structure which includes separate sub-pixels." Ex. 1004, 4:12–13. According to Matthies, Figure 8B illustrates a "color pixel structure" that "includes four sub-pixel elements, 830, 832, 834 and 836." *Id.* at 16:62–64. "Two of these sub-pixel elements, 830 and 836 emit green light when stimulated while the other two pixel elements, 832 and 834 emit red and blue light, respectively." *Id.* at 16:64–66. Matthies indicates that "[t]his structure is known as a quad sub-pixel structure." *Id.* at 16:67. According to Matthies, "[t]he geometry of the quad sub-pixel structure is defined by the dimensions $d_{SH}$, the height of the sub-pixel, $d_{SW}$, the width of the sub-pixel, $d_e$, the distance from the active sub-pixel areas to the edge of the pixel area, and $d_{SI}$, the distance between adjacent sub-pixels." *Id.* at 17:16–20.

Matthies teaches that a "tile may also include circuitry which automatically adjusts the pixel brightness to compensate for aging of the display material," such as a "small light sensor over one or more pixel positions which continually monitors the brightness of that pixel and adjusts

the current level applied to that pixel—and the current levels applied to all of the other pixels on the display—to compensate for variations in pixel brightness due to aging of the display." Ex. 1004, 11:47–58. Matthies also teaches "that the decay in the brightness of an OLED pixel that occurs with aging can be predicted" by, for example, "measuring the current and time for a particular pixel, and integrating the product of current and time" or by "monitor[ing] the voltage that is applied to the pixel." *Id.* at 11:61–12:16. Matthies indicates that the "methods for adjusting the current applied to a pixel in order to maintain a predetermined brightness level may be combined with any other method either as a check or to augment the performance of the other method." *Id.* at 12:41–46.

*2. Discussion*

Petitioner's obviousness contentions for this ground are based on the "quad sub-pixel structure" in Matthies's Figure 8B implemented with the dimensions in Matthies's Table 2. *See* Pet. 21–25. Petitioner provides the following demonstrative of several such quad sub-pixel structures in a tiled arrangement to support its analysis of various limitations in independent claims 1, 13, and 15.




Pet. 26. In this demonstrative from the Petition, Petitioner has indicated the "first pixel[s]" in green, the "second pixels" in blue, and the "third pixels" in red. *Id.* Petitioner has also indicated the "first line" and "second line" with red dashed lines. *Id.* Petitioner provides another version of the same demonstrative, reproduced below, to show the recited "first distance" and "second distance."



Pet. 27. In this demonstrative from the Petition, Petitioner has indicated the recited "first distance" and "second distance" with red lines. *Id.*

Petitioner additionally cites Yamada's teaching that, in order to overcome the problem of OLED pixel colors having different emission efficiencies, "pixels with lower emission efficiencies (blue) should be made larger than pixels with higher emission efficiencies (green)." Pet. 35–36 (citing Ex. 1008, 2:55–3:6, 3:38–44, 3:51–57, 7:3–12, 8:19–28, 8:47–52, Figs. 4, 9). Petitioner contends it would have been obvious to apply these teachings from Yamada to Matthies's OLED display with a "quad sub-pixel structure." *Id.* at 36–37 (citing Ex. 1003 ¶¶ 274–282; Ex. 1004, code (57), 3:6–7, 10:14–18, 10:24–27, 16:21–34, 16:62–17:31, Figs. 1, 7, 8B). Accordingly, Petitioner contends that an ordinarily skilled artisan would have resized Matthies's sub-pixels "in accordance with their emission efficiencies such that the green 'first pixels' are smallest, the blue 'second pixels' are largest, and the red 'third pixels' have an intermediate size." *Id.* at 29–30. Specifically, Petitioner proposes "appl[ying] Yamada's example green:red:blue pixel area ratio of 1:2.6:5.6 to Matthies' 'quad sub-pixel structure.'" *Id.* (citing, *inter alia*, Ex. 1008, 11:8–10). Notwithstanding, Petitioner keeps the blue pixel at its original size while reducing the sizes of the other pixels in accordance with that ratio. *Id.* at 30. Petitioner also keeps the same sub-pixel spacing taught by Matthies. *Id.* Petitioner contends that its proposed modifications would extend the life of the display device. *Id.* at 36 (citing Ex. 1008, 4:5–14, 10:61–11:3).

To summarize these contentions based on the combination of Matthies and Yamada, Petitioner provides the following illustration in the Petition.




Pet. 31. In this demonstrative from the Petition, Petitioner has indicated the "first pixel[s]" in green, the "second pixels" in blue, and the "third pixels" in red. *Id.* Petitioner has also indicated the "first line" and "second line" with red dashed lines. *Id.*

Patent Owner argues that an ordinarily skilled artisan "would not have been motivated to modify Matthies' PMOLED [passive-matrix OLED] display made of multiple tiles based on Yamada's disclosure for AMOLED monolithic displays, let alone with a reasonable expectation of success." PO Resp. 12. Citing Matthies's Figure 8B, Patent Owner explains that "[t]he light-emitting area in Matthies' PMOLED is defined by the overlap of the row and column electrodes" such that "all pixels in the same row . . . have the same height, and all pixels in the same column . . . have the same width." *Id.* at 12–13 (citing Ex. 1004, 17:10–20, Fig. 8B). According to Patent Owner, an ordinarily skilled artisan

> would have recognized that, unlike in Yamada, changing the size of a pixel in Matthies' Figure 8B would entail changing the size of its row and/or column electrode, which would both (1) change the size of all the other pixels defined by that row

> and/or column electrode and (2) have electrical effects that could diminish display performance.

*Id.* at 13 (citing Ex. 2009 ¶¶ 121–128); *see also id.* at 29 (citing Ex. 2009 ¶ 193) (similar argument). Patent Owner further explains that "Matthies' geometric requirements flow from its PMOLED design, as each pixel is defined by the overlap of column and row electrodes, and two different color pixels are found on each row (and column) electrode." *Id.* at 25 (citing Ex. 1004, 17:10–20). In light of this, Patent Owner criticizes Petitioner's proposed re-sizing of pixels as being incompatible with Matthies. *Id.* at 28.

Patent Owner also argues that, contrary to Petitioner's contentions, Petitioner's proposed modifications would actually shorten the life of Matthies's display. PO Resp. 14–15. Patent Owner notes that Petitioner proposes maintaining the size of the blue pixels, which "would not reduce the blue pixels' current density or extend their lifetime." *Id.* at 15. Patent Owner further notes that "Petitioner's proposal would shrink the red and green pixels, substantially reducing their light-emitting areas, increasing their current densities and *reducing* their lifetimes." *Id.* (citing Ex. 2009 ¶¶ 136–137).

In its Reply, Petitioner argues that "Matthies repeatedly explains that the pixels making up its display can have different sizes and shapes." Pet. Reply 11 (citing Ex. 1004, 17:36–37, 18:63–64, 19:8–12). Petitioner also argues that Matthies is not limited to passive-matrix OLEDs and, rather, "Matthies ***repeatedly*** states that it is equally applicable to both actively and passively driven OLEDs." *Id.* at 3 (citing 7:15–19, 7:42–45, 8:20–26, 8:30–33). Thus, according to Petitioner, an ordinarily skilled artisan "plainly would have understood—just as Matthies itself states—that Matthies' OLED pixel arrangements can be used in both passive- and active-matrix displays."

*Id.* at 3–4 (citing Ex. 1018 ¶¶ 6–16; Ex. 1019, 17:18–18:9, 19:13–20:22, 22:7–23:1; Ex. 2009 ¶¶ 47, 119). Petitioner also addresses its rationale based on improving the lifetime of Matthies's display. According to Petitioner, "resizing OLED pixels in accordance with emission efficiency both prevents less efficient blue pixels from failing earlier ***and*** prevents different pixel aging rates from impacting display usability over time." *Id.* at 6 (citing Ex. 1018 ¶¶ 45–48).

In its Sur-reply, Patent Owner argues that "Petitioner relies on misleading quotations of the word 'active' appearing in Matthies." PO Sur-reply 5. Patent Owner explains that Petitioner's quotations actually pertain to active electronics or devices rather than active-matrix addressing. *Id.* Further, Patent Owner argues that Petitioner's obviousness theory "is exclusively based on modifying Matthies' *passive-matrix* Figure 8B display." *Id.* at 6–7.

We agree with Patent Owner that Petitioner has not persuasively shown how or why an ordinarily skilled artisan would have modified Matthies's passive-matrix structure based on Yamada in the manner suggested by Petitioner. In particular, Petitioner bases its combination on the display tile shown in Matthies's Figure 8B, which is a passive-matrix embodiment. *See* Ex. 1004, 10:31–33, 17:10–16; Ex. 2009 ¶ 106. In contrast, Yamada is directed to active-matrix OLEDS. *See* Ex. 1008, 1:6–9; Ex. 2009 ¶¶ 93, 111. For the same reasons discussed above with respect to the Phan–Yamada ground (*see supra* § II.E.2), pixels in a passive-matrix OLEDs are constrained to the intersections of row and column electrodes. *See* Ex. 2009 ¶ 49. Thus, even if Yamada might suggest resizing pixels for various reasons, Petitioner has not persuasively shown how this would be

accomplished based on Matthies's passive-matrix structure in Figure 8B. *See id.* ¶¶ 123–124 (Dr. Kymissis testifying about how pixel sizes cannot be arbitrarily changed in the PMOLED embodiment of Figure 8B). We also do not agree with Petitioner (Pet. Reply 11) that Matthies's references to "larger and smaller pixel apertures" and "different pixel pitches" salvages its proposed combination. Even if Matthies might suggest changing pixel size or the distances between pixels, Petitioner does not persuasively show how it could achieve different pixel sizes along the same column or row electrodes of the passive-matrix structure undergirding its proposed combination. *See* Ex. 2009 ¶¶ 123–124. Thus, we agree with Patent Owner that "Matthies' constraints are incompatible with Petitioner's theory of making differently-sized red, green, and blue pixels based on Yamada." PO Resp. 13 (citing Ex. 2009 ¶¶ 129–132).

Further, to the extent Petitioner cites instances of the word "active" in Matthies for allegedly teaching active-matrix displays (Pet. Reply 2–5), we do not read Matthies in this way. Indeed, nearly all of the instances of "active" cited by Petitioner pertain to active electronics or devices. *See, e.g.*, Ex. 1004, 7:15–19 (referring to "electronics 134" as "active and passive"). Matthies does not refer to active-matrix addressing, as is used with AMOLED displays. *See* Ex. 2086, 81:9–12. Moreover, the only instance of "active matrix" in Matthies appears in the following passage:

> The electronics which form the image processing and pixel driving circuitry are mounted on the layers. Electronics are used in the broadest sense to include both active and passive, and both discrete devices mounted on the layers and devices formed in place by processes such as those now used to make active matrix circuits for displays on various high temperature substrates.

Ex. 1004, 8:20–26. As recognized by Dr. Pattison (Ex. 2086, 46:8–47:19), this passage refers to the two ways Matthies discloses for creating its disclosed "image processing and pixel driving circuitry": (1) mounting discrete devices on a substrate; or (2) forming devices in place on the substrate using processes like those used to make active matrix circuits. *See* Ex. 1004, 8:20–26. Dr. Pattison also recognized that the second option refers to "a whole field of making transistors and passive components that are integrated into electronics." Ex. 2086, 47:10–19. In this sense, the reference to "active matrix" simply identifies known semiconductor manufacturing processes. It does not teach or suggest implementing Matthies's embodiments with active-matrix OLED circuits. And, regardless of how an ordinarily skilled artisan would have understood the mentions of the word "active" in Matthies, Petitioner never explains how Matthies's passively driven embodiment in Figure 8B would have been modified to accommodate differently sized pixels.

Finally, just as with the Phan–Yamada ground, we are not persuaded that reducing the size of the red and green pixels in Matthies's display while maintaining the size of the blue pixels would result in improved display life. We credit Dr. Kymissis's testimony that, based on current density considerations, the life of the blue pixels would not be extended, and the life of the red and green pixels would be reduced, which would shorten the lifetime of the display. *See* Ex. 2009 ¶¶ 135–136. Petitioner's reply arguments—which focus on the pixels' relative aging and "usability over time" (Pet. Reply 5–7)—are not the same arguments it made in the Petition, and we decline to consider them.

For these reasons, we are not persuaded that an ordinarily skilled artisan would have modified Matthies's teachings based on Yamada in the manner suggested by Petitioner. Based on the entire trial record, we determine that Petitioner has not shown by a preponderance of the evidence that the subject matter of claims 1, 2, 4–10, 13, and 15 would have been obvious over the combination of Matthies and Yamada.

### *G. Obviousness Ground Based on Murai and Yamada*

Petitioner contends that the subject matter of claims 1, 2, 4–10, 13, and 15 would have been obvious over the combination of Murai and Yamada. Pet. 60–78; Pet. Reply 17–25. Patent Owner disputes Petitioner's contentions. PO Resp. 47–71; PO Sur-reply 22–27.

#### *1. Murai*

Murai is a Japanese patent directed to "a color image display device." Ex. 1007 ¶ 1. Murai indicates that the display device may be an "organic EL display device[]." *Id.* ¶ 58. Murai discloses a color image display device that "has unit pixels . . . made up of four dots disposed as a grid in the

vertical and horizontal direction." *Id.* ¶ 28. Figure 3 of Murai is reproduced below.




Figure 3 is "a plane view illustrating dot shape and dot arrangement in a color image display device." Ex. 1007 ¶ 27. "The unit pixels 30 are configured by four dots: one first dot 31, two second dots (32a and 32b), and one third dot 33, as a combined display unit." *Id.* ¶ 28. "[T]he second dots (32a and 32b) are configured by a first auxiliary dot 32a disposed on a top right corner of a rectangle made by the unit pixel 30 and a second auxiliary dot 32b disposed on a bottom left corner of the rectangle." *Id.* That is, "the first auxiliary dot 32a and the second auxiliary dot 32b are disposed diagonally in the rectangle made by the unit pixel 30." *Id.*

According to Murai, "the first auxiliary dot and the second auxiliary dot [may] be shaped having cut-off portions wherein at least one corner of the rectangular shape is cut off, and [may] be disposed so that there is a cut-

off portion near a space between the first auxiliary dot and the second auxiliary dot." Ex. 1007 ¶ 11.

*2. Discussion*

Petitioner's obviousness contentions for this ground are based primarily on the embodiment in Murai's Figure 3. *See* Pet. 61–62. Petitioner provides the following annotated version of Figure 3 to support its analysis of various limitations in independent claims 1, 13, and 15.




Pet. 66. In this annotated version of Murai's Figure 3, Petitioner has indicated the "first pixel[s]" in green, the "second pixels" in blue, and the "third pixels" in red. *Id.* (alteration in original). Petitioner has also indicated the "first line" and "second line" with red dashed lines. *Id.* Petitioner provides another annotated version of Murai's Figure 3, reproduced below, to show the recited "first distance" and "second distance."




*Id.* at 67. In this annotated version of Murai's Figure 3, Petitioner has indicated the recited "first distance" and "second distance" with red lines. *Id.*

Petitioner notes Murai's teachings of (1) different dot sizes; (2) differently shaped dots; and (3) dots with different numbers of cutouts. Pet. 68–70 (citing Ex. 1007 ¶¶ 6, 11, 13, 39, Figs. 3, 5(b), 6(a), 6(b)). Petitioner further cites Yamada's teaching of "an OLED display with red, green, and blue pixels re-sized in accordance with the emission efficiency of each color's emissive element." *Id.* at 70 (internal quotations omitted) (citing Ex. 1008, 2:55–60, 3:16–27). Applying Yamada's teachings to Murai, Petitioner contends "[t]he ***'first pixel'*** (the green dot) would continue to be ***'smaller'*** than the other pixels" but "the ***'area'*** of the ***'second pixels'*** (the blue dots) would also be made relatively ***'larger'*** than that of the ***'third pixel'*** (the red dots)." *Id.* at 71 (citing Ex. 1003 ¶¶ 529–531). The re-sizing is accomplished "using the method Murai already teaches (different numbers and sizes of cut-offs)." *Id.*; *see also id.* at 68 (citing Ex. 1007 ¶¶ 6, 11, 13, 39, Fig. 5b) (noting, *inter alia*, Murai's teachings about using "differently sized cutouts").

To summarize these contentions, Petitioner provides the following illustration in the Petition.




Pet. 71 (citing Ex. 1003 ¶ 532). The illustration depicts Petitioner's conception of 9 dots from the dot arrangement in Murai's Figure 3 that have been modified based on Yamada's teachings. *Id.* "The green dots are made smallest via the inclusion of two larger cutouts," "[t]he red dots have an intermediate size with two smaller cutouts," and "[t]he blue dots are largest because they include no cutouts." *Id.*

Petitioner contends that an ordinarily skilled artisan would have been motivated to apply Yamada's teachings to Murai because "it was well-known that adjusting pixel size—and making pixels with lower emission efficiencies (like blue) larger and pixels with higher emission efficiencies (like green) smaller—reduces deterioration and improves display life." Pet. 75–76 (citing Ex. 1003 ¶¶ 561–576). Although Petitioner acknowledges that Murai teaches differently sized dots/pixels for purposes of improving image quality by preventing continuous bands of color, Petitioner contends that an ordinarily skilled artisan "would have understood that this existing design feature could also be used to improve display life." *Id.* at 76–77 (citing Ex. 1003 ¶¶ 570–572).

Patent Owner argues that Murai's cutouts are a solution to a streaking problem that is peculiar to LCD displays with densely packed dots. PO Resp. 50 (citing Ex. 1007 ¶ 11, Fig. 6(a); Ex. 2009 ¶¶ 277–278). According

to Patent Owner, an ordinarily skilled artisan "would not have viewed Murai's cutouts as necessary" in an OLED display, particularly when implementing the emissive area ratios Petitioner cites from Yamada. *Id.* (citing Pet. 32; Ex. 1008, 11:8–10, 11:34–39; Ex. 2009 ¶¶ 277–279). Patent Owner also argues that, even if it were possible to implement the densely packed pixel arrangement of Murai's Figure 3 as an OLED, Petitioner's combination introduces an asymmetry that may exhibit visual artifacts such as color mixing and streaking effects. *Id.* at 52; *see also* Ex. 2009 ¶ 284 (Dr. Kymissis's testimony regarding same).

In addition, Patent Owner argues that downsizing Murai's pixels based on Yamada's teachings is "incompatible" with Murai's goal of improving the display's overall aperture ratio. PO Resp. 49 (citing Ex. 1007 ¶ 42; Ex. 2009 ¶ 276). Patent Owner explains that "Petitioner's modifications would reduce the aperture ratio and thereby undercut Murai's very purpose." *Id.* at 52. Patent Owner additionally argues that "reducing the sizes of the green and red pixels while keeping the blue pixels their same size would not extend the overall lifetime of Murai's display." *Id.* (citing Ex. 2009 ¶ 283).

In its Reply, Petitioner argues that "it would have been well within the ability of a[n ordinarily skilled artisan] to balance the benefits provided by Murai's pixel arrangement with Yamada's teachings to implement a working display." Pet. Reply 18. Regarding the potential for visual artifacts in Petitioner's combination, Petitioner argues that "Murai is open to the use of variably sized pixels with differently arranged cutouts" and Petitioner's example from the Petition "was merely meant to conceptually illustrate one way to apply Yamada." *Id.* (citing Ex. 1007 ¶¶ 13, 48–52).

We agree with Patent Owner that Petitioner has not persuasively shown why an ordinarily skilled artisan would have re-sized Murai's dot arrangement based on Yamada using additional corner cutouts as suggested by Murai. First, even though Murai mentions OLED devices (*see* Ex. 1007 ¶ 58), Petitioner has not persuasively shown that Murai's corner cutouts would be useful in the context of OLED displays, particularly when considering that OLED displays are spaced farther apart than the LCD displays that Murai primarily addresses. *See* Ex. 2009 ¶ 278. This problem is exacerbated when considering the OLED emissive area ratios from Yamada that Petitioner and Dr. Pattison cite in support of making the combination (*see* Pet. 70; Ex. 1003 ¶ 527), because the combination "would result in such large cut-off corners and separations between green dots that it would nullify the reason for implementing Murai's cut-off corners." Ex. 2009 ¶ 279; *see also* Ex. 1008, 11:4–15, 11:34–39 (emissive area ratios from Yamada). We also note that Petitioner does not meaningfully refute Patent Owner's arguments (PO Resp. 52–53) about asymmetries in Petitioner's proposed dot arrangement causing visual artifacts in diagonal directions, which also tends to undermine the rationale for Petitioner's combination. *See* Ex. 2009 ¶ 284.

Second, we agree with Patent Owner that Petitioner's proposed re-sizing of pixels necessarily reduces the aperture ratio of Murai's display. *See* Ex. 2009 ¶ 276. This is at odds with Murai's goal of improving the aperture ratio of the display, which tends to undermine Petitioner's rationale for the combination. *See* Ex. 1007 ¶¶ 10, 42. And, even if Petitioner is correct that an ordinarily skilled artisan could "balance the benefits provided by Murai's pixel arrangement with Yamada's teachings to implement a

working display" (Pet. Reply 18), the trial record includes no such balancing by Petitioner or Dr. Pattison to support its analysis.

Third, for similar reasons to those discussed above for the Phan–Yamada and Matthies–Yamada grounds, we do not agree that Petitioner's proposed combination would improve the lifetime of Murai's display. Keeping the size of the blue dots the same would not reduce the current density applied to the blue dots and thus would not extend the lifetime of the display. Ex. 2009 ¶ 283. Similarly, reducing the size of the green and red dots would require increased current density for these dots in order to maintain the same luminance and brightness, which would shorten the lifetime of these dots and reduce the lifetime of the display. *Id.* Petitioner again refers to its reply arguments about a display's usability over time based on the pixels' aging relative to one another (*see* Pet. Reply 19), but we decline to consider these new reply arguments.

For these reasons, we are not persuaded that an ordinarily skilled artisan would have modified Murai's teachings based on Yamada in the manner suggested by Petitioner. Based on the entire trial record, we determine that Petitioner has not shown by a preponderance of the evidence that the subject matter of claims 1, 2, 4–10, 13, 15 would have been obvious over the combination of Murai and Yamada.

### *H. Petitioner's First Motion to Strike*

Petitioner moves to strike a sentence of Patent Owner's Response that allegedly incorporates arguments from Exhibit 2028. 1st Strike Mot. 1. The sentence states: "For example, the AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the '683 Patent.

Ex. 2009, ¶¶328-330; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063." *Id.* (quoting PO Resp. 69). Petitioner faults Patent Owner for failing to explain the basis for this statement in the Response and instead "simply say[ing] so and point[ing] to Exhibit 2028 (a 20-page claim chart) for the supporting argument." *Id.* at 1, 5. Petitioner argues that this amounts to improper incorporation by reference of an argument for which Patent Owner bears the burden of production. *Id.* at 2. Petitioner also argues that Patent Owner cannot merely explain in exhibits its contention that the Samsung Galaxy S22 Ultra practices the claims of the '683 patent. *Id.* at 2–3; *see also* Exclude Reply 2 (citing Ex. 2009 ¶ 330) (arguing that "Dr. Kymissis's declaration is no better" because "he includes a bare citation to Ex. 2028 without engaging in any explanation or claim-by-claim elaboration.").

Patent Owner characterizes the claim chart at Exhibit 2028 "as supporting *evidence* for . . . nexus arguments that are thoroughly presented in the [Patent Owner Response]." 1st Strike Opp. 1. Patent Owner notes that the Response presents a "teardown image . . . of the pixel arrangement obtained from a Galaxy S22 Ultra . . . with Figure 5 of the '683 Patent superimposed." *Id.* at 3 (alteration in original) (citing PO Resp. 69–70); *see also supra* § II.D.2.i.(1) (reproducing referenced teardown image). Accordingly, Patent Owner argues that the Response "cites Exhibit 2028, a claim chart mapping the challenged claims to the same teardown image presented in the [Patent Owner Response], as additional evidence." 1st Strike Opp. 3; *see also* Exclude Opp. 1 (citing Ex. 2009 ¶ 330) (describing Exhibit 2028 as "a claim chart prepared by Patent Owner's expert,

Dr. Kymissis, explaining his opinion that the Galaxy S22 Ultra practices the challenged claims of the ’683 Patent”).

37 C.F.R. § 42.6(a)(3) states that “[a]rguments must not be incorporated by reference from one document into another document.” In this case, Patent Owner’s Response states the following in support of its nexus arguments: “[T]he AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the ’683 Patent. Ex. 2009, ¶¶328-330; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063.” PO Resp. 69. But Patent Owner’s argument amounts to a conclusion without any explanation.

