Nos. 25-1517, 25-1518, 25-1519, 25-1520, 25-1521

# United States Court of Appeals for the Federal Circuit

MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., WUHAN CHINA STAR OPTOELECTRONICS SEMICONDUCTOR DISPLAY TECHNOLOGY CO., LTD., TIANMA MICROELECTRONICS CO. LTD., VISIONOX TECHNOLOGY, INC.,

Appellants

v.

SAMSUNG DISPLAY CO., LTD.,
Cross-Appellant

———————————————

On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in Nos. IPR2023-00987, IPR2023-00988, IPR2023-01075

———————————————

**CORRECTED CROSS-APPELLANT'S PRINCIPAL AND RESPONSE BRIEF**

———————————————

Jeffrey H. Lerner
Scott C. Weidenfeller
Richard L. Rainey
Matthew Kudzin
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St NW
Washington, DC 20001
(202) 662-6000

October 7, 2025                  *Counsel for Cross-Appellant*

## EXEMPLARY PATENT CLAIMS

### U.S. Patent No. 9,818,803, Claim 1

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, comprising:

a plurality of pixels for displaying an image on the OLED display and comprising:

a first pixel having a center coinciding with a center of a virtual square;

a second pixel separated from the first pixel and having a center at a first vertex of the virtual square;

another first pixel on a line defined by the center of the virtual square and the first vertex, the first pixel, the second pixel, and the other first pixel being consecutive pixels on the line from among the plurality of pixels; and

a third pixel separated from the first pixel and the second pixel, and having a center at a second vertex neighboring the first vertex of the virtual square,

wherein the second pixel has a larger area than that of the third pixel, and

wherein the first pixel is configured to emit green light.

**U.S. Patent No. 10,854,683, Claim 1**

1. A pixel arrangement structure of an organic light emitting diode (OLED) display comprising:

    a plurality of pixels for displaying an image on the OLED display and comprising:

        a first pixel;

        a pair of second pixels separated from the first pixel, the second pixels being located at opposite sides of the first pixel along a first line on which the first pixel, the second pixels, and another first pixel are consecutively arranged such that the first line passes through respective centers of the first pixel, the second pixels, and the other first pixel; and

        a pair of third pixels separated from the first pixel and the second pixels, the third pixels being located at opposite sides of the first pixel along a second line on which the first pixel, the third pixels. and an additional first pixel are consecutively arranged such that the second line passes through respective centers of the first pixel, the third pixels, and the additional first pixel, the second line crossing the first line at a location of the first pixel,

    wherein a first distance between the second pixels is greater than a second distance between one of the second pixels and a neighboring one of the third pixels,

    wherein the first pixels are configured to emit green light, which is a color that is different from light emitted by the second pixels and the third pixels,

    wherein the first pixels are smaller than at least one of the second pixels or the third pixels, and

    wherein each of the second pixels has a larger area than each of the third pixels.

**U.S. Patent No. 11,594,578, Claim 1**

1. A pixel arrangement structure of an organic light emitting diode (OLED) display, the pixel arrangement structure comprising a plurality of pixels comprising:

a plurality of first pixels;

a plurality of second pixels; and

a plurality of third pixels,

wherein the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels,

wherein the first pixels, the second pixels, and the third pixels are configured to emit different color lights,

wherein the first pixels are arranged in first sets extending along a first direction to form respective first lines,

wherein the second pixels and the third pixels are alternately arranged in second sets extending along the first direction to form respective second lines parallel to the first lines,

wherein one of the second lines passes through centers of the second pixels and the third pixels in a corresponding one of the second sets and passes between the first pixels in corresponding adjacent ones of the first sets,

wherein the first lines and the second lines are alternately arranged,

wherein the first pixels are also arranged in third sets extending along a second direction that is perpendicular to the first direction to form respective third lines,

wherein the second pixels and the third pixels are also alternately arranged in fourth sets extending along the second direction to form respective fourth lines that are parallel to the third lines,

wherein the third lines and the fourth lines are alternately arranged,

wherein the first pixels and either the second pixels or the third pixels are alternately arranged along a third direction, which crosses the first direction and the second direction,

wherein a region having a width in the second direction that is equal to a width of the first pixels in the second direction, extending parallel to the first direction, and completely overlapping a row of the first pixels extending in the first direction, is entirely offset in the second direction from at least one of the second pixels or the third pixels in at least one of rows of the second pixels and the third pixels adjacent to the row of the first pixels, and

wherein a shortest distance between two nearest ones of the first pixels in one of the first sets is greater than a shortest distance between one of the second pixels and one of the third pixels that are nearest each other in one of the second sets.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 25-1517, 25-1518, 25-1519, 25-1520, 25-1521

**Short Case Caption** Mianyang BOE Optoelectronics Technology Co., Ltd. v. Samsung Display Co., Ltd.

**Filing Party/Entity** Samsung Display Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/07/2025

Signature: /s/ Jeffrey H. Lerner

Name: Jeffrey H. Lerner

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Samsung Display Co., Ltd. | None | Samsung Electronics Co., Ltd. |
|  |  | Samsung SDI Co., Ltd. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐ Additional pages attached

**FORM 9. Certificate of Interest**

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable      ☐   Additional pages attached

| Covington & Burling LLP | Daniel W. Cho | Kee Young Lee |
|---|---|---|
|  |  |  |
|  |  |  |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable      ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |

# TABLE OF CONTENTS

Table of Authorities.................................................................iv

Table of Abbreviations ...........................................................vii

Statement of Related Cases ...................................................viii

Statement of Jurisdiction......................................................... 1

Counterstatement of the Issues................................................ 2

Introduction ............................................................................ 3

Counterstatement of the Case ................................................. 6

    A.  The Diamond Pixel Patents ........................................... 7

    B.  BOE's Petitions for *Inter Partes* Review..................... 10

    C.  The Board's Decisions ................................................ 11

        1.   Matthies and Yamada........................................ 11

        2.   Murai and Yamada ........................................... 19

        3.   Phan................................................................. 20

        4.   Phan and Yamada............................................. 23

    D.  SDC Initiates an ITC Proceeding for Infringement of the Diamond Pixel Patents. ......................................... 24

    E.  The ITC Rejects BOE's Invalidity Theories as to All Asserted Claims. ...................................................... 26

Summary of the Argument ..................................................... 26

Standards of Review............................................................... 28

Argument............................................................................... 29

I.    Substantial Evidence Supports the Board's Findings that the Challenged Claims Would Not Have Been Obvious Over the Combination of Matthies and Yamada. ........................................ 29

    A.    Substantial Evidence Supports the Board's Factual Finding that Matthies and Yamada Are Incompatible. ............. 31

        1.    BOE's counterarguments lack merit. ................................... 37

    B.    Substantial Evidence Supports the Board's Factual Finding that a POSITA Would Not Have Been Motivated to Combine Matthies and Yamada. ........................................... 41

        1.    The Board did not abuse its discretion in declining to consider BOE's "useful lifetime" argument improperly raised for the first time in its reply brief. ............................. 43

    C.    The Challenged Claims of the '578 Patent Were Not Obvious over Matthies and Yamada. ........................................ 47

        1.    The Board's factual finding that Matthies does not teach a pixel defining layer is supported by substantial evidence. ................................................................................ 50

        2.    The Board's factual finding that it would not have been obvious to add a pixel defining layer to Matthies is supported by substantial evidence. ..................................... 60

II.    Substantial Evidence Supports the Board's Finding that the Challenged Claims Would Not Have Been Obvious Over the Combination of Murai and Yamada. ........................................... 71

III.   Phan Does Not Render Obvious the Challenged Claims of the '803 or '683 Patent. ................................................................ 74

    A.    Phan Does Not Disclose or Suggest a Pixel Arrangement Structure of an OLED Display. .................................................. 74

    B.    Phan Does Not Render Obvious the "Virtual Square" of the '803 Patent. ................................................................................ 86

Conclusion ................................................................................ 95

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*3M Co. v. Westech Aerosol Corp.,*
  No. IPR2018-00576, 2020 WL 578975 (P.T.A.B. Feb. 4, 2020).......... 68

*Allied Erecting and Dismantling Co. v. Genesis Attachments, LLC,*
  825 F.3d 1373 (Fed. Cir. 2016). ........................................................... 39

*Arendi S.A.R.L. v. Apple Inc.,*
  832 F.3d 1355 (Fed. Cir. 2016) ............................................................ 85

*Belden Inc. v. Berk-Tek LLC,*
  805 F.3d 1064 (Fed. Cir. 2015) ...................................................... 30, 62

*Creative Kingdoms, LLC v. Int'l Trade Comm'n,*
  588 F. App'x 993 (Fed. Cir. 2014) ....................................................... 83

*DSS Tech. Management, Inc. v. Apple Inc.,*
  885 F.3d 1367 (Fed. Cir. 2018) ............................................................ 85

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.,*
  881 F.3d 1354 (Fed. Cir. 2018) ............................................................ 62

*Elekta Ltd. v. ZAP Surgical Sys., Inc.,*
  81 F.4th 1368 (Fed. Cir. 2023)............................................................. 29

*Ethicon LLC v. Intuitive Surgical, Inc.,*
  No. 21-1601, 2022 WL 1576779 (Fed. Cir. 2022) ............................... 47

*Google LLC v. Personal Audio, LLC,*
  743 F. App'x 978 (Fed. Cir. 2018) ....................................................... 59

*Henny Penny Corp. v. Frymaster LLC,*
  938 F.3d 1324 (Fed. Cir. 2019) ............................................................ 44

*Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.,*
  222 F.3d 951 (Fed. Cir. 2000) .............................................................. 90

*Hytera Commc'ns Co. v. Motorola Sols, Inc.,*
  840 F. App'x 569 (Fed. Cir. 2021)........................................................ 38

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
  849 F.3d 1034 (Fed. Cir. 2017) .......................................................... 28

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
  97 F.4th 915 (Fed. Cir. 2024).............................................................. 28

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................... 67, 84

*Microsoft Corp. v. Biscotti, Inc.*,
  878 F.3d 1052 (Fed. Cir. 2017) ...................................................... 58, 68

*Netflix, Inc. v. DivX, LLC*,
  84 F.4th 1371 (Fed. Cir. 2023)............................................................ 55

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
  678 F.3d 1280 (Fed. Cir. 2012) .......................................................... 77

*PGS Geophysical AS v. Iancu*,
  891 F.3d 1354 (Fed. Cir. 2018) .......................................................... 29

*Raytheon Techs. Corp. v. General Electric Co.*,
  993 F.3d 1374 (Fed. Cir. 2021) .......................................................... 83

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
  903 F.3d 1286 (Fed. Cir. 2018) ...................................................... 61, 68

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) .......................................................... 58

*In re Stepan Co.*,
  868 F.3d 1342 (Fed. Cir. 2017) .......................................................... 83

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
  18 F.4th 1377 (Fed. Cir. 2021)............................................................ 39

*TQ Delta, LLC v. CISCO Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) .......................................................... 69

*Twitter, Inc. v. VidStream LLC*,
  825 F. App'x 844 (Fed. Cir. 2020)....................................................... 78

*Uber Techs., Inc. v. X One, Inc.*,
957 F.3d 1334 (Fed. Cir. 2020). ........................................... 39

*Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*,
497 F.4th 882 (Fed. Cir. 2024) ............................................ 67

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ........................................... 56

*Yita LLC v. MacNeil IP LLC*,
69 F.4th 1356 (Fed. Cir. 2023) ........................................... 44

**Statutes**

28 U.S.C. §1295(a)(4)(A) .................................................... 1

35 U.S.C. §6 ...................................................................... 1

35 U.S.C. §141(c) ............................................................. 1

35 U.S.C. §318(a) .............................................................. 1

35 U.S.C. §319 .................................................................. 1

**Rules and Regulations**

37 C.F.R. §42.23(b) ......................................................... 46

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '578 patent | U.S. Patent No. 11,594,578 |
| '683 patent | U.S. Patent No. 10,854,683 |
| '803 patent | U.S. Patent No. 9,818,803 |
| Board | Patent Trial and Appeal Board |
| BOE | Appellants Mianyang BOE Optoelectronics Technology Co., Ltd., Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd., Tianma Microelectronics Co. Ltd., Visionox Technology, Inc. |
| Br. | Opening Brief of Appellants Mianyang BOE Optoelectronics Technology Co., Ltd.; Wuhan China Star Optoelectronics Semiconductor Display Technology Co., Ltd.; Tianma Microelectronics Co. Ltd.; and Visionox Technology, Inc. |
| Hong | U.S. Patent Application Publication No. 2011/0234550 |
| Matthies | U.S. Patent No. 6,897,855 |
| Murai | Japanese Patent No. 4,496,852 |
| Phan | U.S. Patent No. 7,091,986 |
| SDC | Cross-Appellant Samsung Display Co., Ltd. |
| Yamada | U.S. Patent No. 6,366,025 |

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals.

The Court's decision in this case may directly affect or be directly affected by the following cases that involve the same or related patents that are at issue in these appeals. *In the Matter of Certain Active Matrix Organic Light-Emitting Diode Display Panels and Modules for Mobile Devices and Components Thereof*, Inv. No. 337-TA-1351 (U.S.I.T.C.), appeal pending, *Samsung Display Co., Ltd. v. International Trade Commission*, No. 25-1791 (Fed. Cir.); *Samsung Display Co., Ltd. v. BOE Tech. Grp. Co., Ltd. et al.*, Case No. 1:25-cv-00908-RDA-LRV (E.D. Va.); *Samsung Display Co., Ltd. v. BOE Tech. Co., Ltd. et al.*, Case No. 2:23-cv-00309-JRG-RSP (E.D. Tex.); *Samsung Display Co., Ltd. v. BOE Tech. Grp. Co., Ltd. et al.*, Case No. 2:25-cv-00426-JRG-RSP (E.D. Tex.); *Samsung Display Co., Ltd. v. BOE Tech. Grp. Co., Ltd. et al.*, Case No. 2:25-cv-00430-JRG-RSP (E.D. Tex.).