To understand Patent Owner’s argument, one must synthesize four separate exhibits: Dr. Kymissis’s declaration (Ex. 2009 ¶¶ 328–330), the proffered claim chart (Ex. 2028), teardown images of the Galaxy S22 Ultra (Ex. 2029), and another declaration by Dr. Fontecchio (Ex. 2063). Specifically, one must first turn to paragraphs 329 of Kymissis’s declaration to learn that “[a] software package called ImageJ was used to obtain certain information about the images of the Galaxy S22 Ultra’s pixel arrangement structures.” Ex. 2009 ¶ 329. Notably, Dr. Kymissis never states how he obtained the Galaxy S22 Ultra images, but he seemingly relies on a single unexplained reference to “Ex. 2063.” *See id.* ¶ 328. Turning to Exhibit 2063, one would learn that Dr. Fontecchio “t[ore] down and obtain[ed] photographs from an AMOLED display in a Samsung Galaxy S22 Ultra smartphone product.” Ex. 2063 ¶ 2. In turn, Dr. Fontecchio’s images are contained in Exhibit 2029.[10] *Id.* ¶ 3. Then, one would have to

[10] We also note that Dr. Fontecchio does not explain his methodology for obtaining the teardown images at Exhibit 2029.

turn to the claim chart itself at Exhibit 2028 for a limitation-by-limitation analysis comparing the claims of the ’683 patent and the Galaxy S22 Ultra smartphone, which relies on Dr. Fontecchio’s images. *See* Ex. 2028. None of this is mentioned in the main document, Patent Owner’s Response. As such, the Board is forced to “play archeologist with the record” in order to understand Patent Owner’s arguments, which “is precisely what the rule against incorporation by reference was intended to prevent.” *Gen. Access Sols., Ltd. v. Sprint Spectrum L.P.*, 811 F. App’x 654, 657–58 (Fed. Cir. 2020).

We also have considered Patent Owner’s inclusion of “[a] teardown image (Ex. 2029 at 5) of the pixel arrangement obtained from a Galaxy S22 Ultra . . . with Figure 5 of the ’683 Patent superimposed.” PO Resp. 69–70; *see also supra* § II.D.2.i.(1) (reproducing referenced teardown image). Although Patent Owner characterizes the claim chart of Exhibit 2028 as “additional evidence” supporting the annotated teardown image (1st Strike Opp. 3), we do not agree with Patent Owner that this solves its incorporation problem relative to Exhibit 2028. Although Petitioner does not ask us to strike the annotated image or the sentence that supports it,[11] we agree with Petitioner that the “the explanation of [its] connection to the ’683 patent is found only in exhibits.” 1st Strike Reply 3. Indeed, the context for this annotated image is only discernable with reference to some of the same exhibits discussed in the previous paragraph. *See, e.g.*, Ex. 2009 ¶ 328 (citing Ex. 2029, 5; Ex. 2063).

[11] In our analysis of secondary considerations of nonobviousness above, we accord the annotated teardown image little to no weight based on its lack of evidentiary support.

For these reasons, we *grant* Petitioner's motion to strike the following statement from Patent Owner's Response at page 69: "For example, the AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the '683 Patent. Ex. 2009, ¶¶328-330; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063." *See* 37 C.F.R. § 42.6(a)(3).

Petitioner also moves to strike another sentence in the Patent Owner Response: "Petitioner Mianyang BOE copied Samsung Display's pixel arrangements to commercialize AMOLED displays for products including the iPhone 12. Ex. 2009, ¶319." 1st Strike Mot. 1–2 (alteration omitted) (quoting PO Resp. 66). Petitioner argues that Patent Owner's statement "relies on its expert declaration and an 80-page district court complaint cited therein (Ex. 2041) to explain the allegation." *Id.* at 5; *see also id.* at 2 (noting that paragraph 319 of Dr. Kymissis's declaration in turn cites Exhibit 2041, the complaint from the Texas litigation). Petitioner again argues that Patent Owner has relegated the basis of its arguments to exhibits, which amounts to improper incorporation by reference. *Id.* at 1–2.

Patent Owner disputes that its argument relies on an 80-page complaint at Exhibit 2041. 1st Strike Opp. 2. Rather, Patent Owner argues that it only utilizes "a specific teardown image from paragraph 84 of a district court complaint." *Id.*

We agree with Patent Owner that it only relies on the complaint from the Texas litigation at Exhibit 2041 for providing a particular teardown image that it uses as part of a side-by-side comparison in its Response. *See* Ex. 2009 ¶ 319 (citing Ex. 2041 ¶ 84) (reproducing the same image from PO Resp. 66 and explaining that it is a "teardown image . . . of the pixel arrangement used in Mianyang BOE's AMOLED display used in the

iPhone 12 and comes from a complaint filed against Mianyang BOE"). Patent Owner does not incorporate any comparison or analysis from that complaint. Thus, we *deny* Petitioner's motion to strike the following sentence at page 66 of Patent Owner's Response: "Petitioner Mianyang BOE copied Samsung Display's pixel arrangements to commercialize AMOLED displays for products including the iPhone 12. Ex. 2009, ¶319."

Petitioner additionally moves to strike a third passage of Patent Owner's Response in which Patent Owner alleges copying by vendors of replacement AMOLED displays. *See* 1st Strike Mot. 1–2. Although Petitioner's motion to strike omits certain parts of the relevant passage, we reproduce the passage in its entirety below:

> Widespread copying of the '683 Patent's inventions is further evident from samples of AMOLED displays distributed by numerous vendors of replacement AMOLED displays for mobile phones. Exs. 2042-2061. These pixel arrangements not only infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-2, 4-10, 13, and 15 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-2, 4-10, 13, and 15 to Sourcely Plus AMOLED Display)), they bear such similarity to those of Samsung Display that they demonstrate copying. Ex. 2009, ¶¶320–324. *See, e.g.*, *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*, 70 F.4th 1331, 1339–42 (Fed. Cir. 2023) (circumstantial evidence of "evidence of access to and substantial similarity with a patented product" can show copying (emphasis omitted)).

PO Resp. 66–67 (partially quoted at 1st Strike Mot. 2). Petitioner faults Patent Owner for not "articulating in its Response why certain third-party displays purportedly 'infringe the challenged claims'" and instead "mak[ing] a bald allegation in its Response and then point[ing] to Exhibits 2042 and 2043 (both 20-page claim charts) for the actual explanation." 1st Strike Mot. 5 (citing PO Resp. 66–67). Petitioner once again argues that Patent

Owner has relegated the basis of its arguments to exhibits, which amounts to improper incorporation by reference. *Id.* at 1–2.

Patent Owner argues that its Response provides an explanation of the alleged copying and "presents exemplary side-by-side comparisons of teardown images of the pixel arrangements in SDC's AMOLED products and teardown images of replica products." 1st Strike Opp. 2 (internal quotations omitted) (citing PO Resp. 65–68). As such, Patent Owner argues that the claim charts at Exhibits 2042 and 2043 are "*further evidence*." *Id.*

We agree with Petitioner that Patent Owner has improperly incorporated by reference the basis for Patent Owner's allegation that "[t]hese pixel arrangements . . . infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-2, 4-10, 13, and 15 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-2, 4-10, 13, and 15 to Sourcely Plus AMOLED Display))." PO Resp. 66. To understand this argument, one must resort to paragraph 320 of Dr. Kymissis's declaration to learn that Dr. Kymissis had reviewed teardown images provided by Dr. Silzars. Ex. 2009 ¶ 320 (citing Exs. 2044–2061). In turn, Dr. Silzars testifies in his declaration that Exhibit 2044 includes teardown images from a Group Vertical AMOLED display sample, whereas Exhibit 2046 includes teardown images from a Sourcely Plus AMOLED display sample. Ex. 2061 ¶¶ 3, 5. Returning to Dr. Kymissis's declaration, one would learn that Dr. Kymissis used ImageJ software on Dr. Silzars's images at Exhibits 2044 and 2046 to obtain data about the Group Vertical and Sourcely Plus AMOLED displays. Ex. 2009 ¶ 322. Dr. Kymissis used this data to create the claim charts located at Exhibits 2042 and 2043. *Id.* These claim charts contain limitation-by-limitation analyses comparing the Group Vertical and

Sourcely Plus AMOLED display to the claims of the '683 patent, which is the basis of Patent Owner's allegation of infringement. *See* Exs. 2042, 2043. Patent Owner's tactic of rolling up all of this background information into a single conclusory sentence about alleged infringement amounts to improper incorporation by reference.

We also have considered Patent Owner's arguments about the claim charts at Exhibits 2042 and 2043 being further evidence to certain other of Patent Owner's assertions, such as its presentation of side-by-side comparison of teardown images with an image of Patent Owner's Galaxy S22 Ultra with Figure 5 of the '683 patent overlaid on top. 1st Strike Opp. 2 (citing PO Resp. 66–68). Again, this does not solve the incorporation issue regarding alleged infringement, because the explanation about infringement, i.e., the "mapping" of the challenged claims, is found only in exhibits. *See* 1st Strike Reply 3.

For these reasons, we *grant* Petitioner's motion to strike the following statement from Patent Owner's Response at pages 66–67: "These pixel arrangements . . . infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-2, 4-10, 13, and 15 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-2, 4-10, 13, and 15 to Sourcely Plus AMOLED Display))." *See* 37 C.F.R. § 42.6(a)(3).

*I. Petitioner's Second Motion to Strike*

Petitioner moves to strike Exhibit 2083, which comprises excerpts of testimony from Dr. Pattison in the ITC Investigation, and the portions of Patent Owner's Sur-reply that rely on it. 2d Strike Mot. 1. We do not rely on this information in rendering this Decision, so we *dismiss as moot*

Petitioner's motion to strike these materials and the portions of the Sur-reply that refer to them.

Petitioner also moves to strike the portions of Patent Owner's Sur-reply that rely on two dictionary excerpts that were introduced during the second deposition of Dr. Pattison. 2d Strike Mot. 1, 4. The excerpts, which were identified as "Exhibit 2084" and "Exhibit 2085" at the deposition, are not of record in this proceeding. *Id.* at 4–5. We do not rely on this information in rendering this Decision, so we *dismiss as moot* Petitioner's motion to strike the portions of the Sur-reply that refer to the dictionary excerpts.

Petitioner additionally reiterates its arguments from its First Motion to Strike related to Exhibits 2028 and 2041–2043. 2d Strike Mot. 1, 5. We have already discussed these arguments above with respect to Petitioner's First Motion to Strike. *See supra* § II.H.

For these reasons, we *dismiss as moot* Petitioner's Second Motion to Strike.

### *J. Petitioner's Motion to Exclude*

Petitioner moves to exclude Exhibit 2028, which is a claim chart supporting Patent Owner's allegations of a nexus between the challenged claims and the Samsung Galaxy S22 Ultra smartphone, as inadmissible hearsay. Exclude Mot. 1 (citing Fed. R. Evid. 802). We already have stricken Patent Owner's reference to this claim chart in Patent Owner's Response. *See supra* § II.H. As such, we do not rely on this exhibit in rendering this Decision. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibit 2028.

Petitioner moves to exclude Exhibit 2041, which is the complaint from the Texas litigation, as inadmissible hearsay. Exclude Mot. 2 (citing Fed. R. Evid. 802). Petitioner argues that the complaint constitutes hearsay because "it is an out-of-court statement that Patent Owner improperly relies on to establish the structure possessed by a BOE product." *Id.* This exhibit relates to Patent Owner's evidence of copying as a secondary consideration of nonobviousness, which we have accorded little to no weight above. *See supra* § II.D.i.5. We also have determined that certain challenged claims are unpatentable despite this evidence. *See supra* § II.D.2–10. Under these circumstances, we find the better course of action is to maintain a complete record of the evidence to facilitate review rather than to exclude this exhibit. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibit 2041.

Petitioner moves to exclude Exhibits 2042 and 2043, which are claim charts supporting Patent Owner's allegations of copying related to Group Vertical and Sourcely Plus AMOLED displays, as inadmissible hearsay. Exclude Mot. 2–3 (citing Fed. R. Evid. 802). We already have stricken Patent Owner's references to these claim charts in Patent Owner's Response. *See supra* § II.H. As such, we do not rely on these exhibits in rendering this Decision. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibits 2042 and 2043.

Petitioner moves to exclude Exhibits 2044–2060, which allegedly are teardown images of various replacement AMOLED displays, as lacking authentication. Exclude Mot. 3–4 (citing Fed. R. Evid. 901). Petitioner notes that Dr. Silzars testifies in his supporting declaration (Exhibit 2061) "only that he 'understand[s]' that the products 'were purchased' from 16 different entities." *Id.* (alteration in original) (quoting Ex. 2061 ¶ 2).

Petitioner likewise moves to exclude Exhibit 2061, Dr. Silzars's declaration, because Dr. Silzars lacks "personal knowledge of the origin of any of the products discussed in his declaration." *Id.* at 4–5 (citing Fed. R. Evid. 602). All of these exhibits relate to Patent Owner's evidence of copying as a secondary consideration of nonobviousness, which we have accorded little to no weight above. *See supra* § II.D.i.5. We also have determined that certain challenged claims are unpatentable despite this evidence. *See supra* § II.D.2–10. Under these circumstances, we find the better course of action is to maintain a complete record of the evidence to facilitate review rather than to exclude these exhibits. Thus, we *dismiss as moot* Petitioner's motion to exclude Exhibits 2044–2061.

## III. CONCLUSION[12]

Petitioner has shown, by a preponderance of the evidence, that the subject matter of claims 1, 4–10, 13, and 15 of the '683 patent would have been obvious over Phan. Petitioner has not shown, by a preponderance of the evidence, that (1) the subject matter of claim 2 of the '683 patent would have been obvious over the combination of Phan and Yamada; (2) the subject matter of claims 1, 2, 4–10, 13, and 15 of the '683 patent would have

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

been obvious over the combination of Matthies and Yamada; or (3) the subject matter of claims 1, 2, 4–10, 13, and 15 of the ’683 patent would have been obvious over the combination of Murai and Yamada.

We *grant* Petitioner’s First Motion to Strike as to the following statement from page 69 of Patent Owner’s Response: “For example, the AMOLED display used in the Samsung Galaxy S22 Ultra product practices all challenged claims of the ’683 Patent. Ex. 2009, ¶¶328-330; Ex. 2028 (Galaxy S22 ULTRA Claim Chart); Ex. 2063.” We also *grant* Petitioner’s First Motion to Strike as to the following statement from pages 66–67 of Patent Owner’s Response: “These pixel arrangements . . . infringe the challenged claims (*see, e.g.*, Ex. 2042 (chart mapping claims 1-2, 4-10, 13, and 15 to Group Vertical AMOLED Display); Ex. 2043 (chart mapping claims 1-2, 4-10, 13, and 15 to Sourcely Plus AMOLED Display)).” We *deny* Petitioner’s First Motion to Strike as to the following statement from page 66 of Patent Owner’s Response: “Petitioner Mianyang BOE copied Samsung Display’s pixel arrangements to commercialize AMOLED displays for products including the iPhone 12. Ex. 2009, ¶319.”

We *dismiss as moot* Petitioner’s Second Motion to Strike and Petitioner’s Motion to Exclude.

In summary:

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not shown Unpatentable** |
|---|---|---|---|---|
| 1, 2, 4–10, 13, 15 | 103(a) | Matthies, Yamada | | 1, 2, 4–10, 13, 15 |
| 1, 4–10, 13, 15 | 103(a) | Phan | 1, 4–10, 13, 15 | |
| 2 | 103(a) | Phan, Yamada | | 2 |
| 1, 2, 4–10, 13, 15 | 103(a) | Murai, Yamada | | 1, 2, 4–10, 13, 15 |
| **Overall Outcome** | | | 1, 4–10, 13, 15 | 2 |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1, 4–10, 13, and 15 of the ’683 patent are unpatentable;

FURTHER ORDERED that claim 2 of the ’683 patent is not unpatentable;

FURTHER ORDERED that Petitioner’s First Motion to Strike (Paper 23) is *granted-in-part* and *denied-in-part* as indicated above;

FURTHER ORDERED that Petitioner’s Second Motion to Strike (Paper 32) is *dismissed as moot*;

FURTHER ORDERED that Petitioner’s Motion to Exclude (Paper 38) is *dismissed as moot*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

K. Patrick Herman
Richard F. Martinelli
Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE, LLP
p52ptabdocket@orrick.com
rfmptabdocket@orrick.com
xw0ptabdocket@orrick.com

PATENT OWNER:

David A. Garr
Scott C. Weidenfeller
COVINGTON & BURLING LLP
dgarr@cov.com
sweidenfeller@cov.com

Trials@uspto.gov
571-272-7822

Paper 46
Entered: January 6, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD., TIANMA MICROELECTRONICS CO. LTD., and VISIONOX TECHNOLOGY, INC.,
Petitioner,

v.

SAMSUNG DISPLAY CO., LTD.,
Patent Owner.

---

IPR2023-01075
Patent 11,594,578 B2

---

Before JAMESON LEE, TERRENCE W. McMILLIN, and JOHN A. HUDALLA, *Administrative Patent Judges*.

McMILLIN, *Administrative Patent Judge*.

JUDGMENT
Determining No Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd.; and Visionox Technology, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1–6, 10, 12, 17–19, 21–23, 40–47, 51, and 52 ("the challenged claims") of U.S. Patent No. 11,594,578 B2 (Ex. 1001, "the '578 patent"). Samsung Display Co., Ltd. ("Patent Owner") filed a Preliminary Response (Paper 9). We instituted the petitioned review (Paper 11, "Inst. Dec.").

Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp.") to oppose the Petition. Petitioner filed a Reply (Paper 29, "Pet. Reply") to the Patent Owner Response. Patent Owner filed a Sur-reply (Paper 31, "PO Sur-reply") to the Reply. We conducted an oral hearing on October 9, 2024. A transcript has been entered into the record (Paper 44).

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–6, 10, 12, 17–19, 21–23, 40–47, 51, and 52 of the '578 patent. We determine Petitioner has not shown by a preponderance of the evidence that any of the challenged claims are unpatentable.

# I. BACKGROUND

## *A. Real Parties-in-Interest*

Petitioner identifies Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd.; and Visionox Technology, Inc. and their subsidiaries as the real parties-in-interest. Pet. 3–4. Patent Owner

identifies Samsung Display Co., Ltd., as the real party-in-interest. Paper 6, 2.

### *B. Related Matters*

The parties identify the following proceedings related to the ’578 patent (Pet. 4; Paper 6, 2):[1]

*Certain Active Matrix Organic Light-Emitting Diode Display Panels And Modules For Mobile Devices, And Components Thereof*, Inv. No. 337-TA-1351 (USITC);[2] and

*Samsung Display Co., Ltd. v. BOE Technology Co., Ltd.*, Case No. 2-23-cv-00309 (E.D. Tex.).

### *C. The ’578 Patent*

The ’578 patent is directed to “a pixel arrangement structure of an organic light emitting diode (OLED) display.” Ex. 1001, 1:22–23. The ’578 patent indicates that “[a]n organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM).” *Id.* at 1:46–48. The ’578 patent notes, however, that “[w]hen reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated,” but “[o]n the other hand, when increasing the gap between the pixels to improve

---

[1] The ’578 patent is based on a continuation of an application that issued as U.S. Patent No. 10,854,683 (challenged in IPR2023-00988) and which in turn is based on a continuation of an application that issued as U.S. Patent No. 9,818,803 (challenged in IPR2023-00987). Ex. 1001, code (63).

[2] The Initial Determination (Ex. 2088) of the U.S. International Trade Commission was entered in this investigation on November 15, 2024. With regard to validity of the ’578 patent, the Administrative Law Judge determined that claims 5, 10, 17, 40, 41, 45, and 47 of the ’578 patent were not shown to be obvious. *Id.* at 101–03.

the deposition reliability, the aperture ratio of the pixel may be deteriorated." *Id.* at 1:48–53. The '578 patent also indicates that pixels of certain colors may have different lifespans from other pixels, and that the described pixel arrangement structure of the OLED display may provide improved life span. *Id.* at 7:35–42. The '578 patent indicates that an exemplary embodiment "provides a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels." Ex. 1001, 1:66–2:3.

Figure 1 of the '578 patent is reproduced below.

FIG.1



Figure 1 depicts "a view of a pixel arrangement structure of an OLED display." Ex. 1001, 3:8–9. "[T]he pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300," which respectively emit green, blue, and red light. *Id.* at 3:62–65, 4:23–24, 4:40–41, 4:53–54.

According to the '578 patent, "each of the first pixels 100 has a smaller area than neighboring second pixels 200 and third pixels 300, and has a quadrilateral (i.e., four-sided) shape." Ex. 1001, 4:14–17. "The second pixels 200 are arranged diagonally with respect to the first pixels 100, such as at first vertices P1 along one diagonal of a virtual square VS having one of the first pixels 100 as a center point (or center) of the virtual square VS." *Id.* at 4:24–28. "In a similar fashion, the third pixels 300 are arranged diagonally with respect to the first pixels 100, such as at second vertices P2 along the other diagonal of the virtual square VS." *Id.* at 4:28–31.

The '578 patent states that, "[e]ach of the third pixels 300 has a larger area than the neighboring first pixel 100 and the same area as each of the second pixels 200." Ex. 1001, 4:46–48. The '578 patent also indicates that "by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved." *Id.* at 5:30–33.

The '578 patent further states that

> the gap of the first length L1 is formed between adjacent pairs of the first pixels 100 and the second pixels 200, between adjacent pairs of the first pixels 100 and the third pixels 300, and between adjacent pairs of the second pixels 200 and the third pixels 300. In addition, the gap of the second length L2

> that is longer than the first length L1 is formed between the neighboring ones of the first pixels 100. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

Ex. 1001, 5:19–29.

Figure 2 of the '578 patent is reproduced below.

FIG.2




Figure 2 depicts "a view of a pixel arrangement structure of an OLED display." Ex. 1001, 3:10–11. In Figure 2, "[t]he plurality of first pixels 100 have the same quadrilateral shape (e.g., a parallelogram)" and "the second pixels 200 have a larger area than the third pixels 300." *Id.* at 6:11–13. According to the '578 patent, because "the second pixels 200 that emit blue have the shortest life span," "the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display." *Id.* at 6:54–59.

Figure 5 of the '578 patent is reproduced below.

FIG.5




Figure 5 depicts "a view of a pixel arrangement structure of an OLED display." Ex. 1001, 3:19–20. According to the '578 patent, "the neighboring first pixels 100 have a octagonal shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300." *Id.* at 8:44–47. The '578 patent states that "[t]his results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300." *Id.* at 8:47–51.

The application that led to the '578 patent was filed on July 8, 2019, and claims priority to, *inter alia*, a Korean application that was filed on March 6, 2012 (i.e., the earliest possible effective filing date). Ex. 1001,

codes (22), (30). We apply the March 6, 2012, date for qualifying the asserted references as prior art.

### *D. Illustrative Claim*

Of the challenged claims, claims 1, 42, and 45 are independent. Claims 2–6, 10, 12, 17–19, 21–23, 40, 41, 43, 44, 46, 47, 51, and 52, directly or indirectly, depend from one of claims 1, 42, and 45. Claim 1 recites:

> 1. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising:
>
> a plurality of first pixels;
>
> a plurality of second pixels; and
>
> a plurality of third pixels,
>
> ***wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels***,
>
> wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,
>
> wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,
>
> wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,
>
> wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets,
>
> wherein the first lines and the second lines are alternately arranged,
>
> wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

> wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,
>
> wherein the third lines and the fourth lines are alternately arranged,
>
> wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,
>
> wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels, and
>
> wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

Ex. 1001, 8:63–9:26 (emphasis added to determinative limitation).

### *E. Cited Art*

Petitioner relies on the following references:

> U.S. Patent No. 6,897,855 B1, filed Feb. 16, 1999, issued May 24, 2005 (Ex. 1004, "Matthies");
>
> U.S. Patent No. 6,366,025 B1, filed Feb. 24, 2000, issued Apr. 2, 2002 (Ex. 1005, "Yamada"); and
>
> U.S. Patent Application Publication No. 2011/0234550 A1, filed Aug. 13, 2010, published Sept. 29, 2011 (Ex. 1011, "Hong").