**STATEMENT OF JURISDICTION**

The Board had jurisdiction under 35 U.S.C. §§6 and 318(a). The Board issued its Final Written Decisions on January 6, 2025. Appx1-124; Appx125-227; Appx228-261. SDC timely filed notices of cross-appeal on March 10, 2025. Appx960-964; Appx1444-1448. This Court has jurisdiction under 28 U.S.C. §1295(a)(4)(A) and 35 U.S.C. §§141(c) and 319.

## COUNTERSTATEMENT OF THE ISSUES

The issues in BOE's appeal are:

1.  Whether substantial evidence supports the Board's findings that the challenged claims of the '803 and '683 patents were not obvious over Matthies and Yamada.

2.  Whether substantial evidence supports the Board's finding that the challenged claims of the '578 patent were not obvious over Matthies and Yamada.

3.  Whether substantial evidence supports the Board's findings that the challenged claims of the '803 and '683 patents were not obvious over Murai and Yamada.


The issues in SDC's cross-appeal are:

4.  Did the Board err in finding claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent obvious over Phan, which discloses no OLED pixels or displays.

# INTRODUCTION

The patents in this consolidated proceeding, U.S. Patent Nos. 9,818,803 ("the '803 patent"); 10,854,683 ("the '683 patent"); and 11,594,578 ("the '578 patent"), concern novel organic light-emitting diode ("OLED") pixel arrangement structures, which are now widely implemented in smartphone displays. The patents solved problems unique to OLED displays and enabled commercialization of high-definition AMOLED displays for mobile devices. The record before the Board demonstrates the claimed inventions were not obvious.

In its challenge to each patent, Appellants (collectively, "BOE") argued obviousness based on its proposed combination of Matthies (U.S. Patent No. 6,897,855) and Yamada (U.S. Patent No. 6,366,025). The Board rejected BOE's arguments on multiple independent factual grounds: A POSITA could not have modified Matthies in the way BOE argued, would not have had a motivation to make the combination, and would not have had a reasonable expectation of success. For the '578 patent, the Board also found BOE's proposed combination failed to satisfy the claim limitation of each challenged claim requiring a pixel defining

layer. These factual findings were supported by, among other things, the disclosures of the references and expert testimony.

For the '803 and '683 patents, BOE additionally argued for a combination of Murai (Japanese Patent No. 4,496,852) and Yamada. The Board again rejected that argument on multiple independent factual grounds, which likewise are supported by substantial evidence.

In challenging the Board's findings as to Matthies and Yamada, and Murai and Yamada, BOE fails to identify any legal error. And BOE shows no lack of substantial evidence supporting the findings. BOE does not engage with key evidence cited by the Board, nor the Board's crediting of technical showings made by SDC's expert, many of which were unrebutted. Repeatedly, BOE attempts to raise new arguments not presented to the Board or resorts to bare attorney argument. In appealing the Board's decision as to claim 5 of the '803 patent, BOE also neglects to mention that in the co-pending ITC proceeding, its expert renounced the opinion that his proposed combination of Matthies and Yamada meets the requirements of claim 4, from which claim 5 depends. Appx5024, 237:15-23. The ALJ found BOE's expert (the same expert as in the IPR proceedings) "in general, lacked credibility," "took positions he knew to

be contrary to the evidence," and "would change his opinion as necessary to fit the circumstances." Appx5478.

The Board erred, however, in finding claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent obvious based on Phan (U.S. Patent No. 7,091,986). Phan does not describe or disclose OLEDs. The sole mention of OLED in Phan is in its background section, seventh in a laundry list of display technologies including two purported "technologies" that do not exist alongside "any light sources known or invented in the future." Appx3121, 1:18-29. Phan's single background sentence attempting to generically list every conceivable display technology does not render obvious the claims, which are specifically directed to OLED pixel arrangement structures that address problems unique to OLEDs. Moreover, the Board failed to articulate any motivation to modify Phan's display to make an OLED display. Its determination is legally erroneous on that basis. And the Board's finding of a reasonable expectation of success is not supported by substantial evidence. The Board's conclusion that Phan renders obvious claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent should thus be reversed.

## COUNTERSTATEMENT OF THE CASE

OLEDs were first developed in the late 1980s. Appx3734. Early OLED displays used a "passive-matrix" design. Appx3743-3746. While relatively simple, passive-matrix OLEDs suffered from short lifetimes and were limited to low-resolution displays. Appx3746.

By the early 2000s, most efforts to develop OLED displays shifted to a different technology—active-matrix OLED ("AMOLED") displays. Appx3778. AMOLEDs are significantly more complicated, with each pixel controlled by its own circuitry, but allowed lower driving voltages and longer lifetime. Appx3746-3747, ¶53. Before the inventions, adoption of AMOLED displays was stalled by their limited resolution, yield, image quality, and lifetime, all relating to challenges in manufacturing OLED displays. Appx3740-3741; Appx3894.

The organic light-emitting layers are typically formed using vapor deposition through a "fine metal mask," which is difficult to control precisely. Appx3743. Color OLED displays contain pixels of different colors (often combinations of red, green, and blue), and different organic materials must be deposited for the different-colored pixels. Appx3742. For proper light output, the organic layers must completely cover each

pixel area and have uniform thickness and composition for all pixels of the same color. At the same time, deposition of organic material outside of the pixel areas causes problems both in yield and image quality. Appx3741. The organic materials are conductive, and stray conductive material may cause the display to short circuit. Appx3741; Appx3750. Deposition of a light-emitting material outside its intended location can also cause color mixing or changes to efficiency, impacting the color and intensity of light output from pixels. Appx3741.

Before the inventions, AMOLED displays suffered from relatively low resolutions and low manufacturing yields and, as a result, high manufacturing costs. Appx3740-41. Thus, even in 2010, nearly all smartphone manufacturers used heavier, more power-hungry liquid crystal displays (LCDs), even in their flagship products. Appx3897-3900. That changed with the inventions of the Diamond Pixel patents.

## A.    The Diamond Pixel Patents

The inventor of the Diamond Pixel patents devised a novel pixel arrangement structure specifically for OLED pixels that greatly improved resolution, image quality, and manufacturability for AMOLED displays, and enabled the manufacture of the first high-definition OLED

displays for mobile devices. The inventive structure was first implemented in the Samsung Galaxy S4, to wide acclaim, Appx3900, ¶182, and has since been used in every Samsung Galaxy smartphone as well as other flagship smartphones such as Apple iPhones, Appx3907, ¶338.

An exemplary embodiment is shown in Figure 5 (below left). The pixels in the Samsung Galaxy S22 Ultra are shown below right.



Appx268; Appx3911 (quoting Appx4204). As the patents explain, their pixel arrangement structures improve an OLED display's aperture ratio (the fraction of the display that emits light) and image quality while simultaneously "efficiently setting up a gap between the pixels" to allow

for manufacturability using fine metal mask technology. Appx269, 1:58-62; Appx271, 5:16-19.

The patents describe specific relationships in spacing, relative size, and shape of the OLED pixels, including arranging red and blue pixels at vertices of a "virtual square" centered on a green pixel. Appx270, 4:14-31. Through these structures, the display contains more green pixels than red pixels or blue pixels, Appx264-268, taking advantage of the different sensitivity of the human eye to different colors of light and increasing the apparent resolution, Appx3840. Each color pixel is also differently sized, providing further benefits in display lifetime. As the patents explain, "the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved." Appx272, 8:43-45.

The introduction of the Diamond Pixel arrangement had a major impact. While AMOLED displays were previously seen as infeasible for smartphones, Appx3897-3900, they have become ubiquitous, with nearly every major manufacturer employing AMOLED displays using the Diamond Pixel arrangement, Appx3908-3915. When the Samsung Galaxy S4 first implementing the inventions was released, it was

9

specifically recognized for its "proprietary diamond structure" that eliminated "[a]ll weaknesses of the existing AMOLED display[]," Appx4172. The arrangement has been credited as "completely resolv[ing] existing concerns that 'it is difficult to implement Full HD resolution in 5-inch level screens with AMOLED.'" Appx4142.

### B.    BOE's Petitions for *Inter Partes* Review

BOE petitioned for *inter partes* review of the '803, '683, and '578 patents, presenting common arguments across multiple petitions.

| Prior Art | Challenged Claims | | |
|---|---|---|---|
| | '803 patent | '683 patent | '578 patent |
| Matthies+Yamada | 1-5, 19-21 | 1, 2, 4-10, 13, 15 | 1-6, 10, 12, 17-19, 21-23, 41, 42, 44, 47, 52 |
| Matthies+Yamada +Hong | | | 40, 43, 45-47, 51, 52 |
| Phan | 1-4, 19-21 | 1, 4-10, 13, 15 | |
| Phan+Yamada | 5 | 2 | |
| Murai+Yamada | 1-5, 19-21 | 1, 2, 4-10, 13, 15 | |

In support of each of its petitions, BOE submitted declarations from Dr. P. Morgan Pattison. Dr. Pattison has never designed an OLED display. Appx4507-4508, 43:5-44:22.

## C.     The Board's Decisions

### 1.     Matthies and Yamada

BOE's primary argument was that all of the challenged claims would have been obvious over Matthies and Yamada. However, as the Board found, Matthies and Yamada relate to fundamentally different types of displays and the modifications BOE proposes are incompatible with Matthies. Matthies is directed to tiled passive-matrix OLED displays, while Yamada is directed to single-substrate active-matrix OLED displays. The Board examined the references and expert testimony in detail and found that BOE failed to show a POSITA could make BOE's modifications to Matthies, much less have a reasonable expectation of success.

Matthies, titled "Tiled Electronic Display Structure," Appx3075, is directed to large (e.g., wall-sized or larger) tiled displays, formed by physically joining many individual display tiles. Appx3089, 1:8-10. Matthies explains "[n]o practical tiled display system has yet been developed" and "barriers" included "eliminating the visibility of the seams between tiles…." Appx3089, 1:66-2:10. Matthies provides design requirements to overcome those issues, including that there be equal spacing between pixels within a tile and equal spacing between the edges

of pixels and the edges of a tile. Appx3092, 8:37-41; Appx3091, 5:47-48; Appx3097, 17:16-20; Appx3784, ¶131; Appx3807-3808, ¶¶178-80; Appx3812-3813, ¶187.

Matthies' tiled displays—including the display tile of Figure 8B on which BOE relied—are passive-matrix OLEDs. Appx3093, 10:31-33; Appx3097, 17:10-16. In Matthies, each pixel is defined by the overlap between row (yellow) and column (orange) electrodes, *see* Appx3094-3095, 12:61-13:11, as seen in annotated Figure 8B:



Appx3081, Fig. 8B (annotated); Appx3773.

By contrast, Yamada is directed to active-matrix OLED displays built on a single substrate. Appx3169-3170, 1:6-3:8. Each pixel has its own pixel circuit with a "gate signal line 51," a "data line 52," a "power source line 53," two transistors, and a capacitor. Appx3172, 7:19-8:18.

Yamada's pixel structure is shown in Figures 5 (plan view) and 6B (cross-section).



Appx3163, Fig. 5 (annotated), Appx3165, Fig. 6B (annotated); *see* Appx3775-3776. As shown in Figure 5, Yamada uses an L-shaped light-emitting area to provide space for the circuitry in non-emissive areas. Appx3170, 3:16-23. Yamada states the sizes of its pixels depend on a variety of different factors, including the different emission efficiencies of the organic materials used in the pixels, the relative luminance of the light emitted by the pixels, and the target white point of the display device. Appx3170, 4:29-37, 4:57-67.

In its IPR petitions, BOE claimed it would have been obvious to modify the structure of Matthies' Figure 8B (a passive-matrix OLED) based on Yamada's disclosures about active-matrix OLED displays. BOE

claimed a POSITA would have kept the blue pixels the same size, made the red pixels smaller, and made the green pixels smallest of all, as shown in the following BOE drawing.



Appx352. According to BOE, a POSITA would have been motivated to make this modification to extend display life. *See, e.g.*, Appx359.

SDC submitted an expert declaration from Dr. Ioannis Kymissis, Chair of the Department of Electrical Engineering at Columbia University, Appx3720, ¶5, and president-elect of the Society for Information Display, the leading professional organization of the display industry, Appx3721, ¶8. Dr. Kymissis explained in detail that a POSITA would not be able to combine Matthies and Yamada as BOE asserted and would have had no reason to attempt to do so. Because Matthies' pixels are defined by the overlap of row and column electrodes, they could not be resized individually in the way BOE's proposed modification requires.

Appx3779-3780, ¶123. Further, even if these problems could be overcome, BOE's proposed modifications would *shorten* the life of the display. Appx3785-3788, ¶¶133-39. The lifetime of an OLED is "a function of current density—the amount of current applied to the pixel divided by the area of the pixel," Appx3786, ¶135, and "if the same current is applied to two OLED pixels with different sizes, then all else being equal, the smaller OLED pixel will tend to have a shorter life than a larger OLED pixel." *Id.* BOE's proposed combination would make the red and green pixels *smaller*, which would *increase* current density, thereby shortening the life of the display. Appx3786-3787, ¶¶136-137.