#### *1. Matthies*

Matthies is a U.S. patent directed to "large-area display devices which are formed as an array of tiled display devices." Ex. 1004, 1:8–10. Matthies

states that "[b]uilding a large-area display out of smaller tiles has been recognized as a desirable solution," because "the basic unit of manufacture is relatively small," which "reduces manufacturing costs." *Id.* at 1:56–65. Matthies explains that "[n]o practical tiled display system has yet been developed" because "[w]hat has been missing is a fabrication technology that allows a display to be constructed so that pixels can be brought up to the very edge . . . while at the same time allowing for electronics to address each tile, even those tiles completely surrounded by other tiles." *Id.* at 1:66–2:7.

Figure 1 of Matthies is reproduced below.




**FIG. 1**

Figure 1 depicts "a front plan drawing of a large area display device from which two tiles have been removed." Ex. 1004, 3:49–50. According to Matthies, "display 100 is a tiled display in which emissive or reflective elements, on which the image pixels are formed, are built as relatively small arrays on tiles 120 and assembled into a frame to produce the large-area

display having a large number of pixel forming elements." *Id.* at 5:38–42. Matthies indicates that "[a]lthough the display 100 is shown as being formed from tiles having 16 pixel forming elements in a four by four array, it is contemplated that each tile may include many more pixels." *Id.* at 5:56–59.

Matthies states that in an exemplary embodiment, "the pixel forming elements are made from an organic light emitting diode (OLED) material." Ex. 1004, 6:17–19. According to Matthies, "[t]he active portion . . . of the pixels occupies only about 1/4 of the total pixel area." *Id.* at 15:67–16:1. Matthies indicates that "this spacing of the pixels leaves room along the edges of the display for the vias . . . to connect to the row and column electrodes of the pixel without interfering with the regular spacing of the pixels across tile boundaries." *Id.* at 16:5–9.

Figure 7 of Matthies is reproduced below.




FIG. 7

Figure 7 depicts "a pixel diagram which shows an exemplary pixel layout for portions of four tiles." Ex. 1004, 4:6–7. "In the layout shown in FIG. 7, the active portions 526 of the pixels are centered in their respective pixel regions and the vias which connect the row and column electrodes of the

display to the electronics are formed between respective pixel elements." *Id.* at 16:22–26. "The distance between the edge of an active region 526 and the edge 712 of the display is equal on all sides of the tile." *Id.* at 16:26–28.

Figure 8B of Matthies is reproduced below.




FIG. 8B

Figure 8B depicts "a front-plan view of an alternative single color pixel structure which includes separate sub-pixels." Ex. 1004, 4:12–13. According to Matthies, Figure 8B illustrates a "color pixel structure" that "includes four sub-pixel elements, 830, 832, 834 and 836." *Id.* at 16:62–64. "Two of these sub-pixel elements, 830 and 836 emit green light when stimulated while the other two pixel elements, 832 and 834 emit red and blue light, respectively." *Id.* at 16:64–66. Matthies indicates that "[t]his structure is known as a quad sub-pixel structure." *Id.* at 16:67. According to Matthies, "[t]he geometry of the quad sub-pixel structure is defined by the dimensions $d_{SH}$, the height of the sub-pixel, $d_{SW}$, the width of the sub-pixel, $d_e$, the distance from the active sub-pixel areas to the edge of the pixel area, and $d_{SI}$, the distance between adjacent sub-pixels." *Id.* at 17:16–20.

Matthies teaches that a "tile may also include circuitry which automatically adjusts the pixel brightness to compensate for aging of the display material," such as a "small light sensor over one or more pixel positions which continually monitors the brightness of that pixel and adjusts the current level applied to that pixel—and the current levels applied to all of the other pixels on the display—to compensate for variations in pixel brightness due to aging of the display." Ex. 1004, 11:47–58. Matthies also teaches "that the decay in the brightness of an OLED pixel that occurs with aging can be predicted" by, for example, "measuring the current and time for a particular pixel, and integrating the product of current and time" or by "monitor[ing] the voltage that is applied to the pixel." *Id.* at 11:61–12:16. Matthies indicates that the "methods for adjusting the current applied to a pixel in order to maintain a predetermined brightness level may be combined with any other method either as a check or to augment the performance of the other method." *Id.* at 12:41–46.

Matthies issued May 24, 2005,[3] (Ex. 1004, code (45)) and Petitioner contends that Matthies qualifies as prior art under 35 U.S.C. § 102(b). Pet. 14. Patent Owner does not contest the prior art status of Matthies. *See generally* PO Resp. We determine that Matthies qualifies as prior art under 35 U.S.C. § 102(b), because Matthies' issue date of May 24, 2005, is more than one year before the earliest claimed priority date for the '578 patent, which is March 6, 2012. Ex. 1001, code (30); Ex. 1004, code (45).

---

[3] The Petition incorrectly states that Matthies issued on May 23, 2005, when it actually issued one day later on May 24, 2005. Pet. 11; Ex. 1004, code (45). This does not affect whether Matthies qualifies as prior art.

### *2. Yamada*

Yamada is a U.S. patent related to an "electroluminescence (EL) display apparatus." Ex. 1005, 1:6–7. Yamada discusses an "EL display apparatus" including "emissive regions 1B, 1R, and 1G for the display pixel of the respective color . . . arranged in a matrix configuration." *Id.* at 2:55–60. Yamada indicates that "the emission efficiency of the emissive layer for emitting light of various colors differs with each color." *Id.* at 2:53–54. According to Yamada, when the pixels "all have identical emissive areas in size," "in order to obtain the same luminance at the display pixels having a low emission efficiency, a current larger than that supplied to the other display pixels having a high emission efficiency must be supplied." *Id.* at 2:55–64. Yamada teaches that "[t]his causes the life of those display pixels having a low emission efficiency, in particular, to shorten, and also possibly causes the life of the EL display apparatus to shorten." *Id.* at 2:64–67.

Yamada purports to improve upon these aspects of EL displays by way of "a color display device, in which a display pixel having an emissive element is provided for every color, wherein the emissive area of the display pixel of any one color, among the display pixels of various colors, is different in size from the emissive area of the display pixel of another color." Ex. 1005, 3:17–22. According to Yamada,

> By setting the emissive area of the display pixel, namely, the emissive area of the emissive element, in accordance with the emission efficiency of the emissive element as in the foregoing, and by supplying, for example, the same power to the emissive elements of colors having different emission efficiencies, it becomes possible to have the same emission luminance at the various display pixels.

*Id.* at 3:65–4:5. Therefore, Yamada states "it is possible to prevent the deterioration from accelerating when a load is selectively placed on the emissive element having low emission efficiency and extend the life of the display device." *Id.* at 4:11–14.

Figure 4 of Yamada is reproduced below.




**Fig. 4**

Figure 4 depicts a "conceptual diagram showing emissive region areas of the EL display apparatus." Ex. 1005, 6:24–25. According to Yamada, Figure 4 "is a top plan view of an EL display apparatus 100" representing "a case where the respective display pixels emit red (R), green (G), and blue (B) light." *Id.* at 6:49–52. "[I]n the case of FIG. 4, the emissive area of the green display pixel 1G is provided as the smallest," while "[e]missive regions 1R and 1B of the other colors are formed with a larger area than that of emissive region 1G." *Id.* at 7:6–10. Yamada indicates that while in Figure 4 the "[a]rea of green emissive region 1G<area of red emissive region 1R<area of blue emissive region 1B," "the order in size of the emission region areas is not fixed at the above-mentioned green<red<blue, but is

determined by the emission efficiency of the emissive materials that are used." *Id.* at 7:10–19.

Yamada issued April 2, 2002, (Ex. 1005, code (45)) and Petitioner contends that Yamada qualifies as prior art under 35 U.S.C. § 102(b). Pet. 17. Patent Owner does not contest the prior art status of Yamada. *See generally* PO Resp. We determine that Yamada qualifies as prior art under 35 U.S.C. § 102(b), because Yamada's issue date of April 2, 2002, is more than one year before the earliest claimed priority date of the '578 patent, which is March 6, 2012. Ex. 1001, code (30); Ex. 1005, code (45).

*3. Hong*

Hong is a U.S. patent application publication directed to an "organic electroluminescent display (ELD) device" in which "aperture ratio and resolution are improved due to an arrangement of organic patterns in sub-pixel regions." Ex. 1011 ¶ 3. Hong discloses each of first, second, and third organic patterns having a rectangular shape with two truncated corners. *Id.* ¶ 61. According to Hong, this allows the organic patterns to be made larger and "[a]s a result, an aperture ratio is . . . improved." *Id.*

Petitioner notes that Hong published September 29, 2011 and was filed in the U.S. on August 13, 2010, and contends that Hong qualifies as prior art under 35 U.S.C. §§ 102(a) and (e). Pet. 18. Patent Owner does not contest the prior art status of Hong. *See generally* PO Resp. We determine that Hong qualifies as prior art under 35 U.S.C. §§ 102(a) and (e), because both Hong's filing date and publication date were before the earliest claimed priority date of the '578 patent, which is March 6, 2012. Ex. 1001, code (30); Ex. 1011, codes (22), (43).

### *F. Asserted Grounds*

Petitioner challenges claims 1–6, 10, 12, 17–19, 21–23, 40–47, 51, and 52 of the '578 patent based on the following grounds (Pet. 6):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–6, 10, 12, 17–19, 21–23, 41, 42, 44, 47, 52 | 103(a)[4] | Matthies, Yamada |
| 40, 43, 45–47, 51, 52 | 103(a) | Matthies, Yamada, Hong |

## II. ANALYSIS

### *A. Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We also recognize that prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re*

[4] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103. Because the '578 patent claims priority to an application filed before March 16, 2013 (the effective date of the relevant amendments), the pre-AIA versions of §§ 102 and 103 apply.

*Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418; *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *In re NuVasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016).

### *B. Level of Ordinary Skill in the Art*

Citing testimony from Dr. Pattison, Petitioner contends a person of ordinary skill in the art "would have had a degree in electrical engineering, materials science, physics, or a similar discipline, along with 2 years of professional experience working with display design, including OLED

displays, or an equivalent level of skill, knowledge, and experience." Pet. 13 (citing Ex. 1003 ¶¶ 37–40). Petitioner further notes that such a person of ordinary skill in the art "would have been aware of and generally knowledgeable about OLED materials, and display pixel design, layout, and operation." *Id.* at 13–14 (citing Ex. 1003 ¶ 40). We adopted Petitioner's definition in the decision on institution. Inst. Dec. 12.

Patent Owner proposes that

> consistent with the finding in the related ITC Investigation, that a person of ordinary skill in the art ("POSITA") would have had a relevant technical degree in Electrical Engineering, Computer Engineering, Material Science, Physics, or the like, and experience in electroluminescence and the design of active-matrix displays or pixel arrangements for such displays.

PO Resp. 5 (citing Ex. 2009 ¶ 64; Ex. 2001, 15). Patent Owner describes its proposal as containing "slightly different language" than Petitioner's definition and does not explain why we should adopt its proposal over Petitioner's articulation. *Id.* Notwithstanding, Patent Owner contends that "Petitioner fails to establish unpatentability under either [party's] definition." *Id.*

For purposes of this Decision, we again adopt Petitioner's definition of the level of ordinary skill in the art. It is supported by the testimony of Dr. Pattison, and appears consistent with what is reflected by the content of the applied prior art references. *Cf. Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).

We find Patent Owner's articulation of the level of ordinary skill to be imprecise, because Patent Owner does not specify the amount of experience possessed by an ordinarily skilled artisan. The unbounded reference to

"experience" is vague and overly broad, as it could mean 1 year of experience or over 30 years of experience, for example. In addition, the '578 patent is directed to "a pixel arrangement structure of an (OLED) [organic light emitting diode] display" (Ex. 1001, 1:22–23), whereas Patent Owner's proposed experience is tied to "active-matrix displays." PO Resp. 5. Given that the field of OLED displays includes both passive and active matrix designs (*see generally* Ex. 2009 ¶¶ 40–56), we see no reason to restrict the relevant experience to active matrix displays. For these reasons, we do not adopt Patent Owner's definition of the level of ordinary skill in the art.

### *C. Claim Construction*

In an *inter partes* review, we construe claims "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim." 37 C.F.R. § 42.100(b). Accordingly, our claim construction standard is the same as that of a district court. *See id.* Under the standard applied by district courts, claim terms are generally given their plain and ordinary meaning, as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

With regard to claim construction, the Petition[5] states:

> In the related ITC action involving the '578 patent, Patent Owner and the Staff proposed constructions for certain claim terms that did not meaningfully depart from the claim language. (*See generally* Ex. 1010.) For purposes of this petition, Petitioner adopts these constructions. (Ex. 1003, ¶¶ 83-88.) **The patent's other terms are afforded their plain and ordinary meaning**. (*Id.*)

Pet. 13 (emphasis added). Patent Owner's Response states:

> The Administrative Law Judge ("ALJ") in related ITC Investigation No. 337-TA-1351 issued a claim construction order construing two terms of the '578 Patent. Ex. 2001. The parties in that Investigation also submitted a list of agreed-upon constructions including certain terms of the '578 Patent. Ex. 2002. No specialized constructions are necessary in this proceeding, as Petitioner fails to prove unpatentability of any claims under any interpretation.

PO Resp. 4–5.

As discussed *infra*, this Decision is based upon our determination that Petitioner has failed to show that the cited art teaches or suggests a "pixel defining layer" as recited. Neither party in this proceeding or in the ITC Investigation argued that "pixel defining layer" as recited in the challenged claims required construction, and neither party presented any arguments regarding the construction or meaning of this term.[6] Pet. 13; PO Resp. 4–5.

---

[5] 37 C.F.R. § 42.104(b)(3) requires that a petition contain a statement identifying how a challenged claim is to be construed.

[6] In our Decision instituting trial, we stated that "[i]f either party contends that explicit claim construction is necessary in order to make a final determination whether or not any challenged claim is unpatentable based on the arguments and evidence presented, it should clearly explain why during

We give the term "pixel defining layer" as recited its plain and ordinary meaning.

For purposes of this decision, we determine that no aspects of the challenged claims require explicit construction. *See, e.g.*, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### *D. Petitioner Has Not Shown That the Cited Art Teaches or Suggests All the Elements of Any Challenged Independent Claim*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). A petitioner has "the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). This burden of persuasion never shifts to the patent owner except in limited circumstances not present here. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review). After weighing the evidence with regard to the "pixel defining layer" limitation in

---

trial and provide a clear and unambiguous construction with supporting evidence including specifically identifying the challenges, claims, and limitations to which the construction is necessary." Inst. Dec. 13 n.5.

the challenged claims, we determine that Petitioner has failed to carry its burden as to any challenged claim.

Petitioner challenges independent claims 1, 42, and 45 of the ’578 patent. Pet. 6; Ex. 1001, 9:5–15:34. The remaining challenged claims (claims 2–6, 10, 12, 17–19, 21–23, 40, 41, 43, 44, 46, 47, 51, 52) are dependent claims that depend directly or indirectly from the challenged independent claims. *Id.* Each of challenged independent claims 1, 42, and 45 includes as an element a "pixel defining layer." Ex. 1001, 9:11–12, 13:48–49, 14:45–46. The challenged dependent claims contain this limitation by virtue of their dependency on a claim that includes this limitation. *See* 35 U.S.C. § 112 ¶ 4 (2006) ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

Petitioner fails to establish that the cited art teaches or suggests a "pixel defining layer" as recited. In the Petition, Matthies is relied on for this limitation. Pet. 23–26 (claim 1), 61–62 (claim 42), 64 (claim 45). Petitioner summarizes the section of the Petition discussing this limitation in challenged, independent claim 1 (*id.*) with this sentence: "In sum, a POSITA would have considered the layer including and around Matthies' shaped active areas 324/326 to be the claimed 'pixel defining layer' (annotated and labeled with blue . . . )."[7] *Id.* at 26. For this limitation in challenged independent claims 42 and 45, the Petition explicitly states that Matthies is solely relied on. *See id.* at 62, 64 ("Matthies teaches what these limitations

[7] The parenthetical in this quote refers to the annotated version of Figure 10B of Matthies that is included in the Petition on page 25 and is discussed and reproduced *supra*.

require for the same reasons set forth above.”). And, in discussing motivation to combine the teachings of Matthies and Yamada, Petitioner articulates no reasoning to support modifying Matthies’ structure based on Yamada to yield a “pixel defining layer.” *See* Pet. 69–75.

Patent Owner argues that “[t]he Petition failed to identify any teaching or suggestion in Matthies of a pixel defining layer, because there is none.” PO Resp. 31 (citing Ex. 2009 ¶ 187); *see also* PO Sur-reply 15–17. Petitioner contends that “[a] POSITA would have understood that Matthies employs (or at least could obviously employ) the claimed ***‘pixel defining layer.’***” Pet. 23. An allegation that a skilled artisan would have understood that the prior art “could obviously” be modified to include an element of the claimed invention does not establish that the prior art teaches or suggests such recited element. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (“[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.”).

The alleged teaching of a “pixel defining layer” relied on in the Petition is depicted in an annotated version of Figure 10B of Matthies, reproduced below. *See* Pet. 25.




FIG. 10B

Figure 10B depicts a cut-away view of a tile "which illustrates an exemplary contact structure for a row electrode." Ex. 1004, 4:21–23. According to Petitioner, the annotated version of Figure 10B from Matthies has a "pixel defining layer" that is shown in blue between each of the active areas 324 (yellow) and electrodes 322 (orange).[8] However, this "pixel defining layer" was added by Petitioner to Figure 10B and is not shown or described in Matthies. Petitioner acknowledges that the "pixel defining layer" is "not labeled or shown in this Figure" and attempts to justify annotating Figure 10B in this manner by arguing that "[a] POSITA would have understood that this ***obviously could include***, for instance, an intervening layer of insulation (blue [in annotated Figure 10B]) that surrounds the active areas."[9] Pet. 25 (emphasis added).

In support of this contention regarding what a skilled artisan would have understood from Matthies, the Petition states that "Matthies also explains that various other 'layers' may be present to improve the function or life of the display layers." *Id.* (citing Ex. 1004, 6:37–38). Yet even if this is true, Petitioner fails to articulate how or why adding a "pixel defining layer" to the structure disclosed in Matthies would improve the function or life of the display layers. Petitioner provides no reasoning or explanation as to how or why Matthies' disclosed structure would benefit from the addition

---

[8] Petitioner never explains why the blue-colored annotations added by it to Figure 10B constitute a "layer."

[9] Petitioner acknowledges that the structure depicted in Matthies already contains insulating layer 330 but does not argue that this insulating layer 330 is the claimed "pixel defining layer." Pet. 24 ("The electrodes and active materials are then covered by 'an insulating layer 330' that 'protect the display materials.'").

of a "pixel defining layer" or how or why any potential problem or deficiency in Matthies' disclosed structure is addressed by the addition of a "pixel defining layer."

Figure 10B of Matthies (unaltered) is reproduced below.




FIG. 10B

Figure 10B neither depicts insulation between the active areas nor calls out the same with a reference number. Thus, without Petitioner's annotations, the "pixel defining layer" does not exist. Further, the detailed description of Figure 10B does not describe any component in the spaces where Petitioner has placed the "pixel defining layer" in the annotated version of Figure 10B in the Petition. Ex. 1004, 17:56–18:24. Nor does Petitioner identify anything depicted or described in Matthies that it argues should be considered to be the claimed "pixel defining layer." Pet. 24.

Petitioner argues that the alleged "pixel defining layer" (colored blue in the version of Figure 10B annotated by the Petitioner) "is responsible for defining the shape of, and thus also the **'area'** occupied by, the various sub-pixels making up Matthies' display." Pet. 26. Notwithstanding, Petitioner states in a somewhat contradictory fashion that it is "the 'OLED materials 324 and 326' that 'define the active area of the pixel'" and "the pixels shapes are defined by the intermediate layer of shaped OLED active materials 324 and 326." Pet. 24 (citing Ex. 1004, 12:62–65, 13:1–5, 13:10–14, 13:16–21, 15:67–16:2, Figs. 3, 9); *see also* Pet. Reply 12 ("Matthies teaches pixels that are located in their own layer and have a specific, defined

shape.”). Petitioner does not attempt to reconcile these ideas. Further, the Petition in describing Figure 10B of Matthies also states that “Matthies’ various OLED active areas 324 (yellow [in annotated Figure 10B]) are depicted as existing in their own layer, are physically separated from each other, and have a defined shape.” *Id.* at 25 (citing Fig. 10B). As such, Petitioner fails to provide a coherent explanation to support that adding the alleged “pixel defining layer” to Figure 10B would define the shape and area of the pixels.

Although Petitioner cites additional passages in Matthies in the section of the Petition relating to this limitation, Petitioner does not allege that any of these passages teach or suggests a “pixel defining layer.” *See* Pet. 23–26 (citing Ex. 1004, 5:47–48, 5:56–61, 6:6–7, 6:18–22, 6:37–38, 12:62–65, 13:1–5, 13:10–14, 13:16–21, 15:67–16:2, Figs. 3, 9).

Petitioner asserts that “Matthies employs the same ‘known’ prior art ‘configuration[]’ referenced in the ‘578 patent: in Matthies, ‘[the] basic light emitting structure consists of a thin organic polymer layer’—its ‘pixel forming elements’—sandwiched between a pair of appropriately selected and patterned electrodes.’” Pet. 23 (quoting Ex. 1004, 6:20–22) (bracketed material in original). This is an argument based on inappropriate application of hindsight in light of the disclosure of the ’578 patent, i.e., that a modification should be made to Matthies to include a “pixel defining layer” or that Matthies should be understood as disclosing a “pixel defining layer” because the ’578 patent discloses a “pixel defining layer.” Petitioner does not identify any acknowledgement or admission in the ’578 patent that the inclusion of a “pixel defining layer” was previously known in the art.

In the Petition, Yamada is relied upon only as providing "an example" showing that "[a] POSITA would have understood that [Matthies] obviously could include, for instance, an intervening layer of insulation (blue [in annotated Figure 10B]) that surrounds the active areas." Pet. 25 (citing Ex. 1005, 9:13–35) ("Yamada provides an example of this, explaining that the 'emissive area' of a particular pixel (which includes 'emissive element layer 165') is bounded by a 'planarization insulating film 167.'"). Petitioner also provides an annotated version of Figure 6B of Yamada, reproduced below, that Petitioner alleges discloses a "pixel defining layer." Pet. 26.




Fig. 6B

Figure 6B depicts a "cross-sectional configuration[ ] of one display pixel." Ex. 1005, 6:31–32. Petitioner does not explain, and we do not discern, how or why the planarization insulating film 167 depicted in Figure 6B of Yamada bounds the emissive element layer 165. The emissive element layer 165 comprises three layers (hole transport layer 162, emissive layer 163, and electron transport layer 164) that extend above and beyond the internal boundaries of planarization insulating film 167. Ex. 1005, 10:18–22, Fig. 6B. The labelled "emissive area" in Figure 6B includes only portions of emissive element layer 165 and emissive layer 163. The alleged "pixel

defining layer" in annotated Figure 6B does not bound or define the shape or area of either emissive element layer 165 or emissive layer 163 in Yamada.

And, as mentioned above, Petitioner does not explain how or why the planarization film 167 that is identified by it as the "pixel defining layer" in Yamada is an example that supports adding the alleged "pixel defining layer" in annotated Figure 10B of Matthies. The alleged "pixel defining layer" in annotated Figure 10B of Matthies was placed by Petitioner in contact with, and between, OLED active material 324 (yellow in annotated Figure 10B). The alleged "pixel defining layer" in annotated Figure 6B of Yamada is depicted as below and separated by intervening hole transport layer 162 from emissive layer 163. Petitioner makes no attempt to reconcile these different dispositions. Nor does Petitioner explain how Yamada's single-pixel configuration in Figure 6B (*see* Ex. 1005, 7:19–30) would be applicable to an entire "pixel defining layer" in a manner consistent with Petitioner's conception of Matthies' Figure 10B.

We also find no support for the contention that Yamada teaches a "pixel defining layer" in Petitioner's cited passage in Yamada, which provides:

> After the anodes 161 of the organic EL elements are formed at the respective display pixel regions, the above-mentioned organic compound materials, which differ for R, G, and B, are used next to form the emissive element layer 165 for R, G, and B. For the organic EL elements, the materials used in the emissive element layer have a relatively high resistance and the emissive region is limited to the region that is sandwiched between the anode and cathode layers in the emissive element layer. Therefore, the emissive element layer may be the same as the anode formation region or larger than the anode formation region. However, to prevent a short circuit at the anode end between the anode and cathode formed on the

> emissive element layer, the emissive element layer for R, G, and B in the present embodiment shown in FIG. 6A are set to be larger than the respective anode area so as to cover the anode. Of course, if another countermeasure is adopted so that a short circuit does not occur between the anode and cathode (for example, forming the **planarization insulating film 167** as shown in FIG. 6B to be described later), it is not absolutely necessary for the emissive element layer 165 to be larger than the anode.