BOE's proposed modifications are further contrary to Matthies' design requirements to avoid visible seams between tiles through, among other things, equal spacing between pixels. Appx17 (quoting Appx3092, 8:37-41). As Dr. Kymissis explained, BOE's proposed resized pixels violate this requirement, with distances between pixels that vary even within a tile, as shown below:



Appx3813-3814, ¶190.

The Board credited Dr. Kymissis' testimony "explaining the difficulties of accomplishing individual sizing of pixels." Appx32-33. As the Board noted, BOE "does not dispute [SDC's] assertion that varying pixel sizes within each tile in accordance with emissive efficiency as [BOE] has proposed for the passive-matrix display of Matthies would be problematic or Dr. Kymissis' testimony that it is not clear how it could be done." Appx33.

The Board also agreed that resizing the pixels as BOE proposed would shorten the life of the display. Appx38-39. The Board observed that, once again, BOE did not dispute any of Dr. Kymissis' relevant opinions. Appx39.

Having argued in its petitions that the motivation for its proposed modifications was that a POSITA would seek to "avoid" deterioration,

Appx358-359, BOE tried to argue in reply that a POSITA would be motivated to *increase* the rate of deterioration of red and green pixels, allegedly to match the blue pixel's rate so as to improve the display's "useful lifetime." Appx39-40 (quoting Appx688-690). The Board explained this was a new argument that "changes the thrust and direction of its original argument in the Petition and thus is not entitled to consideration." Appx41. The Board also found the argument unsupported, concluding that BOE had failed to show that "one of ordinary skill in the art would have modified the pixel sizing in Matthies as proposed by Petitioner." Appx41.

In the '578 IPR, the Board further found BOE failed to show its proposed combination of Matthies and Yamada would "comprise[] a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels," as required by each challenged claim of the '578 patent. Appx300, 9:11-13; Appx302, 13:48-50, 14:45-47; *see* Appx249-259. The petition argued Matthies teaches this limitation in Figure 10B. Appx1476; Appx1478; Appx1514-1515; Appx1517-1518. Dr. Kymissis showed this was incorrect, as Matthies did not disclose a pixel defining layer nor need one. *See, e.g.*, Appx7737-7738, ¶117; Appx7772-7773, ¶182;

Appx7776, ¶187. Neither BOE nor its expert contested this in reply. The Board agreed with Dr. Kymissis, explaining in detail that Matthies does not disclose or describe any purported pixel defining layer. Appx251-253.

BOE also claimed a POSITA would believe Matthies "obviously could include" a pixel defining layer. Appx1478; *see* Appx1476. As Dr. Kymissis explained, however, a POSITA would understand Matthies does not contain a pixel defining layer and there would be no reason to add one, particularly because attempting to add one would have deleterious effects. *See, e.g.*, Appx7737-7738, ¶117, Appx7772-7773, ¶182, Appx7776-7778, ¶¶187-189. These explanations were unrebutted. The Board found BOE presented no explanation of how or why Matthies' structure would be modified to introduce a pixel defining layer. Appx252-253, Appx257-259.

BOE also argued that Yamada teaches an example of a pixel defining layer. Appx1478-1479. But BOE did not contend a POSITA would have combined Yamada with Matthies to meet the pixel-defining-layer limitation. Appx1478-1479; Br., 52 n.3. The Board found the structure BOE referenced in Yamada (planarization insulating film 167, Appx1478-1479) does not define the pixel shape or area, Appx255-256,

that BOE failed to explain how it could serve as a pixel defining layer in Matthies, Appx257, and that, in any event, BOE offered no reason to add a layer like it to Matthies. Appx256.[1]

### 2. Murai and Yamada

In the '803 and '683 IPRs, BOE argued the challenged claims would have been obvious over Murai in light of Yamada. Murai describes an LCD display in which some pixels have "cut off" corners, Appx3143, as shown in Figure 3.



Appx3154. BOE proposed to modify Murai's display by keeping the blue pixels the same size and shrinking the sizes of the red and green pixels. BOE stated the alleged motivation was the same it offered for combining

---

[1] BOE also asserted a combination of Matthies and Yamada with a third reference, Hong. Appx1528-1536. BOE does not contend Hong teaches a pixel defining layer. The Board's conclusions thus apply equally to this three-reference combination.

Matthies and Yamada, namely that the combination would "reduce[] deterioration and improve[] display life." Appx399.

Dr. Kymissis explained in detail why a POSITA would not have been motivated to combine Murai and Yamada. Appx3878-3888. For instance, BOE's proposed modifications are not only inconsistent with Murai's disclosures and purpose, but would shorten, rather than lengthen, the life of the display. Appx3882. His explanations were unrebutted, and the Board credited them. Appx103-110. As to display lifetime, the Board noted BOE repeated the arguments it made for Matthies, and concluded "[t]hese fare no better here." Appx109.

### 3.   Phan

BOE argued that certain claims of the '803 and '683 patents would have been obvious over Phan.

Although the inventions of the '803 and '683 patents specifically concern OLED pixel arrangement structures and problems unique to OLEDs, Phan does not describe or disclose any OLED display. None of Phan's embodiments is an OLED display nor an OLED pixel. Appx3819-3828, ¶¶201-215.

Rather, Phan discloses a method of interlacing multiple images on a low-resolution display at high frequency, "preferabl[y] at a rate of 100 Hz or higher," to "cause the human eye to be tricked into perceiving a more exact representation of the displayed picture" and a higher resolution. Appx3122, 4:50-53. Phan describes its approach as "dynamic" pixels, and discusses it to address to difficulties in manufacturing LCD, plasma, solid-state LED, and field emission displays. *See, e.g.*, Appx3121, 2:26-62. According to Phan, "[o]ne drawback" of a display is that "the number of pixels is limited by the fixed grid, which limits the resolution and the picture sharpness." Appx3121, 2:26-28.

Phan contains just a single reference to OLEDs, found in one sentence in the "Background of the Invention": OLED is listed seventh in a laundry list of alleged display "technologies" that includes items such as "phototronics" or "biotronics" that neither side's experts had ever heard of and which "do not appear to exist," Appx3121, 1:18-29; Appx3759; Appx4623-Appx4624, 159:22-160:21, and "any light sources known or invented in the future," Appx3121, 1:27-28.

BOE argued for combining a particular "quad pixel" structure shown in Figure 11b of Phan with a display shown in Figure 12, but offered no reason a POSITA would try to apply Phan to an OLED display.



FIG 11b

FIG. 12

Appx3112-3113. As Dr. Kymissis explained, neither structure is an OLED pixel or OLED display.

In Figure 11b, the dots are "contoured by black mask or barrier ribs" (shown as thick black lines). Appx3121, 1:30-34. "Neither were used in OLED displays at the time." Appx3822, ¶205.

The display of Figure 12 is also not an OLED display. It is "connected to control circuitry 19 through a network 20," Appx3123, 5:12-15, which "preferably is an optical fiber network, *id.*, 5:20. Each dot "has a receiver of it own." Appx3123, 5:16-19. Unrebutted testimony showed this structure is *incompatible* with an OLED display. Appx3821, ¶203.

22

The Board did not find that either Figure 11b or Figure 12 discloses an OLED display, as required by the claims. Rather, the Board erroneously concluded, based on Phan's boilerplate recital of different display types, that "Phan teaches that its disclosed pixel arrangements can be applied to OLED displays." Appx47. But even if true, that would not render the claims obvious. The Board failed to identify any motivation to modify Phan to form an OLED display. The Board further failed to show a reasonable expectation of success, improperly relying on a conclusory opinion from BOE's expert that does not even address Phan's lack of disclosure of an OLED display let alone the challenges a POSITA would face in trying to modify Phan.

### 4.    Phan and Yamada

BOE claimed that certain claims of the '803 and '683 patents would have been obvious over Phan in view of Yamada. Appx378-383; Appx1024-1029. BOE has not appealed the Board's conclusion that a POSITA would not have been motivated to combine Phan and Yamada. Br., 59.

**D.    SDC Initiates an ITC Proceeding for Infringement of the Diamond Pixel Patents.**

In December 2023, faced with widespread infringement and copying of its patents, SDC brought an action in the ITC for infringement of multiple patents, including the Diamond Pixel patents. To narrow the issues, SDC later withdrew the '683 patent. Mianyang BOE intervened and asserted invalidity defenses based on the same references that it presented in its IPR petitions, relying on the same expert, Dr. Pattison.

At the evidentiary hearing, Dr. Pattison repeatedly contradicted the opinions he had offered in the IPRs. For example, he testified that he no longer agreed with opinions he offered in his IPR declaration regarding the "enclosed" limitation of claim 4 of the '803 patent:

> Q. And you argued to the PTAB that the arrangement drawn in that figure meets the requirements of the "enclosed" limitation of claim 4, correct?
>
> A. Yes.
>
> Q. Now, yesterday you testified that personally you don't think this encloses, correct?
>
> A. Yes. I mean, my -- I did this, I believe, before this report was put in, prior to my next report. So I'd say my thoughts on this have changed, yes.

Appx5024, 237:15-23.

Despite this, BOE never withdrew the original argument or that portion of his declaration in the IPR proceedings. Nor did BOE submit Dr. Pattison's contrary testimony to the Board. BOE not only continued to advance Dr. Pattison's original position in the IPR, but still presses it on appeal in challenging the Board's decision as to claim 5 of the '803 patent, which depends from claim 4.

Dr. Pattison's inconsistencies were pervasive. For example, although Dr. Pattison asserted in his reply IPR declarations that Matthies does not require uniform spacing of pixels to the edge of a tile, he admitted the opposite in cross-examination at the ITC. *Compare* Appx3336, ¶56, *with* Appx5059-5060, 307:24-308:2, 308:13-16. As another example, at the ITC Dr. Pattison admitted that Matthies' Figure 8B is a passive-matrix OLED display, yet offered inconsistent testimony in his IPR deposition. *Compare* Appx5132, 52:17-20, *with* Appx5056, 304:6-12, Appx5057, 305:11-13.

Based on inconsistencies such as these, and with the benefit of observing Dr. Pattison's testimony at the in-person hearing, the ALJ found that Dr. Pattison was not credible:

> I also find that Dr. Pattison's testimony, in general, lacked credibility. His testimony at the hearing revealed that he took

25

positions he knew to be contrary to the evidence and that he would change his opinion as necessary to fit the circumstances. … I therefore afford his testimony less weight.

Appx5478.

### E. The ITC Rejects BOE's Invalidity Theories as to All Asserted Claims.

The ITC found all asserted claims of the Diamond Pixel patents not invalid. In particular, the ALJ found the combination of Matthies and Yamada did not render obvious any asserted claim of the '803 or '578 patents, Appx5490-91, Appx5525-5528, Phan did not anticipate any asserted claim of the '803 patent, Appx5486-5489, and the combination of Phan and Yamada did not render obvious any asserted claim of the '803 patent, Appx5489-90. These findings were left undisturbed in the ITC's Final Determination.

## SUMMARY OF THE ARGUMENT

1. Substantial evidence, including unrebutted expert testimony, supports the Board's factual findings that a POSITA could not combine Matthies' passive-matrix display with Yamada in the manner required by BOE's proposal; a POSITA would not have been motivated to attempt such a combination; and BOE's proposal would, antithetically to its purported rationale, shorten the life of a display. As to the '578 patent,

substantial evidence supports the Board's additional findings that Matthies does not disclose the "pixel defining layer" required by each challenged claim and there was no motivation to add one. BOE showed no reason to modify Matthies to attempt to add one, let alone how it could be implemented with a reasonable expectation of success, and unrebutted evidence shows there would be no benefit to adding one.

2. Substantial evidence supports the Board's factual findings that the challenged claims of the '803 and '683 patents were not obvious over BOE's proposed combination of Murai and Yamada and that a POSITA would not have been motivated to combine the references as BOE proposed.

3. The Board erred in finding claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent obvious over Phan. The challenged claims are directed to pixel arrangements that overcame challenges unique to OLED displays. As the Board acknowledged, Phan does not disclose an OLED display or any OLED pixels. Phan's only reference to OLED is in a background laundry list of "technologies"—several nonexistent, as the experts agreed—purporting to encompass "any light sources known or invented in the future," Appx3121, 1:18-29.

The Board erred in finding this single mention of "OLED" in Phan rendered obvious the challenged claims. The disclosures in Phan on which BOE relied do not relate to OLED displays. And the Board legally erred in finding obviousness without identifying any motivation to modify Phan's display to make an OLED display. Nor is there substantial evidence that a POSITA would have had a reasonable expectation of success in such a modification. The cursory and conclusory assertions of BOE's expert cited by the Board failed even to address modifying Phan to create an OLED display.

The challenged claims of the '803 patent are non-obvious for the additional reason that Phan does not disclose the claimed "virtual square." BOE's entire theory was based on a figure drawn by BOE that inexplicably and improperly removed spaces between quad-pixels disclosed in Phan, with no support in Phan.

## STANDARDS OF REVIEW

"Obviousness is a question of law based on underlying factual determinations." *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 925 (Fed. Cir. 2024). The Court "review[s] the PTAB's factual findings for substantial evidence and its legal conclusions de novo." *Icon*

*Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1039 (Fed. Cir. 2017).

"Whether a skilled artisan would have been motivated to combine references or would have had a reasonable expectation of success in combining references are questions of fact reviewed for substantial evidence." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1374 (Fed. Cir. 2023). Likewise, "the question of what [a prior art reference] teaches … is a factual question." *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1364 (Fed. Cir. 2018) (citation omitted).