Ex. 1005, 9:13–35 (emphasis added). Petitioner does not explain how or why this passage supports its contention that planarization insulating film 167 of Yamada provides an example of a "pixel defining layer" that could be included in Figure 10B of Matthies. According to the cited passage of Yamada, the function of planarization insulating film 167 is to prevent a short circuit between the anode and cathode not to bound or define the area or shape of the pixel. We determine that Petitioner has failed to establish that Yamada teaches or suggests a "pixel defining layer."

Moreover, even assuming that Petitioner intends to rely on a combination of the teachings of Matthies and Yamada for the "pixel defining layer" limitation, Petitioner fails to articulate any reasoning why a skilled artisan would have been motivated to combine the teachings of Matthies and Yamada related to the "pixel defining layer" limitation.

Patent Owner argues that Matthies does not teach or suggest a "pixel defining layer" and that the annotated Figure 10B in the Petition is misleading. PO Resp. 31. The Patent Owner's Response states, "Matthies' tiled displays do not include a pixel defining layer, and there is no reason Petitioner's proposed combination of Matthies and Yamada would" and "[t]he Petition failed to identify any teaching or suggestion in Matthies of a pixel defining layer, because there is none." *Id.* (citing Ex. 2009 ¶¶ 187–

189); *see also* PO Sur-reply 16 ("Petitioner has not identified *any* disclosure of a [pixel defining layer] in Matthies—because no such disclosure exits [sic]."). For the reasons discussed above, we agree with Patent Owner.

With regard to motivation to modify Matthies as depicted in the annotated version of Figure 10B in the Petition, Patent Owner's Response states:

> A POSITA would have had no motivation to modify Matthies' display tile to attempt to add a pixel defining layer. Ex. 2009, ¶188. The Petition failed to identify any reason why a POSITA would add a pixel defining layer to Matthies. It did not even attempt to show that a POSITA would have a reasonable expectation of success. Petitioner merely speculated that a POSITA "could" have added a pixel defining layer. Pet. at 25. Such speculation is insufficient to prove the claims obvious due to the lack of motivation to make such changes. *See Adidas [AG v. Nike, Inc.]*, 963 F.3d [1355,] 1359 [(Fed. Cir. 2020)].

PO Resp. 32; *see also* PO Sur-reply 16 ("The Petition did not argue a POSITA would *add* a [pixel defining layer] to Matthies display, nor offer any motivation for a POSITA to have done so."). We agree with Patent Owner that Petitioner provides an inadequate evidentiary basis for modifying Matthies' tile as depicted in annotated Figure 10B in the Petition or otherwise for modifying or interpreting the disclosure of Matthies to include a teaching or suggestion of a "pixel defining layer." And, as noted previously, in discussing motivation to combine the teachings of Matthies and Yamada, Petitioner articulates no reasoning to support combining the teachings of these references related to a "pixel defining layer." *See* Pet. 69–75.

There is an insufficient evidentiary basis provided by Petitioner to support a finding that the cited art teaches or suggests a "pixel defining layer" as recited in the challenged claims of the '587 patent. The Petition has the following critical deficiencies: (1) Petitioner fails to establish that Matthies teaches or suggests a "pixel defining layer;" (2) Petitioner fails to establish that Yamada teaches or suggests a "pixel defining layer;" and (3) Petitioner fails to articulate any rationale for combining the alleged teachings of a "pixel defining layer" in Matthies and Yamada.

Accordingly, the prior art has not been shown to teach or suggest every limitation of any challenged claim. We determine that Petitioner's unpatentability challenges to the claims of the '587 patent are fatally deficient.[10]

[10] Petitioner filed three pending motions: Petitioner's Motion to Strike (Paper 24); Petitioner's Second Motion to Strike (Paper 33); and Petitioner's Motion to Exclude (Paper 39). These Motions do not relate at all to our consideration of whether Petitioner has established that the prior art teaches or suggests a "pixel defining layer" or otherwise relate to our analysis and this Decision. These Motions are moot and we determine that we need not consider or decide these Motions.

## III. CONCLUSION

After considering the evidence and arguments presented, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–6, 10, 12, 17–19, 21–23, 40–47, 51, and 52 are unpatentable. A summary of our conclusions is set forth in the table below.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–6, 10, 12, 17–19, 21–23, 41, 42, 44, 47, 52 | 103 | Matthies, Yamada | | 1–6, 10, 12, 17–19, 21–23, 41, 42, 44, 47, 52 |
| 40, 43, 45–47, 51, 52 | 103 | Matthies, Yamada, Hong | | 40, 43, 45–47, 51, 52 |
| **Overall Outcome** | | | | 1–6, 10, 12, 17–19, 21–23, 40–47, 51, 52 |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–6, 10, 12, 17–19, 21–23, 40–47, 51, and 52 of the U.S. Patent No. 11,594,578 B2 are not determined to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

K. Patrick Herman
Richard F. Martinelli
Xiang Wang
ORRICK, HERRINGTON & SUTCLIFFE LLP
p52ptabdocket@orrick.com
rfmptabdocket@orrrick.com
xw0ptabdocket@orrick.com

PATENT OWNER:

David A. Garr
Scott C. Weidenfeller
COVINGTON & BURLING LLP
dgarr@cov.com
sweidenfeller@cov.com

US009818803B2

(12) **United States Patent**
**Lee**

(10) **Patent No.:** **US 9,818,803 B2**
(45) **Date of Patent:** **Nov. 14, 2017**

(54) **PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE**


(75) Inventor: **Sang-Shin Lee**, Yongin-si (KR)

(73) Assignee: **Samsung Display Co., Ltd.**, Yongin-si (KR)


(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.


(21) Appl. No.: **13/614,197**

(22) Filed: **Sep. 13, 2012**

(65) **Prior Publication Data**

US 2013/0234917 A1 Sep. 12, 2013

(30) **Foreign Application Priority Data**

Mar. 6, 2012 (KR) ........................ 10-2012-0022967

(51) **Int. Cl.**
***G09G 3/32*** (2016.01)
***H01L 27/32*** (2006.01)

(52) **U.S. Cl.**
CPC ...... ***H01L 27/3216*** (2013.01); ***H01L 27/3218*** (2013.01)

(58) **Field of Classification Search**
USPC .................................................... 345/82, 419
See application file for complete search history.


(56) **References Cited**


U.S. PATENT DOCUMENTS

6,366,025 B1 4/2002 Yamada
6,867,549 B2* 3/2005 Cok et al. .................. 315/169.3
6,882,364 B1 4/2005 Inuiya et al.
7,274,383 B1* 9/2007 Brown Elliot ................ 345/694
8,026,669 B2* 9/2011 Kawasaki et al. ......... 315/169.3
8,330,352 B2* 12/2012 Sung et al. ................... 313/504
8,350,468 B2* 1/2013 Ko et al. ........................ 313/506
8,354,789 B2* 1/2013 Kim .................... H01L 27/3218 313/504
2002/0015110 A1 2/2002 Brown Elliott
2002/0070909 A1 6/2002 Asano et al.
2002/0113195 A1* 8/2002 Osada ........................ 250/208.1
2003/0128179 A1* 7/2003 Credelle ........... G02F 1/133514 345/88
2004/0108818 A1 6/2004 Cok et al.
2004/0183764 A1 9/2004 Kim et al.

(Continued)

FOREIGN PATENT DOCUMENTS

GB 2 437 110 A 10/2007
JP 10-39791 2/1998

(Continued)

OTHER PUBLICATIONS

EPO Search Report dated Jul. 8, 2013, for corresponding European Patent application 13157562.3, (6 pages).

(Continued)


*Primary Examiner* — Kwang-Su Yang
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**


A pixel arrangement structure of an OLED display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.


**21 Claims, 5 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2005/0001542 | A1 | 1/2005 | Kiguchi | |
| 2005/0162079 | A1 | 7/2005 | Sakamoto | |
| 2006/0152531 | A1* | 7/2006 | Lin | G09G 3/3225 345/613 |
| 2008/0001525 | A1 | 1/2008 | Chao et al. | |
| 2008/0001527 | A1 | 1/2008 | Koo et al. | |
| 2008/0273793 | A1 | 11/2008 | Oishi | |
| 2008/0308819 | A1 | 12/2008 | Louwsma et al. | |
| 2009/0302331 | A1* | 12/2009 | Smith et al. | 257/88 |
| 2010/0033084 | A1 | 2/2010 | Ko et al. | |
| 2010/0133994 | A1* | 6/2010 | Song | H01L 27/3211 313/504 |
| 2010/0171440 | A1* | 7/2010 | Satou et al. | 315/294 |
| 2011/0012820 | A1* | 1/2011 | Kim et al. | 345/82 |
| 2011/0291550 | A1 | 12/2011 | Kim et al. | |
| 2012/0056531 | A1 | 3/2012 | Park et al. | |
| 2012/0086330 | A1 | 4/2012 | Umeda et al. | |
| 2012/0287605 | A1* | 11/2012 | Chen | H01L 27/322 362/97.1 |
| 2012/0313844 | A1 | 12/2012 | Im et al. | |
| 2012/0319564 | A1* | 12/2012 | Ghosh et al. | 313/500 |
| 2013/0037827 | A1 | 2/2013 | Levermore et al. | |
| 2013/0127689 | A1* | 5/2013 | Gollier | G02F 1/133504 345/32 |
| 2015/0192834 | A1 | 7/2015 | Morinaga et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2000-235891 | 8/2000 |
| JP | 2004-507773 | 3/2004 |
| JP | 2004-192813 | 7/2004 |
| JP | 2006-309182 | 11/2006 |
| JP | 2008-015521 | 1/2008 |
| JP | 2011-076760 | 4/2011 |
| KR | 10-0742370 B1 | 7/2007 |
| KR | 10-0807524 | 2/2008 |
| KR | 10-2008-0111130 | 12/2008 |
| KR | 10-2009-0017910 | 2/2009 |
| KR | 10-2011-0023996 | 3/2011 |
| KR | 10-2011-0106565 | 9/2011 |
| KR | 10-2011-0129531 | 12/2011 |
| KR | 10-2012-0022967 | 3/2012 |
| TW | I328207 | 8/2010 |
| WO | WO 2004/073356 A1 | 8/2004 |
| WO | WO 2005/067352 A1 | 7/2005 |

OTHER PUBLICATIONS

Korean Patent Abstracts, Publication No. 1020030031207A, dated Apr. 21, 2003 for corresponding Korean Patent 10-0807524 listed above.

EPO Search Report dated Jul. 9, 2014, for European Patent application 14155124.2, (8 pages).

*Korean Patent Abstracts for Korean Publication 1020070055908 dated May 31, 2007, to Korean Patent 10-0742370 dated Jul. 24, 2007, listed above.

EPO Search Report dated Dec. 20, 2013 for European Patent application 13178648.5, (9 pages).

U.S. Office action dated Aug. 29, 2014, for cross reference U.S. Appl. No. 14/059,356, (18 pages).

SIPO Office action dated Mar. 11, 2015, for corresponding Chinese Patent application 201310035429.X, (7 pages).

Taiwan Office action dated Mar. 30, 2015, for corresponding Taiwanese Patent application 102101000, (7 pages).

U.S. Office action dated Jun. 30, 2015, for cross reference U.S. Appl. No. 13/872,018, (22 pages).

U.S. Office action dated Feb. 29, 2016, for cross reference U.S. Appl. No. 13/872,018, (15 pages).

U.S. Office action dated Oct. 16, 2015, for cross reference U.S. Appl. No. 13/872,018, (16 pages).

KIPO Office action dated Jul. 11, 2016, with English translation, for corresponding Korean Patent application 10-2016-0047800, (11 pages).

U.S. Office Action dated Sep. 2, 2016 for U.S. Appl. No. 13/872,018 (15 sheets).

U.S. Office action dated Aug. 5, 2016, for related U.S. Appl. No. 15/090,591 (11 pages).

English Abstract of TW 2008-02221 A, also published as TW I328207, listed above.

TIPO Office Action dated Oct. 11, 2016, for corresponding Taiwanese Patent Application No. 102124953 (6 pages).

U.S. Office Action dated May 11, 2017, issued in cross-reference U.S. Appl. No. 13/872,018 (16 pages).

* cited by examiner

FIG.1





Petitioner Ex 1001, p. 3
BOE et al. v. Samsung, IPR2023-00987

FIG.2





Petitioner Ex 1001, p. 4
BOE et al. v. Samsung, IPR2023-00987

FIG.3






Petitioner Ex 1001, p. 5
BOE et al. v. Samsung, IPR2023-00987

FIG.4





Petitioner Ex 1001, p. 6
BOE et al. v. Samsung, IPR2023-00987

FIG.5



# PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application claims priority to and the benefit of Korean Patent Application No. 10-2012-0022967, filed in the Korean Intellectual Property Office on Mar. 6, 2012, the entire content of which is incorporated herein by reference.

## BACKGROUND

1. Field

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an organic light emitting diode (OLED) display.

2. Description of the Related Art

A display device is a device that displays an image. Recently, an OLED display has been drawing attention. The OLED display has a self-luminous characteristic. Because the OLED display does not need a separate light source, unlike a liquid crystal display, it can have a relatively smaller thickness and weight than liquid crystal displays. In addition, the OLED display exhibits high-quality characteristics such as low power consumption, high luminance, high response speed, etc.

In general, the OLED display includes a plurality of pixels for emitting light of different colors. The plurality of pixels emit light to display an image. Here, the pixel refers to a minimum unit for displaying the images. For instance, there may be a gate line, a data line, and a power line such as a driving power line to drive each pixel. In addition, there may be an insulation layer such as a pixel definition layer to define an area and a shape of each pixel. Further, each pixel may be positioned between its neighboring pixels.

An organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM). When reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated. On the other hand, when increasing the gap between the pixels to improve the deposition reliability, the aperture ratio of the pixel may be deteriorated.

The above information disclosed in this Background section is only for enhancement of understanding of the background of the invention. Therefore, it may contain information that does not form the prior art that is already known in this country to a person of ordinary skill in the art.

## SUMMARY

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an OLED display. More particularly, aspects relate to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels. An exemplary embodiment of the present invention provides a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels.

According to an exemplary embodiment of the present invention, a pixel arrangement structure of an organic light emitting diode display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

The second pixel may include a pair of second pixels. The second pixels may be separated from each other by the first pixel.

The third pixel may include a pair of third pixels. The third pixels may be separated from each other by the first pixel.

The second pixels and the third pixels may enclose the first pixel in the virtual square.

The first pixel, the second pixels, and the third pixels may have polygonal shapes. The second pixels and the third pixels may have a larger area than the first pixel.

The first pixel may have a quadrilateral shape. The second pixels and the third pixels may have hexagonal or octagonal shapes.

The second pixels and the third pixels may have octagonal shapes.

The second pixels and the third pixels may have a same area. A distance between the first pixel and the second pixels, a distance between the first pixel and the third pixels, and a distance between the second pixels and the third pixels may be a same first length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a second length that is longer than the first length.

The second pixels may have a larger area than the third pixels. A distance between the second pixels and the third pixels may be a first length. A distance between the first pixel and the second pixels, and a distance between the first pixel and the third pixels may be a same second length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other. A distance between the neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other.

The second pixels may have a larger area than the third pixels.

The third pixels may have a larger area than the second pixels.

The first pixel, the second pixel, and the third pixel may be configured to emit different color lights.

The first pixel, the second pixel, and the third pixel may be configured to emit green light, blue light, and red light, respectively.

According to an exemplary embodiment of the present invention, the pixel arrangement structure of the OLED display improves the aperture ratio of the pixel while efficiently setting up the gap between the pixels.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a view of a pixel arrangement structure of an OLED display according to a first exemplary embodiment.

FIG. **2** is a view of a pixel arrangement structure of an OLED display according to a second exemplary embodiment.

FIG. **3** is a view of a pixel arrangement structure of an OLED display according to a third exemplary embodiment.

FIG. **4** is a view of a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment.

FIG. **5** is a view of a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment.

## DETAILED DESCRIPTION

Several exemplary embodiments according to the present invention are described hereinafter in detail with reference to the accompanying drawings to allow one of a person of ordinary skill in the art to practice the invention without undue experimentation. The present invention can be embodied in several different forms, and is not limited to exemplary embodiments that are described herein.

In order to clarify the description of embodiments of the present invention, parts that are not related to the embodiments may be omitted. In addition, the same elements or equivalents are referred to with the same reference numerals throughout the specification. For example, the same reference numerals are used for the elements having the same constructions throughout. Such elements are representatively described in a first exemplary embodiment, and in remaining exemplary embodiments, only different constructions from those of the first exemplary embodiment may be described.

Further, since sizes and thicknesses of constituent members shown in the accompanying drawings are arbitrarily given for better understanding and ease of description, the present invention is not limited to the illustrated sizes and thicknesses. In addition, unless explicitly described to the contrary, the word "comprise" and variations such as "comprises" or "comprising" will be understood to imply the inclusion of stated elements but not the exclusion of any other elements.

Nevertheless, even though each of the pixels are drawn as stereotypical polygonal shapes in the drawings, the present invention is not limited to this shape. That is, the shapes of the pixels may be modified to avoid interference with the other components of the OLED (e.g., wirings) within the spirit and scope of the appended claims.

A pixel arrangement structure (or pixel arrangement) of an OLED display according to a first exemplary embodiment will be described with reference to FIG. **1**. FIG. **1** is a view schematically showing a portion of pixels forming an OLED display.

As shown in FIG. **1**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Here, the pixel refers to a minimum unit for displaying an image (for example, the minimum addressable unit of the display).

Further, among the first pixels **100**, the second pixels **200**, and the third pixels **300**, power lines for driving each of the pixels, such as a gate line, a data line, a driving power line, and the like, may be located. In addition, an insulation layer, such as a pixel defining layer, for defining each of the pixels may be disposed. Finally, an OLED including an anode, an organic emission layer, and a cathode to correspond to each of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be disposed. These configurations are technologies known in the art and further description thereof is omitted for ease of description. A shape of each of the pixels may be defined by the power lines, the pixel defining layer, the anode, or the like, but is not limited thereto.

In the pixel arrangement of FIG. **1**, each of the first pixels **100** has a smaller area than neighboring second pixels **200** and third pixels **300**, and has a quadrilateral (i.e., four-sided) shape among polygon shapes. For example, in the pixel arrangement of FIG. **1**, each of the first pixels **100** has the same quadrilateral shape (e.g., a square or rhombus). The first pixels **100** are spaced apart from each other and arranged in rows, such as along a first virtual straight line VL**1**. The first pixels **100** emit green light, and may include an organic emission layer for emitting green light.

The second pixels **200** are arranged diagonally with respect to the first pixels **100**, such as at first vertices P**1** along one diagonal of a virtual square VS having one of the first pixels **100** as a center point (or center) of the virtual square VS. In a similar fashion, the third pixels **300** are arranged diagonally with respect to the first pixels **100**, such as at second vertices P**2** along the other diagonal of the virtual square VS.

In the virtual square VS, each of the second pixels **200** is separated from the first pixel **100**, and is centered at one of the first vertices P**1** of the virtual square VS. Each of the second pixels **200** has a larger area than the neighboring first pixel **100** and has an octagonal (i.e., eight-sided) shape. In FIG. **1**, the second pixels **200** each have the same octagonal shape. In addition, the second pixels **200** are arranged diagonally and separated from each other by the first pixels **100**. The second pixels **200** emit blue light, and may include an organic emission layer for emitting blue light.

In a similar fashion, in the virtual square VS, each of the third pixels **300** is separated from the first pixel **100** and the second pixels **200**, and is centered at one of the second vertices P**2** neighboring the first vertices P**1** of the virtual square VS. Each of the third pixels **300** has a larger area than the neighboring first pixel **100** and the same area as each of the second pixels **200**. Further, the third pixels have an octagonal shape (e.g., similar to or the same as the second pixels **200**). In FIG. **1**, the third pixels **300** each have the same octagonal shape. In addition, the third pixels **300** are arranged diagonally and separated from each other by the first pixels **100**. The third pixels **300** emit red light, and may include an organic emission layer for emitting red light.

The third pixels **300** and the second pixels **200** are spaced apart from each other and alternately arranged in rows, such as along a second virtual straight line VL**2**. In a similar fashion, the third pixels **300** and the second pixels **200** are spaced apart from each other and alternately arranged in columns. Accordingly, in the virtual square VS, two of the second pixels **200** having their corresponding centers positioned at the first vertices P**1** and two of the third pixels **300** having their corresponding centers positioned at the second vertices P**2** to enclose a corresponding one of the first pixels **100** (e.g., in the virtual square VS).

As described above, the center of each of the second pixels **200** is positioned at one of the first vertices P**1** of the virtual square VS. In addition, the center of the corresponding first pixel **100** is the center of the virtual square VS. Further, the center of each of the third pixels **300** is positioned at one of the second vertices P**2**. Moreover, the second pixels **200** and the third pixels **300** each have the same area.

As a non-limiting example, the distance (e.g., a shortest distance) between one of the first pixels **100** and an adjacent one of the second pixels **200** is a first length L**1**, the distance between one of the first pixels **100** and an adjacent one of the

third pixels **300** is the same first length L**1**, and the distance between one of the second pixels **200** and an adjacent one of the third pixels **300** is the same first length L**1**, as shown in FIG. **1**. In addition, the distance (e.g., a shortest distance) between the neighboring first pixels **100** is a second length L**2** that is longer than the first length L**1**. It should be noted that L**1**, L**2**, L**3**, . . . may be used throughout to represent shortest distances between corresponding pixels.

Therefore, the gap of the first length L**1** is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, between adjacent pairs of the first pixels **100** and the third pixels **300**, and between adjacent pairs of the second pixels **200** and the third pixels **300**. In addition, the gap of the second length L**2** that is longer than the first length L**1** is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, a manufacturing time and manufacturing cost of the entire OLED display may be reduced and the display quality of the image of the OLED display may be improved.

As described above, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** have polygonal shapes (e.g., the first pixels have a quadrilateral shape and the second pixels **200** and the third pixels **300** have an octagonal shape). In addition, it is worth considering that the deposition process of the organic emission layer is one of the unique manufacturing characteristics of the OLED display. Accordingly, to improve the deposition reliability of the organic emission layer in the deposition process using the fine metal mask and to improve the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300**, the center of each of the first pixels **100** is positioned at the center of a virtual square VS formed by a first pair of diagonal vertices P**1** and a second pair of diagonal vertices P**2**. In the virtual square VS, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1**, and the centers of a pair of the third pixels **300** are positioned at the second vertices P**2**.

In addition, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** respectively emit green, blue, and red light. However, in pixel arrangement structures of other OLED displays, the first pixels **100**, the second pixels **200**, and the third pixels **300** may emit light of different colors. For example, at least one of the second pixels **200** or the third pixels may emit white light.

Next, a pixel arrangement structure of an OLED display according to a second exemplary embodiment will be described with reference to FIG. **2**. Parts that are different from the exemplary embodiment of FIG. **1** will be described, while the description of parts that are equivalent to the first exemplary embodiment may be omitted. For better comprehension and ease of description, constituent elements of the second exemplary embodiment that are the same as or similar to those of the first embodiment of FIG. **1** will have the same reference numerals.

As shown in FIG. **2**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. The plurality of first pixels **100** have the same quadrilateral shape (e.g., a parallelogram). In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels **300** may have polygonal shapes, such as octagonal or hexagonal (i.e., six-sided).

In a similar fashion to that of FIG. **1**, the centers of a pair of the second pixels **200** are positioned at first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **2**, the second pixels **200** have a larger area than the third pixels **300**.

As a non-limiting example, the distance between adjacent ones of the second pixels **200** and the third pixels **300** is a third length L**3**, while the distance between each of the first pixels **100** and adjacent ones of the second pixels **200** or the third pixels **300** have a same fourth length L**4**. In addition, the distance between neighboring ones of the first pixels **100** is a fifth length L**5** that is longer than the third length L**3** and the fourth length L**4**.