## ARGUMENT

### I. Substantial Evidence Supports the Board's Findings that the Challenged Claims Would Not Have Been Obvious Over the Combination of Matthies and Yamada.

The Board correctly concluded, for multiple independent reasons, that none of the challenged claims of the Diamond Pixel patents would have been obvious over the combination of Matthies and Yamada. BOE has identified no legal error in the Board's analysis; there is no disputed issue of claim construction; and the Board's factual findings are supported by substantial evidence, including the prior art disclosures and the expert testimony of Dr. Kymissis.

The question of obviousness is "whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (emphasis in original). Yet, as the Board found, BOE failed even to show that a POSITA *could* have modified Figure 8B of Matthies to arrive at the structure BOE proposed. Matthies' tiled, passive-matrix display is fundamentally different from Yamada's monolithic, active-matrix display, and BOE's proposed modifications were incompatible with Matthies. As the Board found, BOE's arguments additionally failed because a POSITA would not have been *motivated* to make the modifications BOE proposed, let alone with a reasonable expectation of success. Contrary to BOE's unsupported claim that combining Matthies and Yamada would improve the lifetime of the display, the evidence established the opposite: Resizing Matthies' pixels as BOE proposed (were it possible) would cause the organic materials to decay more rapidly and shorten the lifetime of the display.

### A. Substantial Evidence Supports the Board's Factual Finding that Matthies and Yamada Are Incompatible.

The Board correctly found it would not have been obvious to a POSITA to combine Matthies and Yamada as BOE suggests because the references are "incompatible." Appx31-32.

"Matthies is directed to 'large-area display devices which are formed as an array of tiled display devices.'" Appx15 (citing Appx3089, 1:8-10). Each of Matthies' tiles is a passive-matrix display. In a passive-matrix display, row electrodes run horizontally across the display and column electrodes run vertically from the top of the display to the bottom. Appx3744, ¶48. Matthies depicts this row-and-column structure.



**FIG. 3**

Appx3078, Fig. 3 (annotated); Appx3772. The pixels are defined by the regions where the row and column electrodes overlap. Appx3744-3745, ¶49.

Matthies' Figure 8B, on which BOE relied, shows a "quad-pixel" structure comprising one red pixel, one blue pixel, and two green pixels. Dr. Kymissis annotated Figure 8B to show the placement of the electrodes and how they define the size, shape, and position of each pixel.



Appx3081, Fig. 8B (annotated); Appx3773, ¶109.

BOE's combination requires modifying the display of Figure 8B to shrink the red and green pixels such that each color pixel is a different size, as shown below in the figure BOE created to depict is proposal.



Appx29 (citing Appx352). The Board correctly found that BOE's "proposed re-sizing is incompatible with" Matthies' passive-matrix design. Appx31-32. As the Board explained, because the sizes of the pixels are determined by the width of the row and column electrodes, Matthies' structure is not amenable to resizing of the individual pixels as BOE proposed:

> Blue pixel 834 and green pixel 836 have the same height as the row electrode, and blue pixel 834 and green pixel 830 have the same width as the column electrode. To make the green pixel smaller would entail making one or both electrode narrower, which would make the blue pixel correspondingly smaller.

Appx31 (quoting Appx591); *see* Appx3815-3816, ¶193. The Board therefore concluded that "Petitioner has not adequately explained how

Matthies's sub-pixels may be made larger or smaller, individually, to implement Yamada's pixel sizing." Appx32.

The Board's factual finding is supported by substantial evidence. The Board credited the testimony of Dr. Kymissis, who "explain[ed] the difficulties of accomplishing individual sizing of pixels." Appx32-33. The Board agreed with Dr. Kymissis that "[i]f a POSITA were to try to change the size of a pixel in the PMOLED shown in Figure 8B, that would require changing the size of a row and/or column electrode, but doing so would also change the size of all the other pixels defined by that row and/or column electrode." Appx33 (quoting Appx3779-3780, ¶123). The Board further agreed with Dr. Kymissis that BOE's expert "does not give any explanation of how the pixel sizes could be individually arbitrarily changed into the proportions that he suggests should be used, and it is not clear how such a display could be made." *Id.* Dr. Kymissis also explained the difficulties that would be encountered if a POSITA attempted to resize individual pixels. *Id.* (quoting Appx3790-3781, ¶124). BOE never offered any explanation as to how these problems could be overcome. As the Board noted, Dr. Kymissis' testimony was unrebutted: BOE "does not dispute … Dr. Kymissis' testimony that it is not clear how"

34

Matthies' passive-matrix display could be combined with Yamada. Appx33.

BOE now attempts to argue that Matthies discloses an active-matrix display. Br., 62-63. As the Board noted, however, "even assuming Matthies discloses an active-matrix display embodiment," BOE "did not rely on any such embodiment." Appx37. Instead, BOE's argument was based "exclusively" on modifying the structure shown in Figure 8B of Matthies, *id.*, which even BOE's expert admitted discloses a passive matrix, Appx5056, 304:6-12. This alone suffices to reject BOE's arguments.

The Board also correctly rejected BOE's argument that Matthies discloses an active-matrix embodiment. Appx34-37. BOE's argument is based on the fallacy that any use of the word "active" in Matthies is a reference to an active-matrix display. As the Board thoroughly explained, the terms "active" electronics and "active" circuits used in Matthies in no way refer to "active-matrix" displays. Appx34-37. BOE's expert admitted an "active" element is one, "like a transistor" that is "capable of generating electric energy," while "passive" elements are devices that "cannot generate electric energy," such as "resistors, inductors, and

35

capacitors." Appx5113-5114, 33:10-34:15. BOE's expert also admitted an "active circuit" is a circuit containing a combination of active and passive elements. Appx5117-5120, 37:17-40:4. Thus, any circuit that contains a transistor is an "active" circuit or "active" electronics, whether or not it is even a display. The Board's factual finding that Matthies' reference to "active" electronics or "active" circuits do not disclose an active-matrix display is supported by substantial evidence.[2]

Finally, the Board correctly found that Mathies' reference to "processes such as those now used to make active matrix circuits," Appx3092, 8:21-26, does not disclose or suggest using an active-matrix display as part of Matthies' invention. It merely describes techniques for manufacturing electronic circuits. As the Board explained, electronic circuits "may be created in two ways: (1) mounting discrete devices on a substrate; or (2) forming devices in place on the substrate using processes like those used to make active matrix circuits." Appx36. The Board's

---

[2] No evidence supports BOE's claim that "the primary distinction between an active matrix circuit and a passive matrix circuit is the presence of active components." Br., 66. BOE cites only a hearing transcript in which BOE's attorney made that assertion, also without evidence. Appx853.

understanding that Matthies uses the term to refer to the way the circuits are formed, not the way the display is controlled, is supported by substantial evidence, including the plain language of Matthies and the testimony of BOE's expert, who testified that the second option "refers to 'a whole field of making transistors and passive components that are integrated into electronics.'" Appx36.

### 1.    BOE's counterarguments lack merit.

BOE claims that the Board made three errors in rejecting the combination of Matthies and Yamada. BOE claims that the Board erred by (1) allegedly failing to consider Matthies' teachings regarding "active" electronics as a whole, Br., 64-67; (2) allegedly requiring BOE to "explain[] in precise detail how Matthies and Yamada could be physically combined," Br., 67-69; and, in the '803 IPR, (3) allegedly failing to consider BOE's argument that Matthies discloses an active-matrix display, Br., 69-70. None of these arguments has any merit.

*First*, there is no merit to BOE's claim that the Board failed to consider what Matthies "as a whole fairly suggested." Br., 62. In its reply, BOE identified specific statements in Matthies it claimed disclosed the use of an active-matrix display. *See* Appx685-686 (citing Appx3092, 7:15-

19, 8:21-26, 8:30-33). The Board explained that these passages do not refer to active-matrix displays. Appx34-37.

The Board cannot be faulted for considering and responding to the specific evidence cited by BOE. But the Board did not *limit* its analysis to those passages. For example, as the Board further noted, Matthies explicitly states its displays use "passive addressing." Appx34; *see* Appx3090, 3:4-5 ("According to another aspect of the invention, the tiles use a block-wise passive addressing technique."). The Board noted an active-matrix display requires having a separate driving circuit and "*nowhere* does Matthies disclose or describe having an individual circuit for each pixel." Appx35-36 (emphasis added). After reviewing Matthies in its entirety, the Board concluded that "[e]very disclosure in Matthies indicates its display is passive-matrix." Appx35.

*Second*, the Board did not err in concluding that a POSITA would not have been able to combine Figure 8B of Matthies and Yamada. This Court has repeatedly held that it is not obvious to combine prior art involving incompatible technologies. *Hytera Commc'ns Co. v. Motorola Sols, Inc.*, 840 F. App'x 569, 575 (Fed. Cir. 2021) (affirming Board's determination that combining references involving "incompatible

38

communications protocols" is not obvious). Moreover, a POSITA must have a "reasonable expectation of success" in combining the references to arrive at the claimed invention. *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1380-81 (Fed. Cir. 2021). "[T]he reasonable-expectation-of-success requirement is not satisfied when the skilled artisan would have had no expectation of success." *Id.*

The cases cited by BOE do not hold otherwise. In each, the Court held that a skilled artisan would both know how, and be motivated to, combine the references. In *Allied Erecting and Dismantling Co. v. Genesis Attachments, LLC*, for example, "a skilled artisan could modify Caterpillar in view of Ogawa by treating the first jaw like the second." 825 F.3d 1373, 1381 (Fed. Cir. 2016). Similarly, in *Uber Techs., Inc. v. X One, Inc.*, the combination was nothing more than a "predictable variation" of the prior art, "using a technique that was known to one of ordinary skill in the art." 957 F.3d 1334, 1340 (Fed. Cir. 2020).

Here, by contrast, the Board made findings (based on ample evidence) that the technologies are incompatible and could not be combined by a POSITA. BOE has not cited any evidence of anyone ever resizing individual pixels in a passive-matrix display in a manner

consistent with Matthies' disclosures. BOE offered no evidence or even explanation of how such resizing could be accomplished with Matthies' device. Moreover, the uncontested testimony of Dr. Kymissis established a POSITA would *not* have known how to make the modifications required by BOE's theory. He explained why "[i]t is not a simple matter to resize the row and/or column electrodes." Appx3780-3781, ¶124.

Furthermore, as Dr. Kymissis explained, even if such changes were theoretically possible, they would "necessitate changes not only to the structure of the electrodes, but also to the display driver circuitry." *Id.* Such changes may lead to "morphological defects," called "ITO spikes," in the materials used in the display, "increas[ing] the risk of catastrophic failure of the OLED display." Appx3781-3782, ¶125. These defects could also lead to "dark spot formation," resulting in "significantly decreased luminance" and "even faster degradation of the OLED pixel." Appx3781-3782, ¶¶125-126. Given all of these difficulties, "it is not clear how such a display could be made." Appx33 (quoting Appx3779-3780, ¶123).

*Third*, BOE's suggestion that, in the '803 IPR, the Board failed to consider BOE's argument that Matthies discloses an active-matrix display, is plainly wrong. *See* Br., 69-70. Although the Board observed in

the '803 IPR that BOE had "raise[d] an impermissible new argument" in reply, Appx34, the Board nonetheless proceeded to consider the argument and rejected it on its merits with a thorough explanation. In fact, the Board devoted more than three pages to explaining the flaws in BOE's argument. Appx34-37. The Board expressly found that BOE's arguments "distort the disclosure of Matthies" and "are misplaced and unpersuasive." Appx34.

Thus, substantial evidence supports the Board's findings that a POSITA could not have modified Matthies based on Yamada in the way BOE proposed. For this reason alone, the Board correctly rejected BOE's obviousness arguments based on a combination of Matthies and Yamada.

## B. Substantial Evidence Supports the Board's Factual Finding that a POSITA Would Not Have Been Motivated to Combine Matthies and Yamada.

Even if it were *possible* to combine Matthies and Yamada in the way BOE suggests, a POSITA would not have been motivated to make the combination. In its petitions, BOE argued that Yamada would have motivated a POSITA to resize the individual pixels in Matthies' display because "OLED deterioration is avoided and display life improved by making the blue pixel largest and the green pixel smallest," *see, e.g.*,

Appx321; Appx359-360, and making the blue pixels largest increase the life of the blue pixels, which was important because "the blue pixels have 'the shortest life span,'" Appx329 (quoting Appx271, 6:43-50). The Board properly credited Dr. Kymissis' showing that the proposed combination would have the opposite effect. *See* Appx108-109; Appx3785-3788.

It is undisputed that the rate of deterioration of organic materials in an OLED is a function of the current density applied to the OLED. Appx3786. The higher the current density, the faster the OLEDs decay. *Id.* It is therefore possible to extend the life of an OLED pixel by decreasing the current density. As Dr. Kymissis explained, BOE's combination would not improve the lifetime of the blue pixels because it would not change the size of the blue pixels. Appx3786-3787, ¶136; *see* Appx351 ("Per Yamada, the blue pixel has kept its original size."). Because the blue pixels remain the same size, the current density remains the same, and they decay at the same rate as in Matthies. Appx3786-3787, ¶136. At the same time, BOE's proposal would shrink the red and green pixels. Appx351 ("The other pixels have been reduced in size…."). As Dr. Kymissis explained, "by reducing the sizes of the red

and green pixels, the life of the red and green pixels would be reduced." Appx38 (quoting Appx3786-3787, ¶136); *see* Appx3787, ¶137.