Accordingly, the gap of the fourth length L**4** is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, and between adjacent pairs of the first pixels **100** and the third pixels **300**. In addition, the gap of the third length L**3** is formed between adjacent pairs of the second pixels **200** and the third pixels **300**. Further, the gap of the fifth length L**5** that is longer than the third length L**3** and the fourth length L**4** is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. **2**, the second pixels **200** that emit blue have the shortest life span among the first pixels **100**, the second pixels **200**, and the third pixels **300**. Accordingly, the second pixels **200** have a larger area than the third pixels **300**, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display of FIG. **2** provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a third exemplary embodiment will be described with reference to FIG. **3**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the third exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **3**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring first pixels **100** have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the second pixels **200** have a larger area than the third pixels

300. The second pixels 200 and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. 1-2, the centers of a pair of the second pixels 200 are positioned at first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 3, the neighboring first pixels 100 have a quadrilateral shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by placing each of the first pixels 100 between a pair of the second pixels 200 and between a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. 3, the second pixels 200 that emit blue have the shortest life span among the first pixels 100, the second pixels 200, and the third pixels 300. Accordingly, the second pixels 200 have a larger area than the third pixels 300, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment will be described with reference to FIG. 4. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fourth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 4, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the third pixels 300 have a larger area than the second pixels 200. The second pixels 200 and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. 1-3, the centers of a pair of the second pixels 200 are positioned at the first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 4, the neighboring first pixels 100 have a quadrilateral shape and are symmetrical to each other, while the third pixels 300 have a larger area than the second pixels 200. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Next, a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment will be described with reference to FIG. 5. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fifth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. 5, the pixel arrangement structure of the OLED display includes a plurality of first pixels 100, a plurality of second pixels 200, and a plurality of third pixels 300. Among the plurality of first pixels 100, the neighboring first pixels 100 have a octagonal shape and are symmetrical to each other. In addition, the second pixels 200 have a larger area than the third pixels 300. The second pixels 200 and the third pixels 300 may have quadrilateral shapes (e.g., rhombus).

In a similar fashion to that of FIGS. 1-3, the centers of a pair of the second pixels 200 are positioned at the first vertices P1 along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels 100. In addition, the centers of a pair of the third pixels 300 are positioned at second vertices P2 along another diagonal of the virtual square VS. However, in FIG. 5, the neighboring first pixels 100 have a octagonal shape and are symmetrical to each other, while the second pixels 200 have a larger area than the third pixels 300. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels 100, the second pixels 200, and the third pixels 300.

In addition, by enclosing each of the first pixels 100 by a pair of the second pixels 200 and a pair of the third pixels 300, the aperture ratio of the first pixels 100, the second pixels 200, and the third pixels 300 may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

While this invention has been described in connection with what is presently considered to be practical exemplary embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, and equivalents thereof.

DESCRIPTION OF SOME SYMBOLS

first pixels 100, second pixels 200, third pixels 300

What is claimed is:

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:
- a plurality of pixels for displaying an image on the OLED display and comprising:
  - a first pixel having a center coinciding with a center of a virtual square;
  - a second pixel separated from the first pixel and having a center at a first vertex of the virtual square;
  - another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the

second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels; and

a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square,

wherein the second pixel has a larger area than that of the third pixel, and

wherein the first pixel is configured to emit green light.

**2**. The pixel arrangement structure of claim **1**,

wherein the plurality of pixels further comprises another second pixel separated from the first pixel and having a center at a third vertex neighboring the second vertex of the virtual square, and

wherein the second pixels are separated from each other by the first pixel.

**3**. The pixel arrangement structure of claim **2**,

wherein the plurality of pixels further comprises another third pixel separated from the first pixel and having a center at a fourth vertex neighboring the third vertex of the virtual square, and

wherein the third pixels are separated from each other by the first pixel.

**4**. The pixel arrangement structure of claim **3**, wherein the second pixels and the third pixels enclose the first pixel in the virtual square.

**5**. The pixel arrangement structure of claim **4**, wherein

the first pixel, the second pixels, and the third pixels have polygonal shapes, and

each of the second pixels and each of the third pixels has a larger area than the first pixel.

**6**. The pixel arrangement structure of claim **5**, wherein

the first pixel has a quadrilateral shape, and

the second pixels and the third pixels have hexagonal or octagonal shapes.

**7**. The pixel arrangement structure of claim **6**, wherein the second pixels and the third pixels have octagonal shapes.

**8**. The pixel arrangement structure of claim **7**, wherein a shortest distance between the first pixel and corresponding ones of the second pixels, a shortest distance between the first pixel and corresponding ones of the third pixels, and a shortest distance between each of the second pixels and corresponding ones of the third pixels are a same first length.

**9**. The pixel arrangement structure of claim **8**, wherein

the first pixel comprises a plurality of first pixels,

the plurality of first pixels have a same quadrilateral shape, and

a shortest distance between neighboring pixels of the plurality of first pixels is a second length that is longer than the first length.

**10**. The pixel arrangement structure of claim **6**, wherein

each of the second pixels has a larger area than each of the third pixels,

a shortest distance between each of the second pixels and corresponding ones of the third pixels is a same first length, and

a shortest distance between the first pixel and corresponding ones of the second pixels, and a shortest distance between the first pixel and corresponding ones of the third pixels are a same second length.

**11**. The pixel arrangement structure of claim **10**, wherein

the first pixel comprises a plurality of first pixels,

the plurality of first pixels have a same quadrilateral shape, and

a shortest distance between neighboring pixels of the plurality of first pixels is a third length that is longer than the first length and the second length.

**12**. The pixel arrangement structure of claim **10**, wherein

the first pixel comprises a plurality of first pixels,

neighboring pixels of the plurality of first pixels have quadrilateral shapes that are symmetrical to each other, and

a shortest distance between the neighboring pixels of the plurality of first pixels is a third length that is longer than the first length and the second length.

**13**. The pixel arrangement structure of claim **6**, wherein

the first pixel comprises a plurality of first pixels, and

neighboring pixels of the plurality of first pixels have quadrilateral shapes that are symmetrical to each other.

**14**. The pixel arrangement structure of claim **13**, wherein each of the second pixels has a larger area than each of the third pixels.

**15**. The pixel arrangement structure of claim **5**, wherein

the first pixel has an octagonal shape, and

the second pixels and the third pixels have quadrilateral shapes.

**16**. The pixel arrangement structure of claim **15**, wherein

each of the second pixels has a larger area than each of the third pixels,

a shortest distance between each of the second pixels and each of the third pixels is a same first length, and

a shortest distance between the first pixel and each of the second pixels, and a shortest distance between the first pixel and each of the third pixels are a same second length.

**17**. The pixel arrangement structure of claim **16**, wherein

the first pixel comprises a plurality of first pixels, and

neighboring pixels of the plurality of first pixels have octagonal shapes that are symmetrical to each other.

**18**. The pixel arrangement structure of claim **17**, wherein a shortest distance between the neighboring pixels of the plurality of first pixels is a third length that is longer than the first length and the second length.

**19**. The pixel arrangement structure of claim **1**, wherein the first pixel, the second pixel, and the third pixel are configured to emit different color lights.

**20**. The pixel arrangement structure of claim **19**, wherein the second pixel and the third pixel are configured to emit blue light and red light, respectively.

**21**. The pixel arrangement structure of claim **1**, wherein the second pixel has a larger area than that of the first pixel.

* * * * *

US010854683B2

(12) **United States Patent**
**Lee**

(10) **Patent No.: US 10,854,683 B2**
(45) **Date of Patent: Dec. 1, 2020**

(54) **PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE**


(71) Applicant: **Samsung Display Co., Ltd.**, Yongin-si, Gyeonggi-do (KR)

(72) Inventor: **Sang-Shin Lee**, Yongin-si (KR)

(73) Assignee: **Samsung Display Co., Ltd.**, Yongin-si (KR)



( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/811,599**

(22) Filed: **Nov. 13, 2017**

(65) **Prior Publication Data**

US 2018/0069057 A1 Mar. 8, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 13/614,197, filed on Sep. 13, 2012, now Pat. No. 9,818,803.

(30) **Foreign Application Priority Data**

Mar. 6, 2012 (KR) ........................ 10-2012-0022967

(51) **Int. Cl.**
***G09G 3/32*** (2016.01)
***H01L 27/32*** (2006.01)

(52) **U.S. Cl.**
CPC ...... ***H01L 27/3216*** (2013.01); ***H01L 27/3218*** (2013.01)

(58) **Field of Classification Search**
CPC ........................ H01L 27/3218; H01L 27/3216
USPC .................................................... 345/82, 419
See application file for complete search history.



(56) **References Cited**

U.S. PATENT DOCUMENTS

4,642,619 A 2/1987 Togashi
6,366,025 B1 4/2002 Yamada
6,867,549 B2 3/2005 Cok et al.
6,882,364 B1 4/2005 Inuiya et al.
7,110,031 B2 9/2006 Kondo et al.
7,274,383 B1 9/2007 Brown Elliot
7,710,484 B2 5/2010 Oda
7,982,786 B2 7/2011 Nishida et al.
8,026,669 B2 9/2011 Kawasaki et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN 101009304 A 8/2007
CN 101449382 A 6/2009
(Continued)

OTHER PUBLICATIONS

U.S. Office Action dated Mar. 19, 2018, issued in U.S. Appl. No. 15/688,760 (13 pages).
(Continued)


*Primary Examiner* — Kwang-Su Yang
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP

(57) **ABSTRACT**


A pixel arrangement structure of an OLED display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.


**15 Claims, 5 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,330,352 | B2 | 12/2012 | Sung et al. |
| 8,350,468 | B2 | 1/2013 | Ko et al. |
| 8,354,789 | B2 | 1/2013 | Kim et al. |
| 9,431,469 | B2 | 8/2016 | Park et al. |
| 9,837,476 | B2 | 12/2017 | Park et al. |
| 2002/0015110 | A1 | 2/2002 | Brown Elliott |
| 2002/0070909 | A1 | 6/2002 | Asano et al. |
| 2002/0113195 | A1 | 8/2002 | Osada |
| 2002/0140833 | A1* | 10/2002 | Hirai ..................... G06T 3/4007 348/280 |
| 2003/0128179 | A1 | 7/2003 | Credelle |
| 2003/0128225 | A1 | 7/2003 | Credelle et al. |
| 2004/0108818 | A1 | 6/2004 | Cok et al. |
| 2004/0183764 | A1 | 9/2004 | Kim et al. |
| 2004/0246426 | A1* | 12/2004 | Wang ................ G02F 1/133514 349/146 |
| 2005/0001542 | A1 | 1/2005 | Kiguchi |
| 2005/0162079 | A1 | 7/2005 | Sakamoto |
| 2006/0152531 | A1 | 7/2006 | Lin et al. |
| 2008/0001525 | A1 | 1/2008 | Chao et al. |
| 2008/0001527 | A1 | 1/2008 | Koo et al. |
| 2008/0273793 | A1 | 11/2008 | Oishi |
| 2008/0308819 | A1 | 12/2008 | Louwsma et al. |
| 2009/0302331 | A1 | 12/2009 | Smith et al. |
| 2010/0033084 | A1 | 2/2010 | Ko et al. |
| 2010/0117528 | A1 | 5/2010 | Fukuda |
| 2010/0133994 | A1 | 6/2010 | Song et al. |
| 2010/0171440 | A1 | 7/2010 | Satou et al. |
| 2011/0012820 | A1 | 1/2011 | Kim et al. |
| 2011/0291549 | A1* | 12/2011 | Kim .................... H01L 27/3218 313/504 |
| 2011/0291550 | A1 | 12/2011 | Kim et al. |
| 2012/0049726 | A1 | 3/2012 | Yoo et al. |
| 2012/0056531 | A1 | 3/2012 | Park et al. |
| 2012/0086330 | A1 | 4/2012 | Umeda et al. |
| 2012/0287605 | A1 | 11/2012 | Chen et al. |
| 2012/0313844 | A1 | 12/2012 | Im et al. |
| 2012/0319564 | A1 | 12/2012 | Ghosh et al. |
| 2013/0002911 | A1* | 1/2013 | Miyashita .......... H04N 5/23212 348/247 |
| 2013/0037827 | A1 | 2/2013 | Levermore et al. |
| 2013/0057521 | A1* | 3/2013 | Kim .................... H01L 27/3216 345/204 |
| 2013/0106891 | A1 | 5/2013 | Matsueda et al. |
| 2013/0127689 | A1 | 5/2013 | Gollier |
| 2015/0192834 | A1 | 7/2015 | Morinaga et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 103311266 | A | 9/2013 |
| CN | 203260586 | U | 10/2013 |
| CN | 105206647 | A | 12/2015 |
| EP | 2 637 209 | A1 | 9/2013 |
| GB | 2 437 110 | A | 10/2007 |
| JP | 3-36239 | | 5/1991 |
| JP | 10-39791 | | 2/1998 |
| JP | 2000-235891 | | 8/2000 |
| JP | 2003-203770 | A | 7/2003 |
| JP | 2004-507773 | | 3/2004 |
| JP | 2004-179028 | A | 6/2004 |
| JP | 2004-192813 | | 7/2004 |
| JP | 2005-5227 | A | 1/2005 |
| JP | 2006-18195 | A | 1/2006 |
| JP | 2006-309182 | | 11/2006 |
| JP | 2007-156126 | A | 6/2007 |
| JP | 2008-015521 | | 1/2008 |
| JP | 2008-300367 | | 12/2008 |
| JP | 2009-230096 | A | 10/2009 |
| JP | 2010-3880 | A | 1/2010 |
| JP | 2010-153173 | A | 7/2010 |
| JP | 2011-076760 | | 4/2011 |
| JP | 2011-198761 | A | 10/2011 |
| KR | 10-2004-0096706 | A | 11/2004 |
| KR | 10-0742370 | B1 | 7/2007 |
| KR | 10-0807524 | | 2/2008 |
| KR | 10-2008-0111130 | | 2/2009 |
| KR | 10-2009-0017910 | | 2/2009 |
| KR | 10-2009-0049515 | A | 5/2009 |
| KR | 10-2011-0023996 | | 3/2011 |
| KR | 10-2011-0106565 | | 9/2011 |
| KR | 10-2011-0129531 | | 12/2011 |
| KR | 10-2012-0022967 | | 3/2013 |
| TW | I328207 | | 8/2010 |
| WO | WO 03/053068 | A2 | 6/2003 |
| WO | WO 2004/073356 | A1 | 8/2004 |
| WO | WO 2005/067352 | A1 | 7/2005 |

OTHER PUBLICATIONS

English Abstract of TW 2008-02221 A, also published as TW I328207, listed above.

EPO Search Report dated Jul. 8, 2013, for corresponding European Patent application 13157562.3, (6 pages).

EPO Search Report dated Dec. 20, 2013 for European Patent application 13178648.5, (9 pages).

EPO Search Report dated Jul. 9, 2014, for European Patent application 14155124.2, (8 pages).

JPO Office action dated Feb. 16, 2016, for corresponding Japanese Patent application 2012-108855, (5 pages).

Korean Patent Abstracts, Publication No. 1020030031207A, dated Apr. 21, 2003 for corresponding Korean Patent 10-0807524 listed above.

Korean Patent Abstracts for Korean Publication 1020070055908 dated May 31, 2007, to Korean Patent 10-0742370 dated Jul. 24, 2007, listed above.

KIPO Office action dated Jul. 11, 2016, with English translation, for corresponding Korean Patent application 10-2016-0047800, (11 pages).

SIPO Office action dated Mar. 11, 2015, for corresponding Chinese Patent application 201310035429.X, (7 pages).

Taiwan Office action dated Mar. 30, 2015, for corresponding Taiwanese Patent application 102101000, (7 pages).

TIPO Office Action dated Oct. 11, 2016, for corresponding Taiwanese Patent Application No. 102124953 (6 pages).

U.S. Office action dated Aug. 29, 2014, for cross reference U.S. Appl. No. 14/059,356, (18 pages).

U.S. Office action dated Jun. 30, 2015, for cross reference U.S. Appl. No. 13/872,018, (22 pages).

U.S. Office action dated Oct. 16, 2015, for cross reference U.S. Appl. No. 13/872,018, (16 pages).

U.S. Office action dated Feb. 29, 2016, for cross reference U.S. Appl. No. 13/872,018, (15 pages).

U.S. Office action dated Aug. 5, 2016, for related U.S. Appl. No. 15/090,591 (11 pages).

U.S. Office Action dated Sep. 2, 2016 for U.S. Appl. No. 13/872,018 (15 sheets).

U.S. Office Action dated May 11, 2017, issued in cross-reference U.S. Appl. No. 13/872,018 (16 pages).

EPO Communication Pursuant to Article 94(3) EPC, for Patent Application No. 13 178 648.5, dated Jan. 31, 2019, 8 pages.

U.S. Office Action dated Sep. 3, 2019, issued in U.S. Appl. No. 16/261,437 (11 pages).

U.S. Office Action dated Oct. 25, 2019, issued in U.S. Appl. No. 16/505,536 (14 pages).

* cited by examiner

FIG.1





Petitioner Ex 1001, p. 3
BOE et al. v. Samsung, IPR2023-00988

FIG.2


300
200
R
B
L3
R
VL2
L4
L4
G
G
VL1
G
200
P1
300
P2
B
R
L5
B
100
G
G
G
R
B
R
VS
300
200
P1
P2
G
G
G

FIG.3






Petitioner Ex 1001, p. 5
BOE et al. v. Samsung, IPR2023-00988

FIG.4






Petitioner Ex 1001, p. 6
BOE et al. v. Samsung, IPR2023-00988

FIG.5






Petitioner Ex 1001, p. 7
BOE et al. v. Samsung, IPR2023-00988

# PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application is a continuation of U.S. patent application Ser. No. 13/614,197, filed Sep. 13, 2012, which claims priority to and the benefit of Korean Patent Application No. 10-2012-0022967, filed Mar. 6, 2012, the entire content of both of which is incorporated herein by reference.

## BACKGROUND

### 1. Field

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an organic light emitting diode (OLED) display.

### 2. Description of the Related Art

A display device is a device that displays an image. Recently, an OLED display has been drawing attention. The OLED display has a self-luminous characteristic. Because the OLED display does not need a separate light source, unlike a liquid crystal display, it can have a relatively smaller thickness and weight than liquid crystal displays. In addition, the OLED display exhibits high-quality characteristics such as low power consumption, high luminance, high response speed, etc.

In general, the OLED display includes a plurality of pixels for emitting light of different colors. The plurality of pixels emit light to display an image. Here, the pixel refers to a minimum unit for displaying the images. For instance, there may be a gate line, a data line, and a power line such as a driving power line to drive each pixel. In addition, there may be an insulation layer such as a pixel definition layer to define an area and a shape of each pixel. Further, each pixel may be positioned between its neighboring pixels.

An organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM). When reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated. On the other hand, when increasing the gap between the pixels to improve the deposition reliability, the aperture ratio of the pixel may be deteriorated.

The above information disclosed in this Background section is only for enhancement of understanding of the background of the invention. Therefore, it may contain information that does not form the prior art that is already known in this country to a person of ordinary skill in the art.

## SUMMARY

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an OLED display. More particularly, aspects relate to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels. An exemplary embodiment of the present invention provides a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels.



According to an exemplary embodiment of the present invention, a pixel arrangement structure of an organic light emitting diode display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

The second pixel may include a pair of second pixels. The second pixels may be separated from each other by the first pixel.

The third pixel may include a pair of third pixels. The third pixels may be separated from each other by the first pixel.

The second pixels and the third pixels may enclose the first pixel in the virtual square.

The first pixel, the second pixels, and the third pixels may have polygonal shapes. The second pixels and the third pixels may have a larger area than the first pixel.

The first pixel may have a quadrilateral shape. The second pixels and the third pixels may have hexagonal or octagonal shapes.

The second pixels and the third pixels may have octagonal shapes.

The second pixels and the third pixels may have a same area. A distance between the first pixel and the second pixels, a distance between the first pixel and the third pixels, and a distance between the second pixels and the third pixels may be a same first length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a second length that is longer than the first length.

The second pixels may have a larger area than the third pixels. A distance between the second pixels and the third pixels may be a first length. A distance between the first pixel and the second pixels, and a distance between the first pixel and the third pixels may be a same second length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other. A distance between the neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other.

The second pixels may have a larger area than the third pixels.

The third pixels may have a larger area than the second pixels.

The first pixel, the second pixel, and the third pixel may be configured to emit different color lights.

The first pixel, the second pixel, and the third pixel may be configured to emit green light, blue light, and red light, respectively.

According to an exemplary embodiment of the present invention, the pixel arrangement structure of the OLED display improves the aperture ratio of the pixel while efficiently setting up the gap between the pixels.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a view of a pixel arrangement structure of an OLED display according to a first exemplary embodiment.

FIG. **2** is a view of a pixel arrangement structure of an OLED display according to a second exemplary embodiment.

FIG. **3** is a view of a pixel arrangement structure of an OLED display according to a third exemplary embodiment.

FIG. **4** is a view of a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment.

FIG. **5** is a view of a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment.

DETAILED DESCRIPTION

Several exemplary embodiments according to the present invention are described hereinafter in detail with reference to the accompanying drawings to allow one of a person of ordinary skill in the art to practice the invention without undue experimentation. The present invention can be embodied in several different forms, and is not limited to exemplary embodiments that are described herein.

In order to clarify the description of embodiments of the present invention, parts that are not related to the embodiments may be omitted. In addition, the same elements or equivalents are referred to with the same reference numerals throughout the specification. For example, the same reference numerals are used for the elements having the same constructions throughout. Such elements are representatively described in a first exemplary embodiment, and in remaining exemplary embodiments, only different constructions from those of the first exemplary embodiment may be described.

Further, since sizes and thicknesses of constituent members shown in the accompanying drawings are arbitrarily given for better understanding and ease of description, the present invention is not limited to the illustrated sizes and thicknesses. In addition, unless explicitly described to the contrary, the word "comprise" and variations such as "comprises" or "comprising" will be understood to imply the inclusion of stated elements but not the exclusion of any other elements.

Nevertheless, even though each of the pixels are drawn as stereotypical polygonal shapes in the drawings, the present invention is not limited to this shape. That is, the shapes of the pixels may be modified to avoid interference with the other components of the OLED (e.g., wirings) within the spirit and scope of the appended claims.

A pixel arrangement structure (or pixel arrangement) of an OLED display according to a first exemplary embodiment will be described with reference to FIG. **1**. FIG. **1** is a view schematically showing a portion of pixels forming an OLED display.

As shown in FIG. **1**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Here, the pixel refers to a minimum unit for displaying an image (for example, the minimum addressable unit of the display).

Further, among the first pixels **100**, the second pixels **200**, and the third pixels **300**, power lines for driving each of the pixels, such as a gate line, a data line, a driving power line, and the like, may be located. In addition, an insulation layer, such as a pixel defining layer, for defining each of the pixels may be disposed. Finally, an OLED including an anode, an organic emission layer, and a cathode to correspond to each of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be disposed. These configurations are technologies known in the art and further description thereof is omitted for ease of description. A shape of each of the pixels may be defined by the power lines, the pixel defining layer, the anode, or the like, but is not limited thereto.

In the pixel arrangement of FIG. **1**, each of the first pixels **100** has a smaller area than neighboring second pixels **200** and third pixels **300**, and has a quadrilateral (i.e., four-sided) shape among polygon shapes. For example, in the pixel arrangement of FIG. **1**, each of the first pixels **100** has the same quadrilateral shape (e.g., a square or rhombus). The first pixels **100** are spaced apart from each other and arranged in rows, such as along a first virtual straight line VL**1**. The first pixels **100** emit green light, and may include an organic emission layer for emitting green light.

The second pixels **200** are arranged diagonally with respect to the first pixels **100**, such as at first vertices P**1** along one diagonal of a virtual square VS having one of the first pixels **100** as a center point (or center) of the virtual square VS. In a similar fashion, the third pixels **300** are arranged diagonally with respect to the first pixels **100**, such as at second vertices P**2** along the other diagonal of the virtual square VS.

In the virtual square VS, each of the second pixels **200** is separated from the first pixel **100**, and is centered at one of the first vertices P**1** of the virtual square VS. Each of the second pixels **200** has a larger area than the neighboring first pixel **100** and has an octagonal (i.e., eight-sided) shape. In FIG. **1**, the second pixels **200** each have the same octagonal shape. In addition, the second pixels **200** are arranged diagonally and separated from each other by the first pixels **100**. The second pixels **200** emit blue light, and may include an organic emission layer for emitting blue light.

In a similar fashion, in the virtual square VS, each of the third pixels **300** is separated from the first pixel **100** and the second pixels **200**, and is centered at one of the second vertices P**2** neighboring the first vertices P**1** of the virtual square VS. Each of the third pixels **300** has a larger area than the neighboring first pixel **100** and the same area as each of the second pixels **200**. Further, the third pixels have an octagonal shape (e.g., similar to or the same as the second pixels **200**). In FIG. **1**, the third pixels **300** each have the same octagonal shape. In addition, the third pixels **300** are arranged diagonally and separated from each other by the first pixels **100**. The third pixels **300** emit red light, and may include an organic emission layer for emitting red light.