The Board properly credited Dr. Kymissis' opinion that "a POSITA, particularly a POSITA concerned with the lifetime of the display, would not have sought to reduce the sizes of any of the pixels, as [BOE] suggests, because doing so would decrease the lifetime of the display." Appx39 (quoting Appx3786-3787, ¶136). The Board further found BOE "does not dispute that reducing the size of the red and green pixels would reduce the lifetime of the red and green pixels." Appx39. Dr. Kymissis' undisputed testimony is substantial evidence supporting the Board's factual finding that a POSITA would not have been motivated to combine Matthies and Yamada.

> **1. The Board did not abuse its discretion in declining to consider BOE's "useful lifetime" argument improperly raised for the first time in its reply brief.**

Unable to challenge Dr. Kymissis' explanation that its proposed combination of Matthies and Yamada would exacerbate pixel deterioration and shorten the life of the display, BOE abandoned the petition's theory and offered a completely new theory in its reply. While BOE originally argued that resizing the pixels would "reduce"

43

deterioration, in reply it argued that a POSITA would want to *increase* the deterioration of the red and green pixels, purportedly so the pixels "would all age at or near the same rate." Appx690. The Board properly declined to consider this new argument. Appx40-41.

It is well-established that "an IPR petitioner may not raise in reply an entirely new rationale for why a claim would have been obvious." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330-31 (Fed. Cir. 2019). The Board's determination that a reply raised a new argument is reviewed for abuse of discretion. *Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1366 (Fed. Cir. 2023).

The Board did not abuse its discretion in finding BOE's reply presented a new argument that "change[d] the thrust and direction of its original argument." Appx41. Throughout its petitions, BOE consistently argued a POSITA would have been motivated by Yamada to resize the pixels to "avoid" or "reduce" pixel deterioration. Appx338; *see* Appx359; Appx382; Appx399. Likewise, BOE's expert repeatedly stated the goal was to "reduce" or "avoid premature deterioration." *See* Appx2980; Appx3013; Appx3039; Appx3064; Appx3065.

In its petition, BOE never argued, or even suggested, that a POSITA would deliberately cause certain OLED pixels to deteriorate more rapidly. In its reply, however, BOE attempted to argue that, although increasing deterioration would decrease the lifetime of the display, it would allegedly increase the "useful lifetime." Appx690. Tellingly, BOE's petitions never mention "useful lifetime." BOE created this new argument based on U.S. Patent No. 6,747,618 ("Arnold")—a reference not cited in BOE's petitions. *See* Appx1311-1312.

Even if considered, BOE's argument has no merit. BOE selectively quoted Arnold to assert that relative resizing of pixels "improves the display's 'useful lifetime' by 'maximiz[ing] the time that the relative luminance of the three-color elements can be maintained….'" Appx690 (quoting Appx3964, 2:1-4). But BOE's partial quote omits the critical further teaching of Arnold. Arnold referred to "'maximiz[ing] the time that the relative luminance of the three-color elements can be maintained *while minimizing the loss of absolute luminance*." Appx3964, 2:1-4. This is flatly inconsistent with BOE's proposed modification, which by shrinking the red and green pixels would cause significant "loss of absolute luminance" and shorten the useful limitation of the display. *Id.*

45

BOE commits the same error in its appeal brief. BOE claims "a display's lifetime is improved when all the pixels 'age at approximately the same rate *relative to each other*,' which makes it easier to maintain 'color or 'white balance.'" Br., 73 (quoting Appx689). But Arnold says otherwise. The "useful lifetime" of the display is determined primarily by the luminance (i.e. brightness) of the display, *not* the white balance. Appx3964, 1:63-2:1. As Arnold explains, "[o]nce the display becomes too dim, the user may also consider the display to be at the end of its useful lifetime, *regardless of the relative luminance of the three colors*." *Id.* (emphasis added). BOE failed to show that its combination would increase the "useful lifetime" of the display.

Unable to show any abuse of discretion, BOE suggests the Board should have considered its new arguments because SDC "was provided a sur-reply." Br., 75. Not only does that contravene precedent, it disregards that the Board's limitations on sur-replies did not permit SDC to fully respond, as SDC could not submit new evidence or expert testimony to refute BOE's new argument. *See* 37 C.F.R. §42.23(b).

Finally, BOE attempts to raise another new argument not presented to the Board, claiming U.S. Patent No. 5,644,327 shows

Matthies and Yamada could have been combined. Br., 63-64. BOE did not cite or discuss the '327 patent in its petition, its reply brief, or the hearing. Appx338-364; Appx685-695; Appx832-953. The only reference to it appears in one paragraph of Dr. Pattison's reply declaration. Appx3328-3329, ¶16. But arguments raised only in an expert declaration are waived. *Ethicon LLC v. Intuitive Surgical, Inc.*, No. 21-1601, 2022 WL 1576779, at *6 (Fed. Cir. 2022). And even if considered, the argument is meritless. Dr. Kymissis explained the '327 patent is irrelevant to whether a POSITA would have been motivated to combine Matthies' passive-matrix OLED display with Yamada's active-matrix display.[3]

### C. The Challenged Claims of the '578 Patent Were Not Obvious over Matthies and Yamada.

Substantial evidence supports the Board's additional finding that BOE did not show any challenged claim of the '578 patent would have been obvious based on Matthies and Yamada, or Matthies and Yamada with Hong.

---

[3] The '327 patent does not concern OLED displays, Appx3450-3451, 98:13-99:4, and it uses "*direct* addressing," which is different from both active-matrix and passive-matrix addressing. Appx3453-3454, 101:4-102:6. The '327 patent explains it is "not possible" to use matrix addressing in thin-film electroluminescence displays. Appx3451-3452, 99:15-100:10.

The Board made detailed, well-supported factual findings in the '803 and '683 IPRs that a POSITA could not have combined Matthies with Yamada in the way BOE proposed, let alone with a reasonable expectation of success; and a POSITA would not have had a reason to make such a combination. *See supra* §§I.A-I.B. In the '578 IPR, BOE relied on the same combination and repeated near-verbatim the same alleged motivation. *Compare, e.g.*, Appx1473-1475, Appx1480-1489 (relying on Matthies Fig. 8B), *with* Appx339-349 *and* Appx987-997; *compare, e.g.*, Appx1522-1528, Appx1800-1810 (alleged motivation), *with* Appx358-364, Appx685-695, *and* Appx1004-1010, Appx1307-1317. At the consolidated hearing, BOE's counsel reiterated the same motivation-to-combine arguments were "made across all three proceedings." Appx866, 37:4-6.

In the '578 IPR, the Board offered a further ground for rejecting BOE's obviousness arguments: BOE's proposed combination failed to meet a limitation of each challenged claim requiring that "the OLED display comprises a pixel defining layer defining areas of the first pixels, the second pixels, and the third pixels." Appx300 9:11-13, Appx302 13:48-50, 14:45-47; *see* Appx249-259. The Board's finding is supported by

substantial evidence, including the disclosures of the cited references and Dr. Kymissis' testimony, which the Board agreed with. *See* Appx251-258.

BOE's petition offered two theories for how Matthies and Yamada purportedly rendered obvious this limitation. First, the petition argued Matthies teaches a pixel defining layer in Figure 10B. As the Board found, this is wrong. Appx250-254. The Board explained that "without Petitioner's annotations, the 'pixel defining layer' does not exist," and Matthies' description "does not describe any component in the spaces where Petitioner has placed the 'pixel defining layer' in the annotated version of Figure 10B in the Petition." Appx253. The Board agreed with SDC's arguments, supported by Dr. Kymissis' testimony, that Matthies does not teach or suggest a pixel defining layer. Appx257-258 (quoting Appx1709, Appx1852); *see* Appx7776-7778 ¶¶187-189.

Second, the petition argued that Yamada discloses a pixel defining layer and that a POSITA could have added a pixel defining layer to Matthies. The Board found that the structure BOE pointed to in Yamada was not compatible with Matthies, and that BOE "fail[ed] to articulate how or why" a POSITA would have added a pixel defining layer to Matthies. Appx252-257. The Board agreed with SDC's arguments,

supported by Dr. Kymissis' testimony, that BOE "failed to identify any reason why a POSITA would add a pixel defining layer to Matthies" and "did not even attempt to show that a POSITA would have a reasonable expectation of success." Appx258 (quoting Appx1710, Appx1852); *see* Appx7776-7777, ¶188.

On appeal, BOE does not show any legal error by the Board. In challenging the Board's factual findings, BOE fails to engage with evidence relied upon by the Board and the Board's reasoning. The Board's findings are well-supported by the record, and BOE does not come close to establishing a lack of substantial evidence. Instead, BOE repeatedly attacks strawmen, mischaracterizes the arguments it made below, and attempts to raise new arguments never presented before the Board. The Board fully considered and thoroughly addressed BOE's arguments, and properly rejected them based on the evidence.

### 1.    The Board's factual finding that Matthies does not teach a pixel defining layer is supported by substantial evidence.

The Board's finding that Matthies does not teach a pixel defining layer is supported by substantial evidence. BOE's main theory was that Matthies' Figure 10B allegedly disclosed a pixel defining layer.

Appx1478-1479; Appx1514-1515; Appx1517-1518. This theory was factually incorrect, as the Board found based on a thorough analysis of the record. Appx250-254: Appx257-258.

SDC showed that Matthies does not disclose a pixel defining layer and does not teach or suggest one. Appx1709, Appx1851-1852. Dr. Kymissis explained Matthies' structure does not have nor need a pixel defining layer. Appx7737-7738, ¶117; Appx7772-7773, ¶182; Appx7776-7778, ¶¶187-189. Matthies employs a passive-matrix OLED where areas of pixels are already defined by the overlap of column and row electrodes, as shown in Matthies' Figures 3, 8B, and 10B. Appx7727-7729, ¶¶97-99; Appx7734-7735, ¶112; Appx7737-7738, ¶117; Appx7768, ¶175; Appx7772-7773, ¶182. Matthies' description of its manufacturing process and materials confirms it does not contain a pixel defining layer. Appx3094-3095, 12:58-13:26; Appx3097, 17:56-18:24; Appx7737-7738, ¶117, Appx7772-7773, ¶182.

In the petition, to argue that a pixel defining layer was allegedly shown, BOE misleadingly added blue shading to portions of Matthies' Figure 10B and labeled it a "pixel defining layer." Appx1478-1479.





**BOE's Annotation (Appx1478)**    **Original Figure (Appx3082)**

However, as the Board found, BOE's "pixel defining layer" "is not shown or described in Matthies," and the unaltered version of Figure 10B "neither depicts insulation between the active areas nor calls out the same with a reference number." Appx251-253.

Dr. Kymissis explained that BOE's blue shading was not a pixel defining layer, nor a layer of material. Appx7775-7776, ¶¶186-187. Matthies' disclosure of the manufacturing steps that result in the structure shown in Figure 10B supports his testimony. Appx3094-3095, 12:58-13:26; Appx3097, 17:56-18:24. BOE and its expert offered no response to these points in reply.

Consistent with the above, the Board thoroughly considered and addressed the other portions of Matthies cited by BOE and found Matthies neither discloses nor suggests a pixel defining layer. Appx251-254. BOE has identified no error in this factual finding, let alone a lack of substantial evidence.

52

BOE attacks a strawman in claiming the Board erred in requiring
"an express labeling" as part of its obviousness analysis. Br., 43-44. The
Board did not impose any such requirement. BOE argued, pointing to
Figure 10B, that "a POSITA would have considered the layer including
and around Matthies' shaped active areas 324/326 to be the claimed 'pixel
defining layer' (annotated and labeled with blue above)." Appx1476;
Appx1478-1479. The Board refuted this theory, aptly pointing out that
BOE's labeling was misleading and factually incorrect. Appx251-253;
Appx257-258.

BOE observes that the '578 patent's figures do not label a pixel
defining layer. Br., 43-44. But that does not mean that Matthies discloses
or suggests a pixel defining layer. The '578 patent expressly refers to a
pixel defining layer and is clear that its figures and descriptions may, for
clarity, omit certain components that are part of the display, such as the
pixel defining layer. Appx297 3:31-56, 4:1-13. In contrast, as the Board
found, nothing in Matthies suggests the presence of a pixel defining layer.
Appx251-254; Appx257-258. BOE's reference to §112 is likewise
meritless. Br., 43-44. As BOE acknowledges, the '578 patent describes

the pixel defining layer, which defines the areas of the pixels. Appx296, 1:42-44; Appx297, 4:1-13.

BOE claims that the Board erred in pointing out inconsistencies in BOE's proffered interpretations of Matthies' disclosures because they were separately relied upon for arguments in the alternative. Br., 44-45. The Board never suggested that a party may not make arguments in the alternative. Rather, the Board highlighted that BOE advanced inconsistent interpretations of the same disclosures in Matthies, without justification. Appx253-254. The Board made a factual determination of what Matthies disclosed, taking account of all the evidence. BOE's attempt to characterize the Board's resolution of these factual issues as a legal error is groundless.

And even on appeal, BOE fails to plausibly explain how its positions, which were not offered in any clear way in the alternative, can be reconciled. BOE argues that "the pixel-forming elements (324 and 326) themselves define the active area of the pixels." Br., 44 (citing Appx1477-1478, Appx1810-1811). That would mean another layer added to the interstices around those elements would not be "responsible for defining the shape of, and thus also the 'area' occupied by," pixels, contrary to

54

BOE's argument in the petition that it would be a pixel defining layer. Appx1479. The Board correctly found there was no "coherent explanation to support" BOE's interpretation of the blue-shaded region as the claimed pixel defining layer. Appx253-254.