The third pixels **300** and the second pixels **200** are spaced apart from each other and alternately arranged in rows, such as along a second virtual straight line VL**2**. In a similar fashion, the third pixels **300** and the second pixels **200** are spaced apart from each other and alternately arranged in columns. Accordingly, in the virtual square VS, two of the second pixels **200** having their corresponding centers positioned at the first vertices P**1** and two of the third pixels **300** having their corresponding centers positioned at the second vertices P**2** to enclose a corresponding one of the first pixels **100** (e.g., in the virtual square VS).

As described above, the center of each of the second pixels **200** is positioned at one of the first vertices P**1** of the virtual square VS. In addition, the center of the corresponding first pixel **100** is the center of the virtual square VS. Further, the center of each of the third pixels **300** is positioned at one of the second vertices P**2**. Moreover, the second pixels **200** and the third pixels **300** each have the same area.

As a non-limiting example, the distance (e.g., a shortest distance) between one of the first pixels **100** and an adjacent one of the second pixels **200** is a first length L**1**, the distance between one of the first pixels **100** and an adjacent one of the third pixels **300** is the same first length L**1**, and the distance between one of the second pixels **200** and an adjacent one of the third pixels **300** is the same first length L**1**, as shown in FIG. **1**. In addition, the distance (e.g., a shortest distance) between the neighboring first pixels **100** is a second length L**2** that is longer than the first length L**1**. It should be noted that L**1**, L**2**, L**3**, . . . may be used throughout to represent shortest distances between corresponding pixels.

Therefore, the gap of the first length L**1** is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, between adjacent pairs of the first pixels **100** and the third pixels **300**, and between adjacent pairs of the second pixels **200** and the third pixels **300**. In addition, the gap of the second length L**2** that is longer than the first length L**1** is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, a manufacturing time and manufacturing cost of the entire OLED display may be reduced and the display quality of the image of the OLED display may be improved.

As described above, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** have polygonal shapes (e.g., the first pixels have a quadrilateral shape and the second pixels **200** and the third pixels **300** have an octagonal shape). In addition, it is worth considering that the deposition process of the organic emission layer is one of the unique manufacturing characteristics of the OLED display. Accordingly, to improve the deposition reliability of the organic emission layer in the deposition process using the fine metal mask and to improve the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300**, the center of each of the first pixels **100** is positioned at the center of a virtual square VS formed by a first pair of diagonal vertices P**1** and a second pair of diagonal vertices P**2**. In the virtual square VS, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1**, and the centers of a pair of the third pixels **300** are positioned at the second vertices P**2**.

In addition, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** respectively emit green, blue, and red light. However, in pixel arrangement structures of other OLED displays, the first pixels **100**, the second pixels **200**, and the third pixels **300** may emit light of different colors. For example, at least one of the second pixels **200** or the third pixels may emit white light.

Next, a pixel arrangement structure of an OLED display according to a second exemplary embodiment will be described with reference to FIG. **2**. Parts that are different from the exemplary embodiment of FIG. **1** will be described, while the description of parts that are equivalent to the first exemplary embodiment may be omitted. For better comprehension and ease of description, constituent elements of the second exemplary embodiment that are the same as or similar to those of the first embodiment of FIG. **1** will have the same reference numerals.

As shown in FIG. **2**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. The plurality of first pixels **100** have the same quadrilateral shape (e.g., a parallelogram). In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels **300** may have polygonal shapes, such as octagonal or hexagonal (i.e., six-sided).

In a similar fashion to that of FIG. **1**, the centers of a pair of the second pixels **200** are positioned at first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **2**, the second pixels **200** have a larger area than the third pixels **300**.

As a non-limiting example, the distance between adjacent ones of the second pixels **200** and the third pixels **300** is a third length L**3**, while the distance between each of the first pixels **100** and adjacent ones of the second pixels **200** or the third pixels **300** have a same fourth length L**4**. In addition, the distance between neighboring ones of the first pixels **100** is a fifth length L**5** that is longer than the third length L**3** and the fourth length L**4**.

Accordingly, the gap of the fourth length L**4** is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, and between adjacent pairs of the first pixels **100** and the third pixels **300**. In addition, the gap of the third length L**3** is formed between adjacent pairs of the second pixels **200** and the third pixels **300**. Further, the gap of the fifth length L**5** that is longer than the third length L**3** and the fourth length L**4** is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. **2**, the second pixels **200** that emit blue have the shortest life span among the first pixels **100**, the second pixels **200**, and the third pixels **300**. Accordingly, the second pixels **200** have a larger area than the third pixels **300**, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display of FIG. **2** provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a third exemplary embodiment will be described with reference to FIG. **3**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the third exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **3**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring

first pixels **100** have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. **1-2**, the centers of a pair of the second pixels **200** are positioned at first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **3**, the neighboring first pixels **100** have a quadrilateral shape and are symmetrical to each other, while the second pixels **200** have a larger area than the third pixels **300**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by placing each of the first pixels **100** between a pair of the second pixels **200** and between a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. **3**, the second pixels **200** that emit blue have the shortest life span among the first pixels **100**, the second pixels **200**, and the third pixels **300**. Accordingly, the second pixels **200** have a larger area than the third pixels **300**, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment will be described with reference to FIG. **4**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fourth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **4**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring first pixels **100** have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the third pixels **300** have a larger area than the second pixels **200**. The second pixels **200** and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. **1-3**, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **4**, the neighboring first pixels **100** have a quadrilateral shape and are symmetrical to each other, while the third pixels **300** have a larger area than the second pixels **200**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Next, a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment will be described with reference to FIG. **5**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fifth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **5**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring first pixels **100** have a octagonal shape and are symmetrical to each other. In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels **300** may have quadrilateral shapes (e.g., rhombus).

In a similar fashion to that of FIGS. **1-3**, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **5**, the neighboring first pixels **100** have a octagonal shape and are symmetrical to each other, while the second pixels **200** have a larger area than the third pixels **300**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

While this invention has been described in connection with what is presently considered to be practical exemplary embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, and equivalents thereof.

DESCRIPTION OF SOME SYMBOLS

first pixels **100**, second pixels **200**, third pixels **300**

What is claimed is:

**1**. A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel;

a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel; and

a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels. and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,

wherein a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels,

wherein the first pixels are configured to emit green light, which is a color that is different from light emitted by the second pixels and the third pixels,

wherein the first pixels are smaller than at least one of the second pixels or the third pixels, and

wherein each of the second pixels has a larger area than each of the third pixels.

**2**. The pixel arrangement structure of claim **1**, wherein the first pixels, the second pixels, and the third pixels have polygonal shapes, and

wherein each of the second pixels and the third pixels has a larger area than the first pixel.

**3**. The pixel arrangement structure of claim **2**, wherein the second pixels and the third pixels have octagonal shapes.

**4**. The pixel arrangement structure of claim **1**, wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights.

**5**. The pixel arrangement structure of claim **4**, wherein the second pixels are configured to emit blue light, and the third pixels are configured to emit red light.

**6**. The pixel arrangement structure of claim **1**, wherein each of the second pixels has a larger area than that of the first pixel.

**7**. The pixel arrangement structure of claim **1**, wherein the second pixels are substantially equidistant from the first pixel interposed between the second pixels, and the third pixels are substantially equidistant from the first pixel interposed between the third pixels.

**8**. The pixel arrangement structure of claim **1**, wherein the first distance is measured between respective centers of the second pixels, and the second distance is measured between respective centers of the one of the second pixels and the neighboring one of the third pixels.

**9**. The pixel arrangement structure of claim **1**, wherein the first line passes through respective centers of the first pixel and the second pixels, and the second line passes through respective centers of the first pixel and the third pixels.

**10**. The pixel arrangement structure of claim **1**, wherein each of the first pixels, the second pixels, and the third pixels has a convex shape.

**11**. The pixel arrangement structure of claim **1**, wherein at least one of the first pixels, the second pixels, and the third pixels has a non-quadrilateral shape.

**12**. The pixel arrangement structure of claim **11**, wherein at least one of the first pixels, the second pixels, and the third pixels has five or more interior angles.

**13**. A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel;

a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel; and

a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels, and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,

wherein a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels,

wherein the first pixels are configured to emit green light,

wherein the first pixels have a smaller size than at least one of the second pixels or the third pixels, and

wherein each of the second pixels has a larger area than each of the third pixels.

**14**. A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel;

a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel; and

a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels,. and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,

wherein a first separated distance between adjacent ones of the first pixels is greater than a second separated distance between one of the first pixels and a neighboring pixel of the second pixels or the third pixels,

wherein the first pixels are configured to emit light having a color that is different from colors of the second pixels and the third pixels,

wherein the first pixels have a different size from at least one of the second pixels or the third pixels,

wherein at least one of the first pixels, the second pixels, and the third pixels is a convex polygon having five or more sides,

wherein the first separated distance and the second separated distance are shortest distances between respective ones of the pixels, and

wherein each of the second pixels has a larger area than each of the third pixels.

**15**. A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel;

a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line passing through respective centers of the first pixel and the second pixels on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixels, the second pixels, and the other first pixel; and

a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line passing through respective centers of the first pixel and the third pixels on which the first pixel, the third pixels, and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,

wherein a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels,

wherein the first pixels are configured to emit green light, which is a color that is different from light emitted by the second pixels and the third pixels,

wherein the first pixels are smaller than at least one of the second pixels or the third pixels, and

wherein each of the second pixels has a larger area than each of the third pixels.

* * * * *

US011594578B2

(12) **United States Patent**
**Lee**

(10) **Patent No.: US 11,594,578 B2**
(45) **Date of Patent: Feb. 28, 2023**

(54) **PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE**


(71) Applicant: **Samsung Display Co., Ltd.**, Yongin-si (KR)

(72) Inventor: **Sang-Shin Lee**, Yongin-si (KR)

(73) Assignee: **Samsung Display Co., Ltd.**, Yongin-si (KR)


(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.


(21) Appl. No.: **16/505,536**

(22) Filed: **Jul. 8, 2019**

(65) **Prior Publication Data**

US 2019/0333970 A1 Oct. 31, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/811,599, filed on Nov. 13, 2017, now Pat. No. 10,854,683, which is a continuation of application No. 13/614,197, filed on Sep. 13, 2012, now Pat. No. 9,818,803.

(30) **Foreign Application Priority Data**

Mar. 6, 2012 (KR) ........................ 10-2012-0022967

(51) **Int. Cl.**
***G09G 3/32*** (2016.01)
***H01L 27/32*** (2006.01)

(52) **U.S. Cl.**
CPC ...... ***H01L 27/3216*** (2013.01); ***H01L 27/3218*** (2013.01)

(58) **Field of Classification Search**
CPC ........................ H01L 27/3218; H01L 27/3216
USPC .................................................. 345/82, 419
See application file for complete search history.



(56) **References Cited**

U.S. PATENT DOCUMENTS

4,491,863 A 1/1985 Kurahashi
4,642,619 A 2/1987 Togashi
4,965,565 A 10/1990 Noguchi
5,113,274 A 5/1992 Takahashi et al.
5,142,392 A 8/1992 Ueki et al.
5,461,503 A 10/1995 Deffontaines et al.
5,485,293 A 1/1996 Robinder
(Continued)

FOREIGN PATENT DOCUMENTS

CN 1726593 A 1/2006
CN 1874000 A 12/2006
(Continued)

OTHER PUBLICATIONS

Office action issued in U.S. Appl. No. 15/811,599 by the USPTO, dated Jul. 19, 2019, 19 pages.
(Continued)


*Primary Examiner* — Kwang-Su Yang
(74) *Attorney, Agent, or Firm* — Lewis Roca Rothgerber Christie LLP


(57) **ABSTRACT**

A pixel arrangement structure of an OLED display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.


**92 Claims, 5 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,742,129 | A | 4/1998 | Nagayama et al. | |
| 6,198,507 | B1 | 3/2001 | Ishigami | |
| 6,326,981 | B1 | 12/2001 | Mori et al. | |
| 6,366,025 | B1 | 4/2002 | Yamada | |
| 6,552,706 | B1 | 4/2003 | Ikeda et al. | |
| 6,747,618 | B2 | 6/2004 | Arnold et al. | |
| 6,838,819 | B2 | 1/2005 | Kim et al. | |
| 6,867,549 | B2 | 3/2005 | Cok et al. | |
| 6,882,364 | B1 | 4/2005 | Inuiya et al. | |
| 6,933,976 | B1 | 8/2005 | Suzuki | |
| 6,950,115 | B2 | 9/2005 | Brown Elliott | |
| 7,075,242 | B2 | 7/2006 | Miller et al. | |
| 7,110,031 | B2 * | 9/2006 | Kondo | H04N 9/045 348/272 |
| 7,187,425 | B2 | 3/2007 | Yamazaki | |
| 7,215,347 | B2 * | 5/2007 | Phan | G09G 3/2074 345/694 |
| 7,230,594 | B2 | 6/2007 | Miller et al. | |
| 7,274,383 | B1 | 9/2007 | Brown Elliot | |
| 7,291,970 | B2 | 11/2007 | Kuwabara | |
| 7,301,273 | B2 | 11/2007 | Dedene et al. | |
| 7,397,485 | B2 | 7/2008 | Miller et al. | |
| 7,612,811 | B2 * | 11/2009 | Takeuchi | H01L 27/14621 348/272 |
| 7,646,430 | B2 * | 1/2010 | Brown Elliott | G06T 3/4023 348/458 |
| 7,710,484 | B2 * | 5/2010 | Oda | H04N 5/3728 348/297 |
| 7,755,652 | B2 | 7/2010 | Credelle et al. | |
| 7,982,786 | B2 * | 7/2011 | Nishida | G02B 5/008 348/272 |
| 8,026,669 | B2 | 9/2011 | Kawasaki et al. | |
| 8,118,633 | B2 | 2/2012 | Yuasa | |
| 8,134,583 | B2 | 3/2012 | Credelle | |
| 8,294,741 | B2 | 10/2012 | Brown Elliott et al. | |
| 8,330,352 | B2 | 12/2012 | Sung et al. | |
| 8,334,859 | B2 | 12/2012 | Liu et al. | |
| 8,350,468 | B2 | 1/2013 | Ko et al. | |
| 8,354,789 | B2 | 1/2013 | Kim et al. | |
| 8,363,072 | B2 | 1/2013 | Hong et al. | |
| 8,395,157 | B2 | 3/2013 | Park et al. | |
| 8,405,692 | B2 | 3/2013 | Brown Elliott et al. | |
| 8,456,496 | B2 | 6/2013 | Credelle | |
| 8,519,910 | B2 | 8/2013 | Park et al. | |
| 8,519,917 | B2 | 8/2013 | Ryu et al. | |
| 8,552,635 | B2 | 10/2013 | Kim et al. | |
| 8,587,003 | B2 | 11/2013 | Ando | |
| 8,754,913 | B2 | 6/2014 | Hwang et al. | |
| 8,853,016 | B2 | 10/2014 | Park et al. | |
| 8,866,707 | B2 | 10/2014 | Koyama et al. | |
| 8,883,532 | B2 | 11/2014 | Ando | |
| 9,041,625 | B2 | 5/2015 | Hwang et al. | |
| 9,398,205 | B2 * | 7/2016 | Cote | H04N 9/04557 |
| 9,431,469 | B2 | 8/2016 | Park et al. | |
| 9,837,476 | B2 | 12/2017 | Park et al. | |
| 10,403,211 | B2 | 9/2019 | Hai et al. | |
| 10,854,683 | B2 | 12/2020 | Lee | |
| 2002/0015110 | A1 | 2/2002 | Brown Elliott | |
| 2002/0070909 | A1 | 6/2002 | Asano et al. | |
| 2002/0113195 | A1 | 8/2002 | Osada | |
| 2002/0140833 | A1 | 10/2002 | Hirai | |
| 2003/0117423 | A1 | 6/2003 | Brown-Elliott et al. | |
| 2003/0128179 | A1 | 7/2003 | Credelle | |
| 2003/0128225 | A1 * | 7/2003 | Credelle | G02F 1/133514 345/694 |
| 2003/0218618 | A1 | 11/2003 | Phan | |
| 2004/0036421 | A1 | 2/2004 | Arnold et al. | |
| 2004/0046714 | A1 | 3/2004 | Brown Elliott | |
| 2004/0108818 | A1 | 6/2004 | Cok et al. | |
| 2004/0113875 | A1 | 6/2004 | Miller et al. | |
| 2004/0183764 | A1 | 9/2004 | Kim et al. | |
| 2004/0246426 | A1 | 12/2004 | Wang et al. | |
| 2005/0001542 | A1 | 1/2005 | Kiguchi | |
| 2005/0162079 | A1 | 7/2005 | Sakamoto | |
| 2005/0225575 | A1 | 10/2005 | Elliott et al. | |
| 2006/0119738 | A1 | 6/2006 | Kido | |
| 2006/0152531 | A1 | 7/2006 | Lin et al. | |
| 2007/0164335 | A1 * | 7/2007 | McKee | H01L 27/14641 438/70 |
| 2007/0230818 | A1 * | 10/2007 | Messing | G09G 3/2003 382/275 |
| 2008/0001525 | A1 | 1/2008 | Chao et al. | |
| 2008/0001527 | A1 | 1/2008 | Koo et al. | |
| 2008/0018765 | A1 | 1/2008 | Choi et al. | |
| 2008/0273793 | A1 | 11/2008 | Oishi | |
| 2008/0308819 | A1 | 12/2008 | Louwsma et al. | |
| 2009/0027377 | A1 | 1/2009 | Kwon | |
| 2009/0302331 | A1 | 12/2009 | Smith et al. | |
| 2009/0321727 | A1 | 12/2009 | Yutani et al. | |
| 2010/0033084 | A1 | 2/2010 | Ko et al. | |
| 2010/0045695 | A1 * | 2/2010 | Brown Elliott | G09G 3/2003 345/589 |
| 2010/0117528 | A1 * | 5/2010 | Fukuda | H01L 27/322 313/505 |
| 2010/0117936 | A1 * | 5/2010 | Lhee | H01L 27/3211 345/76 |
| 2010/0133994 | A1 | 6/2010 | Song et al. | |
| 2010/0171440 | A1 | 7/2010 | Satou et al. | |
| 2010/0253608 | A1 | 10/2010 | Kim et al. | |
| 2010/0315318 | A1 | 12/2010 | Lee et al. | |
| 2011/0012820 | A1 | 1/2011 | Kim et al. | |
| 2011/0018858 | A1 | 1/2011 | Ryu et al. | |
| 2011/0084955 | A1 | 4/2011 | Kim | |
| 2011/0115772 | A1 | 5/2011 | Chung | |
| 2011/0177640 | A1 | 7/2011 | Han et al. | |
| 2011/0215302 | A1 * | 9/2011 | Lhee | H01L 51/5265 257/40 |
| 2011/0216056 | A1 | 9/2011 | Yoo et al. | |
| 2011/0260951 | A1 | 10/2011 | Hwang et al. | |
| 2011/0291549 | A1 | 12/2011 | Kim et al. | |
| 2011/0291550 | A1 | 12/2011 | Kim et al. | |
| 2011/0298836 | A1 | 12/2011 | Komiya et al. | |
| 2011/0316892 | A1 | 12/2011 | Sung et al. | |
| 2012/0049726 | A1 | 3/2012 | Yoo et al. | |
| 2012/0056531 | A1 | 3/2012 | Park et al. | |
| 2012/0086330 | A1 | 4/2012 | Umeda et al. | |
| 2012/0176298 | A1 | 7/2012 | Suh et al. | |
| 2012/0287605 | A1 | 11/2012 | Chen et al. | |
| 2012/0313844 | A1 | 12/2012 | Im et al. | |
| 2012/0319564 | A1 | 12/2012 | Ghosh et al. | |
| 2013/0002911 | A1 | 1/2013 | Miyashita et al. | |
| 2013/0037827 | A1 | 2/2013 | Levermore et al. | |
| 2013/0057521 | A1 | 3/2013 | Kim | |
| 2013/0106891 | A1 * | 5/2013 | Matsueda | G09G 3/2003 345/589 |
| 2013/0127689 | A1 | 5/2013 | Collier | |
| 2014/0191202 | A1 | 7/2014 | Shim et al. | |
| 2015/0187273 | A1 | 7/2015 | Chang et al. | |
| 2015/0192834 | A1 | 7/2015 | Morinaga et al. | |
| 2016/0124557 | A1 | 5/2016 | Choi | |
| 2016/0171930 | A1 | 6/2016 | Song et al. | |
| 2016/0190166 | A1 | 6/2016 | Kim et al. | |
| 2019/0333970 | A1 | 10/2019 | Lee | |
| 2020/0394955 | A1 | 12/2020 | Lee | |
| 2022/0319406 | A1 | 10/2022 | Lee | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 101009304 | A | 8/2007 |
| CN | 100439989 | C | 12/2008 |
| CN | 100448020 | C | 12/2008 |
| CN | 101449382 | A | 6/2009 |
| CN | 102354479 | A | 2/2012 |
| CN | 103311266 | A | 9/2013 |
| CN | 203260586 | U | 10/2013 |
| CN | 105206647 | A | 12/2015 |
| EP | 0 322 106 | A2 | 6/1989 |
| EP | 1168448 | A2 | 1/2002 |
| EP | 1450408 | A2 | 8/2004 |
| EP | 2 637 209 | A1 | 9/2013 |
| GB | 2 437 110 | A | 10/2007 |
| JP | 02-000826 | A | 1/1990 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| JP | 03-078390 | A | 4/1991 |
| JP | 3-36239 | | 5/1991 |
| JP | 8-227276 | A | 9/1996 |
| JP | 08-335060 | A | 12/1996 |
| JP | 09-182091 | A | 7/1997 |
| JP | 10-39791 | | 2/1998 |
| JP | 2000-235891 | | 8/2000 |
| JP | 2001-33757 | A | 2/2001 |
| JP | 2001-54127 | A | 2/2001 |
| JP | 2001-76881 | A | 3/2001 |
| JP | 3203907 | B2 | 9/2001 |
| JP | 2001-290441 | A | 10/2001 |
| JP | 2003-203770 | A | 7/2003 |
| JP | 2004-507773 | | 3/2004 |
| JP | 2004-179028 | A | 6/2004 |
| JP | 2004-192813 | | 7/2004 |
| JP | 2005-5227 | A | 1/2005 |
| JP | 2005-62416 | A | 3/2005 |
| JP | 2005-63787 | A | 3/2005 |
| JP | 2005-515505 | A | 5/2005 |
| JP | 2006-18195 | A | 1/2006 |
| JP | 2006-163316 | A | 6/2006 |
| JP | 2006-309182 | | 11/2006 |
| JP | 2007-156126 | A | 6/2007 |
| JP | 2008-015521 | | 1/2008 |
| JP | 2008-277264 | A | 11/2008 |
| JP | 2008-298966 | A | 12/2008 |
| JP | 2008-300367 | | 12/2008 |
| JP | 2009-230096 | A | 10/2009 |
| JP | 2010-3880 | A | 1/2010 |
| JP | 2010-153173 | A | 7/2010 |
| JP | 2011-076760 | | 4/2011 |
| JP | 2011-198761 | A | 10/2011 |
| JP | 2012-15129 | A | 1/2012 |
| JP | 2012-19206 | A | 1/2012 |
| JP | 2012-028170 | A | 2/2012 |
| JP | 2012-79631 | A | 4/2012 |
| JP | 5177957 | B2 | 4/2013 |
| KR | 10-2004-0096706 | A | 11/2004 |
| KR | 10-2006-0118868 | A | 11/2006 |
| KR | 10-0742370 | B1 | 7/2007 |
| KR | 10-0807524 | | 2/2008 |
| KR | 10-2008-0111130 | | 12/2008 |
| KR | 10-2009-0017910 | | 2/2009 |
| KR | 10-2009-0049515 | A | 5/2009 |
| KR | 10-2011-0023996 | | 3/2011 |
| KR | 10-2011-0039773 | A | 4/2011 |
| KR | 10-1056258 | B1 | 8/2011 |
| KR | 10-2011-0106565 | | 9/2011 |
| KR | 10-2011-0108050 | A | 10/2011 |
| KR | 10-2011-0117613 | A | 10/2011 |
| KR | 10-2011-0129531 | | 12/2011 |
| KR | 10-2012-0000887 | A | 1/2012 |
| KR | 10-2012-0014074 | A | 2/2012 |
| KR | 10-2012-0022967 | | 3/2012 |
| KR | 10-1332495 | B1 | 11/2013 |
| KR | 10-2020-0000840 | A | 1/2020 |
| TW | 200305126 | A | 10/2003 |
| TW | I277930 | B | 4/2007 |
| TW | I328207 | | 8/2010 |
| WO | WO 03/053068 | A2 | 6/2003 |
| WO | WO 03/060870 | A1 | 7/2003 |
| WO | WO 2004/073356 | A1 | 8/2004 |
| WO | WO 2005/067352 | A1 | 7/2005 |


OTHER PUBLICATIONS


English Abstract of TW 2008-02221 A, also published as TW I328207.