Indeed, BOE presented a single annotated version of Figure 10B (which was itself misleading) as the basis for its arguments. BOE did not explain how that figure or other disclosures in Matthies should purportedly be interpreted differently under allegedly separate theories. "A petitioner may not rely on a vague, generic, and/or meandering petition and later fault the Board for failing to understand what the petition really meant." *Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1377 (Fed. Cir. 2023).

On appeal, BOE does not defend the petition's theory that Figure 10B of Matthies discloses a pixel defining layer. Instead, BOE pivots to a new theory that a POSITA purportedly would have understood Matthies to contain a pixel defining layer because they were well-known. Br., 36-41. This argument is illogical and unsupported.

*First*, BOE never made this argument below. The petition's theory was that Matthies itself teaches a pixel defining layer (which it does not).

Appx1477-1479. The petition did not argue a pixel defining layer was "well-known," much less that a POSITA would interpret Matthies as having one for that reason. Appx1476-1479.[4] In its reply and at the hearing, BOE made only passing references to the '578 patent's description of the pixel defining layer. *See* Appx1810 (arguing "insulation" is a "known" "pixel definition layer" and that "[t]his is what Matthies and Yamada disclose"); Appx940-941, 111:21-112:22 (similar). BOE's argument was that Matthies' disclosure shows a pixel defining layer (which it does not), which is not an argument that a POSITA would interpret Matthies as having a pixel defining layer *because of* the '578 patent's disclosure or because pixel defining layers were "known." BOE's new argument is forfeited.

*Second*, BOE advances only attorney argument that Matthies must have a pixel defining layer because they were "known." Attorney argument is not evidence. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1284-85 (Fed. Cir. 2017). BOE's expert never contended a

---

[4] The petition cited the '578 patent's statement that an OLED including "an anode, an organic emission layer, and a cathode" is known, not its discussion of a pixel defining layer. Appx1476 (citing Appx297, 4:6-9).

POSITA would interpret Matthies as having a pixel defining layer because such layers were "known" or because of any statement in the '578 patent. BOE's expert did not even cite the patent's description of the pixel defining layer, though he cited the patent's description of an OLED with organic emissive material between two electrodes as a "known" structure. Appx7446-7447, ¶¶156, 159-160; Appx7449, ¶170.

*Third*, BOE's argument is a *non sequitur*. That a pixel defining layer may have been "known" at the time of the '578 patent does not require or imply that Matthies' devices must have contained one. To the contrary, the Board found nothing in Matthies' disclosure that could be understood by a POSITA to disclose or suggest a pixel defining layer.

Insofar as BOE is attempting to make an inherency argument, it is new and unsupported. The lack of a pixel defining layer in Matthies itself refutes any such argument, and evidence beyond Matthies reinforces that an OLED display need not contain a pixel defining layer, as SDC explained. Appx912, 83:3-14. Indeed, while BOE argues that "planarization layer 167" in Yamada's Figure 6B is a pixel defining layer, it ignores that other of Yamada's displays—including Yamada's Figure 6A—do not contain that layer or any other purported pixel defining layer:

57



**Fig. 6B**



**Fig. 6A**

Appx1479; Appx3164; *see* Appx7777-7778, ¶189; Appx912, 83:3-14. Thus, the very reference BOE alleges would be combined with Matthies demonstrates a pixel defining layer is not required.

BOE's string citation to other references, Br., 37, is an undeveloped argument. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). BOE fails to explain how these references show pixel defining layers or that they were well-known. Any such argument is forfeited. *Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1075 (Fed. Cir. 2017).

BOE also resorts to partially quoting and taking out of context a footnote in SDC's Preliminary Response to suggest, as another new argument, that a pixel defining layer must be included in an OLED display. Br., 37-38, 42-43. BOE inaccurately asserts that SDC admitted that a pixel defining layer "must be included for the OLED display to

operate properly." Br., 37-38 (quoting Appx1551 n.1). Not so. In the cited footnote, SDC was describing *Figure 5 of the '578 patent*—an inventive embodiment—and explaining why *that* display has non-light-emitting (or "non-pixel") areas (because it has non-light-emitting components such as the pixel defining layer and circuitry between pixels). Appx1551 & n.1. That the embodiments of the '578 patent contain pixel defining layers is immaterial to how a POSITA would have understood Matthies' vastly different display. SDC did not suggest that a pixel defining layer is required for any OLED displays outside of the '578 patent, and certainly never suggested every OLED display must have one. To the contrary, the evidence shows a pixel defining layer is not required.

BOE also takes issue with the Board's pointing out BOE's reliance on impermissible hindsight. Br., 41-43. But the Board is correct that relying on the '578 patent to supply a pixel defining layer not taught or suggested by Matthies, nor useful in Matthies, is an inappropriate application of hindsight. Appx254.

BOE makes another new argument, claiming there purportedly is "a finite set of 'well-known design choices.'" Br., 42-43. As BOE presented no such argument to the Board, it is forfeited. *E.g.*, *Google LLC v.*

*Personal Audio, LLC*, 743 F. App'x 978, 984 (Fed. Cir. 2018). It is also bare attorney argument. BOE has not shown a finite set of well-known design choices to define the shape and area of OLED pixels. BOE further disregards unrebutted evidence showing functional problems in attempting to add a pixel defining layer to Matthies, including charge accumulation that would increase energy consumption, increased thickness, increased manufacturing complexity, and lower yield. Appx7737-7738, ¶117; Appx7772-7773, ¶182.

The Board's factual finding that Matthies does not disclose a pixel defining layer is supported by substantial evidence.

>        **2.  The Board's factual finding that it would not have been obvious to add a pixel defining layer to Matthies is supported by substantial evidence.**

The Board's finding that a POSITA would not have considered it obvious to add a pixel defining layer to Matthies is supported by substantial evidence.

BOE argued a pixel defining layer "could" be added to Matthies, without articulating any reason a POSITA would have been motivated to do so with a reasonable expectation of success. Appx1476 ("could obviously employ"); Appx1478 ("obviously could include"); Appx1811

("obviously could include"; "allows for the inclusion of additional layers"). BOE's failure to show a POSITA would have had reason to add a pixel defining layer to Matthies is fatal to BOE's obviousness theory, as the Board found based on thorough analysis of the record. Appx252-258. *See Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018).

SDC pointed out this deficiency in BOE's petition, and presented evidence demonstrating a POSITA would have had no reason or motivation to try to add a pixel defining layer to Matthies, much less with a reasonable expectation of success. Appx1710-1711; Appx1852-1853. Dr. Kymissis explained a pixel defining layer is not necessary in Matthies' passive-matrix display, where the emissive areas are defined by the overlaps of the column and row electrodes. Appx7727-7729, ¶¶97-99; Appx7734-7735, ¶112; Appx7737-7738, ¶117; Appx7768, ¶175; Appx7772-7773, ¶182. He provided unrebutted testimony that a POSITA would have seen no benefit to adding a pixel defining layer to Matthies. Appx7776-7778, ¶¶188-189.

Yet even in reply, BOE maintained only that Matthies purportedly "obviously could include" a pixel defining layer, Appx1811, not that there

61

was any motivation or reason to add one to Matthies' structure (let alone with a reasonable expectation of success).

The Board agreed with SDC's arguments that a POSITA would not have had any motivation to modify Matthies to add a pixel defining layer, and would not have had a reasonable expectation of success in doing so. Appx258 (quoting Appx1710, Appx1852). SDC's arguments credited by the Board were supported by unrebutted testimony from Dr. Kymissis that a POSITA would not have had reason to so, and that a POSITA would have recognized problems in attempting to do so. Appx1710 (citing Appx7772-7773, ¶182; Appx7776-7777, ¶188); Appx1852 (citing Appx7737-7738 ¶117). The Board's finding that BOE provided insufficient evidentiary basis for modifying Matthies to include a pixel defining layer is supported by substantial evidence. *See Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018).

As the Board explained, "[a]n allegation that a skilled artisan would have understood that the prior art 'could obviously' be modified to include an element of the claimed invention does not establish that the prior art teaches or suggests such recited element." Appx251 (citing *Belden*, 805 F.3d at 1073). The Board was not, as BOE would have it,

criticizing BOE's word choice or unduly emphasizing the word "could." Br., 48-49. The Board was correctly observing that BOE's argument that a pixel defining layer *could* have been added to Matthies is materially different from an argument that a POSITA *would* have had reason to add it to Matthies.

The Board certainly did not, as BOE now claims, "ignore[] BOE's extensive evidence while failing to 'point to any evidence to support its conclusion,'" Br., 50, nor overlook "the substance of BOE's showing," Br., 48. The Board fully considered the evidence and arguments BOE presented, Matthies itself, and the other evidence, and explained that BOE's evidence does not show why a POSITA would have modified Matthies to add a pixel defining layer. Appx252-253, Appx254-257, 258-259. BOE has shown no lack of substantial evidence for this factual finding, nor could it.

BOE argued that Matthies suggests "various other 'layers' 'may be present to improve the function or life of the display layers,'" and posited that an insulating layer could be added to surround the pixel active areas and that could be a pixel defining layer. Appx1478-1479. The Board considered and rejected this argument. Appx252-254. As the Board found,

BOE failed to explain how or why adding BOE's purported pixel defining layer to Matthies would meet the criteria of "improv[ing] the function or life of the display layers," otherwise improve Matthies, or address "any potential problem or deficiency" in Matthies. Appx252-254. Based on Matthies' disclosures, the Board found that BOE's suggestion that Matthies provides a reason for adding a pixel defining layer to its display is inaccurate and unfounded. *Id.*

On appeal, BOE attempts to contest this factfinding by relying on a misleading selective quotation of Matthies' Column 6:28-38. *Compare* Br., 46, *with* Appx3091, 6:28-38. The Board addressed this passage. Appx252. BOE omits language, italicized below, supporting the Board's conclusion: Matthies states "[a]dditional layers *such as blocking or passivation layers may be present to* improve the function or life of the display layers." Br., 46; Appx3091, 6:28-38. Blocking and passivation layers are not pixel defining layers, and BOE presented no evidence (or argument) otherwise. BOE also offered no evidence or explanation that its proposed pixel defining layer would "improve the function or life of the display layers" in Matthies such that this statement could be construed as referencing such a purported layer. *See* Appx252. Dr. Kymissis

explained a POSITA would not have tried to add any blocking or isolation layer between the row and column electrodes in the manner proposed by BOE. Appx7737-7738, ¶117, Appx7772-7773, ¶182.

BOE next offers a misleading selective quotation from a passage not referenced in the petition, to assert Matthies suggested adding "a 'structural layer[]' such as an 'insulator.'" Br., 46 (citing Appx3092, 7:24-26). This is meritless. This passage refers to a structural layer in the ceramic substrate, not a layer defining shapes or areas of OLED pixels in the display area. *See* Appx3092, 7:24-29. That Matthies identifies "metal" as an alternative material for this layer underscores it is not between Matthies' electrodes (as would be necessary to define pixels); a metal layer there would short the display. Appx1478.

Moreover, BOE never articulated, much less presented evidence to show, how or why any type of insulation layer contemplated by Matthies would be a pixel defining layer. Rather, BOE assumes any insulation layer is a pixel defining layer, which is not the case. That the '578 patent states a pixel defining layer *may be* an insulation layer does not suggest otherwise. Matthies itself describes "[a]n insulating layer 330 … formed

on top of the row electrodes" (Appx3095, 13:16-21) that indisputably is *not* a pixel defining layer. Appx252 n.9; Appx1477, Appx7448, ¶167.



Appx7737-7738, ¶117.

BOE also refers to Yamada, Br., 47, but has expressly waived any argument that a combination of Matthies and Yamada shows this limitation, Br., 52 n.3. The Board found BOE articulated no rationale for such combination, and BOE does not dispute this finding on appeal. *Id.*; Appx257-259. Nor could it.

Regardless, BOE did not show the type of pixel defining layer it purports to find in Yamada could be applied to Matthies. Nor did BOE explain why a POSITA would have modified Matthies based on a layer designed for Yamada's active-matrix display, given significant differences and incompatibilities with Matthies' passive-matrix structures. *See* Appx7777-7778, ¶189; *supra* §I.A. BOE's claim that SDC did not dispute that Yamada's example supports adding a pixel defining

layer to Matthies, Br., 47, is also unfounded. SDC disputed that point below. Appx1710-1711.

BOE's assertion that because a pixel defining layer was "known" in the prior art, a POSITA would therefore have found it obvious to add to Matthies, is meritless. *See, e.g.*, *Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 497 F.4th 882, 888 (Fed. Cir. 2024). "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *see also supra* §I.C.1.

Substantial evidence supports the Board's finding that the purported example of a pixel defining layer in one embodiment of Yamada does not render obvious adding a pixel defining layer to Matthies. Appx255-259.

BOE also makes a series of additional arguments, many for the first time on appeal, which have no merit and fail to show a lack of substantial evidence for the Board's factual findings.

*First*, BOE makes cursory references to a "Seo prior-art reference" (Br., 47, 51-52) not mentioned in the petition nor discussed by BOE's

expert. BOE has not shown—nor can it show with its bare attorney argument—that Seo's "insulating bank" is a pixel defining layer or relevant here. BOE's petition did not argue for a combination with Seo, nor does BOE articulate any motivation to combine Seo with Matthies. *Broad*, 903 F.3d at 1291.