EPO Search Report dated Jul. 8, 2013, for corresponding European Patent application 13157562.3, (6 pages).

EPO Search Report dated Dec. 20, 2013 for European Patent application 13178648.5, (9 pages).

EPO Search Report dated Jul. 9, 2014, for European Patent application 14155124.2, (8 pages).

JPO Office action dated Feb. 16, 2016, for corresponding Japanese Patent application 2012-108855, (5 pages).

Korean Patent Abstracts, Publication No. 1020030031207A, dated Apr. 21, 2003 for corresponding Korean Patent 10-0807524.

Korean Patent Abstracts for Korean Publication 1020070055908 dated May 31, 2007, to Korean Patent 10-0742370 dated Jul. 24, 2007.

KIPO Office action dated Jul. 11, 2016, with English translation, for corresponding Korean Patent application 10-2016-0047800, (11 pages).

SIPO Office action dated Mar. 11, 2015, for corresponding Chinese Patent application 201310035429.X, (7 pages).

Taiwan Office action dated Mar. 30, 2015, for corresponding Taiwanese Patent application 102101000, (7 pages).

TIPO Office Action dated Oct. 11, 2016, for corresponding Taiwanese Patent Application No. 102124953 (6 pages).

EPO Communication Pursuant to Article 94(3) EPC, for Patent Application No. 13 178 648.5, dated Jan. 31, 2019, 8 pages.

U.S. Office action dated Aug. 29, 2014, for cross reference U.S. Appl. No. 14/059,356, (18 pages).

U.S. Office action dated Jun. 30, 2015, for cross reference U.S. Appl. No. 13/872,018, (22 pages).

U.S. Office action dated Oct. 16, 2015, for cross reference U.S. Appl. No. 13/872,018, (16 pages).

U.S. Office action dated Feb. 29, 2016, for cross reference U.S. Appl. No. 13/872,018, (15 pages).

U.S. Office action dated Aug. 5, 2016, for related U.S. Appl. No. 15/090,591 (11 pages).

U.S. Office Action dated Sep. 2, 2016 for U.S. Appl. No. 13/872,018 (15 sheets).

U.S. Office Action dated May 11, 2017, issued in cross-reference U.S. Appl. No. 13/872,018 (16 pages).

U.S. Office Action dated Mar. 19, 2018, issued in U.S. Appl. No. 15/688,760 (13 pages).

U.S. Office Action dated Sep. 3, 2019, issued in U.S. Appl. No. 16/261,437 (11 pages).

U.S. Office Action dated Oct. 21, 2020, issued in U.S. Appl. No. 16/882,384 (24 pages).

U.S. Office Action dated Apr. 13, 2021, issued in U.S. Appl. No. 17/005,753 (22 pages).

U.S. Final Office Action dated Nov. 24, 2021, issued in U.S. Appl. No. 17/005,753 (13 pages).

U.S. Office Action dated Nov. 3, 2022, issued in U.S. Appl. No. 17/808,984 (25 pages).

U.S. Office Action dated Nov. 10, 2022, issued in U.S. Appl. No. 17/865,304 (23 pages).

Chinese Office Action dated Sep. 13, 2022, issued in corresponding Chinese Patent Application No. 201910040602.2 (9 pages).

U.S. Office Action dated Oct. 14, 2022, issued in U.S. Appl. No. 17/808,982 (25 pages).

U.S. Office Action dated Oct. 14, 2022, issued in U.S. Appl. No. 17/808,983 (23 pages).

U.S. Office Action dated Sep. 19, 2022, issued in U.S. Appl. No. 17/808,985 (25 pages).

U.S. Office Action dated Jul. 8, 2022, issued in U.S. Appl. No. 17/005,753 (48 pages).

U.S. Restriction Requirement from U.S. Appl. No. 13/614,197, dated Aug. 18, 2014, 7 pages.

U.S. Advisory Action from U.S. Appl. No. 13/614,197, dated May 18, 2015, 3 pages.

U.S. Office Action from U.S. Appl. No. 13/614,197, dated Dec. 2, 2015, 11 pages.

U.S. Advisory Action from U.S. Appl. No. 13/614,197, dated Feb. 5, 2016, 3 pages.

U.S. Ex Parte Quayle Action from U.S. Appl. No. 13/614,197, dated Jan. 5, 2017, 5 pages.

U.S. Notice of Allowance from U.S. Appl. No. 13/614,197, dated Mar. 22, 2017, 7 pages.

U.S. Notice of Allowance from U.S. Appl. No. 13/614,197, dated Jul. 11, 2017, 7 pages.

(56) **References Cited**

OTHER PUBLICATIONS

U.S. Restriction Requirement from U.S. Appl. No. 13/872,018, dated Nov. 5, 2014, 8 pages.
U.S. Office Action from U.S. Appl. No. 13/872,018, dated Oct. 16, 2015, 15 pages.
U.S. Advisory Action from U.S. Appl. No. 13/872,018, dated Dec. 8, 2015, 3 pages.
U.S. Office Action from U.S. Appl. No. 13/872,018, dated Jun. 23, 2016, 12 pages.
U.S. Advisory Action from U.S. Appl. No. 13/872,018, dated Nov. 14, 2016, 3 pages.
U.S. Patent Board Decision from U.S. Appl. No. 13/872,018, dated Dec. 2, 2019, 8 pages.
U.S. Notice of Allowance from U.S. Appl. No. 13/872,018, dated Feb. 19, 2020, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 13/872,018, dated May 28, 2020, 5 pages.
U.S. Office Action from U.S. Appl. No. 14/059,356, dated Jun. 18, 2015, 15 pages.
U.S. Notice of Allowance from U.S. Appl. No. 14/059,356, dated Sep. 10, 2015, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 14/059,356, dated Nov. 25, 2015, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 14/059,356, dated Apr. 27, 2016, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 15/090,591, dated Feb. 13, 2017, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 15/688,760, dated Sep. 14, 2018, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 15/688,760, dated Jan. 30, 2019, 5 pages.
U.S. Restriction Requirement from U.S. Appl. No. 15/811,599, dated Mar. 28, 2018, 7 pages.
U.S. Notice of Allowance from U.S. Appl. No. 15/811,599, dated Feb. 14, 2019, 7 pages.
U.S. Office Action from U.S. Appl. No. 15/811,599, dated Jan. 21, 2020, 18 pages.
U.S. Notice of Allowance from U.S. Appl. No. 15/811,599, dated Mar. 31, 2020, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 15/811,599, dated Jul. 10, 2020, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Jan. 10, 2020, 6 pages.
U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Apr. 27, 2020, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Aug. 14, 2020, 5 pages.
U.S. Notice of Allowance from U.S. Appl. No. 16/261,437, dated Dec. 28, 2020, 5 pages.
Decision by the Intellectual Property Trial and Appeal Board (IPTAB) of the Korean Intellectual Property Office (KIPO) on Patent Cancellation Request of Korean Patent No. KR 2115531 (corresponding to U.S. Pat. No. 9,818,803) dated Mar. 16, 2021, 12 pages.
English translation of Decision by the Intellectual Property Trial and Appeal Board (IPTAB) of the Korean Intellectual Property Office (KIPO) on Patent Cancellation Request of Korean Patent No. KR 2115531 (corresponding to U.S. Pat. No. 9,818,803) dated Mar. 16, 2021, 15 pages.
English translation of Petition for Patent Invalidation of Chinese Patent No. ZL201310035429.X (corresponding to U.S. Pat. No. 9,818,803) dated Dec. 22, 2020, 31 pages.
English translation of Petition for Patent Invalidation of Chinese Patent No. ZL201510595095.0 (corresponding to U.S. Pat. No. 9,818,803) dated Jan. 22, 2021, 26 pages.
U.S. Final Office Action dated Jan. 4, 2023, issued in U.S. Appl. No. 17/808,985 (27 pages).

* cited by examiner

FIG.1





Petitioner Ex 1001, p. 5
BOE et al. v. Samsung, IPR2023-01075

FIG.2


300
200
R
B
L3
R
VL2
L4
L4
G
G
VL1
G
200
P1
300
P2
B
R
L5
B
100
G
G
G
R
B
R
VS
300
200
P1
P2
G
G
G

FIG.3



FIG.4



FIG.5






Petitioner Ex 1001, p. 9
BOE et al. v. Samsung, IPR2023-01075

# PIXEL ARRANGEMENT STRUCTURE FOR ORGANIC LIGHT EMITTING DISPLAY DEVICE

## CROSS-REFERENCE TO RELATED PATENT APPLICATION

This application is a continuation of U.S. patent application Ser. No. 15/811,599, filed Nov. 13, 2017, which is a continuation of U.S. patent application Ser. No. 13/614,197, filed Sep. 13, 2012, now U.S. Pat. No. 9,818,803, which claims priority to and the benefit of Korean Patent Application No. 10-2012-0022967, filed Mar. 6, 2012, the entire content of all of which is incorporated herein by reference.

## BACKGROUND

### 1. Field

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an organic light emitting diode (OLED) display.

### 2. Description of the Related Art

A display device is a device that displays an image. Recently, an OLED display has been drawing attention. The OLED display has a self-luminous characteristic. Because the OLED display does not need a separate light source, unlike a liquid crystal display, it can have a relatively smaller thickness and weight than liquid crystal displays. In addition, the OLED display exhibits high-quality characteristics such as low power consumption, high luminance, high response speed, etc.

In general, the OLED display includes a plurality of pixels for emitting light of different colors. The plurality of pixels emit light to display an image. Here, the pixel refers to a minimum unit for displaying the images. For instance, there may be a gate line, a data line, and a power line such as a driving power line to drive each pixel. In addition, there may be an insulation layer such as a pixel definition layer to define an area and a shape of each pixel. Further, each pixel may be positioned between its neighboring pixels.

An organic emission layer included in the pixel of an OLED display may be deposited and formed by using a mask such as a fine metal mask (FMM). When reducing a gap between the neighboring pixels to obtain a high aperture ratio of the pixel, deposition reliability may be deteriorated. On the other hand, when increasing the gap between the pixels to improve the deposition reliability, the aperture ratio of the pixel may be deteriorated.

The above information disclosed in this Background section is only for enhancement of understanding of the background of the invention. Therefore, it may contain information that does not form the prior art that is already known in this country to a person of ordinary skill in the art.

## SUMMARY

Aspects of embodiments of the present invention relate generally to a pixel arrangement structure of an OLED display. More particularly, aspects relate to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels. An exemplary embodiment of the present invention provides a pixel arrangement structure for an OLED display having an improved aperture ratio of a pixel while efficiently setting up a gap between the pixels.

According to an exemplary embodiment of the present invention, a pixel arrangement structure of an organic light emitting diode display is provided. The pixel arrangement structure includes: a first pixel having a center coinciding with a center of a virtual square; a second pixel separated from the first pixel and having a center at a first vertex of the virtual square; and a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square.

The second pixel may include a pair of second pixels. The second pixels may be separated from each other by the first pixel.

The third pixel may include a pair of third pixels. The third pixels may be separated from each other by the first pixel.

The second pixels and the third pixels may enclose the first pixel in the virtual square.

The first pixel, the second pixels, and the third pixels may have polygonal shapes. The second pixels and the third pixels may have a larger area than the first pixel.

The first pixel may have a quadrilateral shape. The second pixels and the third pixels may have hexagonal or octagonal shapes.

The second pixels and the third pixels may have octagonal shapes.

The second pixels and the third pixels may have a same area. A distance between the first pixel and the second pixels, a distance between the first pixel and the third pixels, and a distance between the second pixels and the third pixels may be a same first length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a second length that is longer than the first length.

The second pixels may have a larger area than the third pixels. A distance between the second pixels and the third pixels may be a first length. A distance between the first pixel and the second pixels, and a distance between the first pixel and the third pixels may be a same second length.

The first pixel may include a plurality of first pixels. The plurality of first pixels may have a same quadrilateral shape. A distance between neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other. A distance between the neighboring ones of the plurality of first pixels may be a third length that is longer than the first length and the second length.

The first pixel may include a plurality of first pixels. Neighboring ones of the plurality of first pixels may have quadrilateral shapes that are symmetrical to each other.

The second pixels may have a larger area than the third pixels.

The third pixels may have a larger area than the second pixels.

The first pixel, the second pixel, and the third pixel may be configured to emit different color lights.

The first pixel, the second pixel, and the third pixel may be configured to emit green light, blue light, and red light, respectively.

According to an exemplary embodiment of the present invention, the pixel arrangement structure of the OLED display improves the aperture ratio of the pixel while efficiently setting up the gap between the pixels.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a view of a pixel arrangement structure of an OLED display according to a first exemplary embodiment.

FIG. **2** is a view of a pixel arrangement structure of an OLED display according to a second exemplary embodiment.

FIG. **3** is a view of a pixel arrangement structure of an OLED display according to a third exemplary embodiment.

FIG. **4** is a view of a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment.

FIG. **5** is a view of a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment.

## DETAILED DESCRIPTION

Several exemplary embodiments according to the present invention are described hereinafter in detail with reference to the accompanying drawings to allow one of a person of ordinary skill in the art to practice the invention without undue experimentation. The present invention can be embodied in several different forms, and is not limited to exemplary embodiments that are described herein.

In order to clarify the description of embodiments of the present invention, parts that are not related to the embodiments may be omitted. In addition, the same elements or equivalents are referred to with the same reference numerals throughout the specification. For example, the same reference numerals are used for the elements having the same constructions throughout. Such elements are representatively described in a first exemplary embodiment, and in remaining exemplary embodiments, only different constructions from those of the first exemplary embodiment may be described.

Further, since sizes and thicknesses of constituent members shown in the accompanying drawings are arbitrarily given for better understanding and ease of description, the present invention is not limited to the illustrated sizes and thicknesses. In addition, unless explicitly described to the contrary, the word "comprise" and variations such as "comprises" or "comprising" will be understood to imply the inclusion of stated elements but not the exclusion of any other elements.

Nevertheless, even though each of the pixels are drawn as stereotypical polygonal shapes in the drawings, the present invention is not limited to this shape. That is, the shapes of the pixels may be modified to avoid interference with the other components of the OLED (e.g., wirings) within the spirit and scope of the appended claims.

A pixel arrangement structure (or pixel arrangement) of an OLED display according to a first exemplary embodiment will be described with reference to FIG. **1**. FIG. **1** is a view schematically showing a portion of pixels forming an OLED display.

As shown in FIG. **1**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Here, the pixel refers to a minimum unit for displaying an image (for example, the minimum addressable unit of the display).

Further, among the first pixels **100**, the second pixels **200**, and the third pixels **300**, power lines for driving each of the pixels, such as a gate line, a data line, a driving power line, and the like, may be located. In addition, an insulation layer, such as a pixel defining layer, for defining each of the pixels may be disposed. Finally, an OLED including an anode, an organic emission layer, and a cathode to correspond to each of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be disposed. These configurations are technologies known in the art and further description thereof is omitted for ease of description. A shape of each of the pixels may be defined by the power lines, the pixel defining layer, the anode, or the like, but is not limited thereto.

In the pixel arrangement of FIG. **1**, each of the first pixels **100** has a smaller area than neighboring second pixels **200** and third pixels **300**, and has a quadrilateral (i.e., four-sided) shape among polygon shapes. For example, in the pixel arrangement of FIG. **1**, each of the first pixels **100** has the same quadrilateral shape (e.g., a square or rhombus). The first pixels **100** are spaced apart from each other and arranged in rows, such as along a first virtual straight line VL**1**. The first pixels **100** emit green light, and may include an organic emission layer for emitting green light.

The second pixels **200** are arranged diagonally with respect to the first pixels **100**, such as at first vertices P**1** along one diagonal of a virtual square VS having one of the first pixels **100** as a center point (or center) of the virtual square VS. In a similar fashion, the third pixels **300** are arranged diagonally with respect to the first pixels **100**, such as at second vertices P**2** along the other diagonal of the virtual square VS.

In the virtual square VS, each of the second pixels **200** is separated from the first pixel **100**, and is centered at one of the first vertices P**1** of the virtual square VS. Each of the second pixels **200** has a larger area than the neighboring first pixel **100** and has an octagonal (i.e., eight-sided) shape. In FIG. **1**, the second pixels **200** each have the same octagonal shape. In addition, the second pixels **200** are arranged diagonally and separated from each other by the first pixels **100**. The second pixels **200** emit blue light, and may include an organic emission layer for emitting blue light.

In a similar fashion, in the virtual square VS, each of the third pixels **300** is separated from the first pixel **100** and the second pixels **200**, and is centered at one of the second vertices P**2** neighboring the first vertices P**1** of the virtual square VS. Each of the third pixels **300** has a larger area than the neighboring first pixel **100** and the same area as each of the second pixels **200**. Further, the third pixels have an octagonal shape (e.g., similar to or the same as the second pixels **200**). In FIG. **1**, the third pixels **300** each have the same octagonal shape. In addition, the third pixels **300** are arranged diagonally and separated from each other by the first pixels **100**. The third pixels **300** emit red light, and may include an organic emission layer for emitting red light.

The third pixels **300** and the second pixels **200** are spaced apart from each other and alternately arranged in rows, such as along a second virtual straight line VL**2**. In a similar fashion, the third pixels **300** and the second pixels **200** are spaced apart from each other and alternately arranged in columns. Accordingly, in the virtual square VS, two of the second pixels **200** having their corresponding centers positioned at the first vertices P**1** and two of the third pixels **300** having their corresponding centers positioned at the second vertices P**2** to enclose a corresponding one of the first pixels **100** (e.g., in the virtual square VS).

As described above, the center of each of the second pixels **200** is positioned at one of the first vertices P**1** of the

virtual square VS. In addition, the center of the corresponding first pixel **100** is the center of the virtual square VS. Further, the center of each of the third pixels **300** is positioned at one of the second vertices P**2**. Moreover, the second pixels **200** and the third pixels **300** each have the same area.

As a non-limiting example, the distance (e.g., a shortest distance) between one of the first pixels **100** and an adjacent one of the second pixels **200** is a first length L**1**, the distance between one of the first pixels **100** and an adjacent one of the third pixels **300** is the same first length L**1**, and the distance between one of the second pixels **200** and an adjacent one of the third pixels **300** is the same first length L**1**, as shown in FIG. **1**. In addition, the distance (e.g., a shortest distance) between the neighboring first pixels **100** is a second length L**2** that is longer than the first length L**1**. It should be noted that L**1**, L**2**, L**3**, . . . may be used throughout to represent shortest distances between corresponding pixels.

Therefore, the gap of the first length L**1** is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, between adjacent pairs of the first pixels **100** and the third pixels **300**, and between adjacent pairs of the second pixels **200** and the third pixels **300**. In addition, the gap of the second length L**2** that is longer than the first length L**1** is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability when using a fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, a manufacturing time and manufacturing cost of the entire OLED display may be reduced and the display quality of the image of the OLED display may be improved.

As described above, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** have polygonal shapes (e.g., the first pixels have a quadrilateral shape and the second pixels **200** and the third pixels **300** have an octagonal shape). In addition, it is worth considering that the deposition process of the organic emission layer is one of the unique manufacturing characteristics of the OLED display. Accordingly, to improve the deposition reliability of the organic emission layer in the deposition process using the fine metal mask and to improve the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300**, the center of each of the first pixels **100** is positioned at the center of a virtual square VS formed by a first pair of diagonal vertices P**1** and a second pair of diagonal vertices P**2**. In the virtual square VS, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1**, and the centers of a pair of the third pixels **300** are positioned at the second vertices P**2**.

In addition, in the pixel arrangement structure of the OLED display of FIG. **1**, the first pixels **100**, the second pixels **200**, and the third pixels **300** respectively emit green, blue, and red light. However, in pixel arrangement structures of other OLED displays, the first pixels **100**, the second pixels **200**, and the third pixels **300** may emit light of different colors. For example, at least one of the second pixels **200** or the third pixels may emit white light.

Next, a pixel arrangement structure of an OLED display according to a second exemplary embodiment will be described with reference to FIG. **2**. Parts that are different from the exemplary embodiment of FIG. **1** will be described, while the description of parts that are equivalent to the first exemplary embodiment may be omitted. For better comprehension and ease of description, constituent elements of the second exemplary embodiment that are the same as or similar to those of the first embodiment of FIG. **1** will have the same reference numerals.

As shown in FIG. **2**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. The plurality of first pixels **100** have the same quadrilateral shape (e.g., a parallelogram). In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels **300** may have polygonal shapes, such as octagonal or hexagonal (i.e., six-sided).

In a similar fashion to that of FIG. **1**, the centers of a pair of the second pixels **200** are positioned at first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **2**, the second pixels **200** have a larger area than the third pixels **300**.

As a non-limiting example, the distance between adjacent ones of the second pixels **200** and the third pixels **300** is a third length L**3**, while the distance between each of the first pixels **100** and adjacent ones of the second pixels **200** or the third pixels **300** have a same fourth length L**4**. In addition, the distance between neighboring ones of the first pixels **100** is a fifth length L**5** that is longer than the third length L**3** and the fourth length L**4**.

Accordingly, the gap of the fourth length L**4** is formed between adjacent pairs of the first pixels **100** and the second pixels **200**, and between adjacent pairs of the first pixels **100** and the third pixels **300**. In addition, the gap of the third length L**3** is formed between adjacent pairs of the second pixels **200** and the third pixels **300**. Further, the gap of the fifth length L**5** that is longer than the third length L**3** and the fourth length L**4** is formed between the neighboring ones of the first pixels **100**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. **2**, the second pixels **200** that emit blue have the shortest life span among the first pixels **100**, the second pixels **200**, and the third pixels **300**. Accordingly, the second pixels **200** have a larger area than the third pixels **300**, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display of FIG. **2** provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a third exemplary embodiment will be described with reference to FIG. **3**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of

the third exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **3**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring first pixels **100** have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. **1**-**2**, the centers of a pair of the second pixels **200** are positioned at first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **3**, the neighboring first pixels **100** have a quadrilateral shape and are symmetrical to each other, while the second pixels **200** have a larger area than the third pixels **300**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by placing each of the first pixels **100** between a pair of the second pixels **200** and between a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Further, in the pixel arrangement structure of the OLED display of FIG. **3**, the second pixels **200** that emit blue have the shortest life span among the first pixels **100**, the second pixels **200**, and the third pixels **300**. Accordingly, the second pixels **200** have a larger area than the third pixels **300**, thereby suppressing the deterioration of the life span of the OLED display. That is, the pixel arrangement structure of the OLED display provides improved life span.

Next, a pixel arrangement structure of an OLED display according to a fourth exemplary embodiment will be described with reference to FIG. **4**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fourth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **4**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring first pixels **100** have a quadrilateral shape (e.g., parallelogram) and are symmetrical to each other. In addition, the third pixels **300** have a larger area than the second pixels **200**. The second pixels **200** and the third pixels may have polygonal shapes (e.g., hexagonal or octagonal).

In a similar fashion to that of FIGS. **1**-**3**, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **4**, the neighboring first pixels **100** have a quadrilateral shape and are symmetrical to each other, while the third pixels **300** have a larger area than the second pixels **200**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

Next, a pixel arrangement structure of an OLED display according to a fifth exemplary embodiment will be described with reference to FIG. **5**. Parts that are different from the above exemplary embodiments will be described, while the description of parts that are equivalent to the above exemplary embodiments may be omitted. For better comprehension and ease of description, constituent elements of the fifth exemplary embodiment that are the same as or similar to the above exemplary embodiments will have the same reference numerals.

As shown in FIG. **5**, the pixel arrangement structure of the OLED display includes a plurality of first pixels **100**, a plurality of second pixels **200**, and a plurality of third pixels **300**. Among the plurality of first pixels **100**, the neighboring first pixels **100** have a octagonal shape and are symmetrical to each other. In addition, the second pixels **200** have a larger area than the third pixels **300**. The second pixels **200** and the third pixels **300** may have quadrilateral shapes (e.g., rhombus).

In a similar fashion to that of FIGS. **1**-**3**, the centers of a pair of the second pixels **200** are positioned at the first vertices P**1** along one diagonal of a virtual square VS having a center coinciding with a center of one of the first pixels **100**. In addition, the centers of a pair of the third pixels **300** are positioned at second vertices P**2** along another diagonal of the virtual square VS. However, in FIG. **5**, the neighboring first pixels **100** have a octagonal shape and are symmetrical to each other, while the second pixels **200** have a larger area than the third pixels **300**. This results in improved deposition reliability in the deposition process using the fine metal mask to form the green, blue, and red organic emission layers respectively included in the first pixels **100**, the second pixels **200**, and the third pixels **300**.