*Second*, BOE attempts to provide alleged reasons, based on purported benefits, for modifying Matthies to add a pixel defining layer that it did not present to the Board. Br., 47-48. These arguments are forfeited. *Biscotti*, 878 F.3d at 1074-75. BOE does not cite anywhere these alleged reasons were presented below. It cites only a single paragraph of its expert's declaration, one that was merely within a range of paragraphs string-cited in the petition for a different point. Appx1479 (citing Appx7449-7450, ¶¶173-177). That is insufficient to present the argument below. It is not the role of the Board to "formulate arguments on [a petitioner's] behalf, search the record for pertinent facts, and inject [its] own reasoning." *3M Co. v. Westech Aerosol Corp.*, No. IPR2018-00576, 2020 WL 578975, at *3 (P.T.A.B. Feb. 4, 2020), *aff'd sub nom. 3M Co. v. Evergreen Adhesives, Inc.*, 860 F. App'x 724 (Fed. Cir. 2021). Further, in the sole cited paragraph, BOE's expert offers mere conclusory assertion.

"'[O]bviousness grounds,' in particular, 'cannot be sustained by mere conclusory statements.'" *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) (citation omitted).

BOE offered no evidence that a pixel defining layer added to Matthies would purportedly provide any of the benefits it now alleges on appeal. Matthies already has insulating layers protecting the display materials, Appx3095, 13:16-21; Appx1477; Appx7448, ¶167; *see also* Appx3092, 7:28-31, has no problem of electrical shorts, and has no need for additional planarization. No expert identified any such needs in Matthies, and Dr. Kymissis provided unrebutted testimony that a pixel defining layer would *not* be beneficial in Matthies.[5] Appx7776-7777, ¶188 (cited in Appx258).

BOE inaccurately asserts that the Board ignored that it "expressly linked" Matthies' discussion of additional layers with "the benefits of using an insulation layer to surround the OLED active areas in Matthies."

---

[5] Dr. Kymissis also explained that attempting to add an insulating layer would result in unnecessary manufacturing steps, reduced yield, increased device thickness, and increased power consumption, while providing no particular benefit. Appx7737-7738, ¶117; Appx7772-7773, ¶182.

Br., 49-50. BOE made no such argument or showing in the petition, in the reply, or the hearing before the Board. *See* Appx1476-1479; Appx1810-1811; Appx940-943, 111:21-114:3. Before the Board, BOE made no claims about purported benefits of additional layers, let alone an insulation layer to surround the OLED active areas. And BOE never argued such purported benefits would have been "'protection of the active areas from contamination or damage, prevention of electrical shorts,' and 'planarization of the active area.'" Br., 49; *see* Appx1476-1479; Appx1810-1811. BOE's claim of an "express link[ing]" is illusory and forfeited.

*Third*, there is no merit to BOE's assertion that the Board violated the APA. Br., 52-58. The Board did not implicitly adopt a new claim construction in its Final Written Decision, nor does its decision rest on one. BOE alleged Yamada's planarization layer was an "example" of a pixel defining layer that could be present in Matthies. Appx1478-1479. In explaining that BOE failed to make such a showing, the Board highlighted relevant structural differences between those references. Appx255-257. The Board did not construe "pixel defining layer" to require any of the purported "narrowing constructions" conjured by BOE; it merely pointed out that "Petitioner does not explain how or why the

planarization film 167 that is identified by it as the 'pixel defining layer' in Yamada is an example that supports adding the alleged 'pixel defining layer' in annotated Figure 10B of Matthies." Appx256.

*Finally*, BOE mischaracterizes SDC's arguments below. Br., 51-52. SDC never conceded Matthies' blocking or passivation layers could be a pixel defining layer. *See* Appx1852. Nor did SDC argue a pixel defining layer is necessary for all OLED displays. *See supra* §I.C.1. And as the Board found in the '803 and '683 IPRs, Matthies and its Figure 8B embodiment BOE relies on are passive-matrix displays. *See supra* §I.A.

The Board's finding that a POSITA would not have had reason to modify Matthies to add a pixel defining layer with a reasonable expectation of success is supported by substantial evidence.

## II. Substantial Evidence Supports the Board's Finding that the Challenged Claims Would Not Have Been Obvious Over the Combination of Murai and Yamada.

Substantial evidence supports the Board's finding that a POSITA would not have been motivated to combine Murai and Yamada and that the challenged claims of the '803 and '683 patents would not have been obvious over the combination. BOE argued it would have been obvious to combine Murai and Yamada "for the same reasons it would have been

71

obvious to apply Yamada to both Matthies and Phan," namely that the combination allegedly "reduces deterioration and improves display life." Appx399; Appx1044-1045. The Board correctly rejected this argument "[f]or the same reasons." Appx109.

As with the combination of Matthies and Yamada, BOE proposed to modify Murai by shrinking the sizes of the red and green pixels while keeping the size of the blue pixels fixed. Appx103. The Board credited Dr. Kymissis' explanation that this would *increase* deterioration and *worsen* display life. Appx108. Dr. Kymissis' testimony and the disclosures of the references thus provide substantial evidence for the Board's finding.

BOE's remaining arguments are based on a misreading of the Board's decision. *First*, BOE erroneously claims the Board "demand[ed] a showing that the combination would produce only advantages," because it allegedly "h[eld] that reduced aperture alone defeated a showing of obviousness." Br., 78-79. In fact, the Board found as a matter of fact that *both* aperture ratio and lifetime weighed against the proposed modification: the resulting display would have both a lower aperture ratio and a shorter lifetime. Appx103-109. The Board also considered, and rejected, the other alleged benefits of the combination. For example,

although BOE claims the combination would provide "improved color," Br., 77, the Board credited Dr. Kymissis' explanation that the combination would have worse color because of problems with "color mixing" and "streaking effects." Appx106-107. The Board also found the allegedly "'simpler' design," Br., 78, would not have motivated the combination because it "hinged on [BOE's] explanation of the base benefit" of longer display life. Appx41.[6] The Board properly considered all of BOE's arguments and found that the most important considerations—display life, aperture ratio, and color quality—all weighed against BOE's proposed modifications. Appx103-108. It did not rely on any one factor as being dispositive.

*Second*, BOE claims the Board "erred in finding that Murai's cutouts were not useful for OLEDs." Br., 79. BOE again mischaracterizes the Board's decision. What the Board actually found was that BOE had not shown it would have been obvious to resize the pixels "based on Yamada using additional corner cutouts as suggested by Murai."

---

[6] Dr. Kymissis also explained resizing pixels would not simplify the display; BOE's alleged simplifications assume removing circuitry required for Matthies' display to operate. Appx3788-3790, ¶¶140-43.

Appx110. The Board credited Dr. Kymissis' explanation that following Yamada's teachings "would result in such large cut-off corners and separations between green dots that it would nullify the reasons for implementing Murai's cut-off corners." Appx110 (quoting Appx3880). According to Yamada, the green pixels needed to be one-fifth the size or, in some cases, one-thirty-fifth the size of the blue pixels. *See* Appx3880. Dr. Kymissis explained why such a dramatic reduction in size could not reasonably be accomplished merely by cutting off the corners of the pixels. *Id.* BOE's expert, Dr. Pattison, agreed, testifying it "would be very difficult to get to a one-35th number" by cutting off the corners and that, "if I was going to try to make the green one-35th the size of the blue, I would actually have a lot of other problems with my device." Appx4660. Substantial evidence supports the Board's finding that a POSITA would not have been motivated to resize the pixels by cutting off corners.

## III. Phan Does Not Render Obvious the Challenged Claims of the '803 or '683 Patent.

### A. Phan Does Not Disclose or Suggest a Pixel Arrangement Structure of an OLED Display.

The Diamond Pixel patents are directed to OLED displays. Every claim of the '803 and '683 patents recites "[a] pixel arrangement structure of an organic light emitting diode (OLED) display" and requires "a

plurality of pixels for displaying an image on the OLED display." *E.g.*, Appx272, 8:60-61; Appx284, 8:65-66. The claimed pixel arrangements are specifically designed to solve problems associated with depositing the organic light-emitting layers that define OLEDs. Creating a high-resolution display requires "reducing [the] gap between the neighboring pixels," but such displays are difficult to manufacture because the smaller gap sizes reduce deposition reliability. Appx269, 1:28-45. The claimed pixel arrangements are optimized for OLEDs, such that "the manufacturing time and the manufacturing cost of the OLED display may be reduced and the display quality of the image of the OLED display may be improved." Appx272, 8:43-45.

Phan, however, contains no description of an OLED display or OLED pixels; no discussion of an OLED display or OLED pixels; and no figure showing an OLED display or OLED pixels. As Dr. Kymissis explained, none of Phan's embodiments relate to OLED displays. Appx3819-3820, ¶201. And as BOE's expert admitted, nothing in the description of any figure in Phan states it is describing, or purporting to describe, OLED pixel arrangements. Appx5052, 300:16-21. The Board did not find otherwise.

The sole reference to OLED in Phan comes in the middle of a laundry list of "display technologies" in its Background of the Invention. Appx3121, 1:18-29. There, Phan compiles a lengthy list of "display technologies" including numerous nonexistent "technologies" as well as "*any light sources known or invented in the future,*" and in that context lists OLED seventh:

> The invention relates to a display comprising pixels and dots, including but not limited to the following display technologies: Cathode Ray Tube (CRT), Field Emission Display (FED), Vacuum Florescent Display (VFD), Plasma Display Panel (PDP), Liquid Crystal Display (LCD), Light Emitting Diode (LED), Organic Light Emitting Diode (OLED), Polymer Light Emitting Diode (PLED), Electroluminescence (EL), Electronic inks, Surface Emitting Display (SED), Digital Light Processing (DLP), Electro-mechanics, Phototronics, Biotronics and any light sources known or invented in the future as well as a method for controlling the (said) display.

Appx3121, 1:18-29. Both sides' experts agreed that various of the supposed "technologies" Phan listed—such as "phototronics" and "biotronics"—"do not appear to exist." Appx3759; Appx4623-Appx4624, 159:22-160:21. There is no other reference in all of Phan to OLEDs.

The Board based its conclusion that it would have been obvious that Phan's pixel arrangements "may be applied to OLEDs" on this single mention of OLEDs in the laundry list. Appx47. But this Court has

previously rejected such arguments. In *Otsuka Pharm. Co. v. Sandoz, Inc.*, the defendant attempted to rely on a prior art patent referencing a "broad genus" of chemical compounds. 678 F.3d 1280, 1286 (Fed. Cir. 2012). The Court rejected the argument that such a broad disclosure rendered the claims obvious, because "one of ordinary skill in the art would not have understood [a] patent's 'laundry list' of potential" therapeutic effects to mean every listed compound was disclosed as a potential antipsychotic. *Id.* at 1294. The same is true here.

It is undisputed that different display technologies require different pixel arrangements. Dr. Kymissis explained how, for example, pixel arrangements in LCD displays differ from those in OLED displays. Appx3738-3742, ¶¶39-43. Even BOE's expert admits that pixel layouts would be adjusted based on the underlying technology. Appx4505-4507, 41:6-43:4. The mere inclusion of OLEDs on a list of display technologies broad enough to encompass "any light sources known or invented in the future," Appx3121, 1:18-29, is not a teaching or suggestion that a *specific* pixel arrangement structure could—much less should—be used in a *specific* type of display.

While the Board noted that it "must consider a prior art reference not only for what it expressly teaches, but also for what it fairly suggests." Appx47 (quoting *Twitter, Inc. v. VidStream LLC*, 825 F. App'x 844, 850 (Fed. Cir. 2020)), nothing in Phan suggests using the quad-pixel structure of Figure 11b in an OLED display, let alone how it would need to be modified to do so. As BOE concedes, Phan is not directed to pixel arrangements. Br., 11 ("Phan's innovation is circuitry that allows each dot to be controlled individually, with groups of 'adjacent dots' forming the 'one-pixel logical unit.'"). Phan discloses a display in which the pixels are updated at a high frequency to "cause the human eye to be tricked into perceiving" a high-resolution image on a low-resolution display. Appx3122, 4:48-53. Phan repeatedly states the pixel arrangement is not important to its invention. *See* Appx3122, 4:36-38; Appx3123, 5:4-5 ("The spatial arrangement of the different color dots 13, 14, 15 is not critical."). Given that Phan was not teaching any particular pixel arrangement, combined with its lack of any discussion or disclosures of an OLED display or OLED pixels, there is nothing in Phan to "suggest" the pixel structures of the challenged claims.

Even if Phan disclosed OLED technology at a high level, the Board erred in holding claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent would have been obvious over Phan's specific teachings. The Board's obviousness finding is based on a combination of the "quad pixel" shown in Figure 11b of Phan with the display shown in Figure 12. Relying on a drawing prepared by BOE, the Board found that it would have been obvious to combine Figures 11b and 12 as follows:



Appx52 (quoting Appx368). But this combination does not satisfy the claims, because the pixels of Figure 11b are not OLEDs; they are not the "plurality of pixels for displaying an image on the OLED display" required by the claim. Likewise, the display of Figure 12 is not an "OLED display."

The structure of the quad-pixel of Figure 11b is inconsistent with an OLED display. Phan teaches that, as shown in Figure 11b, the pixels

are "contoured by black mask or barrier ribs" that surround each pixel. Appx3121, 1:30-34.