In addition, by enclosing each of the first pixels **100** by a pair of the second pixels **200** and a pair of the third pixels **300**, the aperture ratio of the first pixels **100**, the second pixels **200**, and the third pixels **300** may be improved. Accordingly, the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved.

While this invention has been described in connection with what is presently considered to be practical exemplary embodiments, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the spirit and scope of the appended claims, and equivalents thereof.

DESCRIPTION OF SOME SYMBOLS

first pixels **100**, second pixels **200**, third pixels **300**

What is claimed is:

**1**. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising:

a plurality of first pixels;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets,

wherein the first lines and the second lines are alternately arranged,

wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

wherein the third lines and the fourth lines are alternately arranged,

wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

**2**. The pixel arrangement structure of claim **1**, wherein one of the first lines passes between the second pixels and the third pixels in corresponding adjacent ones of the second sets.

**3**. The pixel arrangement structure of claim **1**, wherein one of the third lines passes between the second pixels and the third pixels in corresponding adjacent ones of the fourth sets.

**4**. The pixel arrangement structure of claim **1**, wherein one of the fourth lines passes between the first pixels in corresponding adjacent ones of the third sets.

**5**. The pixel arrangement structure of claim **1**, wherein a shortest distance between the first pixels and the second pixels, and a shortest distance between the first pixels and the third pixels, are a same first length.

**6**. The pixel arrangement structure of claim **1**, wherein the first pixels are configured to emit green light, the second pixels are configured to emit blue light, and the third pixels are configured to emit red light.

**7**. The pixel arrangement structure of claim **1**, wherein each of the second pixels has a same area as each of the third pixels.

**8**. The pixel arrangement structure of claim **7**, wherein a shortest distance between the first pixels and the second pixels, a shortest distance between the second pixels and the third pixels, and a shortest distance between the first pixels and the third pixels, are a same first length.

**9**. The pixel arrangement structure of claim **8**, wherein a shortest distance between neighboring ones of the plurality of first pixels is a second length that is greater than the first length.

**10**. The pixel arrangement structure of claim **1**, wherein each of the second pixels has a larger area than each of the third pixels.

**11**. The pixel arrangement structure of claim **1**, wherein each of the third pixels has a larger area than each of the second pixels.

**12**. The pixel arrangement structure of claim **1**, wherein the first pixels, the second pixels, and the third pixels have polygonal shapes.

**13**. The pixel arrangement structure of claim **12**, wherein neighboring ones of the plurality of first pixels have octagonal shapes that are symmetrical to each other.

**14**. The pixel arrangement structure of claim **12**, wherein the second pixels and the third pixels have octagonal shapes.

**15**. The pixel arrangement structure of claim **14**, wherein each of the second pixels have a same octagonal shape.

**16**. The pixel arrangement structure of claim **14**, wherein each of the third pixels have a same octagonal shape.

**17**. The pixel arrangement structure of claim **1**, wherein each of the first pixels has a smaller area than the second pixels and the third pixels.

**18**. The pixel arrangement structure of claim **1**, wherein:

some of the second pixels are spaced from, and alternately arranged with, some of the first pixels in a fifth set of pixels aligned along the third direction;

the third pixels are spaced from the first pixels and the second pixels;

some of the third pixels are alternately arranged with some of the first pixels in a sixth set of pixels aligned along a fourth direction crossing the third direction;

the fifth set of pixels and the sixth set of pixels intersect at one of the first pixels that is in both the fifth set and the sixth set; and

the first pixels are different in size from at least one of the second pixels or the third pixels.

**19**. The pixel arrangement structure of claim **18**, wherein the first pixels are configured to produce green light, wherein the second pixels are configured to produce blue light, and wherein the third pixels are configured to produce red light.

**20**. The pixel arrangement structure of claim **18**, wherein the first pixels are smaller in size than at least one of the second pixels or the third pixels.

**21**. The pixel arrangement structure of claim **18**, wherein the second pixels are different in size from the third pixels.

**22**. The pixel arrangement structure of claim **18**, wherein a shortest distance between two adjacent ones of the first pixels is greater than a shortest distance between one of the second pixels and one of the third pixels that is adjacent to the one of the second pixels, and

wherein the shortest distance between the two adjacent ones of the first pixels is different from a shortest distance between two adjacent ones of the second pixels.

**23**. The pixel arrangement structure of claim **1**, wherein:

the plurality of second pixels comprises a first second pixel, a second second pixel, and a third second pixel;

each of the second pixels is configured to produce light having a second color;

the plurality of third pixels comprises a first third pixel, a second third pixel, and a third third pixel;

each of the third pixels is configured to produce light having a third color that is different from the second color;

the first second pixel, the first third pixel, the second second pixel, and the second third pixel form a first virtual quadrangle,

the second second pixel, the second third pixel, the third second pixel, and the third third pixel form a second virtual quadrangle;

the plurality of first pixels comprises a first first pixel in the first virtual quadrangle and a second first pixel in the second virtual quadrangle;

the first and second virtual quadrangles share a common side having endpoints at a common first vertex and a common second vertex of the first and second virtual quadrangles,

the second second pixel is arranged at the common first vertex, and the second third pixel is arranged at the common second vertex;

the plurality of first pixels further comprises a third first pixel;

the first first pixel and the third first pixel are located at opposite sides of the second second pixel;

each of the first pixels is configured to produce light having a first color that is different from the second color and the third color; and

the second pixels are larger in area than the first pixels and the third pixels.

**24**. The pixel arrangement structure of claim **23**, wherein a first virtual line extending in the second direction, crossing a center of a second virtual line extending from the first third pixel to the second second pixel, and being perpendicular to the second virtual line, passes through the first first pixel.

**25**. The pixel arrangement structure of claim **23**, wherein a first virtual line extending in the second direction, crossing a center of a second virtual line extending from the second second pixel to the third third pixel, and being perpendicular to the second virtual line, passes through the second first pixel.

**26**. The pixel arrangement structure of claim **23**, wherein centers of two or more of the first pixels are aligned with each other along the first direction.

**27**. The pixel arrangement structure of claim **23**, wherein centers of at least one of the second pixels and at least one of the third pixels are aligned with each other along the second direction.

**28**. The pixel arrangement structure of claim **1**, wherein:

some of the second pixels are spaced from and alternately arranged with respective ones of the first pixels in a fifth set of pixels aligned along a fourth direction crossing the third direction from among the plurality of pixels;

the plurality of third pixels is spaced from the first pixels and the second pixels;

some of the third pixels are alternately arranged with other respective ones of the first pixels in a sixth set of pixels aligned along the third direction;

the fifth set of pixels and the sixth set of pixels intersect at one of the first pixels that corresponds to both the fifth set and the sixth set;

some of the first pixels and some of the third pixels are alternately arranged in a seventh set of pixels aligned along the fourth direction and an eighth set of pixels aligned along the third direction; and

the seventh set of pixels and the eighth set of pixels are located at sides of the fifth set of pixels.

**29**. The pixel arrangement structure of claim **28**, wherein centers of one of the first pixels in the fifth set of pixels and one of the first pixels in the seventh set of pixels are aligned along the second direction.

**30**. The pixel arrangement structure of claim **28**, wherein some of the first pixels and some of the second pixels are alternately arranged in each of a ninth set of pixels aligned along the fourth direction and a tenth set of pixels aligned along the fourth direction.

**31**. The pixel arrangement structure of claim **30**, wherein the first pixels in the ninth set of pixels are arranged along the fourth direction, and wherein the second pixels in the ninth set of pixels are arranged along the fourth direction.

**32**. The pixel arrangement structure of claim **30**, wherein the ninth set of pixels and the tenth set of pixels are arranged symmetrically with each other with respect to a column of ones of the first pixels and the third pixels extending in the fourth direction.

**33**. The pixel arrangement structure of claim **28**, wherein:

a shortest distance between two adjacent ones of the first pixels is greater than a shortest distance between one of the second pixels and one of the third pixels that is adjacent to the one of the second pixels; and

the shortest distance between the two adjacent ones of the first pixels is different from a shortest distance between two adjacent ones of the second pixels.

**34**. The pixel arrangement structure of claim **1**, wherein:

the plurality of second pixels comprises a first second pixel, a second second pixel, and a third second pixel;

each of the second pixels is configured to produce light having a second color;

the plurality of third pixels comprises a first third pixel, a second third pixel, and a third third pixel;

each of the third pixels is configured to produce light having a third color that is different from the second color;

the first second pixel, the first third pixel, the second second pixel, and the second third pixel form a first virtual quadrangle;

the second second pixel, the second third pixel, the third second pixel, and the third third pixel form a second virtual quadrangle;

the plurality of first pixels comprises a first first pixel in the first virtual quadrangle, and a second first pixel in the second virtual quadrangle;

the first and second virtual quadrangles share a common side having endpoints at a common first vertex and a common second vertex of the first and second virtual quadrangles; and

the second second pixel is arranged at the common first vertex, and the second third pixel is arranged at the common second vertex.

**35**. The pixel arrangement structure of claim **34**, wherein centers of the first second pixel and the second third pixel are aligned with each other along the first direction.

**36**. The pixel arrangement structure of claim **34**, wherein:

the plurality of first pixels further comprises a third first pixel;

the plurality of second pixels further comprises a fourth second pixel;

the plurality of third pixels further comprises a fourth third pixel;

the first third pixel, the second second pixel, the fourth second pixel, and the fourth third pixel form a third virtual quadrangle in the second direction from the first virtual quadrangle; and

the third first pixel is located in the third virtual quadrangle.

**37**. The pixel arrangement structure of claim **36**, wherein centers of the first first pixel and the third first pixel are aligned with each other along the second direction.

**38**. The pixel arrangement structure of claim **36**, wherein the first virtual quadrangle and the third virtual quadrangle have a common side, and

wherein the first first pixel and the third first pixel are symmetrical to each other along the second direction with respect to the common side.

**39**. The pixel arrangement structure of claim **1**, wherein each of the first pixels has a non-quadrilateral polygonal shape.

**40**. The pixel arrangement structure of claim **1**,

wherein each of the first pixels has two elongated sides that are elongated in the third direction or a fourth direction crossing the third direction and different from the first and second directions, and two connection portions that connect the two elongated sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two elongated sides.

**41**. The pixel arrangement structure of claim **1**, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in the third direction or a fourth direction crossing the third direction.

**42**. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising:

a plurality of first pixels;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

wherein the first lines and the second lines are alternately arranged,

wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

wherein the third lines and the fourth lines are alternately arranged,

wherein respective ones of the first pixels and respective ones of either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

wherein each of the second pixels has a larger area than each of the third pixels,

wherein a distance between centers of neighboring pixels of the second pixels and the third pixels is a first length,

wherein a distance between centers of neighboring pixels of the first pixels and the second pixels, and a distance between centers of neighboring pixels of the first pixels and the third pixels are a second length,

wherein a distance between centers of neighboring pixels of the first pixels is a third length that is greater than the second length, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

**43**. The pixel arrangement structure of claim **42**,

wherein each of the first pixels has two parallel sides that are elongated in the third direction or a fourth direction crossing the third direction and two connection portions that connect the two parallel sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**44**. The pixel arrangement structure of claim **42**, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in the third direction or a fourth direction crossing the third direction.

**45**. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising:

a plurality of first pixels, wherein the first pixels have a shape comprising edges;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein only one of the second pixels and the third pixels is included in a virtual quadrangle containing outer edges comprising some of the edges of a group of four neighboring ones of the plurality of first pixels, all portions of all others of the second pixels and the third pixels being outside of the virtual quadrangle, and

wherein a shortest distance between any two of the group of four neighboring ones of the plurality of first pixels is greater than a shortest distance between the only one of the second pixels and the third pixels included in the virtual quadrangle and a nearest one of the second pixels or the third pixels in a direction perpendicular to any side of the virtual quadrangle.

**46**. The pixel arrangement structure of claim **45**, wherein the first pixels are configured to emit green light.

**47**. The pixel arrangement structure of claim **45**, wherein the virtual quadrangle does not cross any other of the first pixels, the second pixels, or the third pixels.


Petitioner Ex 1001, p. 16
BOE et al. v. Samsung, IPR2023-01075

**48**. The pixel arrangement structure of claim **45**, wherein each of the first pixels, the second pixels, and the third pixels comprises an anode, a cathode, and an organic emission layer, at least one of the anode, the cathode, or the organic emission layer partially overlapping the pixel defining layer in a plan view.

**49**. The pixel arrangement structure of claim **45**, wherein each of the first pixels, the second pixels, and the third pixels comprises an anode, a cathode, and an organic emission layer, and

wherein the organic emission layer is formed utilizing a fine metal mask.

**50**. The pixel arrangement structure of claim **45**, wherein the first pixels have a polygonal shape different from a quadrilateral shape.

**51**. The pixel arrangement structure of claim **45**,

wherein two parallel edges from among the edges of each of the first pixels are elongated in a first direction or a second direction crossing the first direction,

wherein remaining edges from among the edges of each of the first pixels connect respective first ends of the two parallel edges to each other and connect respective second ends of the two parallel edges to each other, and

wherein a total length of the remaining edges between at least one of the first ends or the second ends is greater than a shortest distance between the two parallel edges.

**52**. The pixel arrangement structure of claim **45**, wherein a shortest distance between two parallel edges that are elongated in a first direction or a second direction crossing the first direction from among the edges of one of the group of four neighboring ones of the plurality of first pixels is less than a shortest distance between the one of the group of four neighboring ones of the plurality of first pixels and the only one of the second pixels and the third pixels included in the virtual quadrangle.

**53**. A display comprising:

a plurality of first pixel rows, each of the first pixel rows comprising a plurality of first pixels arranged along a first direction;

a plurality of second pixel rows alternately arranged with the plurality of first pixel rows along a second direction crossing the first direction, each of the second pixel rows comprising a plurality of second pixels and a plurality of third pixels that are alternately arranged along the first direction;

a plurality of first pixel groups, each of the first pixel groups comprising a first one of the first pixels and one of the second pixels neighboring the first one of the first pixels; and

a plurality of second pixel groups, each of the second pixel groups comprising a second one of the first pixels and one of the third pixels neighboring the second one of the first pixels,

wherein the first pixel groups and the second pixel groups are alternately arranged along the first direction,

wherein a shortest distance between two nearest ones of the first pixels in the second direction is greater than a width in the second direction of at least one of the second pixels or the third pixels, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first pixel rows is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second pixel rows.

**54**. The display of claim **53**, wherein the first pixel groups and the second pixel groups are alternately arranged along the second direction.

**55**. The display of claim **53**, wherein:

the first pixels are arranged on a plurality of first pixel columns extending in the second direction;

the second pixels and the third pixels are alternately arranged on a plurality of second pixel columns extending in the second direction; and

the first pixel columns and the second pixel columns are alternately arranged along the first direction.

**56**. The display of claim **53**, wherein:

the first pixel groups are arranged in a plurality of first pixel sets along a first diagonal direction crossing the first direction and the second direction;

the second pixel groups are arranged in a plurality of second pixel sets along the first diagonal direction; and

the first pixel sets and the second pixel sets are alternately arranged along a second diagonal direction crossing the first diagonal direction.

**57**. The display of claim **56**, wherein the first pixels and the second pixels in the first pixel sets are alternately arranged along the first diagonal direction.

**58**. The display of claim **56**, wherein the first pixels and the third pixels in the second pixel sets are alternately arranged along the first diagonal direction.

**59**. The display of claim **56**, wherein the first pixel groups are arranged in a plurality of third pixel sets along the second diagonal direction, wherein the second pixel groups are arranged in a plurality of fourth pixel sets along the second diagonal direction, and wherein the third pixel sets and the fourth pixel sets are alternately arranged along the first diagonal direction.

**60**. The display of claim **59**, wherein the first pixels in the first pixel groups are elongated in the second diagonal direction, and wherein the first pixels in the second pixel groups are elongated in the first diagonal direction.

**61**. The display of claim **53**, wherein a virtual quadrangle formed by centers of two adjacent ones of the first pixels and centers of one of the second pixels and one of the third pixels that are adjacent to the two adjacent ones of the first pixels has a rhombus shape.

**62**. The display of claim **53**, wherein each of the first pixels has two parallel sides that are elongated in a first diagonal direction crossing the first direction and the second direction or a second diagonal direction crossing the first diagonal direction, and

wherein the two parallel sides are parallel to at least one side of the second pixels or the third pixels.

**63**. The display of claim **53**, wherein each of the first pixels has two parallel sides that are elongated in a first diagonal direction crossing the first direction and the second direction or a second diagonal direction crossing the first diagonal direction, and two connection portions that connect the two parallel sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**64**. The display of claim **53**, wherein the first pixels and the second pixels are alternately arranged along a first diagonal direction crossing the first direction and the second direction, and

wherein an imaginary line extending in the first direction through upper edges or lower edges of ones of the second pixels overlaps only the ones of the second pixels, the upper edges and the lower edges being defined with respect to the second direction.

65. The display of claim 53, wherein each of the third pixels is larger than any of the first pixels, and wherein each of the second pixels is larger than any of the first pixels and the third pixels.

66. The display of claim 53, wherein a shortest distance between two elongated sides of one of the first pixels is less than a shortest distance between the one of the first pixels and a nearest one of the second pixels in a first diagonal direction crossing the first direction and the second direction, or a second diagonal direction crossing the first diagonal direction.

67. A display comprising a plurality of pixels for displaying an image, the plurality of pixels comprising:

a plurality of first pixels to produce light of a first color;

a plurality of second pixels to produce light of a second color different from the first color; and

a plurality of third pixels to produce light of a third color different from the first color and the second color,

wherein the plurality of pixels is organized into a plurality of first pixel rows and a plurality of second pixel rows that are alternately arranged along a column direction,

wherein each of the first pixel rows comprises some of the first pixels and some of the second pixels that are alternately arranged along a row direction substantially perpendicular to the column direction,

wherein each of the second pixel rows comprises some of the first pixels and some of the third pixels that are alternately arranged along the row direction,

wherein the first pixels in the second pixel rows are entirely outside a region extending in the row direction and completely overlapping the first pixels in one of the first pixel rows that is adjacent to the second pixel rows, and

wherein a shortest distance between two nearest ones of the first pixels in a third direction crossing the row direction and the column direction is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in the third direction.

68. The display of claim 67, wherein:

the first pixels and the second pixels are alternately arranged along the column direction in a plurality of first pixel columns;

the first pixels and the third pixels are alternately arranged along the column direction in a plurality of second pixel columns; and

the first pixel columns and the second pixel columns are alternately arranged along the row direction.

69. The display of claim 68, wherein centers of the first pixels on the first pixel columns are aligned in the column direction.

70. The display of claim 68, wherein centers of the first pixels on the second pixel columns are aligned in the column direction.

71. The display of claim 68, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the first pixel columns.

72. The display of claim 68, wherein each of the first pixels is at an intersection of one of the first pixel rows and one of the second pixel columns only, or at an intersection of one of the second pixel rows and one of the first pixel columns only.

73. The display of claim 68, wherein:

centers of corresponding ones of the second pixels are aligned in the first pixel rows and in the first pixel columns; and

centers of corresponding ones of the third pixels are aligned in the second pixel rows and in the second pixel columns.

74. The display of claim 73, wherein:

two neighboring ones of the pixels on one of the first pixel rows and two neighboring ones of the pixels on one of the second pixel rows adjacent to the one of the first pixel rows form a virtual square; and

only the two neighboring ones of the pixels on the one of the first pixel rows and the two neighboring ones of the pixels on the one of the second pixel rows are in an area of the virtual square.

75. The display of claim 67, wherein:

each of the first pixel rows comprises a plurality of first pixel groups, each of the first pixel groups consisting of one of the first pixels and one of the second pixels adjacent to the one of the first pixels on a corresponding first pixel row; and

each of the second pixel rows comprises a plurality of second pixel groups, each of the second pixel groups consisting of one of the first pixels and one of the third pixels adjacent to the one of the first pixels on a corresponding second pixel row.

76. The display of claim 67, wherein centers of corresponding ones of the first pixels on the first pixel rows are aligned in the row direction.

77. The display of claim 67, wherein centers of corresponding ones of the first pixels on the second pixel rows are aligned in the row direction.

78. The display of claim 67, wherein all of the pixels on the second pixel rows are offset entirely in the column direction from the first pixels on the first pixel rows.

79. The display of claim 67, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the second pixel rows.

80. The display of claim 67, wherein the first color is green, the second color is blue, and the third color is red.

81. The display of claim 67,

wherein each of the first pixels has two parallel sides that are elongated in the row direction or the column direction, and two connection portions that connect the two parallel sides to each other at respective ends of the two parallel sides, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

82. The display of claim 67, wherein an imaginary line extending in the row direction through upper edges or lower edges of ones of the second pixels overlaps only the ones of the second pixels, the upper edges and the lower edges being defined with respect to the column direction.

83. The display of claim 67, wherein each of the third pixels is larger than any of the first pixels, and wherein each of the second pixels is larger than any of the first pixels and the third pixels.

84. The display of claim 67, wherein a shortest distance between two parallel sides that are elongated in the row direction of one of the first pixels is less than a shortest distance between one of the two parallel sides and a nearest one of the second pixels in the column direction.

85. A display comprising:

a plurality of first pixel rows, each of the first pixel rows comprising a plurality of first pixels arranged along a first direction;

a plurality of second pixel rows alternately arranged with the plurality of first pixel rows along a second direction

crossing the first direction, each of the second pixel rows comprising a plurality of second pixels and a plurality of third pixels that are alternately arranged along the first direction;

a plurality of first pixel groups, each of the first pixel groups comprising a first one of the first pixels and one of the second pixels neighboring the first one of the first pixels; and

a plurality of second pixel groups, each of the second pixel groups comprising a second one of the first pixels and one of the third pixels neighboring the second one of the first pixels,

wherein the first pixel groups and the second pixel groups are alternately arranged along the first direction,

wherein each of the first pixels is elongated in a first diagonal direction crossing the first direction and the second direction or a second diagonal direction crossing the first diagonal direction and has two parallel sides, and two connection portions that connect the two parallel sides to each other at respective ends, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**86**. The display of claim **85**, wherein the first pixel groups and the second pixel groups are alternately arranged along the second direction.

**87**. The display of claim **85**, wherein:

the first pixels are arranged on a plurality of first pixel columns extending in the second direction;

the second pixels and the third pixels are alternately arranged on a plurality of second pixel columns extending in the second direction; and

the first pixel columns and the second pixel columns are alternately arranged along the first direction.

**88**. The display of claim **85**, wherein:

the first pixel groups are arranged in a plurality of first pixel sets along the first diagonal direction;

the second pixel groups are arranged in a plurality of second pixel sets along the first diagonal direction; and

the first pixel sets and the second pixel sets are alternately arranged along the second diagonal direction.



**89**. A display comprising a plurality of pixels for displaying an image, the plurality of pixels comprising:

a plurality of first pixels to produce light of a first color;

a plurality of second pixels to produce light of a second color different from the first color; and

a plurality of third pixels to produce light of a third color different from the first color and the second color,

wherein the plurality of pixels is organized into a plurality of first pixel rows and a plurality of second pixel rows that are alternately arranged along a column direction,

wherein each of the first pixel rows comprises some of the first pixels and some of the second pixels that are alternately arranged along a row direction substantially perpendicular to the column direction,

wherein each of the second pixel rows comprises some of the first pixels and some of the third pixels that are alternately arranged along the row direction,

wherein each of the first pixels is elongated in the row direction or the column direction and has two parallel sides, and two connection portions that connect the two parallel sides to each other at respective ends of the two parallel sides, and

wherein at least one of the two connection portions has a length that is greater than a shortest distance between the two parallel sides.

**90**. The display of claim **89**, wherein:

the first pixels and the second pixels are alternately arranged along the column direction in a plurality of first pixel columns;

the first pixels and the third pixels are alternately arranged along the column direction in a plurality of second pixel columns; and

the first pixel columns and the second pixel columns are alternately arranged along the row direction.

**91**. The display of claim **90**, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the first pixel columns.

**92**. The display of claim **89**, wherein a shortest distance between neighboring ones of the pixels on the first pixel rows is the same as a shortest distance between neighboring ones of the pixels on the second pixel rows.

* * * * *

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 13,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Melanie L. Bostwick*
Melanie L. Bostwick
*Counsel for Appellants*