FIG 11b

Appx3112. As Dr. Kymissis explained, black masks were used in LCD displays and barrier ribs were used in plasma displays. Appx3822. But "[n]either were used in OLED displays at the time." *Id.* Dr. Kymissis' explanation is uncontested. Dr. Kymissis also explained Figure 11b "show[s] essentially no spacing between adjacent dots," which "were not feasible to implement in an OLED display." Appx3822-3823.

The structure of the display in Figure 12 is likewise inconsistent with an OLED display. In Phan, the display connects to "control circuitry" through "preferably … an optical fiber network" that addresses individual pixels' "receiver[s]." Appx3123, 5:9-24. Dr. Kymissis explained this is not the structure of an OLED display, as "OLED displays do not

80

use optical fiber networks or receivers." Appx3821. Once again, Dr. Kymissis' testimony was uncontested.

Critically, the Board did *not* find that Phan's quad-pixel, illustrated in Figure 11b, discloses OLED pixels. Nor did it find the display shown in Figure 12 is an OLED display. There would be no evidence to support such a finding given the clear and undisputed differences between OLED displays and what Phan discloses. Instead, the Board merely concluded that Phan's "pixel arrangements *can be applied* to OLED displays." Appx47 (emphasis added). That is, to arrive at the claimed invention, it is necessary not only to combine Figures 11b and 12, but to *modify* the pixels and display to create an OLED display.

It would not have been obvious to modify Phan in this manner. As the specification of the '803 patent and '683 patent explains, the inventions solved problems unique to OLED displays, which rely on sensitive organic light-emitting materials whose deposition is challenging. Appx269, 1:38-45. Nothing in Phan taught or suggested how to design pixel structures for an OLED display, or even the problems that would need to be overcome.

The Board's obviousness finding is error for additional reason. *First*, the Board, like BOE, failed to identify any motivation to modify the pixels of Figure 11b or the display of Figure 12 to create an OLED display. It is not enough to state, as the Board did, that "the pixel arrangements disclosed in Phan … may be applied to OLEDs." Appx47. The disclosures in Phan were indisputably *not* disclosures of OLED pixels or OLED displays. And the experts agree that pixel arrangements and structures will differ depending on the display technology (e.g., LCD pixel structures and layouts will differ from CRTs and OLEDs). Appx3738-3742, ¶¶39-43; Appx4505-4507, 41:6-43:4. Hence, it would be necessary to *modify* Phan to make an OLED pixel structure. But there was no motivation to modify Phan to make an OLED pixel structure, much less to make one in a way that arrives at the claimed inventions of the '803 and '683 patents.

Even in cases of single reference obviousness, a claim is not obvious without a motivation to make the required modifications. "Whether [obviousness] is based on combining disclosures from multiple references, combining multiple embodiments from a single reference, or selecting from large lists of elements in a single reference, *there must be a*

*motivation to make the combination* … otherwise a skilled artisan would not arrive at the claimed combination." *In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017). But the Board did not identify any reason why a POSITA would have attempted to modify Phan's displays to create an OLED display, let alone in the specific ways necessary to meet the requirements of the challenged claims with a reasonable expectation of success.

*Second*, Phan does not render any of the challenged claims obvious because a POSITA could not have modified it to create an OLED display with a reasonable expectation of success. Phan provided no guidance or disclosures about how to make any of its embodiments into an OLED display. *Cf. Raytheon Techs. Corp. v. General Electric Co.*, 993 F.3d 1374, 1381 (Fed. Cir. 2021) ("[A] standalone §103 reference must enable the portions of its disclosure being relied upon."). The mere mention of "OLED" in Phan's background listing of all possible (and some nonexistent) display technologies is not adequate. *Cf. Creative Kingdoms, LLC v. Int'l Trade Comm'n*, 588 F. App'x 993, 994-95 (Fed. Cir. 2014) ("merely includ[ing] a laundry list" of potential technologies failed to provide enabling disclosure).

83

Here, nothing in Phan teaches how to modify its embodiments of Figure 11 or Figure 12 to make a pixel arrangement for an OLED display, much less given the unique challenges associated with OLED pixels. As is clear from Phan itself, and supported by Dr. Kymissis' uncontested testimony, "a POSITA would not view Phan as teaching an OLED display or a pixel arrangement structure of an OLED display." Appx3828, ¶215; Appx596. Dr. Kymissis further explained that it "would not be feasible" to convert Phan to an OLED display, because of the need for high voltage and current density. Appx3826-3828, ¶¶210-213 (explaining "[a] POSITA certainly would not have a reasonable expectation of success in making an OLED display from Phan's disclosures"); Appx3828, ¶215; Appx596.

The Board further erred in relying entirely on the knowledge of a skilled artisan to supply all of the disclosures necessary to both motivate a POSITA to attempt to make an OLED display and to meet the limitations requiring OLED pixels. *See* Appx48-49 (finding "the application of Phan's pixel arrangements to OLED displays … to be among the 'inferences and creative steps that a person of ordinary skill in the art would employ'") (quoting *KSR*, 550 U.S. at 418). This Court has repeatedly cautioned the Board against relying on "common sense" or

"ordinary creativity" as a "gap-filler" to "supply a missing claim limitation." *DSS Tech. Management, Inc. v. Apple Inc.*, 885 F.3d 1367, 1375 (Fed. Cir. 2018); *see Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016). Even if ordinary creativity could be used to supply a missing limitation where "the limitation in question was unusually simple and the technology particularly straightforward," *Arendi*, 832 F.3d at 1362, it cannot be cited as the sole basis to completely redesign Phan's network-and-receiver display and convert it into a OLED display. Rather the Board is required to provide "reasoned analysis and evidentiary support," which it has not done. *DSS*, 855 F.4f at 1374.

The Board's finding that a POSITA would have had a reasonable expectation of success in modifying Phan to arrive at the claimed OLED display is not supported by substantial evidence. The Board purports to rely on Dr. Pattison, Appx50 (citing Appx3032-3033, ¶¶400-403). But he never opined on the matter. Although he claimed that a POSITA would have had a reasonable expectation of success in combining Figures 11b and 12, Appx3033, ¶403, he offered no opinion on the separate question of whether there is an expectation of success in further modifying the combination to use OLEDs.

The Board's reliance on Cok, Appx50-51, is equally unavailing. The Board relies on superficial similarities in pixel shapes in one quad-pixel, but does not address the myriad other changes necessary to convert Phan to an OLED display. As discussed above, Phan uses an optical fiber networks and individual receivers in its display, along with black mask and/or barrier ribs between pixels, none of which is applicable to an OLED display. Cok does not speak to whether a POSITA would have a reasonable expectation of success in redesigning Phan's display to try to use OLEDs.

Because Phan neither discloses an OLED display, because there was no evidence of a reason or motivation to make the required modifications, and because there is no evidence to find a reasonable expectation of success, there was no basis to conclude that claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent would have been obvious based on Phan. The Board's decision as to these claims should therefore be reversed.

## B.    Phan Does Not Render Obvious the "Virtual Square" of the '803 Patent.

The claims of the '803 patent require the pixels to form a specified "virtual square." Independent claim 1 requires "a first pixel having a

center coinciding with a center of a virtual square" and second and third pixels having centers coinciding with two of the vertices of the virtual square. Appx272-273, 8:62-9:6. In Figure 1, the virtual square is shown by the dotted lines labelled "VS."



Appx264, Fig. 1 (annotated). None of the claims of the '803 patent is obvious over Phan because Phan does not teach or suggest the required virtual square.

Phan does not describe or disclose any "virtual square," so the Board cannot identify any such disclosure in Phan. Nor does the Board conclude that Phan describes the same concept as a virtual square using different words. Instead, the Board's conclusion of obviousness is based on a figure created by BOE, which does not appear anywhere in Phan:



Appx55 (citing Appx369). According to BOE, this figure allegedly shows a virtual square, drawn in red, spanning four quad-pixels. But the figure does not accurately depict Phan's teachings.

BOE claims to have combined the quad-pixel from Phan's Figure 11b with the display of Figure 12, as shown in the following depiction from BOE's petition.



Appx368. But Phan's Figure 12 shows there are spaces (highlighted in yellow) between the quad-pixels:



Appx3113, Fig. 12 (annotated). In creating its figure, BOE improperly

removed these spaces.

If the spaces are preserved consistent with Phan's disclosure, as

shown in the figure below, the centers of the pixels do not form a "virtual

square."



FIG. 12

89

Appx57 (quoting PO Resp. 35). Moreover, the size of the spaces between the pixels does not change the analysis; there is no "virtual square" within the meaning of the '803 patent if there is *any* spacing between Phan's pixels. BOE's figure is therefore not an accurate representation of a display that would result from inserting the quad-pixels of Figure 11b into the display of Figure 12.

The Board does not deny that Figure 12 of Phan depicts spaces between the quad-pixels. Nor did the Board find that BOE's figure is an accurate portrayal of the display of Figure 12. Instead, the Board implicitly found that it would be possible to *modify* Figure 12, because it "do[es] not interpret Phan's teachings as being limited by the spacing depicted in Figure 12." The Board noted that "Phan does not describe its figures as drawn to scale" and that it does "not rely on patent drawings for showing particular sizes." Appx59 (citing *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000)).

The Board's reliance on *Hockerson-Halberstadt* is misplaced. There, the Court held that, unless patent figures are drawn to scale, the figures "do not define the precise proportions of the elements." *Id.* at 956. The figures may therefore not depict the "quantitative relationship" between

claim elements. *Id.* But the Court did not hold, or suggest, that it would be appropriate to entirely eliminate an element from a figure as the Board did here. Figure 12 shows spacing between each of the quad-pixels. If there is spacing between quad-pixels—no matter how thin—the light-emitting elements do *not* form the claimed virtual square. The only way to arrive at the claimed virtual square is to completely remove the spacing between quad-pixels, when Phan provides no reason to do so. SDC's argument does not rely on any "precise proportions" or "quantitative relationship" between Phan's quad-pixels. Rather, it is BOE that is improperly making a fundamental, *qualitative* change to Phan's display by completely eliminating the spaces.

The Board's claim that Phan describes its pixels as being "'regularly disposed' in a repeating 'grid' or 'matrix,'" Appx58, is based on a misreading of the reference. Phan uses the word "pixel" differently than the Diamond Pixel patents. In Phan, a "pixel" is a grouping of multiple "dots." *See, e.g.*, Appx3122, 3:31-32 (describing Fig. 1 as showing ways "of arranging four dots within a square pixel"). In the Diamond Pixel patents, a "pixel" is a single element of the display—what Phan calls a "dot." Phan states that the dots are "regularly disposed" *within* a pixel.

91

Appx3122, 4:30-31 ("Pixels 12a, 12b and 12c comprise regularly disposed dots...."). Phan never says that the pixels are "regularly disposed."

Regardless, nothing about these terms suggests there are not spaces between pixels or that the spaces shown in Figure 12 should be eliminated. On the contrary, the pixels in Figure 12 are themselves "regularly disposed" and arranged in a "grid" or "matrix," with spacing between the pixels.

Pixels regularly disposed in repeating grids and matrices can have spaces between them. As Dr. Kymissis explained, "it was not uncommon to see displays designed to have spacings between each set of individual pixel unit groups (such as Phan's quad pixel unit) in both literature and in manufactured display devices," as illustrated by the following examples. Appx3833, ¶224.





Appx3833-3837.

The Board similarly erred in relying on Phan's alleged teaching that pixels should be "evenly spaced." Appx60. According to the Board, "every drawing" in Phan "shows even spacing for both static and dynamic pixels." Appx60.[7] But "*even* spacing" does not mean "*no* spacing." Figure 12 itself shows "even" spacing, where the spacing between pixels is

---

[7] The Board is inconsistent in its treatment of Phan's figures. By reasoning the figures "show[] even spacing for both static and dynamic pixels," Appx60, the Board is "rely[ing] on patent drawings for showing particular sizes," Appx59—what it says it should not do.

consistent throughout the matrix. Nothing in Phan describes or suggests *removing* spacing between pixels, when that spacing was common in the art and shown not just in Figure 12, but also Figures 2a and 2b.



Appx3106 (annotated).

Thus, there is nothing in Phan disclosing or suggesting the claimed "virtual square." Nor does the Board identify any motivation to create the claimed "virtual square," particularly when Phan was not describing OLED pixel structures in any of its embodiments. It was error for the Board to find obviousness based on a drawing prepared by BOE which does not accurately represent any disclosures of Phan. That drawing

alters Phan for no reason other than to try to fill in limitations, through hindsight, not disclosed or suggested in Phan or the prior art. For this reason as well, the Board erred in concluding Phan rendered any claims of the '803 patent obvious.

## CONCLUSION

The Court should affirm the Board's determinations that claim 5 of the '803 patent, claim 2 of the '683 patent, and all challenged claims of the '578 patent are not unpatentable. The Court should reverse, or vacate, the Board's determination that claims 1-4 and 19-21 of the '803 patent and claims 1, 4-10, 13, and 15 of the '683 patent are unpatentable.

Dated: October 7, 2025

/s/ *Jeffrey H. Lerner*

Jeffrey H. Lerner
Scott C. Weidenfeller
Richard L. Rainey
Matthew Kudzin
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 2000
(202) 662-6000
jlerner@cov.com
rrainey@cov.com
sweidenfeller@cov.com
mkudzin@cov.com

*Counsel for Cross-Appellant*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing principal and response brief of Cross-Appellant Samsung Display Co., Ltd. complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(2)(A) and contains 16,485 words, excluding the portions of the brief exempted by Fed. Cir. R. 32(b)(2).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been composed in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

*/s/ Jeffrey H. Lerner*
Jeffrey H. Lerner
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
jlerner@cov.com